POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN KENDALL, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ODONATE THERAPEUTICS, INC., KEVIN C. TANG, MICHAEL HEARNE, and JOHN G. LEMKEY, <br><br> Defendants. | Case No.  3:20-cv-1828-H-LL <br><br> <u>CLASS ACTION</u> <br><br> FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Kevin Kendall ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public statements and publicly available documents, presentations and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Odonate Therapeutics, Inc. ("Odonate"), analysts' reports and advisories and other press coverage about Odonate, Odonate's stock chart, Odonate's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Odonate securities between December 7, 2017, and August 21, 2020, both dates inclusive

1

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Odonate and its Chief Executive Officer, Defendant Tang, and Chief Financial Officers, Defendants Lemkey and Hearne.

2.      Founded in 2013 and based in San Diego, Odonate is a pharmaceutical company that develops therapeutics for treatment of cancer and that has a single, primary drug candidate – tesetaxel, an orally administered chemotherapy agent that is within a class of cancer treating drugs known as taxanes.  Seeking to capitalize on tesetaxel's purported convenience advantages over certain already-approved therapies, Odonate has focused on trying to obtain the U.S. Food & Drug Administration (FDA)'s approval of tesetaxel for treatment of patients with locally advanced or metastatic breast cancer ("MBC"), administered in combination with an existing approved drug, capecitabine.

3.      Preceding the Class Period, Defendants Tang, Lemkey, and Hearne, through their privately-held venture capital and private equity firm, held a 52.9% stake in Odonate, and just after Odonate's IPO closed at the start of the Class Period, their firm held over 12.2 million Odonate shares, valued at over $300 million, representing over 47.5% of the firm's investment portfolio.  Large investments in

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

two other pharmaceutical companies, valued at $263 million, meant that the firm had 90% of its portfolio committed to large, illiquid stakes in just three companies.

4.     Odonate required hundreds of millions of dollars to fund tesetaxel's Phase 3 clinical trials, called CONTESSA, an amount that could only be raised by repeatedly accessing the public equities markets, via Odonate's IPO and secondary offerings.  This funding need motivated Defendants to misrepresent the true risk profile of tesetaxel and the CONTESSA trial, while concealing negative information known to Defendants about tesetaxel and the CONTESSA trial, so as to inflate Odonate's stock value and thereby maximize the proceeds obtained from offerings and minimize the dilution to Defendants' large position in Odonate.

5.     In reality, tesetaxel represented a much riskier bet than investors realized, with longer odds for an FDA approval, because tesetaxel when combined with capecitabine raised ***significant safety concerns***, in the form of highly elevated incidences of Grade ≥3 treatment-emergent ***adverse events ("AEs")***, including, *inter alia*, ***neutropenia (71.2% of patients)***, ***febrile neutropenia (12.8%)***, ***neuropathy (5.9%)***, diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which ***compare unfavorably*** against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had become apparent in the CONTESSA trial, which had ***elevated patient discontinuation rates due to AEs (23.1%)***, including AEs from neutropenia

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA. In response, Odonate launched an urgent, "all hands on deck" program to stem the tide of trial withdrawals due to neutropenia and diarrhea by making presentations, which were pre-approved by Defendants Tang and Lemkey, to every trial site. Odonate's executive management, including Defendants Tang and Lemkey, closely monitored tesetaxel's AE rates and discussed them at regularly scheduled, weekly or bi-weekly meetings, the written minutes of which were circulated to Defendants Tang and Lemkey and other executive management afterward.

6. Defendants concealed these material, adverse facts from investors while misrepresenting both tesetaxel and the CONTESSA trial during the Class Period. For instance, Odonate's SEC filings, including its Forms 10-K and S-3, touted tesetaxel as "*unique among taxanes*" and "*generally well tolerated in clinical studies*" and claimed that "*[n]onclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy*." Investor presentations in May and June 2019 boasted that "*Tesetaxel has been generally well tolerated in clinical studies*…." and that "[t]he all-oral *regimen of tesetaxel plus* a reduced dose of *capecitabine* will lengthen PFS *while being well-tolerated as compared to capecitabine alone*." Later in the Class Period, Defendants touted the "*completion*

4

*of enrollment in CONTESSA*" without disclosing the many setbacks reaching that milestone. Defendants also made contemporaneous misrepresentations and omissions in reporting Odonate's operating results without disclosing the underlying negative trends regarding tesetaxel and the CONTESSA trial, in violation of Regulation S-K, Item 303. They also signed false and misleading SOX certifications attesting to the sufficiency of Odonate's internal controls, the accuracy of its SEC filings, and the purported disclosure of any frauds to Odonate's auditors and the audit committee of its Board of Directors.

7.    On August 24, 2020, Odonate issued a press release announcing top-line results from the CONTESSA trial. While disclosing that the study met its primary endpoint, this press release was the first time that Odonate revealed the true extent of Grade 3 or higher AEs, including a 71.2% rate of neutropenia in patients who received the combination treatment of tesetaxel capecitabine versus 8.3% for capecitabine alone, and the high 23.1% discontinuation rate of patients from the CONTESSA trial due to AEs as compared to 11.9% in the capecitabine alone group, including a 4.2% withdrawal rate due to neutropenia.

8.    Analysts, investors, and even former Odonate employees, who worked on the CONTESSA trial but from whom access to full trial data had been blocked by Defendants, were shocked. On this news, Odonate's stock price fell $15.21 per share, or 45.35%, to close at $18.33 per share on August 24, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Odonate's securities once Defendants' fraud was revealed, as alleged herein, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Odonate is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **PARTIES**

14.    Lead Plaintiff, as set forth in his prior-filed Certification, which is incorporated by reference herein, purchased Odonate securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

15.    Defendant Odonate is a Delaware corporation with principal executive offices located at 4747 Executive Drive, Suite 210, San Diego, California 92121. Odonate common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the symbol "ODT."

16.    Defendant Kevin C. Tang ("Tang") has served as Odonate's Chairman and Chief Executive Officer at all relevant times.

17.    Defendant Michael Hearne ("Hearne") has served as Odonate's Chief Financial Officer ("CFO") since November 2018.

18.    Defendant John G. Lemkey ("Lemkey") served as Odonate's CFO from before the start of the Class Period until November 2018, when he was promoted to the position of Chief Operating Officer ("COO").

19.    Defendants Tang, Hearne, and Lemkey are sometimes referred to herein as the "Individual Defendants."

20.    Odonate and the Individual Defendants are sometimes collectively referred to herein as "Defendants."

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NON-PARTY CONFIDENTIAL WITNESSES

21.    CW1 was an Associate Director, Clinical Site Relationship Management at Odonate from May 2018 to December 2018, who reported to VP of Site Management Jill Krause, who in turn reported directly to Defendant Tang. CW1 acted as a liaison between Odonate and medical facilities and investigators participating in the CONTESSA trial and managed those relationships.  CW1 was responsible for managing between 20 and 30 sites located throughout California, Washington, and Texas.  CW1 contacted clinical trial sites to relay information from Odonate, provide updates on new requirements, check up on late data submissions, and help address other issues.   CW1 and others on the clinical site management team also responded to questions or concerns by clinical trial sites. CW1's job afforded direct visibility into both the complaints and concerns of trial sites regarding the CONTESSA trial and Odonate's responses.

22.    CW2 was a Director of Clinical Operations at Odonate from June 2017 to September 2019, who reported to Executive Director of Clinical Operations Jennifer Baca, who in turn reported to the VP of Clinical Operations, a position filled first by Valerie Legagneur and later by Kimberly Ma.  CW2 was part of a small clinical operations team at Odonate, responsible for starting up and running the CONTESSA trial.  CW2 assisted with selecting vendors, writing protocols, visiting investigative sites for assessments, and training sites on trial protocols.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CW2's expertise and substantive work focus was on tumor data, and CW2's geographic focus was on the European and Asia Pacific regions more than the U.S.

23.     CW3 was an Executive Assistant at Odonate from September 2017 to April 2019, supporting Odonate Chief Medical Officer ("CMO"), Joseph O'Connell and Odonate VP of Program Management and Regulatory Operations Natasha Bartasch-Price.  CW3's responsibilities included taking notes at regularly scheduled executive management meetings that occurred either weekly or bi-weekly throughout CW3's tenure, with corporate headquarters employees participating in person and remote employees participating via conference call.  The meetings included Defendant Tang, Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Valerie Legagneur, Odonate Co-Founder and Vice Chair Jeff Vacirca, Odonate Chief Development Officer ("CDO") Stew Kroll, Odonate Chief Scientific Officer ("CSO") Thomas Wei, and potentially, Odonate Associate Director of Program Management Gena Dillon.

## SUBSTANTIVE ALLEGATIONS

### Odonate's Business & Operations

#### *The Individual Defendants, Tang Capital Management, and Tang Capital Partners Control Odonate*

24.     Defendant Tang is the sole manager and principal of Tang Capital Management, LLC ("TCM"), a privately held venture capital and private equity

9

firm headquartered in San Diego, California, with additional offices in New York, which managed assets of over $550 million as of Q3 2020, just after the Class Period.  Defendant Hearne is TCM's CFO, and Defendant Lemkey is TCM's COO.

25.    TCM is a life sciences-focused investment firm, which manages an investment fund, Delaware-incorporated Tang Capital Partners, LP ("TCP"), that invests in biopharmaceutical companies and is currently the largest shareholder in Heron Therapeutics, Inc. (NASDAQ: HRTX) ("Heron"), La Jolla Pharmaceutical Company (NASDAQ: LJPC) ("La Jolla"), and Odonate.  Defendant Tang serves as Chairman of Heron and La Jolla, and as Chairman and CEO of Odonate, which is TCP's largest single holding.

26.    Before Odonate's IPO, TCM, through TCP, held over 10.9 million Odonate shares, acquired privately.  This massive pre-IPO position made TCM / TCP Odonate's majority, controlling shareholder, with a 52.9% stake, before the Class Period, and put the Individual Defendants firmly in control of Odonate and its public statements in the leadup to the IPO and beyond.

### *Odonate Has Only One Drug Candidate - Tesetaxel*

27.    Based in San Diego, California, Odonate was founded in 2013 as a pharmaceutical company to develop therapeutics to treat cancer.  In 2013, Odonate licensed tesetaxel and its patents from Daiichi Sankyo Company, Limited, the pharmaceutical company that first developed tesetaxel.  Odonate obtained the rights

10

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to develop and market tesetaxel in the U.S., France, Germany, Italy, Spain, and the United Kingdom, in exchange for up to $31 million in milestone payments (regulatory milestones have not been achieved) and a tiered royalty that ranges from the low to high single digits, depending on annual net sales, if approved.

28.     Tesetaxel is Odonate's only drug candidate.  Tesetaxel is an orally administered chemotherapy agent that belongs to a class of drugs known as taxanes, which are widely used to treat cancer.  Odonate claimed that tesetaxel has certain purported advantages over current approved taxanes, including that it is orally rather than intravenously administered and that it has a less-intensive dosing regimen of once every three weeks.

29.     Odonate had focused on the treatment of patients with metastatic breast cancer ("MBC") with tesetaxel in Phase 1 and Phase 2 clinical trials.  Having done so, Odonate approached the next stage of tesetaxel's clinical study in need of hundreds of millions of dollars, with a correlating need to access public sources of funding in order to pursue Phase 3 clinical trials and the additional steps necessary in order to seek the FDA's approval of tesetaxel, a milestone that would permit vesting of the Individual Defendants' stock options and position them to sell Odonate to a larger, more established pharmaceutical company, thereby recouping their original investment at a significant profit margin.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30.     In December 2017, Odonate initiated CONTESSA, a multinational, multicenter, randomized Phase 3 study of tesetaxel in combination with capecitabine in patients with locally advanced or MBC.   Odonate ultimately initiated three studies in breast cancer – CONTESSA, along with two Phase 2 studies, CONTESSA 2 and CONTESSA TRIO.   Odonate's value proposition to investors hinged upon whether tesetaxel, in combination with capecitabine was not only efficacious and convenient, but also safe, relative to existing treatment options.

### *Odonate Needed To Access Hundreds of Millions of Dollars To Advance Tesetaxel Through The CONTESSA Clinical Trials*

31.     To fund Odonate's continued operations and tesetaxel's clinical study, on November 13, 2017, Odonate filed a registration statement on Form S-1 with the SEC signed by Defendants Tang and Lemkey and others in connection with its IPO, which, after amendment on November 27, 2017, was declared effective by the SEC on December 6, 2017 (the "Registration Statement").   On December 8, 2017, Odonate filed Form 424B4 with the SEC for an IPO of 6,250,000 shares of common stock at a price of $24.00 per share.   The underwriters were given the option to purchase up to an additional 937,500 shares from Odonate at the initial price to the public, less the underwriting discount.   On January 10, 2018, the underwriters exercised their option to purchase 441,073 additional shares of common stock.   The aggregate gross proceeds from the IPO were $160.6 million and net proceeds were

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

$147.3 million.  Upon completion of its IPO, Odonate's common stock traded publicly on the NASDAQ under the symbol "ODT."

32.     Thereafter, Odonate funded ongoing operations, tesetaxel's development and study, and the CONTESSA trials by again accessing the public equities markets later during the Class Period.  On June 27, 2019, Odonate filed Form 424B5 with the SEC for an underwritten public offering of 4,750,000 shares of common stock at a price of $26.00 per share (the "June 2019 Offering").  The aggregate gross proceeds from the June 2019 Offering were $142 million and net proceeds were $135.1 million.  Also, on September 27, 2019, Odonate filed a prospectus on Form S-3 with the SEC which became effective October 18, 2019, offering to sell up to an aggregate of $200,000,000 of common stock.

33.     Thus, through its IPO and subsequent offering, Odonate raised $282.4 million in net proceeds from public investors, during the Class Period alone, to pursue the CONTESSA trial and advance tesetaxel toward FDA approval.  To do so, Defendants materially misrepresented the facts and circumstances regarding tesetaxel and the CONTESSA trial, while concealing material, negative information from investors and analysts, who looked to Defendants for accurate information and fulsome, timely updates.

13

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Undisclosed, Material, Negative Facts**

34.     Unbeknownst to investors, tesetaxel, particularly in combination with capecitabine, raised ***significant safety concerns***, which manifested themselves in elevated AE risks and high discontinuation rates from the CONTESSA trials.  These issues were known to Defendants early in the Class Period and were evidenced, *inter alia*, by real-time interim trial data and feedback from participating doctors and trial sites, and they persisted through the end of the Class Period.

35.     CW2 recalled that the first CONTESSA trial site received a green light to enroll patients and start the trial in early 2018, during the winter months after CW2 conducted an Investigative Site Visit in Washington D.C.  CW1 stated that the first doses of tesetaxel in the CONTESSA trial were administered in June or July 2018, a time frame that aligns with CW2's recollection of doses beginning to be administered in "early 2018."

36.     CW1 said that by August 2018, trial sites were already reporting back to Odonate a much higher-than-expected rate of neutropenia in patients, including febrile neutropenia.  CW1 said that trial doctors became frustrated and angry and expressed to Odonate concerns about the unexpectedly higher rate of neutropenia, wanting to know why it was happening and how it could be managed.  CW1 said that a lot of patients began withdrawing from the CONTESSA trial, both voluntarily and after removal by their doctors, due to both neutropenia and diarrhea.

14

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

37.   CW1 called the extent of neutropenia reports and related patient withdrawals sharply unexpected and large enough to cause serious concern to Odonate's leadership.   CW1 confirmed that Defendant Tang, Defendant Lemkey, and Odonate CMO Joseph O'Connell, M.D., were aware of the higher-than-expected neutropenia numbers, the related patient drop-out numbers, and the questions and concerns of trial doctors.   CW1 said that CONTESSA was not a double-blind trial, so Odonate had visibility on the raw trial data and information throughout the trial.   CW1 explained that trial sites entered data into a software program at their locations and were required to send it on regular intervals (twice-monthly or monthly), first to the Contact Research Organization ("CRO") and later, after Odonate fired the CRO early in the trial, directly to Odonate.   CW1 added that febrile neutropenia usually requires hospitalization, and that serious AE events, such as hospitalizations or death, had required, expedited reporting (typically 48 to 72 hours) from sites to Odonate that was provided to company leadership, including Defendant Tang, Defendant Lemkey, and CMO O'Connell.   CW1 said that Odonate and its top leadership received expedited reports of patients being hospitalized for neutropenia in the first few months of the CONTESSA trial.

38.   In mid- to late-August 2018, CW1 participated in an "urgent" teleconference, at six o-clock at night, with CMO O'Connell, VP of Site Management Jill Krause, and the clinical site management team about the higher-

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

than-expected neutropenia rates and related patient withdrawals.  On the call, O'Connell and Krause said that Odonate was initiating a new, urgent, "all-hands-on-deck" program to lower the amount of patients leaving the trial by advising all trial sites on how to identify early signs of neutropenia (*e.g.*, calling patients 3-4 days after receiving a dose to inquire about fever or other neutropenia symptoms) and how to treat it in ways permitted by the trial.  O'Connell and Krause added that three team members would be trained to provide a presentation to clinical site investigators and would, after their training, give a practice run of the presentation to company leadership, including Defendants Tang and Lemkey, before they could go out into the field to present it to clinical sites.  CW1 said the presentation was intended to provide doctors with knowledge and alternative options to keep patients experiencing neutropenia within the trial, including lowering the tesetaxel dose for a short time.  CW1 said the goal was to lower the rate of patient withdrawals due to neutropenia.  In CW1's experience, Odonate's urgency for dealing with the unexpected rates of neutropenia and patient withdrawals from the trial, on an "all-hands-on-deck" and "emergency level," was unusual.  Odonate wanted the presentation delivered to all 100-120 then-existing trial sites, in person or by phone, within about two weeks after the program was initiated.  CW1 said that Odonate later initiated a similar program for clinical sites to provide information about treating diarrhea in ways that could permit patients to remain in the trial, such as

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

using stronger medications if over-the-counter remedies failed.  CW2 corroborated that patients began experiencing neutropenia, diarrhea, and a number of side effects as the CONTESSA trial got underway and that Odonate initiated a training program, beyond the initial training for trial sites, to advise them on how to best manage neutropenia in trial patients so that they would not drop out of the trial.

39.    Krause told CW1 that the directive for initiating this response by Odonate to the higher-than-expected neutropenia rates came from Defendant Tang, Defendant Lemkey, and CMO O'Connell.  CW1 added that Odonate is a small company where top leaders were involved in and signed off on any significant activities.

40.    CW1 described continued setbacks even after Odonate's presentation program was undertaken.  Upon hearing the presentation, some sites implemented the new practices Odonate suggested to see what would happen, while others were not as responsive, and some doctors were frustrated by Odonate's proposed measures and dropped out of the CONTESSA trial altogether.  CW1 said that in the first months of the CONTESSA trial, about 10 trial sites, or roughly 10% of the 100-120 total sites, dropped out due to higher-than-expected neutropenia rates. CW1 characterized this dropout rate as unusually high for a clinical trial, exceeding a more typical rate of less than 5% of sites dropping out.  CW1 added that Odonate had to find new sites to replace those that dropped out.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

41.     CW3 confirmed that critical information about tesetaxel and the CONTESSA trial, including AE data, was regularly communicated to Odonate's top leadership, including the Individual Defendants.  As Executive Assistant to CMO O'Connell and VP of Program Management and Regulatory Operations Bartasch-Price, CW3 participated in regularly scheduled executive management meetings that occurred either weekly or bi-weekly throughout CW3's tenure, with corporate HQ employees joining in person and remote employees dialing in via conference call.  CW3 said the meetings included Defendant Tang, Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Valerie Legagneur, Odonate Co-Founder/Vice Chair Vacirca, CDO Kroll, CSO Wei, and potentially, Odonate Associate Director of Program Management Dillon.

42.     CW3's role was to take notes of these executive management meetings, at which the heads of each Odonate department provided reports and updates to Defendant Tang and the other participants.  CW3 recalled that from CONTESSA's early stages, Odonate was receiving AE reports from trial sites, which the executives discussed during the executive management meetings CW3 attended.  CW3 said that CMO O'Connell presented AE reports to Defendant Tang and the other executives, along with ongoing updates about the CONTESSA trial, its progress, and even side effects not rising to the AE-level.  CW3 specifically

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

recalled CMO O'Connell reporting CONTESSA AE events of neutropenia, diarrhea, and hand-foot syndrome. CW3 also vaguely recalls the executives discussing less-serious AE reports of fatigue, anemia, and alopecia in CONTESSA patients. CW3 recalled that Defendant Tang paid close attention to the reports presented at these meetings and asked CMO O'Connell questions about the AE reports to better understand what was happening. CW3 added that when the trial process was "not working right," Defendant Tang got upset and "was very hard on people," particularly VP of Program Management and Regulatory Operations Bartasch-Price and VP of Clinical Operations Legagneur.

43.     CW3 detailed the communications preceding and following these executive management meetings. VP of Program Management and Regulatory Operations Bartasch-Price oversaw the conduct of the meetings and sent out a meeting agenda to participants in advance. CW3 took notes during each meeting, using a template that CW3 created, which included section titles with the names of department heads who provided updates during the meetings, including CMO O'Connell. As each department head presented an update at a given meeting, CW3 recorded notes of the presentation under that person's section title. Once the meeting concluded, CW3 typed the notes up into more formal meeting minutes, which CW3 submitted to Ms. Bartasch-Price, who reviewed the minutes, made any necessary edits or corrections, and then circulated them to the meeting participants,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

including Defendant Tang and Defendant Lemkey.  CW3 confirmed that all meeting participants received the finalized minutes within a day or two of each meeting.  CW3 added that the minutes from all the executive management meetings were also kept on a shared access file on Odonate's internal computer system, to which she uploaded the finalized versions.

44.    Yet, the CWs also described how Defendants tightly controlled information about the CONTESSA trial.  CW1 said that Defendant Tang fired the CRO within months of CONTESSA's start, so as to shift the trial's management in-house, a change CW1 believes was fully completed by March or April 2019.  CW2 stated that while CONTESSA was not blinded, such that trial sites were submitting patient data regularly to the company, Odonate's top leadership decided to internally restrict and block employee access to large parts of the data, an approach that prevented rank-and-file employees from spotting trends.  According to CW2, "The leadership level was not transparent" and communication was lacking, even at CW2's level.  CW2 described Odonate as having a "toxic" culture and being a place where an employee could not "speak truth to power" and many employees were fired for purportedly being "insubordinate."  Indeed, CW2 was fired for correcting errors made by "one of the principals" of Odonate, who had less relevant experience than CW2, in the tumor data aspects of the CONTESSA trial.  CW3 corroborated that the environment at Odonate was stressful, because employees

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were suddenly fired without much explanation, as occurred to CW3 who was simply told one day that CW3's job was eliminated, which CW3 found odd, because a Chief Medical Office needs an Executive Assistant.

45.     Throughout the Class Period, Defendants knew, but concealed, that tesetaxel combined with capecitabine yielded highly elevated incidences of Grade ≥3 treatment-emergent AE, as evidenced on a rolling basis in the CONTESSA trial, including, *inter alia*, neutropenia (71.2%), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%).  Defendants also knew that, despite their emergency training presentations to trial sites, tesetaxel combined with capecitabine caused an elevated rate of patients to discontinue participation in the CONTESSA trial, as its data evidenced on a rolling basis, whether voluntarily or at their doctor's instruction, due to any AE (23.1%), including elevated discontinuation rates specifically for neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%).  As detailed below, Defendants shocked the market when Odonate finally revealed these uncontested, adverse facts in a pre-market press release and Form 8-K that announced top-line results from the CONTESSA trial.

46.     Indeed, despite all the work CW2 did on the CONTESSA trial, when CW2 saw the publicly-disclosed top-line trial results showing that 71% of patients on tesetaxel plus capecitabine had experienced neutropenia, CW2 was "shocked,"

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

as were many of CW2's colleagues.  Even Odonate employees who designed and oversaw aspects of the CONTESSA trial were blindsided by the material adverse facts that Defendants knew but concealed from investors.

### Materially False and Misleading
### Statements & Omissions During the Class Period

47.    During the Class Period, Defendants made materially false and misleading statements and omissions that can be organized into three primary threads of the alleged fraud: (i) the Clinical Trials & Business Operations Fraud; (ii) the Reported Results Fraud; and (iii) the Internal Controls Fraud.

#### *Clinical Trials & Business Operations Fraud*

48.    The Class Period begins on December 7, 2017, when Odonate securities began publicly trading on the NASDAQ following an IPO pursuant to a Registration Statement containing false and misleading statements and omissions. The Registration Statement said, "We intend to use the proceeds of the offering for development and regulatory activities relating to tesetaxel, including the conduct of our Phase 3 study, CONTESSA, working capital and general corporate purposes." It touted tesetaxel's **safety** and ***tolerability profile*** and its ongoing ***success in clinical studies***, while concealing and omitting material adverse information about, *inter alia*, ***adverse events associated with tesetaxel***, ***tesetaxel's ability to be combined safely with capecitabine***, and the ***rate of discontinuations from clinical studies***.

22

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

49.     The Registration Statement stated, in relevant part:

(a)     "***Tesetaxel has been generally well tolerated in clinical studies*** and has demonstrated robust single-agent antitumor activity in two Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC")."

(b)     "***Tesetaxel has several potential therapeutic advantages*** over currently available taxanes" including "a formulation that does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions …."

(c)     "More than 500 patients were treated with tesetaxel between 2001 and 2012 across 22 clinical studies.  Tesetaxel was administered as monotherapy in 16 studies and in combination with other chemotherapy agents in 6 studies.  Final study data are available for 8 of these studies, while data collection . . . is underway for 14 of these studies."

(d)     "In Study TOB203, which was conducted . . . from 2010 to 2012, 46 patients with HER2 negative MBC were enrolled to receive, as first-line chemotherapy, tesetaxel administered orally at 27 mg/m$^2$ . . . on the first day of a 21-day cycle, with escalation to 35 mg/m$^2$ in subsequent cycles depending on tolerability, without anti-allergy premedication."  In this study: "***Tesetaxel was generally well tolerated.  The most common Grade $\geq 3$ (severe or serious) adverse event ("AE") was neutropenia*** (low level of neutrophils, a type of white blood cell), ***which occurred in 26% of patients receiving 27 mg/m$^2$, the dose [Odonate] chose***

*for our Phase 3 [CONTESSA] study.*  Also, ***at this dose, there were no cases of Grade ≥ 3 peripheral neuropathy,*** and ***the incidence of Grade 2 alopecia*** (significant hair loss) ***was 15%***."

(e)    "In Study 927E-PRT005, which was conducted . . . from 2004 to 2006, 34 patients with MBC were enrolled to receive, as first-, second- or third-line chemotherapy, tesetaxel administered orally at initial doses of 27 mg/m$^2$ (79% of patients) or 35 mg/m$^2$ (21% of patients) on the first day of a 21-day cycle.  Thirty-two (32) patients completed at least one course of therapy and were included in the efficacy population."  In this study:  "***Tesetaxel was generally well tolerated***.  ***The most common Grade ≥ 3 AE was neutropenia, which occurred in 35% of patients***.  ***The incidence of Grade ≥ 3 peripheral sensory neuropathy*** (numbness and/or pain from damage to the nerves) ***was 3%***, and ***the incidence of Grade 2 alopecia was 18%***."

(f)    The "Clinical studies that have been conducted with tesetaxel are shown in the following table."

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Clinical Studies of Tesetaxel**

| Study Name | Phase | N | Patient Population | Treatment Tested |
|---|---|---|---|---|
| TOB203/TOB203XT[(1)(3)] | 2 | 61[(3)] | First-line chemotherapy MBC | Tesetaxel monotherapy |
| 927E-PRT005[(2)(4)] | 2 | 34 | Mixed-line chemotherapy MBC | Tesetaxel monotherapy |
| TOST107/TOST107XT[(1)(4)(5)] | 1 | 19[(5)] | Solid tumors | Tesetaxel-capecitabine |
| 927A-PRT006[(2)(4)] | 1 | 27 | Solid tumors | Tesetaxel-capecitabine |
| TOB206[(1)] | 2 | 3 | First-line chemotherapy MBC | Tesetaxel vs. capecitabine |
| 927E-PRT003[(2)(4)] | 2 | 35 | Second-line gastric cancer | Tesetaxel monotherapy |
| TOG201[(1)] | 2 | 53 | Second-line gastric cancer | Tesetaxel monotherapy |
| TOPK105[(1)] | 1-2 | 15 | First-line gastric cancer | Tesetaxel-capecitabine-cisplatin |
| TOG301[(1)] | 2 | 2 | Second-line gastric cancer | Tesetaxel-capecitabine vs. capecitabine |
| 927A-PRT004[(2)(4)] | 2 | 71 | Second-line CRC | Tesetaxel monotherapy |
| 927E-PRT007[(2)(4)] | 2 | 34 | Second-line NSCLC | Tesetaxel monotherapy |
| TOBL204[(1)] | 2 | 30 | Second-line bladder cancer | Tesetaxel monotherapy |
| TOP205[(1)] | 2 | 23 | First-line prostate cancer | Tesetaxel monotherapy |
| TOM202[(1)] | 2 | 17 | Second-line melanoma | Tesetaxel monotherapy |
| TOPK101/TOST201[(1)] | 1 | 59 | Solid tumors | Tesetaxel monotherapy |
| 927A-PRT001[(2)(4)] | 2 | 48 | Solid tumors/lymphomas | Tesetaxel monotherapy |
| 927J-PRT001[(2)] | 1 | 6 | Solid tumors | Tesetaxel monotherapy |
| TOPK103[(1)] | 1 | 12 | Solid tumors | Tesetaxel monotherapy |
| TOPK106[(1)] | 1 | 6 | Solid tumors | Tesetaxel monotherapy |
| **Total** | | **555** | | |

N = Number of patients treated
CRC = Colorectal cancer
NSCLC = Non-small cell lung cancer
(1)   Studies conducted by Genta Incorporated. Patients treated from 2008 to 2012.
(2)   Studies conducted by Daiichi Sankyo. Patients treated from 2001 to 2006.
(3)   Includes 46 patients who received tesetaxel once every 21 days. A cohort of 15 patients receiving tesetaxel weekly (days 1, 8 and 15 of a 28-day cycle) was discontinued early due to study termination. In this prospectus, Studies TOB203 and TOB203XT are referred to as Study TOB203.

(4)   Final study data available.
(5)   The Phase 1 study in solid tumors was split into Study TOST107, which included data from the first two cycles, and TOST107XT, which included data from patients receiving three or more cycles. In this prospectus, Studies TOST107 and TOST107XT are referred to as Study TOST107.

(g)     The Registration Statement compared tesetaxel's tolerance to those of other therapeutics, stating, "***Tesetaxel has been generally well tolerated in clinical studies.*** The ***incidence of certain adverse events observed with tesetaxel***

25

*as compared to those observed with paclitaxel and capecitabine* in first-line MBC studies is shown in the following table."

**Tolerability of Paclitaxel, Capecitabine and Tesetaxel in the First-line Chemotherapy Treatment of MBC**

|  | Tesetaxel[(1)] | Paclitaxel[(2)(3)] | Capecitabine[(2)(4)] |
|---|---|---|---|
| **Peripheral Neuropathy, Grades 3-4** | 0% | 10% (5%-18%) | 0% (0%-1%) |
| **Alopecia, Grade 2** | 15% | 39% (18%-60%) | NR |
| **Hand-Foot Syndrome[(5)] (HFS), Grades 3-4** | 0% | 3% | 18% (14%-26%) |
| **Diarrhea, Grades 3-4** | 0% | 2% (2%-3%) | 9% (6%-13%) |

NR = Not reported
(1)  Study TOB203 and, for HFS, an internal report of treatment-related AEs in 222 patients receiving tesetaxel monotherapy
(2)  Randomized, multicenter studies in the first-line chemotherapy treatment of MBC
(3)  Albain et al, *Journal of Clinical Oncology* 2008; Bishop et al, *Journal of Clinical Oncology* 1999; Gradishar et al, *European Journal of Cancer* 2013; Gray et al, *Journal of Clinical Oncology* 2009; Paridaens et al, *Journal of Clinical Oncology* 2000
(4)  Harbeck et al, *Breast Cancer Res Treat* 2016; O'Shaughnessy et al, *Annals of Oncology* 2001; Robert et al, *Journal of Clinical Oncology* 2011; Stockler et al, *Journal of Clinical Oncology* 2011
(5)  Redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulcerations

(h)     The Registration Statement specifically addressed how tesetaxel was tolerated in prior clinical studies, both alone and in combination with capecitabine:

*Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated.* In the 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final study data are available, a total of 268 patients received tesetaxel either alone (222 patients from 5 studies) or in combination with capecitabine (46 patients from three studies). *The most common Grade ≥3 (severe or serious) treatment-related adverse event ("AE") was neutropenia* (low level of neutrophils, a type of white blood cell), which *occurred in 37% of patients receiving tesetaxel alone and 43% of patients receiving tesetaxel in combination with capecitabine and was generally reversible and manageable with supportive measures. Six percent (6%) of patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced*

26

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***treatment-related febrile neutropenia*** (fever coinciding with neutropenia).

Overall, ***there was no non-hematologic Grade ≥3 treatment-related AE that occurred in more than 6% of patients***. ***Three percent (3%) of patients receiving tesetaxel alone and 2% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥3 treatment-related peripheral neuropathy*** (weakness, numbness and/or pain from damage to the nerves). ***No patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥3 treatment-related hand-foot syndrome*** (redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulceration). Six percent (6%) of patients receiving tesetaxel alone and 7% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related diarrhea. Seventeen percent (17%) of patients receiving tesetaxel alone and 9% of patients receiving tesetaxel in combination with capecitabine experienced any grade of treatment-related alopecia (hair loss).

(i)     Beneath the header "Tesataxel Plus a Reduced Dose of Capecitabine Generally Well Tolerated in Phase 1 Study (TOST107)," the Registration Statement stated, "In a Phase 1 study (TOST107), which was conducted … from 2011 to 2012, the safety and tolerability of tesetaxel plus a reduced dose of capecitabine was evaluated in patients with advanced solid tumors. Eight (8) patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 1,750 mg/m$^2$/day orally on days 1-14 of each 21-day cycle, and 9 patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 2,000 mg/m$^2$/day orally on Days 1-14 of each 21-day cycle."  In this study, "***Tesetaxel in combination with capecitabine at either***

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*1,750 mg/m²/day or 2,000 mg/m²/day was generally well tolerated with no indication of overlapping toxicity*." It added, "***The most common Grade ≥3 AE was neutropenia (47% of patients), which was reversible and manageable with supportive measures. There was a low rate of febrile neutropenia (6% of patients), which only occurred in the tesetaxel 27 mg/m² plus capecitabine 2,000 mg/m²/day group. The incidence of Grade ≥3 peripheral neuropathy was 6%, Grade ≥3 hand-foot syndrome was 6%, and Grade ≥3 diarrhea was 6%. There was no Grade 2 alopecia, and there were no hypersensitivity reactions***." It added a chart comparing the "frequency and extent of dose reductions in Study TOST107 as compared to those in the Phase 3 study that served as the basis for approval for capecitabine combined with docetaxel in the treatment of MBC":

**Dose Reductions for Tesetaxel plus Reduced Dose of Capecitabine Compared to Those for Docetaxel plus the Approved Dose of Capecitabine**

| | Tesetaxel 27 mg/m²[(1)] + Capecitabine 1,750/2,000 mg/m²/day[(2)] (N=17)[(3)] | | Docetaxel 75 mg/m²[(1)] + Capecitabine 2,500 mg/m²/day[(2)] (N=255)[(4)] | |
|---|---|---|---|---|
| | Tesetaxel | Capecitabine | Docetaxel | Capecitabine |
| First dose reduction to: | 89% of starting dose | 75% of starting dose | 75% of starting dose | 75% of starting dose |
| Patients | 24% | 47% | 59% | 51% |
| Median months to reduction | 2.0 | 1.9 | 1.4 | 1.5 |
| Second dose reduction to: | 78% of starting dose | 50% of starting dose | 50% of starting dose | 50% of starting dose |
| Patients | 0% | 6% | 4% | 18% |
| Median months to reduction | NA | 3.5 | 2.3 | 2.8 |

(1)   Day 1 of a 21-day cycle
(2)   Days 1-14 of a 21-day cycle
(3)   TOST107/107XT
(4)   O'Shaughnessy et al, *Journal of Clinical Oncology* 2002

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

50.    The Registration Statement also described the CONTESSA trial and its purported rationales, stating:

(a)    "We are initiating a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that will compare tesetaxel (27 mg/m$^2$ on the first day of a 21-day cycle) plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on days 1–14 of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on days 1–14 of a 21-day cycle) in patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."

(b)    "CONTESSA is designed to evaluate whether tesetaxel plus a reduced dose of capecitabine results in improved PFS with manageable toxicity and favorable quality-of-life compared to the approved dose of capecitabine alone. Tesetaxel plus a reduced dose of capecitabine incorporates two agents with synergistic mechanisms of action and is an all-oral regimen that requires a pill burden that is approximately 30% less than the approved dose of capecitabine alone."

(c)    "Our rationale for the CONTESSA study design includes the following points": "Capecitabine is a preferred agent as a first- or second-line chemotherapy treatment for patients with HER2 negative, HR positive MBC.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Therefore, capecitabine, at the approved dose, is an appropriate control regimen for a registration-enabling Phase 3 study"; "There is a high unmet medical need for combination chemotherapy regimens with improved benefit-risk profiles"; "Combining the approved dose of capecitabine with currently available taxanes results in improved efficacy but with significant toxicity"; "Preclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy"; "Single-agent tesetaxel had demonstrated antitumor activity in two Phase 2 studies in MBC: TOB203 (first-line chemotherapy) and 927E-PRT005 (mixed-line chemotherapy)"; and "***In a Phase 1 study, the combination of tesetaxel plus a reduced dose of capecitabine was associated with a tolerable AE profile, with minimal overlapping toxicity***."

(d)     "We expect to begin enrolling patients in our multinational, multicenter, randomized, Phase 3 study in MDB, known as CONTESSA, in the fourth quarter of 2017 and report top-line results from this study in 2020."

51.     The misrepresentations and omissions from the Registration Statements, as alleged in ¶¶48-50, *supra*, were materially false and misleading, because s more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To

30

Emerge" section infra, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AEs, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.

52.     On December 28, 2017, Odonate issued a press release (the "12/28/2017 Press Release") announcing the initiation of CONTESSA, its Phase 3 study of tesetaxel in patients with locally advanced or metastatic breast cancer, which **touted tesetaxel and its tolerability**, stating that it has "**several potential therapeutic advantages over currently available taxanes**" including having a "**formulation that does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions**."

53.     The misrepresentations and omissions in the 12/28/2017 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section supra, the "Defendants' Knowledge Or Reckless Disregard" section infra, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section infra, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated

incidences of Grade $\geq 3$ treatment-emergent AE, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.

54.     Odonate announced is Q4 2017 quarterly and 2017 annual results in a series of public statements on February 14, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.  That day, Odonate issued an earnings press release (the "2/14/2018 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2017.  The 2/14/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He further stated that tesetaxel's "***lack of history of hypersensitivity reactions***" "may translate into significant benefits for patients."

55.     Also on February 14, 2018, Odonate filed its first annual report on Form 10-K with the SEC, reporting Odonate's financial and operating results for Q4 and full year ended December 31, 2017 (the "2017 10-K"), which was signed

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and accompanied by certifications under the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Tang and Lemkey. The 2017 10-K touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel has "unique" properties over other taxanes that "may translate into significant benefits for patients" including "[a] formulation that does not contain polyoxyethylated castor oil or polysorbate 80, solubilizing agents contained in other taxane formulations known to cause hypersensitivity reactions." The 2017 10-K also stated that "*[t]esetaxel has been generally well tolerated in clinical studies* and has demonstrated robust single-agent antitumor activity in two Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC")."

56.     The 2017 10-K extensively touted tesetaxel's tolerability both alone and in combination with capecitabine across all studies.

(a)     The 2017 10-K stated:

*Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated*. In the 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final study data are available, a total of 268 patients received tesetaxel either alone (222 patients from 5 studies) or in combination with capecitabine (46 patients from three studies). *The most common Grade ≥ 3 (severe or serious) treatment-related adverse event ("AE") was neutropenia* (low level of neutrophils, a type of white blood cell), *which occurred in 37% of patients receiving tesetaxel alone and 43% of patients receiving tesetaxel in combination with capecitabine* and *was generally reversible and manageable with supportive measures*. *Six percent (6%) of patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced*

33

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*treatment-related febrile neutropenia* (fever coinciding with neutropenia).

*Overall, there was no non-hematologic Grade ≥ 3 treatment-related AE that occurred in more than 6% of patients*. *Three percent (3%) of patients receiving tesetaxel alone and 2% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related peripheral neuropathy* (weakness, numbness and/or pain from damage to the nerves). *No patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related hand-foot syndrome* (redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulceration). *Six percent (6%) of patients receiving tesetaxel alone and 7% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related diarrhea*. *Seventeen percent (17%) of patients receiving tesetaxel alone and 9% of patients receiving tesetaxel in combination with capecitabine experienced any grade of treatment-related alopecia* (hair loss).

(b)     The 2017 10-K also depicted results across all completed studies in the following chart:



Adverse Event Profile Across All Completed Studies(1)

**N = 268 (222 Received Tesetaxel Alone and 46 Received Tesetaxel plus Capecitabine)**

- The most common Grade ≥ 3 treatment-related adverse event was neutropenia (38% overall; 37% tesetaxel alone; 43% tesetaxel plus capecitabine)

- No non-hematologic Grade ≥ 3 treatment-related adverse event occurred in more than 6% of patients
  - Peripheral neuropathy (3% overall; 3% tesetaxel alone; 2% tesetaxel plus capecitabine)
  - HFS (2% overall; 0% tesetaxel alone; 11% tesetaxel plus capecitabine)
  - Diarrhea (6% overall; 6% tesetaxel alone; 7% tesetaxel plus capecitabine)

- Treatment-related alopecia (any grade) occurred in 16% of patients overall (17% receiving tesetaxel alone; 9% receiving tesetaxel plus capecitabine)

- There were no hypersensitivity reactions

(1) 927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.    The 2017 10-K also stated results from a 46-patient Phase 2 clinical study of tesetaxel monotherapy for MBC (TOB203), administered orally at 27 mg/m2, which is the same dosage administered for the Phase 3 CONTESSA study.

(a)    Regarding tesetaxel's tolerance and AE rate, the 2017 10-K stated:

> ***Tesetaxel was generally well tolerated***.  The starting tesetaxel dose (27 mg/m$^2$) was escalated to 35 mg/m$^2$ in 19 of 46 patients. CONTESSA, our Phase 3 study, is using a dose of 27 mg/m$^2$. ***The most common Grade ≥ 3 AE was neutropenia***, which ***was more common in the escalated dose (26% of patients in the non-escalated 27 mg/m$^2$ dose group and 42% in the 27 mg/m$^2$ escalated to 35 mg/m$^2$ dose group***). ***The incidence of Grade ≥ 3 febrile neutropenia was 4%***. ***There was no Grade ≥ 3 peripheral neuropathy observed in the non-escalated 27 mg/m$^2$ dose group***. ***The incidence of Grade 2 alopecia (significant hair loss) was 15%*** and similar ***in both dose groups***. ***There were no hypersensitivity reactions***.

(b)    It also summarized the results for Grade ≥ 3 AEs in this chart:

| TOB203: Grade ≥ 3 Adverse Events | | | | |
|---|---|---|---|---|
| Grade ≥3 Adverse Events in 2 or More Patients | 27 mg/m² (N = 27) n (%) | | 27 mg/m² Escalated to 35 mg/m² (N = 19) n (%) | |
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 4 (15) | 3 (11) | 2 (11) | 6 (32) |
| Thrombocytopenia(1) | 2 (7) | 0 | 0 | 0 |
| Fatigue | 2 (7) | 0 | 2 (11) | 0 |
| Hypokalemia(2) | 0 | 0 | 3 (16) | 0 |
| Peripheral Neuropathy | 0 | 0 | 3 (16) | 0 |
| Decreased Appetite | 2 (7) | 0 | 0 | 0 |
| Pain in Extremity | 1 (4) | 0 | 1 (5) | 0 |
| Muscular Weakness | 1 (4) | 0 | 1 (5) | 0 |
| Vomiting | 1 (4) | 0 | 1 (5) | 0 |

(1) Low level of platelets, a type of blood cell
(2) Low level of potassium

58.    The 2017 10-K also stated results from a 34-patient Phase 2 clinical study (927E-PRT005) of tesetaxel as a mixed-line therapy for MBC.

35

(a)      Regarding tesetaxel's tolerance and AE rate, the 2017 10-K

stated:

> ***Tesetaxel was generally well tolerated***. ***The most common Grade ≥ 3
> AE was neutropenia (35% of patients)***. **The incidence of Grade ≥ 3
> febrile neutropenia was 3%, the incidence of Grade ≥ 3 peripheral
> sensory neuropathy** (numbness and/or pain from damage to the
> nerves) **was 3%, and the incidence of Grade 2 alopecia was 18%.**
> ***There were no hypersensitivity reactions***.

(b)      It also summarized the results for Grade ≥ 3 AEs in this chart:

927E-PRT005: Grade ≥ 3 Adverse Events

| Grade ≥3 Adverse Events in 2 or More Patients | All Patients (N = 34) n (%) | |
|---|---|---|
| | Grade 3 | Grade 4 |
| Neutropenia | 4 (12) | 8 (24) |
| Leukopenia[1] | 1 (3) | 4 (12) |
| Anemia[2] | 2 (6) | 0 |
| Constipation | 2 (6) | 1 (3) |
| Vomiting | 2 (6) | 0 |
| Anorexia | 2 (6) | 0 |
| Hypokalemia | 2 (6) | 0 |

(1) Low level of leukocytes, a type of white blood cell
(2) Low level of red blood cells

59.    The 2017 10-K also described the results of a Phase 1 study

(TOST107) that combined tesetaxel with capecitabine, under a heading declaring,

"Tesetaxel Plus a Reduced Dose of Capecitabine Generally Well Tolerated in Phase

1 Study (TOST107)."  It stated as follows:

(a)      The 2017 10-K touted the safety and tolerability of tesetaxel:

In a Phase 1 study (TOST107), the safety and tolerability of tesetaxel
plus a reduced dose of capecitabine was evaluated in patients with
advanced solid tumors. Eight (8) patients received tesetaxel at 27
mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at

36

1,750 mg/m$^2$/day orally on days 1-14 of each 21-day cycle, and 9 patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 2,000 mg/m$^2$/day orally on Days 1-14 of each 21-day cycle.

***Tesetaxel in combination with capecitabine at either 1,750 mg/m$^2$/day or 2,000 mg/m$^2$/day was generally well tolerated with no indication of overlapping toxicity. The most common Grade ≥ 3 AE was neutropenia (47% of patients), which was reversible and manageable with supportive measures. There was a low rate of febrile neutropenia (6% of patients), which only occurred in the tesetaxel 27 mg/m$^2$ plus capecitabine 2,000 mg/m$^2$/day group. The incidence of Grade ≥ 3 peripheral neuropathy was 6%, Grade ≥ 3 hand-foot syndrome was 6%, and Grade ≥ 3 diarrhea was 6%. There was no Grade 2 alopecia, and there were no hypersensitivity reactions.***

(b)     It also presented a favorable depiction as to the rate of dose reduction among patients in the study, comparing the frequency and extent of dose reductions in study TOST107 to those in a Phase 3 study that was the basis for approving capecitabine combined with docetaxel for treatment of MBC:

**Dose Reductions for Tesetaxel plus Reduced Dose of Capecitabine Compared to Those for Docetaxel plus the Approved Dose of Capecitabine**

| | Tesetaxel 27 mg/m$^{2(1)}$ + Capecitabine 1,750/2,000 mg/m$^2$/day$^{(2)}$ (N=17)$^{(3)}$ | | Docetaxel 75 mg/m$^{2(1)}$ + Capecitabine 2,500 mg/m$^2$/day$^{(2)}$ (N=255)$^{(4)}$ | |
|---|---|---|---|---|
| | Tesetaxel | Capecitabine | Docetaxel | Capecitabine |
| First dose reduction to: | 89% of starting dose | 75% of starting dose | 75% of starting dose | 75% of starting dose |
| Patients | 24% | 47% | 59% | 51% |
| Median months to reduction | 2.0 | 1.9 | 1.4 | 1.5 |
| | | | | |
| Second dose reduction to: | 78% of starting dose | 50% of starting dose | 50% of starting dose | 50% of starting dose |
| Patients | 0% | 6% | 4% | 18% |
| Median months to reduction | NA | 3.5 | 2.3 | 2.8 |

(1) Day 1 of a 21-day cycle
(2) Days 1-14 of a 21-day cycle
(3) TOST107/107XT
(4) O'Shaughnessy et al, *Journal of Clinical Oncology* 2002;20(12):2812-2823

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

60.     The 2017 10-K also described the CONTESSA trial, stating, "We are conducting a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that will compare tesetaxel (27 mg/m$^2$ on the first day of a 21-day cycle) plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on days 1-14 of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on days 1-14 of a 21-day cycle) in patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It stated, "we expect to report top-line results from this study in 2020." The 2017 10-K reiterated the same rationales for the CONTESSA study as had been described in the Registration Statement, including that "*[i]n a Phase 1 study (TOST107), the combination of tesetaxel plus a reduced dose of capecitabine was associated with a tolerable AE profile, with minimal overlapping toxicity*." The 2017 10-K also cited to a researcher, Alain Lortholary, claiming that "the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability." The 2017 10-K added, "we believe that the data support the investigation of tesetaxel at 27 mg/m$^2$ on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle as a novel,

38

all-oral regimen with a potentially favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive MBC."

61.     The misrepresentations and omissions from the 2/14/2018 Earnings Release and the 2017 10-K, as alleged in ¶¶54-60, supra, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section supra, the "Defendants' Knowledge Or Reckless Disregard" section infra, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section infra, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.

62.     Odonate announced its Q1 2018 quarterly results in a series of public statements on May 3, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)     On May 3, 2018, Odonate issued an earnings press release (the "5/3/2018 Earnings Release") announcing its financial and operating results for the three months ended March 31, 2018.   The 5/3/2018 Earnings Release touted

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He further stated that tesetaxel's "***lack of history of hypersensitivity reactions***" "may translate into significant benefits for patients."

(b)     Also on May 3, 2018, Odonate also filed a Form 10-Q with the SEC for the first quarter of 2018 (the "Q1 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey.  The Q1 2018 10-Q touted tesetaxel as having "a formulation that ***does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions***" and further stated that "***[t]esetaxel has been generally well tolerated in clinical studies***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

63.     The misrepresentations and omissions in the 5/3/2018 Earnings Release and the Q1 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

64.    On May 16, 2018, Odonate issued a press release (the "5/16/2018 Press Release) announcing presentations at the 2018 American Society of Clinical Oncology (ASCO) meeting to be held June 1-5, 2018, which provided links to the abstracts of the presentations. The 5/16/2018 Press Release provided a link to Abstract 1042 (Poster Board #123) for the presentation titled "Activity of Tesetaxel, an Oral Taxane, Given as a Single-agent in Patients (Pts) with HER2-, Hormone Receptor + (HR+) Locally Advanced or Metastatic Breast Cancer (MBC) in a Phase

2 Study," which provided background for tesetaxel, stating that it has "**no history of hypersensitivity reactions** (HSRs)," that patients in the TOB203 Phase 2 study receiving tesetaxel were the same "population being enrolled in CONTESSA, an ongoing Phase 3 study," and that:

> In the 24 HR+ pts receiving 27 mg/m$^2$ without escalation, **Grade ≥ 3 neutropenia, the most common Grade ≥ 3 AE, occurred in 29% of pts** (febrile neutropenia 4%), **there were no cases of Grade ≥ 3 peripheral neuropathy**, and **the incidence of Grade 1/2 alopecia was 29% / 21%. There were no HSRs or study drug-related deaths**.

65. The misrepresentations and omissions in the 5/16/2018 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone. By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally

42

(23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

66.    On June 2, 2018, issued a press release (the "6/2/2018 Press Release") announcing results from the TOB203 Phase 2 study of tesetaxel, which were presented at the 2018 ASCO Annual Meeting. The 6/2/2018 Press Release reported on adverse events, stating:

> ***Neutropenia was the most common Grade ≥3 adverse event and occurred in 25% of the 24 patients who were not dose-escalated*** beyond the 27 mg/m² starting dose (the dose selected for CONTESSA, our ongoing Phase 3 study (Poster Board #184a; Abstract #TPS1106); in these patients, ***febrile neutropenia occurred in 1 patient (4%)*** and ***Grade ≥3 neuropathy occurred in 1 patient (4%). There were no hypersensitivity reactions or drug-related deaths***, and the ***rate of Grade 2 alopecia (hair loss) was 18%***.

67.    The misrepresentations and omissions in the 6/2/2018 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge"

43

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

68.    Odonate announced its Q2 1028 quarterly results in a series of public statements on July 30, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)    That day, Odonate issued an earnings press release (the "7/30/2018 Earnings Release") announcing its financial and operating results for the three and

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

six months ended June 30, 2018.  The 7/30/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "Results from our multicenter Phase 2 study of tesetaxel were recently presented at the 2018 ASCO Annual Meeting.  In this study, tesetaxel, administered orally as a single agent, resulted in 45% confirmed response rate in patients with HER2 negative, HR positive, metastatic breast cancer.  With these results, we look forward to further characterizing tesetaxel's therapeutic profile in CONTESSA."

(b)     Also on July 30, 2018, Odonate filed a Form 10-Q with the SEC for the second quarter of 2018 (the "Q2 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey.  The Q2 2018 10-Q touted tesetaxel as "***unique among taxanes***" with "***no history of hypersensitivity (allergic) reactions***."   It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

69.     The misrepresentations and omissions in the 7/30/2018 Earnings Release and the Q2 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth

45

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

70.    Odonate announced its Q3 2018 quarterly results in a series of public statements on October 23, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     That day, Odonate issued an earnings press release (the "10/23/2018 Earnings Release") announcing its financial and operating results for the three and nine months ended September 30, 2018.  The 10/23/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial, stating that tesetaxel is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions)***."

(b)     The same day Odonate filed a Form 10-Q with the SEC for the third quarter of 2018 (the "Q3 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey.  The Q3 2018 10-Q touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

71.     The misrepresentations and omissions in the 10/23/2018 Earnings Release and the Q3 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone. By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

72. Odonate announced is Q4 2018 and 2018 annual results in a series of public statements on February 22, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials. That day, Odonate issued an earnings press release (the "2/22/2019 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2018. The 2/22/2019 Earnings Release touted tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history***

*of hypersensitivity (allergic) reactions)*."  Defendant Tang is quoted as stating, "[w]e remain committed to developing novel therapies that improve the lives of patients with cancer…Tesetaxel, our investigational, orally administered taxane, has been shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies and *may provide significant quality-of-life advantages over other chemotherapy options*. *We expect to complete enrollment in CONTESSA*, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, *in the second half of 2019* and report top-line results in 2020."

73.    On February 22, 2019, Odonate filed an annual report on Form 10-K with the SEC, reporting Odonate's financial and operating results for Q4 and full year ended December 31, 2018 (the "2018 10-K"), which was signed and SOX certified by Defendants Tang and Hearne.  The 2018 10-K touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel is "*unique among taxanes*" with "*no history of hypersensitivity (allergic) reactions*."

74.    The 2018 10-K touted tesetaxel's tolerability both alone and in combination with capecitabine.

(a)    The 2018 10-K touted clinical results, stating:

*Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated*. In the 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final

49

study data are available, a total of 187 patients were treated with tesetaxel at 27 mg/m$^2$ once every three weeks as monotherapy (N=156) or in combination with capecitabine at 1,750-2,500 mg/m$^2$ (N=31). In this population, ***the most common Grade ≥3 (severe or serious) treatment-related adverse event ("AE") was neutropenia*** (low level of neutrophils, a type of white blood cell), ***(33%) febrile neutropenia*** (fever coinciding with neutropenia) ***occurred in 5% of patients***. ***The most common non-hematologic Grade ≥3 treatment-related AEs were: dehydration (5%); diarrhea (5%); fatigue (5%); and anorexia (4%)***. ***Other non-hematologic Grade ≥ 3 treatment-related AEs include: nausea (3%); peripheral neuropathy (weakness, numbness and/or pain from damage to the nerves) (3%); and vomiting (2%). Treatment-related alopecia (hair loss) (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients. There were no hypersensitivity reactions***.

(b)     Tesetaxel's adverse event profile across all completed studies was shown in this chart:

Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA

**187 patients treated with tesetaxel at 27 mg/m² once every 3 weeks as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31)**

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)
- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)
- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients
- There were no hypersensitivity reactions

75.     The 2018 10-K also stated results from a Phase 2 clinical study of tesetaxel monotherapy for MBC (TOB203), administered orally at 27 mg/m2,

50

which is the same dosage administered for the Phase 3 CONTESSA study. Similarly, for the TOB203 Phase 2 study, the 2018 10-K touted, "*Tesetaxel was generally well tolerated*," adding:

> ***Neutropenia was the most common Grade ≥3 AE and occurred in 25% of the 24 patients who were not dose-escalated*** beyond the 27 mg/m[2] starting dose (the dose selected for CONTESSA, our ongoing Phase 3 study); in these patients, ***febrile neutropenia occurred in one patient (4%) and Grade ≥3 neuropathy occurred in one patient (4%). There were no hypersensitivity reactions or drug-related deaths***, and ***the rate of Grade 2 alopecia*** (significant hair loss) ***was 18%***.

A summary of Grade ≥ 3 AEs regardless of relationship is shown in the following table:

**Grade ≥3 Adverse Events Regardless of Relationship**

| Adverse Events in 2 or More Patients | 27 mg/m² (n=24) n (%) | | 27 mg/m² Escalated to 35 mg/m² (n=14) n (%) | |
|---|---|---|---|---|
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 3 (13) | 3 (13) | 0 (0) | 6 (43) |
| Febrile neutropenia | 1 (4) | 0 (0) | 0 (0) | 1 (7) |
| Thrombocytopenia | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Neuropathy | 1 (4) | 0 (0) | 4 (29) | 0 (0) |
| Fatigue | 2 (8) | 0 (0) | 2 (14) | 0 (0) |
| Pain in extremity | 1 (4) | 0 (0) | 2 (14) | 0 (0) |
| ALT increased | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Diarrhea | 0 (0) | 1 (4) | 1 (7) | 0 (0) |
| Muscle weakness | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Pyrexia | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Sepsis | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Vomiting | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Hypokalemia | 0 (0) | 0 (0) | 2 (14) | 0 (0) |
| AST increased | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Decreased appetite | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Dehydration | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Renal failure acute | 2 (8) | 0 (0) | 0 (0) | 0 (0) |

76.   The 2018 10-K stated, "We are conducting a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that

51

is comparing tesetaxel dosed orally at 27 mg/m² on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m²/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m²/day on the first 14 days of a 21-day cycle) in patients with HER2 negative, HR positive LA/MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It added, "[W]e expect to report top-line results from this study in 2020." It described the "rationale for the CONTESSA study design includes" that "*[n]onclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy*." The 2018 10-K also cited to a researcher, Alain Lortholary, who stated that "*the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity*, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability." The 2018 10-K further stated, "we believe that the data support the investigation of tesetaxel at 27 mg/m² on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m²/day on the first 14 days of a 21-day cycle as a novel, all-oral regimen with a potentially favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive LA/MBC."

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

77.     The misrepresentations and omissions from the 2/22/2019 Earnings Release and the 2018 10-K, as alleged in ¶¶72-76, *supra*, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

53

78.    On February 22, 2019, Odonate filed a prospectus on Form S-3 with the SEC, signed by Defendants Tang and Hearne, which became effective February 28, 2019, offering to sell up to an aggregate of $150,000,000 of common stock in order to fund the study of its only drug, tesetaxel.  The prospectus again touted tesetaxel as "***unique among taxanes***" and "***generally well tolerated in clinical studies***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

79.    The misrepresentations and omissions in the Form S-3, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

80.     Between February 28, 2019 and April 2, 2019, Odonate made a series of public statements focused on recent clinical milestones regarding tesetaxel.

(a)     On February 28, 2019, Odonate issued a press release (the "2/28/2019 Press Release) announcing a presentation by Defendant Tang and others at the American Association for Cancer Research (AACR) Annual Meeting 2019 to be held March 29-April 3, 2019, which provided links to the abstract of the presentation, Abstract 3078 (Poster Board #12), titled "Tesetaxel, a novel, oral taxane, crosses, intact blood-brain (BBB) at therapeutically relevant concentrations" (regarding a preclinical study on animals), which stated that tesetaxel has "***no history of hypersensitivity reactions***."

(b)     On March 4, 2019, Odonate issued a press release (the "3/4/2019 Press Release") announcing the initiation of CONTESSA 2, a Phase 2 study of tesetaxel

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in patients with locally advanced or metastatic breast cancer who have not previously received a taxane. The 3/4/2019 Press Release stated that CONTESSA 2 is designed to complement the Phase 3 CONTESSA study by investigating the same tesetaxel-containing regimen in patients who have not previously received a taxane. The 3/4/2019 Press Release stated that tesetaxel is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

(c)      On March 28, 2019, Odonate issued a press release (the "3/28/2019 Press Release") announcing the initiation of CONTESSA TRIO, a multi-cohort and multicenter Phase 2 study, which is the first randomized clinical study to compare three approved PD-(L)1 inhibitors, investigating tesetaxel-immuno-oncology combinations in patients with metastatic triple-negative breast cancer, and investigating tesetaxel monotherapy in elderly patients with HER2 negative MBC. It touted the tolerability of tesetaxel stating that is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

(d)      On April 2, 2019, Odonate issued a press release (the "4/2/2019 Press Release") announcing that it presented results of the preclinical studies of tesetaxel at the AACR 2019 annual meeting. The 4/2/2019 Press Release touted the tolerability of tesetaxel stating that it has "***no history of hypersensitivity reactions***."

81.      The misrepresentations and omissions in the 2/28/2019 Press Release, the 3/4/2019 Press Release, the 3/28/2019 Press Release, and the 4/2/2019 Press

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Release and abstract, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.     Odonate announced its Q1 2019 quarterly results in a series of public statements on April 25, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)     That day, Odonate issued an earnings press release (the "4/25/2019 Earnings Release") announcing its financial and operating results for the three months ended March 31, 2019.  The 4/25/2019 Earnings Release touted the progress and efficacy of the CONTESSA trials.  Defendant Tang was quoted as stating, "[i]n the first quarter of 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO, the first study to investigate tesetaxel in combination with PD-(L)1 inhibitors…***We continue to expect to complete enrollment in CONTESSA***, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, ***in the second half of 2019*** and report top-line results in 2020."  The 4/25/2019 Press Release also touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity reactions***."

(b)     Also on April 25, 2019, Odonate filed a Form 10-Q with the SEC for the first quarter of 2019 (the "Q1 2019 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  The Q1 2019 10-Q touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic)***

*reactions*."  It added, "We are currently conducting multiple studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA. We expect to report top-line results from CONTESSA in 2020."  It described the ongoing clinical trials of tesetaxel in this chart:

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

83.    The misrepresentations and omissions in the 4/25/2019 Press Release and the Q1 20129 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with

59

capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

84.    On May 6, 2019, Odonate gave an investor presentation that included a slide deck titled "Corporate Presentation May 2019" (the "May 2019 Presentation").  It described tesetaxel as follows: "Tesetaxel: An Orally Administered Taxane with Improved Pharmacologic Properties."  In addition:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     The May 2019 Presentation stated, "***Tesetaxel has been generally well tolerated in clinical studies***…." It summarized AE rates from prior clinical study in this chart:

## Grade ≥3 Adverse Events Regardless of Relationship



- There were no adverse events leading to death

- There were no hypersensitivity reactions

- The incidence of Grade 2 alopecia was 18%

| Adverse Events in 2 or More Patients | 27 mg/m² (n=24) n (%) | | 27 mg/m² Escalated to 35 mg/m² (n=14) n (%) | |
|---|---|---|---|---|
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 3 (13) | 3 (13) | 0 (0) | 6 (43) |
| Febrile neutropenia | 1 (4) | 0 (0) | 0 (0) | 1 (7) |
| Thrombocytopenia | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Neuropathy | 1 (4) | 0 (0) | 4 (29) | 0 (0) |
| Fatigue | 2 (8) | 0 (0) | 2 (14) | 0 (0) |
| Pain in extremity | 1 (4) | 0 (0) | 2 (14) | 0 (0) |
| ALT increased | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Diarrhea | 0 (0) | 1 (4) | 1 (7) | 0 (0) |
| Muscle weakness | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Pyrexia | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Sepsis | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Vomiting | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Hypokalemia | 0 (0) | 0 (0) | 2 (14) | 0 (0) |
| AST increased | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Decreased appetite | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Dehydration | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Renal failure acute | 2 (8) | 0 (0) | 0 (0) | 0 (0) |

(b)     The May 2019 Presentation also added, "We are conducting a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA." It described the hypothesis behind CONTESSA as being: "The all-oral regimen of tesetaxel plus a reduced dose of capecitabine will lengthen PFS ***while being well-tolerated as compared to capecitabine alone***." It included a chart illustrating the ongoing tesetaxel studies:

61

## Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

85.    The misrepresentations and omissions in the May 2019 Presentation, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial,

which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

86.     On June 7, 2019, Odonate gave an investor presentation that included a slide deck titled "Corporate Presentation June 2019" (the "June 2019 Presentation").   It described tesetaxel as follows: "Tesetaxel: An Orally Administered Taxane with Improved Pharmacologic Properties."  In addition:

(a)     The June 2019 Presentation stated, "***Tesetaxel has been generally well tolerated in clinical studies***…."  It summarized AE rates from prior clinical study in this chart:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS



## Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA

**187 patients treated with tesetaxel at 27 mg/m² Q3W as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31)**

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)

- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)

- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients

- There were no hypersensitivity reactions

(b)    The June 2019 Presentation also added, "We are conducting a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA."  It described the hypothesis behind CONTESSA as being: "The all-oral regimen of tesetaxel plus a reduced dose of capecitabine will lengthen PFS *while being well-tolerated as compared to capecitabine alone*."  It included a chart illustrating the ongoing tesetaxel studies:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

87.    The misrepresentations and omissions in the June 2019 Presentation, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

88.    In late June 2019, Defendants made several public statements in furtherance of the June 2019 Offering.

(a)    On June 25, 2019, Odonate issued a press release (the "6/25/2019 Press Release") announcing that it commenced the June 2019 Offering.  The 6/25/2019 Press Release stated that Odonate intended to use the proceeds from the offering "for development and regulatory activities relating to tesetaxel."

(b)    The same day, Odonate filed a preliminary prospectus supplement (the "6/25/2019 Prospectus Supplement") for the June 2019 Offering to fund the study of tesetaxel. The prospectus supplement touted tesetaxel as "***unique among taxanes***" because, among other things, it has ***no history of hypersensitivity (allergic) reactions***." The 6/25/2019 Prospectus Supplement described CONTESSA, stating, "We are currently conducting multiple studies in breast

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with HER2 negative, hormone receptor positive metastatic breast cancer, known as CONTESSA. ***We expect to complete enrollment of CONTESSA in the second half of 2019 and to report topline results in 2020***."

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

(c)     On June 27, 2019, Odonate filed a prospectus supplement on Form 424B5 offering 4,750,000 of shares of common stock, making substantially the same statements as contained in the 6/25/2019 Prospectus Supplement.

89.     The misrepresentations and omissions pertaining to the June 2019 Offering, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless

67

Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

90.   Odonate announced its Q2 2019 quarterly results in a series of public statements on July 24, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a)     That day, Odonate issued an earnings press release (the "7/24/2019 Earnings Release") announcing its financial and operating results for the three and six months ended June 30, 2019.  The 7/24/2019 Earnings Release touted the progress of the CONTESSA trials.  Defendant Tang was quoted as stating, "In March 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO…" and "*[w]e continue to expect to complete enrollment in CONTESSA…in the second half of 2019* and report top-line results in 2020."  The 7/24/2019 Press Release also touted the tolerability of tesetaxel stating that it is "*unique among taxanes*" including that it has "*no history of hypersensitivity reactions*."

(b)     The same day, Odonate also filed a Form 10-Q with the SEC for the second quarter of 2019 (the "Q2 2019 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  The Q2 2019 10-Q touted tesetaxel as "*unique among taxanes*" because, *inter alia*, it has "*no history of hypersensitivity (allergic) reactions*."  The Q2 2019 10-Q described the CONTESSA trial, touted its efficacy, and said, "*We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020*."  It also described the then-ongoing clinical trials of tesetaxel and listed them in this chart:

69

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer;

91.   The misrepresentations and omissions in the 7/24/2019 Earnings Release and the Q2 2019 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient

70

discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

92.    On September 27, 2019, Odonate filed a prospectus on Form S-3 with the SEC, signed by Defendants Tang and Hearne, which became effective October 18, 2019 (the "2019 Form S-3"), offering to sell up to an aggregate of $200,000,000 of common stock to fund the study of tesetaxel. The 2019 Form S-3 touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***." It also touted the clinical trial progress of tesetaxel, stating, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA. ***We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020***." It displayed the clinical trials in the following chart:

71

## Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

93.     The misrepresentations and omissions in the 2019 Form S-3, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone. By no later than August 2018, these risks had manifested themselves in the CONTESSA trial,

72

which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

94.     On October 21, 2019, Odonate issued a press release (the "10/21/2019 Press Release") announcing completion of enrollment in the CONTESSA Phase 3 Study.  It stated that Odonate "today announced ***the completion of enrollment in CONTESSA***, a multinational, multicenter, randomized, Phase 3 study investigating tesetaxel as a potential treatment for patients with HER2 negative, hormone receptor positive metastatic breast cancer" and that it "***expects to report top-line results from CONTESSA in the third quarter of 2020***."  The 10/21/2019 Press Release reiterated Odonate's longstanding boasts that tesetaxel was "***unique among taxanes***," due to factors including that it has "***no history of hypersensitivity (allergic) reactions***."

95.     The misrepresentations and omissions in the 10/21/2019 Press Release, as alleged in the preceding paragraph, were materially false and

misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

96.    Odonate announced its Q3 2019 quarterly results in a series of public statements on November 6, 2019, which discussed tesetaxel and clinical study

progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)    That day, Odonate issued an earnings press release (the "11/6/2019 Earnings Release") announcing its financial and operating results for the three and nine months ended September 30, 2019.  The 11/6/2019 Earnings Release touted the progress and efficacy of the CONTESSA trials.  Defendant Tang was quoted as stating, "***We are pleased to have recently announced the completion of enrollment in CONTESSA…We expect to report top-line results from CONTESSA in the third quarter of 2020***."  The 11/6/2019 Earnings Release also again touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" for reasons including that it has "***no history of hypersensitivity reactions***."

(b)    Also on November 6, 2019, Odonate filed a Form 10-Q with the SEC for the third quarter of 2019 (the "Q3 2019 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  The Q3 2019 10-Q again touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."    The Q3 2019 10-Q also touted the progress of the CONTESSA clinical trial, stating in relevant part, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR")

75

positive metastatic breast cancer ("MBC"), known as CONTESSA. ***Enrollment in CONTESSA is complete, and we expect to report top-line results from CONTESSA in the third quarter of 2020***." It displayed the progress of clinical trials in this chart:

### Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

97. The misrepresentations and omissions in the 11/6/2019 Earnings Release and the Q3 2019 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*,

76

neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

98.    Odonate announced its Q4 2019 quarterly and 2019 annual results in a series of public statements on February 20, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.  That day, Odonate issued an earnings press release (the "2/20/2020 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2019.  The 2/20/2020 Earnings Release touted the progress of the CONTESSA trials.  Defendant Tang was once again quoted as stating, "***We are pleased to have recently announced the***

*completion of enrollment in CONTESSA…We expect to report top-line results from CONTESSA in the third quarter of 2020*." The 2/20/2020 Earnings Release again touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

99.     Also on February 20, 2020, Odonate filed its 2019 10-K, which was signed and SOX certified by Defendants Tang and Hearne.  The 2019 10-K once again touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel is "***unique among taxanes***" with "***no history of hypersensitivity (allergic) reactions***."

100.    The 2019 10-K also touted tesetaxel's tolerability both alone and in combination with capecitabine.

(a)     The 2019 10-K touted clinical results, stating:

> ***Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated***. In 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT), a total of 187 patients were treated with tesetaxel at 27 mg/m$^2$ once every three weeks as monotherapy (N=156) or in combination with capecitabine at 1,750-2,500 mg/m$^2$ (N=31).

(b)     Tesetaxel's adverse event profile across all studies to date was summarized in the following table:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA**

**187 patients treated with tesetaxel at 27 mg/m² once every 3 weeks as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31)**

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)

- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)

- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients

- There were no hypersensitivity reactions

101. The 2019 10-K stated, "We are conducting a multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that is comparing tesetaxel dosed orally at 27 mg/m² on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m²/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m²/day on the first 14 days of a 21-day cycle) in approximately 600 patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."  It added, "In October 2019, we announced that *enrollment in CONTESSA was complete*. We *expect to report top-line results from CONTESSA in the third quarter of 2020*."  It added, "We are currently conducting three clinical studies in breast cancer, including CONTESSA, a multinational, multicenter, randomized Phase 3 study of tesetaxel in patients with MBC, as shown in the following table."

79

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC= metastatic breast cancer; TNBC=triple-negative breast cancer

102. The 2019 10-K described the rationale underlying CONTESSA: "***Clinical studies support investigating the combination of a taxane with a reduced dose of capecitabine such as 1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle, the dose of capecitabine chosen for combination with tesetaxel in CONTESSA***. In a review of 18 first-line MBC studies of taxane plus capecitabine combinations shown in the following table, there was no apparent loss of efficacy when comparing capecitabine at 1,650 mg/m$^2$/day to capecitabine at 2,000 mg/m$^2$/day (on the first 14 days of a 21-day cycle). Among these studies, the capecitabine 1,650 mg/m$^2$/day dose was the most studied dose less than 2,000 mg/m$^2$/day (5/8 studies)."

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Support for Combining Capecitabine at 1,650 mg/m²/day[1] with a Taxane**

| Taxane+Capecitabine Studies Conducted at a Capecitabine Dose of: | # of Studies | # of Patients | ORR | PFS (months) | OS (months) |
|---|---|---|---|---|---|
| 1,900-2,000 mg/m²/day[1],[2] | 10 | 498 | 53% | 10.5 | 27.4 |
| 1,800 mg/m²/day[1],[3] | 2 | 195 | 55% | 10.4 | 25.9 |
| 1,650 mg/m²/day[1],[4] | 5 | 436 | 64% | 11.8 | 27.2 |
| 1,500 mg/m²/day[1],[5] | 1 | 37 | 50% | NA | NA |

ORR=objective response rate; OS=overall survival; PFS=progression-free survival
[1] Days 1-14 of a 21-day cycle
[2] Bachelot et al., Oncology 2011;80(3-4):262-268; Campone et al., The Breast Journal 2013;19(3):240-249; Chitapanarux et al., Asia-Pacific Journal of Clinical Oncology 2012;8:76-82; Fan et al., Annals of Oncology 2013;24:1219-1225; Liao et al., Chemotherapy 2013;59:207-213; Michalaki et al., Anti-Cancer Drugs 2009;20(3):204-207; Michalaki et al., Anticancer Research 2010;30:3051-3054; Venturini et al., Cancer 2003;97(5):1174-1180; Wang et al., Cancer 2015;121:3412; Wardley et al., Journal of Clinical Oncology 2010;28(6):976-983
[3] Bisagni et al., Cancer Chemotherapy and Pharmacology 2013;71(4):1051-1057; Luck et al., Breast Cancer Research and Treatment 2015;149:141-149
[4] Hatschek et al., Breast Cancer Research and Treatment 2012;131(3):939-947; Lam et al., European Journal of Cancer 2014;50(18):3077-3088; Perez et al., Annals of Oncology 2010;21(2):269-274; Schwartzberg et al., Clinical Breast Cancer 2012;12(2):87-93; Tonyali et al., Journal of Cancer Research and Clinical Oncology 2013;139(6):981-986
[5] Silva et al., Clinical Breast Cancer 2008;8(2):162-167

103. The 2019 10-K also cited to a researcher, Alain Lortholary, who stated that "***the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity***, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability." The 2019 10-K further stated, "we believe that the data support the investigation of tesetaxel at 27 mg/m² on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m²/day on the first 14 days of a 21-day cycle as a novel, all-oral regimen with a potentially favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive MBC."

104. The misrepresentations and omissions from the 2/20/2020 Earnings Release and the 2019 10-K, as alleged in ¶¶98-103, *supra*, were materially false and

misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone. By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

105.   Odonate announced its Q1 2020 quarterly results in a series of public statements on April 28, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)   That day, Odonate issued an earnings release (the "4/28/2020 Earnings Release") announcing its financial and operating results for the three months ended March 31, 2020.   The 4/28/2020 Earnings Release touted the progress of the CONTESSA trials.   Defendant Tang was quoted as stating, "***We continue to expect to report top-line results from CONTESSA…in the third quarter of 2020***."   The 4/28/2020 Earnings Release also touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

(b)   Also on April 28, 2020, Odonate filed a form 10-Q with the SEC for the first quarter of 2020 (the "Q1 2020 10-Q) signed and SOX-certified by Defendants Tang and Hearne.   The Q1 2020 10-Q again touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."   It reiterated, referencing the table shown below, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA."   It elaborated, stating, "We are conducting a multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

is comparing tesetaxel dosed orally at 27 mg/m$^2$ on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on the first 14 days of a 21-day cycle) in approximately 600 patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."  It added, "In October 2019, we announced that **enrollment in CONTESSA was complete**. **We expect to report top-line results from CONTESSA in the third quarter of 2020**."

### Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

106. The misrepresentations and omissions in the 4/28/2020 Earnings Release and the Q1 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the

84

"Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

107.   Odonate announced its Q2 2020 quarterly results in a series of public statements on July 30, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a)     That day, Odonate issued an earnings release (the "7/30/2020 Earnings Release") announcing its financial and operating results for the three and six months ended June 30, 2020.  The 7/30/2020 Earnings Release touted the progress of the CONTESSA trials.  Defendant Tang was again quoted as stating, "***We continue to expect to report top-line results from CONTESSA…in the third quarter of 2020***." The 7/30/2020 Earnings Release also reiterated positive characterizations of the tolerability of tesetaxel, stating that it is "***unique among taxanes***" for reasons including that it has "***no history of hypersensitivity (allergic) reactions***."

(b)     On the same day, Odonate filed a form 10-Q with the SEC for the second quarter of 2020 ("the Q2 2020 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  It once again touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."  It reiterated, referencing the table shown below, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA."  It elaborated, stating, "CONTESSA is a multinational, multicenter, randomized, Phase 3 study of tesetaxel, an investigational, orally administered taxane, in patients with MBC. CONTESSA is comparing tesetaxel dosed orally at 27 mg/m$^2$ on the first day of each 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m$^2$/day dosed orally for 14 days of

86

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

each 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day dosed orally for 14 days of each 21-day cycle) in approximately 600 patients randomized 1:1 with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It added, "In October 2019, we announced that *enrollment in CONTESSA was complete*. *We expect to report top-line results from CONTESSA in the third quarter of 2020*."

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

108. The misrepresentations and omissions in the 7/30/2020 Earnings Release and the Q2 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants'

87

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

### *Reported Results Fraud*

109.  Odonate made a series of filings and public statements reporting revenues, net income, and earnings without disclosing that they were being generated and artificially inflated through improper practices, unreported

88

operational setbacks, and undisclosed negative trends.  These statements also touted Odonate's progress in advancing toward necessary FDA approvals as a primary factor underlying these results, without disclosing that its clinical trials for tesetaxel were encountering significant issues and setbacks, including, *inter alia*, serious adverse events and high discontinuation rates among trial participants.  These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).  The "Reported Results Fraud" included the following misstatements.

110.  Odonate announced its Q4 and full year 2017 financial results in a series of releases and filings made on February 14, 2018, including the following:

(a)  On February 14, 2018, Odonate issued the 2/14/2018 Earnings Press Release announcing its financial and operating results for the three and twelve months ended December 31, 2017.  In it, Odonate reported Q4 2017 quarterly net loss of $15.7 million, or $0.81 per share, and full year loss of $32.7 million, or $2.31 per share, as well as $198.1 million in cash on hand as of December 31, 2017. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He specifically cited tesetaxel's "lack of history of

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

hypersensitivity reactions" as a favorable metric in assessing the CONTESSA trial initiation.

(b)     Also on February 14, 2018, Odonate filed the 2017 10-K, executed by Defendants Tang and Lemkey.  The 2017 10-K reported the same financial and operating results and cash position as were reported in the 2/14/2018 Earnings Release Earnings Release.  It explained, "Our net loss was $32.7 million and $3.1 million for the years ended December 31, 2017 and 2016, respectively. As of December 31, 2017 and December 31, 2016, we had an accumulated deficit of $39.3 million and $6.5 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expenses to date have been incurred in connection with tesetaxel. We expect our research and development expenses to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $27.9 million and $2.6 million for the years ended December 31, 2017 and 2016, respectively. The increase of $25.3 million was primarily due to increased activities in connection with our tesetaxel clinical development program, including the initiation of CONTESSA, resulting in increased clinical development

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

costs of $16.9 million, increased personnel and related costs of $5.7 million and increased equity-based compensation expense of $2.6 million." It also stated, "Tesetaxel has been generally well tolerated in clinical studies and has demonstrated robust single-agent antitumor activity in two multicenter, Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC"). We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the 2017 10-K were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Lemkey executed a Section 906 Certification, dated February 14, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated February 14, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

111.   Odonate announced its Q1 2018 financial results in a series of releases and filings made on May 3, 2018 including the following:

(a)     On May 3, 2018, Odonate issued the 5/3/2018 Earnings Release announcing its financial and operating results for the three months ended March 31,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2018.  In it, Odonate reported Q1 2018 quarterly net loss of $16.9 million, or $0.69 per share, as well as $195.2 million in cash on hand as of March 31, 2018. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He specifically cited tesetaxel's "lack of history of hypersensitivity reactions" as a favorable metric in assessing the CONTESSA trial initiation.

(b)     The same day, Odonate filed the Q1 2018 10-Q executed by Defendants Tang and Lemkey.  The Q1 2018 10-Q reported the same financial and operating results and cash position as were reported in the 5/3/2018 Earnings Release.  It explained, "Our net loss was $16.9 million and $2.7 million for the three months ended March 31, 2018 and 2017, respectively. As of March 31, 2018 and December 31, 2017, we had an accumulated deficit of $56.2 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."   It added, "Research and development expense was $14.5 million and $2.5 million for the three months ended March 31, 2018 and 2017, respectively. The increase of $12.0 million was primarily due to increased activities in connection with our tesetaxel clinical development program." It also stated, "Tesetaxel has been generally well tolerated in clinical studies and has demonstrated robust single-agent antitumor activity in two multicenter, Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC"). We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the Q1 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated May 3, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated May 3, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

93

112.    Odonate announced its Q2 2018 financial results in a series of releases and filings made on July 30, 2018 including the following:

(a)    On July 30, 2018, Odonate issued the 7/30/2018 Earnings Release announcing its financial and operating results for the three and six months ended June 30, 2018.  In it, Odonate reported Q2 2018 net loss for the three and six months ended June 30, 2018 of $19.4 million and $36.3 million, or $0.79 per share and $1.49 per share respectively, as well as $177.4 million in cash on hand as of June 30, 2018.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "Results from our multicenter Phase 2 study of tesetaxel were recently presented at the 2018 ASCO Annual Meeting.  In this study, tesetaxel, administered orally as a single agent, resulted in 45% confirmed response rate in patients with HER2 negative, HR positive, metastatic breast cancer. With these results, we look forward to further characterizing tesetaxel's therapeutic profile in CONTESSA."  He specifically cited tesetaxel's "45% confirmed response rate" as a favorable metric in assessing the CONTESSA trial progress.

(b)    The same day, Odonate filed the Q2 2018 10-Q executed by Defendants Tang and Lemkey.  The Q2 2018 10-Q reported the same financial and operating results and cash position as were reported in the 7/30/2018 Earnings Release.  It explained, "Our net loss was $19.4 million and $36.3 million for the

94

three and six months ended June 30, 2018, respectively, compared to $3.9 million [and] $6.6 million for the same periods in 2017, respectively.  As of June 30, 2018 and December 31, 2017, we had an accumulated deficit of $75.6 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $17.0 million and $31.5 million for the three and six months ended June 30, 2018, respectively, compared to $3.3 million and $5.7 million for the same periods in 2017. The increase in research and development was due to increased activities in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two, multicenter, Phase 2 studies.  We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

95

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c)     Accompanying the Q2 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated July 30, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated July 30, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

113.   Odonate announced its Q3 2018 financial results in a series of releases and filings made on October 23, 2018 including the following:

(a)     On October 23, 2018, Odonate issued the 10/23/2018 Earnings Release announcing its financial and operating results for the three and nine months ended September 30, 2018.  In it, Odonate reported Q3 2018 net loss for the three and nine months ended September 30, 2018 of $23.9 million and $60.2 million, or $0.98 per share and $2.47 per share respectively, as well as $161.0 million in cash on hand as of September 30, 2018.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.

(b)     The same day, Odonate filed the Q3 2018 10-Q executed by Defendants Tang and Lemkey.  The Q3 2018 10-Q reported the same financial and

96

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

operating results and cash position as were reported in the 10/23/2018 Earnings Release.  It explained, "Our net loss was $23.9 million and $60.2 million for the three and nine months ended September 30, 2018, respectively, compared to $10.4 million and $17.0 million for the same periods in 2017, respectively.  As of September 30, 2018 and December 31, 2017, we had an accumulated deficit of $99.5 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase for as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $21.7 million and $53.2 million for the three and nine months ended September 30, 2018, respectively, compared to $9.1 million and $14.9 million for the same periods in 2017, respectively. The increase in research and development expense was due to increased activities in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two, multicenter, Phase 2 studies.  The Company is conducting a multinational,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the Q3 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated October 23, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."   They also executed a Section 302 Certification, dated October 23, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

114.   Odonate announced its Q4 and full year 2018 financial results in a series of releases and filings made on February 22, 2019, including the following:

(a)     On February 22, 2019, Odonate issued the 2/22/2019 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2018.  In it, Odonate reported Q4 2017 quarterly net loss of $28.8 million, or $1.17 per share, and full year loss of $89.0 million, or $3.64 per share, as well as $139.1 million in cash on hand as of December 31, 2018. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was quoted as saying, "We expect to complete enrollment in CONTESSA, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, in the second half of 2019 and report top-line results in 2020."   He specifically cited tesetaxel's "significant, single-agent antitumor activity in two multicenter, Phase 2 studies" as a favorable metric in assessing the CONTESSA trial initiation.

(b)   Also on February 22, 2019, Odonate filed the 2018 10-K, executed by Defendants Tang and Hearne.   The 2018 10-K reported the same financial and operating results and cash position as were reported in the 2/22/2019 Earnings Release.   It explained, "Our net loss was $89.0 million and $32.7 million for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018 and 2017, we had an accumulated deficit of $128.3 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."   In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with tesetaxel. We expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."   It added, "Research and development expense was $79.9 million

99

and $27.9 million for the years ended December 31, 2018 and 2017, respectively. The increase of $52.0 million was primarily due to increased activities in connection with our tesetaxel clinical development program, resulting in increased clinical development costs of $34.4 million, increased personnel and related costs of $14.2 million and increased equity-based compensation expense of $3.0 million."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the 2018 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated February 22, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification, dated February 22, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

115.   Odonate announced its Q1 2019 financial results in a series of releases and filings made on April 25, 2019 including the following:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     On April 25, 2019, Odonate issued the 4/25/2019 Earnings Release announcing its financial and operating results for the three months ended March 31, 2019.   In it, Odonate reported Q1 2019 net loss for the three months ended March 31, 2019 of $28.6 million, or $1.16 per share, as well as $112.1 million in cash on hand as of December 31, 2018.   Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.   Defendant Tang was quoted as saying, "In the first quarter of 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO, the first study to investigate tesetaxel in combination with PD-(L)1 inhibitors.   We expect to complete enrollment in CONTESSA, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, in the second half of 2019 and report top-line results in 2020."   He specifically cited the initiation of the "first study to investigate tesetaxel in combination with PD-(L)1 inhibitors" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q1 2019 10-Q executed by Defendants Tang and Hearne.   The Q1 2019 10-Q reported the same financial and operating results and cash position as were reported in the 4/25/2019 Earnings Release.   It explained, "Our net loss was $28.6 million and $16.9 million for the three months ended March 31, 2019 and 2018, respectively.   As of March 31, 2019

101

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and December 31, 2018, we had an accumulated deficit of $156.9 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel."  It added, "Research and development expense was $26.6 million and $14.5 million for the three months ended March 31, 2019 and 2018, respectively.  The increase of $12.1 million was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two, multicenter, Phase 2 studies. The Company is conducting multiple studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA."

(c)     Accompanying the Q1 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated April 25, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

material respects, the financial condition and results of operations of the Company."

They also executed a Section 302 Certification, dated April 25, 2019, as quoted and

discussed in the Internal Controls Fraud section herein.

116.   Odonate announced its Q2 2019 financial results in a series of releases

and filings made on July 24, 2019 including the following:

(a)      On July 24, 2019, Odonate issued the 7/24/2019 Earnings

Release announcing its financial and operating results for the three and six months

ended June 30, 2019.  In it, Odonate reported Q2 2019 net loss for the three and six

months ended June 30, 2019 of $28.7 million and $57.3 million, or $1.15 per share

and $2.31 per share, respectively as well as $206.9 million in cash on hand as of

June 30, 2019.  Underlying these results was Odonate's progress in seeking FDA

approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant

Tang was quoted as saying, "In March 2019, we expanded the development of

tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA

TRIO, and, in June 2019, the Independent Data Monitoring Committee for

CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential

treatment for patients with metastatic breast cancer, recommended that the study

continue with no modifications following a planned interim efficacy futility

analysis.  We continue to expect to complete enrollment in CONTESSA in the

second half of 2019 and report top-line results in 2020."  He specifically cited the

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Independent Data Monitoring Committee recommendation that the "study continue with no modifications" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q2 2019 10-Q executed by Defendants Tang and Hearne.  The Q2 2019 10-Q reported the same financial and operating results and cash position as were reported in the 7/24/2019 Earnings Release.  It explained, "Our net loss was $28.7 million and $57.3 million for the three months and six ended June 30, 2019, respectively, compared to $19.4 million and $36.3 million, respectively, for the same periods in 2018.  As of June 30, 2019 and December 31, 2018, we had an accumulated deficit of $185.6 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel." It added, "Research and development expense was $26.5 million and $53.1 million for the three and six months ended June 30, 2019, respectively, compared to $17.0 million and $31.5 million, respectively, for the same periods in 2018.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies. We are currently conducting three studies in breast cancer, [] including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA. We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020."

(c)     Accompanying the Q2 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Hearne executed a Section 906 Certification, dated July 24, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated July 24, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

117.   Odonate announced its Q3 2019 financial results in a series of releases and filings made on November 6, 2019 including the following:

(a)     On November 6, 2019, Odonate issued the 11/6/2019 Earnings Release announcing its financial and operating results for the three and nine months

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

ended September 30, 2019.  In it, Odonate reported Q3 2019 net loss for the three and nine months ended September 30, 2019 of $26.6 million and $84.0 million, or $0.88 per share and $3.15 per share, respectively as well as $204.2 million in cash on hand as of September 30, 2019.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "We are pleased to have recently announced the completion of enrollment in CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer.  We expect to report top-line results from CONTESSA in the third quarter of 2020."  He specifically cited the "completion of enrollment in CONTESSA" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q3 2019 10-Q executed by Defendants Tang and Hearne.  The Q3 2019 10-Q reported the same financial and operating results and cash position as were reported in the 11/6/2019 Earnings Release.  It explained, "Our net loss was $26.6 million and $84.0 million for the three months and nine ended September 30, 2019, respectively, compared to $23.9 million and $60.2 million, respectively, for the same periods in 2018.  As of September 30, 2019 and December 31, 2018, we had an accumulated deficit of $212.2 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel."  It added, "Research and development expense was $25.1 million and $78.2 million for the three and nine months ended September 30, 2019, respectively, compared to $21.7 million and $53.2 million, respectively, for the same periods in 2018.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA."

(c)     Accompanying the Q3 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated November 6, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated November 6, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

118. Odonate announced its Q4 and full year 2019 financial results in a series of releases and filings made on February 20, 2020, including the following:

(a) On February 20, 2020, Odonate issued the 2/20/2020 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2019. In it, Odonate reported Q4 2019 quarterly net loss of $27.9 million, or $0.91 per share, and full year loss of $111.8 million, or $4.05 per share, as well as $180.5 million in cash on hand as of December 31, 2019. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "We are pleased to have recently announced the completion of enrollment in CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer. We expect to report top-line results from CONTESSA in the third quarter of 2020." He specifically cited the "completion of enrollment in CONTESSA" as a favorable metric in assessing the CONTESSA trial progress.

(b) Also on February 20, 2020, Odonate filed its 2019 10-K, executed by Defendants Tang and Hearne. The 2019 10-K reported the same

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

financial and operating results and cash position as were reported in the 2/20/2020 Earnings Release.  It explained, "Our net loss was $111.8 million and $89.0 million for the years ended December 31, 2019 and 2018, respectively. As of December 31, 2019 and 2018, we had an accumulated deficit of $240.1 million and $128.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase in the near term in connection with the development of tesetaxel.   It added, "Research and development expense was $104.0 million and $79.9 million for the years ended December 31, 2019 and 2018, respectively. The increase of $24.1 million was primarily due to increased activities and headcount in connection with our tesetaxel clinical development program, resulting in increased clinical development costs of $11.3 million, increased personnel and related costs of $7.0 million and increased equity-based compensation expense of $4.3 million."  It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.   We are conducting three studies in breast cancer, including a multinational, multicenter,

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

randomized, Phase 3 study in patients with MBC, known as CONTESSA. Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c)     Accompanying the 2019 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated February 20, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated February 20, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

119.   Odonate announced its Q1 2020 financial results in a series of releases and filings made on April 28, 2020 including the following:

(a)     On April 28, 2020, Odonate issued the 4/28/2020 Earnings Release announcing its financial and operating results for the three months ended March 31, 2020.  In it, Odonate reported Q1 2020 net loss for the three months ended March 31, 2020 of $30.2 million, or $0.99 per share, as well as $153.1 million in cash on hand as of March 31, 2020.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "We continue to expect to

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

report top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel, an investigational, orally administered chemotherapy as a potential treatment for patients with metastatic breast cancer, in the third quarter of 2020." He specifically cited Odonate's reporting of top-line results from CONTESSA "in the third quarter of 2020" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q1 2020 10-Q executed by Defendants Tang and Hearne.  The Q1 2020 10-Q reported the same financial and operating results and cash position as were reported in the 4/28/2020 Earnings Release.  It explained, "Our net loss was $30.2 million and $28.6 million for the three months ended March 31, 2020 and 2019, respectively.  As of March 31, 2020 and December 31, 2019, we had an accumulated deficit of $270.2 million and $240.1 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase in the near term in connection with the development of tesetaxel."  It added, "Research and development expense was $27.9 million and $26.6 million for the three months

111

ended March 31, 2020 and 2019, respectively. The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program." It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies. The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA. Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c)     Accompanying the Q1 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Hearne executed a Section 906 Certification, dated April 28, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated April 28, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

120.    Odonate announced its Q2 2020 financial results in a series of releases and filings made on July 30, 2020 including the following:

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     On July 30, 2020, Odonate issued the 7/30/2020 Earnings Release announcing its financial and operating results for the three and six months ended June 30, 2020.  In it, Odonate reported Q2 2020 net loss for the three and six months ended June 30, 2020 of $33.4 million and $63.6, or $1.09 per share and $2.07 per share, as well as $125.4 million in cash on hand as of June 30, 2020. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "We continue to expect to report top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel, an investigational, orally administered chemotherapy as a potential treatment for patients with metastatic breast cancer, in the third quarter of 2020."  He specifically cited Odonate's reporting of top-line results from CONTESSA "in the third quarter of 2020" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q2 2020 10-Q executed by Defendants Tang and Hearne.  The Q2 2020 10-Q reported the same financial and operating results and cash position as were reported in the 7/30/2020 Earnings Release.  It explained, "Our net loss was $33.4 million and $63.6 million for the three and six months ended June 30, 2020, respectively, compared to $28.7 million and $57.3 million, respectively, for the same periods in 2019.  As of June 30, 2020 and December 31, 2019, we had an accumulated deficit of $303.7 million and

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

$240.1 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel.  We expect our research and development expense to increase in the near term in connection with the development of tesetaxel."  It added, "Research and development expense was $30.8 million and $58.7 million for the three and six months ended June 3, 2020, respectively, compared to $26.5 million and $53.1 million, respectively, for the same periods in 2019.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA.  Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c)     Accompanying the Q2 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed

114

a Section 906 Certification, dated July 30, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated July 30, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

121.   The foregoing statements in ¶¶109-120 were materially false and misleading because they reported financial metrics and results like net loss, loss per share, research and development expenses, and cash position for Odonate without disclosing that these results were generated through improper practices, unreported operational setbacks, and undisclosed negative trends, including those detailed by the CW accounts set forth herein in the "Undisclosed, Material, Negative Facts" section *supra* and the "Defendants' Knowledge Or Reckless Disregard" section *infra*. Those sections, along with the "Truth Begins To Emerge" section *infra*, illustrate, *inter alia*, that tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.

115

By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, as regularly discussed at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.  The statements ¶¶109-120 also touted Odonate's positive progress advancing toward necessary FDA approvals through ongoing clinical trials as a primary factor underlying its reported results, without disclosing that its clinical trials for tesetaxel were in actuality encountering significant issues and setbacks, including, *inter alia*, serious adverse events and high discontinuation rates among trial participants, the scope and extent of which were concealed from investors.  Specifically, as described by the CWs, beginning in August 2018, CONTESSA had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site.    It was materially false and misleading to reference positive metrics, developments, and milestones in the clinical development and evaluation of tesetaxel and its progress toward FDA approval, while omitting timely and fulsome disclosure of the negative developments, setbacks, adverse events, discontinuations, and other undisclosed risks arising during clinical trials.  As such,

116

these misstatements and omissions in ¶¶109-120 violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

### *Internal Controls Fraud*

122.   During the Class Period, Defendants also made a series of public statements and filings regarding Odonate's internal controls that were materially false and misleading.

123.   Odonate's 2017 10-K was signed and SOX certified by Defendants Tang and Lemkey and stated that the financial information contained in the 2017 10-K was accurate and disclosed any material changes to Odonate's internal control over financial reporting.  Specifically, Defendants Tang and Lemkey represented:

I, [Kevin C. Tang and John G. Lemkey], certify that:

1.   I have reviewed this Annual Report on Form 10-K of Odonate Therapeutics, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

    c.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

    a.    ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b.    ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

124.   On February 22, 2019, Odonate filed the 2018 10-K, representing that the financial information contained in Odonate's 2018 10-K was accurate and disclosed any material changes to Odonate's internal control over financial reporting.  Specifically, Defendants Tang and Hearne represented:

I, [Kevin C. Tang and Michael Hearne], certify that:

1.   I have reviewed this Annual Report on Form 10-K of Odonate Therapeutics, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(f)) for the registrant and have:

a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance

119

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

regarding the reliability of financial reporting and the preparation of financial statement for external purposes in accordance with generally accepted accounting principles;

c.      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

a.      ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.      ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

125.    On February 20, 2020, Odonate filed the 2019 10-K, making the same representations as those contained in Odonate's 2018 10-K certifications alleged above stating the financial information contained in Odonate's 2019 10-K was

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

accurate and disclosed any material changes to Odonate's internal control over financial reporting.

126.   On May 3, 2018, Odonate filed the Q1 2018 Form 10-Q.  Odonate's Q1 2018 Form 10-Q contained SOX certifications signed by Defendants Tang and Lemkey making representations that the financial information contained in Odonate's Q1 2018 Form 10-Q was accurate and disclosed any material changes to Odonate's internal control over financial reporting.  Specifically, Defendants Tang and Lemkey represented:

I, [Kevin C. Tang and John G. Lemkey], certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Odonate Therapeutics, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under

121

our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

c.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

127.   Defendants Tang and Lemkey made the same representations as those contained in Odonate's Q1 2018 Form 10-Q alleged above stating the financial information contained in Odonate's Q2 2018 Form 10-Q and Q3 2018 Form 10-Q

122

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were accurate and disclosed any material changes to Odonate's internal control over financial reporting.

128.   On April 25, 2019, Odonate filed the Q1 2019 Form 10-Q.  Odonate's Q1 2019 Form 10-Q contained SOX certifications signed by Defendants Tang and Hearne making representations that the financial information contained in Odonate's Q1 2019 Form 10-Q was accurate and disclosed any material changes to Odonate's internal control over financial reporting.  Specifically, Defendants Tang and Hearne represented:

I, [Kevin C. Tang and Michael Hearne], certify that:

5.   I have reviewed this Quarterly Report on Form 10-Q of Odonate Therapeutics, Inc.;

6.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

7.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

8.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(f)) for the registrant and have:

a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under

123

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statement for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):*

a. *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b. *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*

124

129.   Defendants Tang and Hearne made the same representations as those contained in Odonate's Q1 2019 Form 10-Q alleged above stating the financial information contained in Odonate's Q2 2019 Form 10-Q, Q3 2019 Form 10-Q, Q1 2020 Form 10-Q, and Q2 2020 Form 10-Q were accurate and disclosed any material changes to Odonate's internal control over financial reporting.

130.   The foregoing statements in ¶¶122-129 were materially false and misleading because, *inter alia*: (a) the SEC filings in which they were made did, in fact, contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered and (b) the fraud alleged herein involved management and other employees with a significant role in Odonate's internal controls over financial reporting, and yet, it was not disclosed to Odonate's auditors or to the audit committee of Odonate's Board of Directors.   As more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, the undisclosed fraud, and the associated material misstatements and omissions, arose from the fact that tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*,

125

neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

### **The Truth Begins To Emerge**

131.   Just before the truth of Defendants' fraud was revealed, the market as a whole remained in the dark as to the CONTESSA clinical problems with tesetaxel, including elevated incidents of AE and high discontinuation rates.  The market, including analysts following Odonate, expected it to report positive top-line results.

132.   For example, on August 10, 2020, a Cowen analyst stated,

We expect investors to evaluate the PFS primary endpoint data to ensure taxane-like efficacy, but also give extensive focus to tesetaxel's AE profile.

*****

126

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Thus, should tesetaxel+capecitabine produce alopecia in the low teens, neuropathy in the teens on an all-grade basis, and very low single digits to 0 on a grade 3 basis (consistent with the Phase 2 experience), we believe the drug would be viewed as superior to IV taxanes.

\*\*\*\*\*

Our conversations and recent Biotech Sentimometer indicate investors are anticipating CONTESSA to report an all-grade neuropathy in the mid-teens and a grade 3+ neuropathy rate in the low single digits.

133.   Thus, the market was shocked on August 24, 2020 when Odonate, during pre-market hours, issued a press release that was filed with the SEC as an attachment to a Form 8-K signed by Hearne, announcing top-line results from the CONTESSA trial.  Although the study met its primary endpoint, tesetaxel plus capecitabine was associated with Grade 3 or higher neutropenia (low levels of white blood cells) that occurred in **71.2%** of patients with the combination treatment versus **8.3%** for capecitabine alone.  Various other Grade 3 or higher treatment-emergent AEs were also associated with tesetaxel plus capecitabine versus capecitabine alone, and discontinuation rates were 4.2% from neutropenia and 3.6% from neuropathy, while the **overall discontinuation rate was 23.1% in the treatment group compared to 11.9% in the capecitabine alone group.** Specifically, that press release disclosed, in relevant part:

> **Grade ≥3 treatment-emergent adverse events (TEAEs) that occurred in ≥5% of patients were: neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone);** diarrhea (13.4% for tesetaxel plus capecitabine vs. 8.9% for capecitabine alone); hand-foot syndrome (6.8% for tesetaxel plus capecitabine vs. 12.2% for capecitabine alone); **febrile neutropenia (12.8% for tesetaxel plus**

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*capecitabine vs. 1.2% for capecitabine alone);* fatigue (8.6% for tesetaxel plus capecitabine vs. 4.5% for capecitabine alone); hypokalemia (8.6% for tesetaxel plus capecitabine vs. 2.7% for capecitabine alone); leukopenia (10.1% for tesetaxel plus capecitabine vs. 0.9% for capecitabine alone); and anemia (8.0% for tesetaxel plus capecitabine vs. 2.1% for capecitabine alone).

[AEs] resulting in treatment discontinuation in ≥1% of patients were: neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone); neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); diarrhea (0.9% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone); and hand-foot syndrome (0.6% for tesetaxel plus capecitabine vs. 2.1% for capecitabine alone). *Treatment discontinuation due to any adverse event occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone.*

Grade 2 alopecia (hair loss) occurred in 8.0% of patients treated with tesetaxel plus capecitabine versus 0.3% of patients treated with capecitabine alone. *Grade ≥3 neuropathy occurred in 5.9% of patients treated with tesetaxel plus capecitabine versus 0.9% of patients treated with capecitabine alone.*

134.   On this news, Odonate's stock price fell $15.21 per share, or 45.35%, to close at $18.33 per share on August 24, 2020.

135.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Odonate's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## Additional Facts Probative Of Scienter

136.   A strong inference of Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2

*Defendants' Knowledge Or Reckless Disregard*
*Of Red Flags Demonstrates Scienter*

3

4

137.   As described in the "Undisclosed, Material, Negative Facts" section

*supra*, and the CW statements set forth therein, during the Class Period, Defendants

5

6

knew that tesetaxel when combined with capecitabine raised ***significant safety***

7

***concerns***, which manifested themselves in elevated AE risks and high

8

9

discontinuation rates early in the CONTESSA trials.

10

138.   Defendants knew or recklessly disregarded that tesetaxel when

11

combined with capecitabine, yielded highly elevated incidences of Grade ≥3

12

13

treatment-emergent AEs, including, *inter alia*, neutropenia (71.2%), febrile

14

neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%),

15

hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%).   These rates

16

17

compared unfavorably against those arising from other treatment alternatives,

18

including capecitabine alone.   Defendants knew or recklessly disregarded that

19

clinical trial patients who received tesetaxel combined with capecitabine

20

21

discontinued trial participation at elevated rates due to AE events (23.1%) in

22

general, including specifically AEs concerning neutropenia or febrile neutropenia

23

(4.2%) and neuropathy (3.6%).

24

139.   CW1 and CW2 established that elevated rates of these AEs manifested

25

26

themselves no later than the earliest stages of the CONTESSA trial, in which

27

patients began receiving tesetaxel doses in "early 2018," or by June or July 2018 at

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the latest.  CW1, corroborated by CW2, said that by August 2018, trial sites were already reporting back to Odonate a higher-than-expected rate of neutropenia, including febrile neutropenia, doctors were angry and expressing concerns over the unexpectedly high rate of neutropenia, and patients were withdrawing from CONTESSA, both voluntarily and after removal by their doctors, due to neutropenia and diarrhea.  CW1 described the "urgent" teleconference in mid- to late-August 2018, where Odonate CMO O'Connell and VP of Site Management Jill Krause discussed the higher-than-expected neutropenia rates and related patient withdrawals from CONTESSA and announced an urgent, "all hands on deck" program to decrease the number of patient discontinuations due to neutropenia, corroborated by CW2, whereby three clinical site management team members received training, gave a practice presentation to company leadership including Defendants Tang and Lemkey, and then presented to all 100-120 then-existing trial sites in roughly two weeks.  CW1 said that Odonate initiated a similar program to stem the patient discontinuation rate from CONTESSA due to diarrhea.  CW1 was told by Krause that Defendant Tang, Defendant Lemkey, and CMO O'Connell gave the directive for this response, adding that top leaders were involved in and signed off on any significant activities.  Despite this program, CW1 said that 10 trial sites (roughly 10% of the total) withdrew from CONTESSA in its first months, due to higher-than-expected neutropenia rates, an unusually high rate.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

140.  These events established, by August 2018 at the latest, the undisclosed, elevated rates of AEs and clinical trial discontinuations in patients receiving tesetaxel plus capecitabine, which led to an unusually high rate of clinical trial site withdrawals in the first months of CONTESSA.

141.  CW3 described the regularly scheduled, weekly or bi-weekly executive management meetings, at which Odonate department heads provided updates, including CMO O'Connell's presentation of CONTESSA updates, including reports of AEs that began during CONTESSA's early stages, including those regarding neutropenia, diarrhea, hand-foot syndrome, and other AEs.  CW3 described Defendant Tang's close attention paid to the AE reports, including his questions and his angry reactions to negative trial updates.  CW3 took notes of every meeting, which were typed into meeting minutes reviewed and edited by VP of Program Management and Regulatory Operations Bartasch-Price, who oversaw the meetings and sent all participants pre-meeting agendas and post-meeting copies of the minutes.  In addition to Defendant Tang, CW3 said that Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Legagneur, Odonate Co-Founder and Vice Chair Vacirca, CDO Kroll, CSO Wei, and potentially Associate Director of Program Management Dillon attended these meetings.  CW3 also loaded the

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

meeting minutes to a shared access file on Odonate's internal computer system, to which executive management, including the C-suite executives, had access.

142.   CW1 also explained how Defendants Tang and Lemkey and Odonate CMO O'Connell knew of the higher-than-expected neutropenia numbers in real time, from unblinded raw trial data and information entered by trial sites into local software and provided, once or twice a month, first to the CONTESSA CRO and later to Odonate.   CW1 also explained that serious AE events causing hospitalization, like febrile neutropenia, required expedited reporting within 2-3 days to Odonate leadership, including Defendants Tang and Lemkey and CMO O'Connell, and that such reports began in the first few months of CONTESSA.

143.   Given the foregoing, Defendants knew that their public misrepresentations and omissions, as pled in herein, would mislead investors or were deliberately reckless as to the danger of misleading investors, which was known to them or was so obvious that they must have been aware of it.

### Defendants Suppressed Information From Employees
### Who Endured Rebukes, A Toxic Work Environment, And Retaliatory Firings

144.   As described in the "Undisclosed, Material, Negative Facts" section *supra*, and the CW statements set forth therein, during the Class Period, Defendants tightly controlled access to information about the CONTESSA trial.  CW1 said that Defendant Tang fired the CRO within months of CONTESSA's start to shift the trial management in-house, which was completed by early 2019 at the latest.  CW2

132

said that Odonate's top leadership was "not transparent" and internally restricted and blocked employee access to large parts of the CONTESSA data.  CW2 also described a "toxic" environment in which Odonate's "principals" overruled employees with greater experience on matters of trial data, leading to CW2's retaliatory firing for seeking to correct errors in the CONTESSA tumor data.  CW3 corroborated that the work environment was stressful, with abrupt, unexplained firings of needed employees, such as CW3, whose position as an Executive Assistant to a Chief Medical Office was necessary to support a clinical trial.

145.   Defendants' internal suppression of clinical trial data from employees, including those who designed and oversaw aspects of the CONTESSA trial, and their retaliatory firings of employees working to advance the trial further evidence their scienter.

### *Defendants Had Motive And Opportunity To Commit The Fraud*

146.   Before the Class Period, TCM, through TCP, held over 10.9 million Odonate shares, a number that swelled to over 12.2 million shares after Odonate's IPO, a stake valued at over $300 million – over 47.5% of TCM's portfolio value.  TCM had another $263 million in holdings in Heron and La Jolla, accounting for over 41.5% of its portfolio value.  Thus, TCM had nearly 90% of its portfolio committed to massive, illiquid stakes in just three biopharmaceutical companies.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

147.   Hundreds of millions of dollars were needed to fund the CONTESSA trial and to obtain FDA approval of tesetaxel, an amount that TCM could not commit without tapping the public equities markets multiple times.   To do so, Defendants were motivated to misrepresent the true risk profile of tesetaxel and the CONTESSA trial and to conceal negative information known to them about tesetaxel and the CONTESSA trial, both to permit Odonate's IPO and secondary offerings to draw sufficient investor interest and to inflate the value of Odonate's stock, thereby maximizing proceeds from the offerings while minimizing dilution of Defendant's massive ownership stake.

148.   The Individual Defendants all shared this motivation.   The vast majority of their reported Odonate stock holdings were indirectly held beneficial ownership stakes through TCP.   Their small directly held positions were acquired at below-market, discounted prices, and their Odonate stock options were unvested prior to FDA approval of tesetaxel.

149.   During the Class Period, Odonate indeed raised hundreds of millions of dollars in funds while its stock traded at prices elevated by the fraud alleged herein.   First, Odonate's IPO sold 6.25 million shares at $24.00 per share, for gross proceeds of $160.6 million and net proceeds of $147.3 million.   Second, Odonate's June 2019 secondary offering sold 4.75 million shares at $26.00 per share, for gross

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2

proceeds of $142 million and net proceeds of $135.1 million.  Third, Odonate filed

3
4

its Form S-3 in September 2019 to permit sale of up to $200 million more in stock.

5

150.   As discussed herein, the related SEC filings contained materially false

6
7

and misleading misstatements and omissions in furtherance of the alleged fraud.

8

151.   These Class Period offerings, during the fraud alleged herein, strongly

9
10

evidence Defendants' scienter, including Odonate's corporate scienter.

11

*The Fraud Implicated Core Operations*

12

152.   The fraud alleged herein implicates the core operations of Odonate.

13
14

Odonate is a small biotech company attempting to win FDA approval for tesetaxel,

15

Odonate's sole product candidate.   The alleged misconduct directly implicated

16
17

adverse events, a key indicator of tesetaxel's success.  Moreover, the CW statements

18

alleged herein conclusively demonstrate that executives, including Defendants

19
20

Tang, Lemkey, and Hearne, had a hands-on role in the everyday activities of

21

Odonate, oversaw management and progress of the tesetaxel trials, including that

22
23

they received all reports of severe adverse events and patient withdrawals from

24

trials, and they also signed off on all significant trial activities.

25

153.   In light of these facts, it is inconceivable that the Individual Defendants

26
27

and executive management did not know the facts and circumstances of the fraud

28

as alleged herein.  Moreover, such knowledge is imputable to Defendants, given the

implication of core operations, the Defendants' roles and status within Odonate, and

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including by the CW statements.

### *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements*

154.   As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Tang, Lemkey, and Hearne were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

155.   As the individuals who SOX certified SEC filings as described above, Defendants Tang, Lemkey, and Hearne were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

### *The Fraud Violated Odonate's Corporate Code Of Conduct*

156.   Odonate's Employee Code of Conduct ("Code of Conduct"), published on its website throughout the Class Period, barred all of the misconduct detailed by the CW statements set forth above.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

157.   Odonate's Code of Conduct makes clear that it was binding upon all employees and Defendant Hearne, as Odonate's Compliance Officer, was charged with overseeing application of the Code of Conduct, stating:

> ***Odonate conducts its business in accordance with the highest ethical standards of corporate leadership and citizenship and expects all of its employees to act in accordance with the highest standards of personal and professional integrity. This Code of Conduct (the "Code") applies to all employees of Odonate***, including any subsidiaries. In the conduct of Odonate business, all employees shall be guided by the principles described in this Code.
>
> \*\*\*\*\*
>
> ***Employees are responsible for adhering to the standards in the Code,*** for raising questions if they are in doubt about the best course of action and for reporting possible misconduct promptly after it comes to their attention. ***Odonate's Compliance Officer, Michael Hearne, is responsible for interpreting and overseeing the application of the Code.***

158.   Odonate's Code of Conduct also makes clear that every employee must adhere not only to its provisions, but also to all applicable laws, stating "It is Odonate's policy to comply with all laws, rules, regulations and Odonate policies. It is the personal responsibility of employees to adhere honestly and in good faith to the standards and restrictions imposed by those laws, rules, regulations and Odonate policies."

159.   The Code of Conduct makes clear that employees should not engage in illegal business practices or misrepresent facts in order for Odonate to be a successful company, stating:

137

Odonate seeks to obtain competitive advantages through superior performance, never through unethical or illegal business practices. Employees should not take unfair advantage of anyone through manipulation, exaggeration, concealment, misrepresentation of facts, abuse of confidential or privileged information or like practices.

160. Odonate's Code of Conduct further states that books, records, and SEC filings must be accurate, full, and complete, stating:

Employees are expected to **maintain books and records in appropriate detail to reflect Odonate's transactions accurately, fairly and completely. Odonate's policy of accurate, fair and complete recordkeeping applies to all Odonate records.** Documentation relating to a transaction should fully and accurately describe the nature of the transaction.

Odonate is required to file financial statements and other information with the U.S. Securities and Exchange Commission ("SEC"). Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to Odonate. **Reports and other documents that Odonate files with or submits to the SEC, and other public communications, should contain full, fair, accurate, timely and understandable disclosure.**

161. Odonate's Code of Conduct, as detailed herein, barred the Defendants' misrepresentations and omissions as alleged herein.  Defendants' violation of this express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge of their recklessness.

### _Defendant Lemkey's Resignation Evidences Scienter_

162. Another indicator of Defendants' scienter is the removal, resignation, or departure of key executives during or shortly after the Class Period.   On

138

December 10, 2020, Defendant Lemkey resigned as Chief Operating Officer of Odonate.  His resignation was suspect in timing and strongly supports scienter.

## NO SAFE HARBOR

163.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Odonate's then-ongoing misconduct.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

looking statement was authorized and/or approved by an executive officer of Odonate who knew that those statements were false when made.

164.   For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

**THE CLAIMS ARE TIMELY**

165.   The claims set forth herein were timely filed.

166.   The market was not arguably aware until August 24, 2020, at the earliest, that credible allegations existed to the effect that Odonate misrepresented and failed to disclose that its business practices during the Class Period were improper and illegal.

167.   It was also not until August 24, 2020 that Lead Plaintiff was first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period.  In the absence of publicly available information prior to then suggesting that Odonate's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Plaintiffs were not under any duty to inquire as to the truthfulness of Odonate's public statements.  Therefore, Lead Plaintiff's duty in that regard arose no earlier than August 24, 2020.

168.   Prior to August 24, 2020, Lead Plaintiff and Class members could not have been on any inquiry notice of possible claims under the Securities Exchange

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Act.  Even assuming this early date for inquiry notice, Lead Plaintiff's Securities Exchange Act claims against Defendants were brought within two years.  Therefore, Lead Plaintiff has complied with the requirements of 28 U.S.C. § 1658(b).

## LOSS CAUSATION / ECONOMIC LOSS

169.  The market for Odonate shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Odonate shares and operated as a fraud or deceit on Class Period purchasers of Odonate shares by misrepresenting the material facts detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Odonate shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of Odonate share during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

170.  During the Class Period, Defendants presented a misleading picture of Odonate's financial condition, revenues, growth, performance, and business prospects.  Defendants' false and misleading statements had the intended effect and caused Odonate shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

171.   In response to the issuance of the corrective press release and SEC filing on August 24, 2020, the price of Odonate share sharply dropped, on high volume, as detailed herein.  This drop removed inflation from the price of Odonate shares, causing real economic loss to investors who had purchased Odonate shares during the Class Period.

172.   The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Odonate shares negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors or Odonate-specific facts unrelated to Defendants' fraudulent conduct.

173.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Odonate share price and the subsequent significant decline in the value of Odonate shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PRESUMPTION OF RELIANCE

174.   At all times, the market for Odonate shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

142

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     Odonate met the requirements for listing, and was listed and actively traded on the NASDAQ under the ticker symbol "ODT", a highly efficient and automated market;

(b)     Odonate had approximately 14,169,464 shares outstanding as of December 31, 2017, such that its stock was liquid.  During the Class Period, numerous shares of Odonate stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Odonate stock and permitting a strong presumption of an efficient market;

(c)     As a regulated issuer, Odonate filed periodic public reports with the SEC;

(d)     Odonate regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Odonate was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

143

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(f)     Unexpected material news about Odonate was rapidly reflected and incorporated into Odonate's stock price during the Class Period.

175.   As a result of the foregoing, the market for Odonate stock promptly digested current information regarding Odonate from all publicly available sources and reflected such information in the prices of the stock.   Under these circumstances, all purchasers of Odonate stock during the Class Period suffered similar injury through their purchase of Odonate stock at artificially inflated prices and a presumption of reliance applies.

176.   Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

177.   Lead Plaintiff brings this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of a class (the "Class") of all persons and entities, other than Defendants, their family members and their affiliates, who purchased or otherwise acquired the stock of Odonate (NASDAQ:ODT) between December 7, 2017 and August 21, 2020, both dates inclusive (the "Class Period").

178.   Excluded from the Class are Defendants herein, the officers and directors of Odonate at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

179.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Odonate securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Odonate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

180.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

181.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

145

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

182.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Odonate;

- whether the Individual Defendants caused Odonate to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Odonate securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

183.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

146

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

184.   As alleged herein, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine insomuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Odonate's securities; and Lead Plaintiff and members of the Class purchased or otherwise acquired Odonate securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

**(Against All Defendants for Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

185.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

186.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

187.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made

147

various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Odonate securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Odonate securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

188. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Odonate securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Odonate's finances and business prospects.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

189.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Odonate, and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

190.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Odonate securities.

191.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of Odonate, the Individual Defendants had knowledge of the details of Odonate's internal affairs.

192.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and

149

authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Odonate.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Odonate's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Odonate securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Odonate's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Odonate securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

193.   During the Class Period, Odonate securities were traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Odonate securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased

150

or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Odonate securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class.  The market price of Odonate securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

194.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

195.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that Odonate had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

196.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

197.   During the Class Period, the Individual Defendants participated in the operation and management of Odonate, and conducted and participated, directly and indirectly, in the conduct of Odonate's business affairs.  Because of their senior positions, they knew the adverse non-public information about Odonate's finances, operations, finances, and prospects.

198.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Odonate's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by Odonate which had become materially false or misleading.

199.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Odonate disseminated in the marketplace during the Class Period concerning Odonate's business, operations, financial condition, results of operations, and prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Odonate to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Odonate within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

unlawful conduct alleged which artificially inflated the market price of Odonate securities.

200.   Each of the Individual Defendants, therefore, acted as a controlling person of Odonate.  By reason of their senior management positions and/or being directors of Odonate, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Odonate to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of Odonate and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

201.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Odonate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated:  February 16, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Matthew L. Tuccillo (admitted *pro hac vice*)
Jennifer Banner Sobers (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:    (917) 463-1044

154

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Email:mltuccillo@pomlaw.com
     jbsobers@pomlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer (admitted *pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff*

155

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS