1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

KEVIN KENDALL, Individually
and On Behalf of All Others
Similarly Situated,

                           Plaintiff,

                v.

ODONATE THERAPEUTICS, INC.,
KEVIN C. TANG, MICHAEL
HEARNE, and JOHN G. LEMKEY,

                           Defendants.

Case No.  3:20-cv-1828-H-LL

CLASS ACTION

SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Kevin Kendall ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public statements and publicly available documents, presentations and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Odonate Therapeutics, Inc. ("Odonate"), analysts' reports and advisories and other press coverage about Odonate, Odonate's stock chart, Odonate's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Odonate securities between December 7, 2017, and March 19, 2021, both dates inclusive

(the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Odonate and its Chief Executive Officer, Defendant Tang, and Chief Financial Officers, Defendants Lemkey and Hearne.

2.     Founded in 2013 and based in San Diego, Odonate is a pharmaceutical company that develops therapeutics for treatment of cancer and that has a single, primary drug candidate – tesetaxel, an orally administered chemotherapy agent that is within a class of cancer treating drugs known as taxanes. Seeking to capitalize on tesetaxel's purported convenience advantages over certain already-approved therapies, during the Class Period, Odonate was focused on trying to obtain the U.S. Food & Drug Administration (FDA)'s approval of tesetaxel for treatment of patients with locally advanced or metastatic breast cancer ("MBC"), administered in combination with an existing approved drug, capecitabine, or secondarily, its approval as a monotherapy.

3.     Preceding the Class Period, Defendants Tang, Lemkey, and Hearne, through their privately-held venture capital and private equity firm, held a 52.9% stake in Odonate, and just after Odonate's IPO closed at the start of the Class Period, their firm held over 12.2 million Odonate shares, valued at over $300 million, representing over 47.5% of the firm's investment portfolio. Large investments in

2

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

two other pharmaceutical companies, valued at $263 million, meant that the firm had 90% of its portfolio committed to large, illiquid stakes in just three companies.

4.    Odonate required hundreds of millions of dollars to fund tesetaxel's Phase 3 clinical trials, called CONTESSA, an amount that could only be raised by repeatedly accessing the public equities markets, via Odonate's IPO and secondary offerings.  This funding need motivated Defendants to misrepresent the true risk profile of tesetaxel and the CONTESSA trial and the true risks of FDA non-approval, while concealing negative information known to Defendants about tesetaxel, the CONTESSA trial, and the FDA's concerns about tesetaxel's clinical data package and any potential approval, so as to inflate Odonate's stock value and thereby maximize the proceeds obtained from necessary offerings and minimize the dilution to Defendants' large position in Odonate from those offerings.

5.    In reality, tesetaxel represented a much riskier bet than investors realized, with longer odds for an FDA approval, because tesetaxel when combined with capecitabine raised *significant safety concerns*, in the form of highly elevated incidences of Grade ≥3 treatment-emergent *adverse events ("AEs")*, including, *inter alia*, *neutropenia (71.2% of patients)*, *febrile neutropenia (12.8%)*, *neuropathy (5.9%)*, diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which *compare unfavorably* against such risks from treatment alternatives, like capecitabine alone.  As early as May/June

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2018 and by no later than August 2018, these risks had become apparent to Defendants in the CONTESSA trial, which had ***elevated patient discontinuation rates due to AEs (23.1%)***, including AEs from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported to Odonate by concerned doctors and trial sites, many of which withdrew from CONTESSA.  In response, by August 2018 Odonate launched an urgent, "all hands on deck" program to stem the tide of trial withdrawals due to neutropenia and diarrhea by making presentations, which were pre-approved by Defendants Tang and Lemkey, to every trial site. Odonate's executive management, including Defendants Tang and Lemkey, closely monitored tesetaxel's AE rates and discussed them at regularly scheduled, weekly or bi-weekly meetings, the written minutes of which were circulated to Defendants Tang and Lemkey and other executive management afterward.  Indeed, the CONTESSA clinical trial safety board compiled AE data on an ongoing basis at regular intervals and provided AE reports roughly every six months to both the FDA and to Defendant Tang and other top Odonate executives.

6.      Defendants concealed these material, adverse facts from investors while misrepresenting both tesetaxel and the CONTESSA trial during the Class Period.  For instance, Odonate's SEC filings, including its Forms 10-K and S-3, touted tesetaxel as "***unique among taxanes***" and "***generally well tolerated in clinical studies***" and claimed that "***[n]onclinical and clinical studies support***

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy*."  Investor presentations in May and June 2019 boasted that "*Tesetaxel has been generally well tolerated in clinical studies*…." and that "[t]he all-oral *regimen of tesetaxel plus* a reduced dose of *capecitabine* will lengthen PFS *while being well-tolerated as compared to capecitabine alone*."  Later in the Class Period, Defendants touted the "*completion of enrollment in CONTESSA*" without disclosing the many setbacks reaching that milestone.

7.  Throughout the Class Period, Defendants also made contemporaneous misrepresentations and omissions in reporting Odonate's operating results without disclosing the underlying negative trends regarding tesetaxel and the CONTESSA trial, in violation of Regulation S-K, Item 303.  They also signed false and misleading certifications under the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the sufficiency of Odonate's internal controls, the accuracy of its SEC filings, and the purported disclosure of any frauds to Odonate's auditors and the audit committee of its Board of Directors.

8.  On August 24, 2020, Odonate issued a press release announcing top-line results from the CONTESSA trial.  While disclosing that the study met its primary endpoint, this press release was the first time that Odonate revealed the true extent of Grade 3 or higher AEs, including a 71.2% rate of neutropenia in patients

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

who received the combination treatment of tesetaxel capecitabine versus 8.3% for capecitabine alone, and the high 23.1% discontinuation rate of patients from the CONTESSA trial due to AEs as compared to 11.9% in the capecitabine alone group, including a 4.2% withdrawal rate due to neutropenia.

9.     Analysts, investors, and even former Odonate employees, who worked on the CONTESSA trial but from whom access to full trial data had been blocked by Defendants, were shocked.  On this news, Odonate's stock price fell $15.21 per share, or 45.35%, to close at $18.33 per share on August 24, 2020.

10.     Yet, Defendants pressed on with their fraud.  After Odonate disclosed top-line CONTESSA results, Defendants made additional false and misleading positive statements to mute the impacts of the trial's elevated AE data.  Odonate's SEC filings called the top-line CONTESSA results "*positive*," characterized the reported AEs as "*manageable side effects*," and noted the "*absence of an adverse effect*" on overall survival rates despite incomplete data.  Defendants repeatedly insisted, "*We plan to submit an NDA [New Drug Application] for tesetaxel to the FDA in mid-2021*."  By at least December 2020, Defendant Tang had publicly stated that Odonate was "*engaged in discussions with FDA*" after Odonate "*went to the FDA to discuss*" tesetaxel's "*positive experience*."  Hedging against any concerns over tesetaxel's AE data as a combination therapy with capecitabine,

Defendant Tang also touted "*a lot of interest in tesetaxel monotherapy*" and Odonate's expanded clinical study into monotherapy patients.

11.     Contrary to these statements, on March 22, 2021, Odonate issued a press release announcing its *discontinuation* of tesetaxel's development and the *wind down of its corporate operations*, even before ever filing its long-awaited New Drug Application ("NDA"), "following feedback" from the FDA "that the clinical data package for tesetaxel is unlikely to support FDA approval."  On this news, Odonate's stock price cratered, falling $15.07 (a -79% drop) to close at $3.96 per share on March 22, 2021.  On March 25, 2021, Odonate filed an after-hours Form 8-K with the SEC that provided more details, including that it had committed to a plan of termination of its workforce by June 30, 2021, which would cost $14 million.  On this news, Odonate's stock price fell another $0.52 (a -14.4% drop) to close at $3.09 per share on March 26, 2021.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Odonate's securities once Defendants' fraud was revealed, as alleged herein, Lead Plaintiff and other Class members have suffered significant losses and damages.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Odonate is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff, as set forth in his prior-filed Certification, which is incorporated by reference herein, purchased Odonate securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

8

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.    Defendant Odonate is a Delaware corporation with principal executive offices located at 4747 Executive Drive, Suite 210, San Diego, California 92121. Odonate common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the symbol "ODT."

19.    Defendant Kevin C. Tang ("Tang") has served as Odonate's Chairman and Chief Executive Officer at all relevant times.

20.    Defendant Michael Hearne ("Hearne") has served as Odonate's Chief Financial Officer ("CFO") since November 2018.

21.    Defendant John G. Lemkey ("Lemkey") served as Odonate's CFO from before the start of the Class Period until November 2018, when he was promoted to the position of Chief Operating Officer ("COO").

22.    Defendants Tang, Hearne, and Lemkey are sometimes referred to herein as the "Individual Defendants."

23.    Odonate and the Individual Defendants are sometimes collectively referred to herein as "Defendants."

## NON-PARTY CONFIDENTIAL WITNESSES

24.    Below are descriptions of the Confidential Witnesses whose statements are among the factual bases for this pleading.  Given Odonate's March 2021 announcements that it is winding down its operations and terminating its workforce, Lead Plaintiff expects access to former employees of the company with

relevant information supporting the claims herein to significantly increase in the near future, such that further amendment may be warranted.

25.     CW1 was an Associate Director, Clinical Site Relationship Management at Odonate from May 2018 to December 2018, who reported to VP of Site Management Jill Krause, who in turn reported directly to Defendant Tang. CW1 acted as a liaison between Odonate and medical facilities and investigators participating in the CONTESSA trial and managed those relationships.  CW1 was responsible for managing between 20 and 30 sites located throughout California, Washington, and Texas.  CW1 contacted clinical trial sites to relay information from Odonate, provide updates on new requirements, check up on late data submissions, and help address other issues.   CW1 and others on the clinical site management team also responded to questions or concerns by clinical trial sites. CW1's job afforded direct visibility into both the complaints and concerns of trial sites regarding the CONTESSA trial and Odonate's responses.

26.     CW2 was a Director of Clinical Operations at Odonate from June 2017 to September 2019, who reported to Executive Director of Clinical Operations Jennifer Baca, who in turn reported to the VP of Clinical Operations, a position filled first by Valerie Legagneur and later by Kimberly Ma.  CW2 was part of a small clinical operations team at Odonate, responsible for starting up and running the CONTESSA trial.  CW2 assisted with selecting vendors, writing protocols,

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

visiting investigative sites for assessments, and training sites on trial protocols. CW2's expertise and substantive work focus was on tumor data, and CW2's geographic focus was on the European and Asia Pacific regions more than the U.S.

27.   CW3 was an Executive Assistant at Odonate from September 2017 to April 2019, supporting Odonate Chief Medical Officer ("CMO"), Joseph O'Connell and Odonate VP of Program Management and Regulatory Operations Natasha Bartasch-Price.  CW3's responsibilities included taking notes at regularly scheduled executive management meetings that occurred either weekly or bi-weekly throughout CW3's tenure, with corporate headquarters employees participating in person and remote employees participating via conference call.  The meetings included Defendant Tang, Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Valerie Legagneur, Odonate Co-Founder and Vice Chair Jeff Vacirca, Odonate Chief Development Officer ("CDO") Stew Kroll, Odonate Chief Scientific Officer ("CSO") Thomas Wei, and potentially, Odonate Associate Director of Program Management Gena Dillon.

28.   CW4 was an Associate Director, Site Management at Odonate from December 2017 to March 2019, reporting to VP of Site Management Jill Krause and Senior Director of Site Management Kathryn "Kate" McGovren.  One of the first employees in Odonate's site management department, CW4 began work when

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the company was enrolling clinical trial sites and providing protocol training to get the sites up and running. CW4 helped manage 75 clinical trial sites throughout the U.S., focusing later on the Northeast to the Ohio area region.

29. CW5 worked at Odonate from May 2018 until mid-March 2021 in three different capacities: Associate Director, Clinical Site Relationship Manager (May 2018 – February 2019), Regional Medical Liaison (March 2019 – April 2019), and Regional Director, Clinical Operations (May 2019 – mid-March 2021). As both Associate Director and Regional Medical Liaison, CW5 reported to VP of Site Management Jill Krause and acted as a liaison between Odonate and investigative sites where clinical trials were conducted, working with doctors and site medical staff to ensure they had necessary training, information, and support. As Regional Director, CW5 reported to Senior VP of Clinical Operations Kimberly Ma and was responsible for visiting clinical trial sites, reviewing their clinical trial files, and ensuring the sites reported data fully and accurately in accordance with the trial protocols.

## SUBSTANTIVE ALLEGATIONS

### Odonate's Business & Operations

#### *The Individual Defendants, Tang Capital Management, and Tang Capital Partners Control Odonate*

30. Defendant Tang is the sole manager and principal of Tang Capital Management, LLC ("TCM"), a privately held venture capital and private equity

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

firm headquartered in San Diego, California, with additional offices in New York, which managed assets of over $550 million as of Q3 2020, just after the Class Period. Defendant Hearne is TCM's CFO, and Defendant Lemkey is TCM's COO.

31.    TCM is a life sciences-focused investment firm, which manages an investment fund, Delaware-incorporated Tang Capital Partners, LP ("TCP"), that invests in biopharmaceutical companies and is currently the largest shareholder in Heron Therapeutics, Inc. (NASDAQ: HRTX) ("Heron"), La Jolla Pharmaceutical Company (NASDAQ: LJPC) ("La Jolla"), and Odonate. Defendant Tang serves as Chairman of Heron and La Jolla, and as Chairman and CEO of Odonate, which is TCP's largest single holding.

32.    Before Odonate's IPO, TCM, through TCP, held over 10.9 million Odonate shares, acquired privately. This massive pre-IPO position made TCM / TCP Odonate's majority, controlling shareholder, with a 52.9% stake, before the Class Period, and put the Individual Defendants firmly in control of Odonate and its public statements in the leadup to the IPO and beyond.

### *Odonate Has Only One Drug Candidate - Tesetaxel*

33.    Based in San Diego, California, Odonate was founded in 2013 as a pharmaceutical company to develop therapeutics to treat cancer. In 2013, Odonate licensed tesetaxel and its patents from Daiichi Sankyo Company, Limited, the pharmaceutical company that first developed tesetaxel. Odonate obtained the rights

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to develop and market tesetaxel in the U.S., France, Germany, Italy, Spain, and the United Kingdom, in exchange for up to $31 million in milestone payments (regulatory milestones have not been achieved) and a tiered royalty that ranges from the low to high single digits, depending on annual net sales, if approved.

34.    Tesetaxel is Odonate's only drug candidate.  Tesetaxel is an orally administered chemotherapy agent that belongs to a class of drugs known as taxanes, which are widely used to treat cancer.  Odonate claimed that tesetaxel has certain purported advantages over current approved taxanes, including that it is orally rather than intravenously administered and that it has a less-intensive dosing regimen of once every three weeks.

35.    Odonate had focused on the treatment of patients with metastatic breast cancer ("MBC") with tesetaxel in Phase 1 and Phase 2 clinical trials.  Having done so, Odonate approached the next stage of tesetaxel's clinical study in need of hundreds of millions of dollars, with a correlating need to access public sources of funding in order to pursue Phase 3 clinical trials and the additional steps necessary in order to seek the FDA's approval of tesetaxel, a milestone that would permit vesting of the Individual Defendants' stock options and position them to sell Odonate to a larger, more established pharmaceutical company, thereby recouping their original investment at a significant profit margin.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36.    In December 2017, Odonate initiated CONTESSA, a multinational, multicenter, randomized Phase 3 study of tesetaxel in combination with capecitabine in patients with locally advanced or MBC.   Odonate ultimately initiated three studies in breast cancer – CONTESSA, along with two Phase 2 studies, CONTESSA 2 and CONTESSA TRIO.   Odonate's value proposition to investors hinged upon whether tesetaxel, in combination with capecitabine or as a monotherapy, was not only efficacious and convenient, but also safe, relative to existing treatment options.

### Odonate Needed To Access Hundreds of Millions of Dollars To Advance Tesetaxel Through The CONTESSA Clinical Trials

37.    To fund Odonate's continued operations and tesetaxel's clinical study, on November 13, 2017, Odonate filed a registration statement on Form S-1 with the SEC signed by Defendants Tang and Lemkey and others in connection with its IPO, which, after amendment on November 27, 2017, was declared effective by the SEC on December 6, 2017 (the "Registration Statement").   On December 8, 2017, Odonate filed Form 424B4 with the SEC for an IPO of 6,250,000 shares of common stock at a price of $24.00 per share.   The underwriters were given the option to purchase up to an additional 937,500 shares from Odonate at the initial price to the public, less the underwriting discount.   On January 10, 2018, the underwriters exercised their option to purchase 441,073 additional shares of common stock.   The aggregate gross proceeds from the IPO were $160.6 million and net proceeds were

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

$147.3 million.  Upon completion of its IPO, Odonate's common stock traded publicly on the NASDAQ under the symbol "ODT."

38.     Thereafter, Odonate funded ongoing operations, tesetaxel's development and study, and the CONTESSA trials by again accessing the public equities markets later during the Class Period.  On June 27, 2019, Odonate filed Form 424B5 with the SEC for an underwritten public offering of 4,750,000 shares of common stock at a price of $26.00 per share (the "June 2019 Offering").  The aggregate gross proceeds from the June 2019 Offering were $142 million and net proceeds were $135.1 million.  Also, on September 27, 2019, Odonate filed a prospectus on Form S-3 with the SEC which became effective October 18, 2019, offering to sell up to an aggregate of $200 million of common stock. Odonate's September 1, 2020 public offering (the "September 2020 Offering") sold 6.456 million shares at $14.25 per share, for gross proceeds of $92 million and net proceeds of $87.4 million.  Even then, the company's thirst for new rounds of investor funding had not ended.  On February 23, 2021, Odonate entered into an Open Market Sale Agreement with Jefferies LLC to sell common stock having an aggregate offering price of up to $100 million more in "at the market" offerings.

39.     Thus, through its IPO and subsequent offerings, Odonate raised $394.6 million in gross proceeds and $369.8 million in net proceeds from public investors, during the Class Period alone, to pursue the CONTESSA trial and advance tesetaxel

toward FDA approval.  To do so, Defendants materially misrepresented the facts and circumstances regarding tesetaxel, the CONTESSA trial, and discussions with the FDA, while concealing material, negative information from investors and analysts, who looked to Defendants for accurate information and fulsome, timely updates.  Defendants' material misstatements and omissions inaccurately conveyed and dramatically understated the risks of any investment in Odonate, thereby wrongly altering the market's assessment of the company's value while artificially inflating the value of its securities.

## **Undisclosed, Material, Negative Facts**

40.    Unbeknownst to investors, tesetaxel, particularly in combination with capecitabine, raised *significant safety concerns*, which manifested themselves in elevated AE risks and high discontinuation rates from the CONTESSA trials.  These issues were known to Defendants early in the Class Period and were evidenced, *inter alia*, by real-time interim trial data and feedback from participating doctors and trial sites, and they persisted through the end of the Class Period.

41.    CW2 recalled that the first CONTESSA trial site received a green light to enroll patients and start the trial in early 2018, during the winter months after CW2 conducted an Investigative Site Visit in Washington D.C.  CW5 stated that when CW5 joined Odonate in May 2018, CONTESSA clinical trial data was already coming in to the company, a time frame that aligns with CW2's recollection

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of doses beginning to be administered in "early 2018."   CW1 put the timeline slightly later, stating that the first doses of tesetaxel in the CONTESSA trial were administered in June or July 2018.

42.   CW1 said that by August 2018, trial sites were already reporting back to Odonate a much higher-than-expected rate of neutropenia in patients, including febrile neutropenia.  CW1 said that trial doctors became frustrated and angry and expressed to Odonate concerns about the unexpectedly higher rate of neutropenia, wanting to know why it was happening and how it could be managed.  CW1 said that a lot of patients began withdrawing from the CONTESSA trial, both voluntarily and after removal by their doctors, due to both neutropenia and diarrhea.

43.   CW1 called the extent of neutropenia reports and related patient withdrawals sharply unexpected and large enough to cause serious concern to Odonate's leadership.  CW1 confirmed that Defendant Tang, Defendant Lemkey, and Odonate CMO Joseph O'Connell, M.D., were aware of the higher-than-expected neutropenia numbers, the related patient drop-out numbers, and the questions and concerns of trial doctors.  CW1 said that CONTESSA was not a double-blind trial, so Odonate had visibility on the raw trial data and information throughout the trial.  CW1 explained that trial sites entered data into a software program at their locations and were required to send it on regular intervals (twice-monthly or monthly), first to the Contact Research Organization ("CRO") and later,

after Odonate fired the CRO early in the trial, directly to Odonate.  CW1 added that febrile neutropenia usually requires hospitalization, and that serious AE events, such as hospitalizations or death, had required, expedited reporting (typically 48 to 72 hours) from sites to Odonate that was provided to company leadership, including Defendant Tang, Defendant Lemkey, and CMO O'Connell.  CW1 said that Odonate and its top leadership received expedited reports of patients being hospitalized for neutropenia in the first few months of the CONTESSA trial.

44.   In mid- to late-August 2018, CW1 participated in an "urgent" teleconference, at six o-clock at night, with CMO O'Connell, VP of Site Management Jill Krause, and the clinical site management team about the higher-than-expected neutropenia rates and related patient withdrawals.  On the call, O'Connell and Krause said that Odonate was initiating a new, urgent, "all-hands-on-deck" program to lower the amount of patients leaving the trial by advising all trial sites on how to identify early signs of neutropenia (*e.g.*, calling patients 3-4 days after receiving a dose to inquire about fever or other neutropenia symptoms) and how to treat it in ways permitted by the trial.  O'Connell and Krause added that three team members would be trained to provide a presentation to clinical site investigators and would, after their training, give a practice run of the presentation to company leadership, including Defendants Tang and Lemkey, before they could go out into the field to present it to clinical sites.  CW1 said the presentation was

intended to provide doctors with knowledge and alternative options to keep patients experiencing neutropenia within the trial, including lowering the tesetaxel dose for a short time.  CW1 said the goal was to lower the rate of patient withdrawals due to neutropenia.   In CW1's experience, Odonate's urgency for dealing with the unexpected rates of neutropenia and patient withdrawals from the trial, on an "all-hands-on-deck" and "emergency level," was unusual.   Odonate wanted the presentation delivered to all 100-120 then-existing trial sites, in person or by phone, within about two weeks after the program was initiated.  CW1 said that Odonate later initiated a similar program for clinical sites to provide information about treating diarrhea in ways that could permit patients to remain in the trial, such as using stronger medications if over-the-counter remedies failed.

45.    Multiple CWs corroborated CW1's statement as to this training program and its timing.   CW2 corroborated that patients began experiencing neutropenia, diarrhea, and a number of side effects as the CONTESSA trial got underway and that Odonate initiated a training program, beyond the initial training for trial sites, to advise them on how to best manage neutropenia in trial patients so that they would not drop out of the trial.   CW5 also corroborated, stating that in about August 2018, Odonate initiated a trial protocol change and implemented a training program to help clinical trial sites better identify and treat neutropenia in patients.   CW5 described these steps as designed to deal with neutropenia once it

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was noted that patients in the CONTESSA trial were experiencing neutropenia, sometimes severe neutropenia or febrile neutropenia, and needed more support than what the trial was providing. CW5 described the trial protocol change as adjusting the pacing of blood draws from Day 1 and Day 15, which was consistent with the National Cancer Institute's standard of care for treatment with taxanes, to Day 1 and Day 8 instead, thereby allowing doctors to more quickly identify and treat patients who were developing neutropenia before the condition worsened. CW5 described the new training program as alerting doctors and medical staff at the investigative sites as to the protocol changes and the best ways to treat neutropenia when it was identified, with the goal of reducing the rate of more severe neutropenia cases, including potentially life-threatening febrile neutropenia.

46.     Krause told CW1 that the directive for initiating this response by Odonate to the higher-than-expected neutropenia rates came from Defendant Tang, Defendant Lemkey, and CMO O'Connell. CW1 added that Odonate is a small company where top leaders were involved in and signed off on any significant activities. CW5 corroborated that Defendant Tang was aware of the protocol changes and new training program initiated in about August 2018, which were significant undertakings, adding "Everything went across his desk. He knew we were doing it." CW4 added color, noting that Defendant Tang was "very involved" in running Odonate, stayed closely informed about what was happening with the

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

clinical trials, and contacted CW4 at night after work hours to discuss concerns over getting a clinical trial site up and running or trained in protocols, such that CW4 was "always on call," one of the reasons CW4 left the company.   CW4 said, "Nothing happened at that company without Kevin [Tang] knowing about it."   CW4 added that Defendant Lemkey was Defendant Tang's "right-hand man," worked closely with Tang, and was very involved in what happened at Odonate.

47.    CW1 described continued setbacks even after Odonate's presentation program was undertaken.   Upon hearing the presentation, some sites implemented the new practices Odonate suggested to see what would happen, while others were not as responsive, and some doctors were frustrated by Odonate's proposed measures and dropped out of the CONTESSA trial altogether.   CW1 said that in the first months of the CONTESSA trial, about 10 trial sites, or roughly 10% of the 100-120 total sites, dropped out due to higher-than-expected neutropenia rates. CW1 characterized this dropout rate as unusually high for a clinical trial, exceeding a more typical rate of less than 5% of sites dropping out.   CW1 added that Odonate had to find new sites to replace those that dropped out.

48.    CW5 stated that the underlying AE data was compiled, on an ongoing basis at regular intervals, by the CONTESSA clinical trial safety board, as is the case with all clinical trials to ensure that AE and other trial data are regularly reviewed to confirm that a trial is safe to continue.   CW5 believed that

22

CONTESSA's safety board reviewed AE reports and trial data every six months. CW5 said that as part of the board's review, it prepared a report including rates of AEs experienced by patients that was submitted to the FDA and provided to Defendant Tang and other top executives.

49.    CW3 confirmed that critical information about tesetaxel and the CONTESSA trial, including AE data, was regularly communicated to Odonate's top leadership, including the Individual Defendants.  As Executive Assistant to CMO O'Connell and VP of Program Management and Regulatory Operations Bartasch-Price, CW3 participated in regularly scheduled executive management meetings that occurred either weekly or bi-weekly throughout CW3's tenure, with corporate HQ employees joining in person and remote employees dialing in via conference call.  CW3 said the meetings included Defendant Tang, Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Valerie Legagneur, Odonate Co-Founder/Vice Chair Vacirca, CDO Kroll, CSO Wei, and potentially, Odonate Associate Director of Program Management Dillon.

50.    CW3's role was to take notes of these executive management meetings, at which the heads of each Odonate department provided reports and updates to Defendant Tang and the other participants.  CW3 recalled that from CONTESSA's early stages, Odonate was receiving AE reports from trial sites,

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which the executives discussed during the executive management meetings CW3 attended.  CW3 said that CMO O'Connell presented AE reports to Defendant Tang and the other executives, along with ongoing updates about the CONTESSA trial, its progress, and even side effects not rising to the AE-level.  CW3 specifically recalled CMO O'Connell reporting CONTESSA AE events of neutropenia, diarrhea, and hand-foot syndrome.  CW3 also vaguely recalls the executives discussing less-serious AE reports of fatigue, anemia, and alopecia in CONTESSA patients.  CW3 recalled that Defendant Tang paid close attention to the reports presented at these meetings and asked CMO O'Connell questions about the AE reports to better understand what was happening.  CW3 added that when the trial process was "not working right," Defendant Tang got upset and "was very hard on people," particularly VP of Program Management and Regulatory Operations Bartasch-Price and VP of Clinical Operations Legagneur.

51.    CW3 detailed the communications preceding and following these executive management meetings.  VP of Program Management and Regulatory Operations Bartasch-Price oversaw the conduct of the meetings and sent out a meeting agenda to participants in advance.  CW3 took notes during each meeting, using a template that CW3 created, which included section titles with the names of department heads who provided updates during the meetings, including CMO O'Connell.  As each department head presented an update at a given meeting, CW3

24

recorded notes of the presentation under that person's section title.  Once the meeting concluded, CW3 typed the notes up into more formal meeting minutes, which CW3 submitted to Ms. Bartasch-Price, who reviewed the minutes, made any necessary edits or corrections, and then circulated them to the meeting participants, including Defendant Tang and Defendant Lemkey.  CW3 confirmed that all meeting participants received the finalized minutes within a day or two of each meeting.  CW3 added that the minutes from all the executive management meetings were also kept on a shared access file on Odonate's internal computer system, to which she uploaded the finalized versions.

52.   Yet, the CWs also described how Defendants tightly controlled information about the CONTESSA trial.  CW1 said that Defendant Tang fired the CRO within months of CONTESSA's start, to shift the trial's management in-house, a change CW1 believes was fully completed by March or April 2019.  CW2 stated that while CONTESSA was not blinded, such that trial sites were submitting patient data regularly to the company, Odonate's top leadership decided to internally restrict and block employee access to large parts of the data, an approach that prevented rank-and-file employees from spotting trends.  According to CW2, "The leadership level was not transparent" and communication was lacking, even at CW2's level.  CW4 added that Odonate maintained a clinical trial database with all CONTESSA trial data, to which CMO O'Connell had access, but limited

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

employee access to individuals with job responsibilities involving the trial. CW4 said the database included all data submitted by investigative sites about patients, including AE information, and that reports known as data listings could be run and given to Odonate's senior leadership. CW5 corroborated that trial investigative sites on a daily basis submitted patient data, including AE data, to an electronic trial database, which were aggregated with data coming in from all investigative sites into a larger overall trial database maintained at Odonate, to which only authorized employees had data access. CW4 said CMO O'Connell shared his email and cell phone number with investigative site doctors to communicate directly with them. While CW4 stated that O'Connell's discussions with site doctors would have covered topics like protocols, data management, and AE issues, O'Connell did not share the substance of his site doctor communications with CW4.

53. CW2 described Odonate as having a "toxic" culture and being a place where an employee could not "speak truth to power" and many employees were fired for purportedly being "insubordinate." Indeed, CW2 was fired for correcting errors made by "one of the principals" of Odonate, who had less relevant experience than CW2, in the tumor data aspects of the CONTESSA trial. CW3 corroborated that the environment at Odonate was stressful, because employees were suddenly fired without much explanation, as occurred to CW3 who was simply told one day

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

that CW3's job was eliminated, which CW3 found odd, because a Chief Medical

Office needs an Executive Assistant.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

54.     Throughout the Class Period, Defendants knew, but concealed, that tesetaxel combined with capecitabine yielded highly elevated incidences of Grade ≥3 treatment-emergent AE, as evidenced on a rolling basis in the CONTESSA trial, including, *inter alia*, neutropenia (71.2%), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%).  Defendants also knew that, despite their emergency training presentations to trial sites, tesetaxel combined with capecitabine caused an elevated rate of patients to discontinue participation in the CONTESSA trial, as its data evidenced on a rolling basis, whether voluntarily or at their doctor's instruction, due to any AE (23.1%), including elevated discontinuation rates specifically for neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%).  As detailed below, Defendants shocked the market when Odonate finally revealed these uncontested, adverse facts in a pre-market press release and Form 8-K that announced top-line results from the CONTESSA trial and, after discounting the severity of these results and maintaining that tesetaxel could be approved, they further shocked the market when Odonate abruptly announced that the FDA had indicated otherwise and Odonate was winding down its operations.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

55.     Indeed, despite all the work CW2 did on the CONTESSA trial, when CW2 saw the publicly-disclosed top-line trial results showing that 71% of patients on tesetaxel plus capecitabine had experienced neutropenia, CW2 was "shocked," as were many of CW2's colleagues.  Even Odonate employees who designed and oversaw aspects of the CONTESSA trial were blindsided by the material adverse facts that Defendants knew but concealed from investors.

## Materially False and Misleading
## Statements & Omissions During the Class Period

56.     During the Class Period, Defendants made materially false and misleading statements and omissions that can be organized into three primary threads of the alleged fraud: (i) the Clinical Trials & Business Operations Fraud; (ii) the Reported Results Fraud; and (iii) the Internal Controls Fraud.

### *Clinical Trials & Business Operations Fraud*

57.     The Class Period begins on December 7, 2017, when Odonate securities began publicly trading on the NASDAQ following an IPO pursuant to a Registration Statement containing false and misleading statements and omissions. The Registration Statement said, "We intend to use the proceeds of the offering for development and regulatory activities relating to tesetaxel, including the conduct of our Phase 3 study, CONTESSA, working capital and general corporate purposes." It touted tesetaxel's **safety** and **tolerability profile** and its ongoing **success in clinical studies**, while concealing and omitting material adverse information about,

28

*inter alia*, **adverse events associated with tesetaxel**, **tesetaxel's ability to be combined safely with capecitabine**, and the **rate of discontinuations from clinical studies**.

58.  The Registration Statement stated, in relevant part:

(a)  "***Tesetaxel has been generally well tolerated in clinical studies*** and has demonstrated robust single-agent antitumor activity in two Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC")."

(b)  "***Tesetaxel has several potential therapeutic advantages*** over currently available taxanes" including "a formulation that does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions ...."

(c)  "More than 500 patients were treated with tesetaxel between 2001 and 2012 across 22 clinical studies.  Tesetaxel was administered as monotherapy in 16 studies and in combination with other chemotherapy agents in 6 studies.  Final study data are available for 8 of these studies, while data collection . . . is underway for 14 of these studies."

(d)  "In Study TOB203, which was conducted . . . from 2010 to 2012, 46 patients with HER2 negative MBC were enrolled to receive, as first-line chemotherapy, tesetaxel administered orally at 27 mg/m$^2$ . . . on the first day of a 21-day cycle, with escalation to 35 mg/m$^2$ in subsequent cycles depending on tolerability, without anti-allergy premedication."  In this study: "***Tesetaxel was***

29

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*generally well tolerated*. *The most common Grade ≥3 (severe or serious) adverse event ("AE") was neutropenia* (low level of neutrophils, a type of white blood cell), *which occurred in 26% of patients receiving 27 mg/m², the dose [Odonate] chose for our Phase 3 [CONTESSA] study.* Also, *at this dose, there were no cases of Grade ≥ 3 peripheral neuropathy,* and *the incidence of Grade 2 alopecia* (significant hair loss) *was 15%*."

(e)    "In Study 927E-PRT005, which was conducted . . . from 2004 to 2006, 34 patients with MBC were enrolled to receive, as first-, second- or third-line chemotherapy, tesetaxel administered orally at initial doses of 27 mg/m² (79% of patients) or 35 mg/m² (21% of patients) on the first day of a 21-day cycle. Thirty-two (32) patients completed at least one course of therapy and were included in the efficacy population." In this study: "*Tesetaxel was generally well tolerated*. *The most common Grade ≥ 3 AE was neutropenia, which occurred in 35% of patients*. *The incidence of Grade ≥ 3 peripheral sensory neuropathy* (numbness and/or pain from damage to the nerves) *was 3%*, and *the incidence of Grade 2 alopecia was 18%*."

(f)    The "Clinical studies that have been conducted with tesetaxel are shown in the following table."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Clinical Studies of Tesetaxel**

| Study Name | Phase | N | Patient Population | Treatment Tested |
|---|---|---|---|---|
| TOB203/TOB203XT[(1)(3)] | 2 | 61[(3)] | First-line chemotherapy MBC | Tesetaxel monotherapy |
| 927E-PRT005[(2)(4)] | 2 | 34 | Mixed-line chemotherapy MBC | Tesetaxel monotherapy |
| TOST107/TOST107XT[(1)(4)(5)] | 1 | 19[(5)] | Solid tumors | Tesetaxel-capecitabine |
| 927A-PRT006[(2)(4)] | 1 | 27 | Solid tumors | Tesetaxel-capecitabine |
| TOB206[(1)] | 2 | 3 | First-line chemotherapy MBC | Tesetaxel vs. capecitabine |
| 927E-PRT003[(2)(4)] | 2 | 35 | Second-line gastric cancer | Tesetaxel monotherapy |
| TOG201[(1)] | 2 | 53 | Second-line gastric cancer | Tesetaxel monotherapy |
| TOPK105[(1)] | 1-2 | 15 | First-line gastric cancer | Tesetaxel-capecitabine-cisplatin |
| TOG301[(1)] | 2 | 2 | Second-line gastric cancer | Tesetaxel-capecitabine vs. capecitabine |
| 927A-PRT004[(2)(4)] | 2 | 71 | Second-line CRC | Tesetaxel monotherapy |
| 927E-PRT007[(2)(4)] | 2 | 34 | Second-line NSCLC | Tesetaxel monotherapy |
| TOBL204[(1)] | 2 | 30 | Second-line bladder cancer | Tesetaxel monotherapy |
| TOP205[(1)] | 2 | 23 | First-line prostate cancer | Tesetaxel monotherapy |
| TOM202[(1)] | 2 | 17 | Second-line melanoma | Tesetaxel monotherapy |
| TOPK101/TOST201[(1)] | 1 | 59 | Solid tumors | Tesetaxel monotherapy |
| 927A-PRT001[(2)(4)] | 1 | 48 | Solid tumors/lymphomas | Tesetaxel monotherapy |
| 927J-PRT001[(2)] | 1 | 6 | Solid tumors | Tesetaxel monotherapy |
| TOPK103[(1)] | 1 | 12 | Solid tumors | Tesetaxel monotherapy |
| TOPK106[(1)] | 1 | 6 | Solid tumors | Tesetaxel monotherapy |
| **Total** | | **555** | | |

N = Number of patients treated
CRC = Colorectal cancer
NSCLC = Non-small cell lung cancer
(1)   Studies conducted by Genta Incorporated. Patients treated from 2008 to 2012.
(2)   Studies conducted by Daiichi Sankyo. Patients treated from 2001 to 2006.
(3)   Includes 46 patients who received tesetaxel once every 21 days. A cohort of 15 patients receiving tesetaxel weekly (days 1, 8 and 15 of a 28-day cycle) was discontinued early due to study termination. In this prospectus, Studies TOB203 and TOB203XT are referred to as Study TOB203.

(4)   Final study data available.
(5)   The Phase 1 study in solid tumors was split into Study TOST107, which included data from the first two cycles, and TOST107XT, which included data from patients receiving three or more cycles. In this prospectus, Studies TOST107 and TOST107XT are referred to as Study TOST107.

(g)     The Registration Statement compared tesetaxel's tolerance to those of other therapeutics, stating, "***Tesetaxel has been generally well tolerated in clinical studies.** The **incidence of certain adverse events observed with tesetaxel***

31

***as compared to those observed with paclitaxel and capecitabine*** in first-line MBC

studies is shown in the following table."

**Tolerability of Paclitaxel, Capecitabine and Tesetaxel in the First-line Chemotherapy Treatment of MBC**

|  | Tesetaxel[1] | Paclitaxel[2][3] | Capecitabine[2][4] |
|---|---|---|---|
| **Peripheral Neuropathy, Grades 3-4** | 0% | 10% (5%-18%) | 0% (0%-1%) |
| **Alopecia, Grade 2** | 15% | 39% (18%-60%) | NR |
| **Hand-Foot Syndrome[5] (HFS), Grades 3-4** | 0% | 3% | 18% (14%-26%) |
| **Diarrhea, Grades 3-4** | 0% | 2% (2%-3%) | 9% (6%-13%) |

NR = Not reported
[1] Study TOB203 and, for HFS, an internal report of treatment-related AEs in 222 patients receiving tesetaxel monotherapy
[2] Randomized, multicenter studies in the first-line chemotherapy treatment of MBC
[3] Albain et al, *Journal of Clinical Oncology* 2008; Bishop et al, *Journal of Clinical Oncology* 1999; Gradishar et al, *European Journal of Cancer* 2013; Gray et al, *Journal of Clinical Oncology* 2009; Paridaens et al, *Journal of Clinical Oncology* 2000
[4] Harbeck et al, *Breast Cancer Res Treat* 2016; O'Shaughnessy et al, *Annals of Oncology* 2001; Robert et al, *Journal of Clinical Oncology* 2011; Stockler et al, *Journal of Clinical Oncology* 2011
[5] Redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulcerations

(h)     The Registration Statement specifically addressed how tesetaxel was

tolerated in prior clinical studies, both alone and in combination with capecitabine:

> ***Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated.*** In the 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final study data are available, a total of 268 patients received tesetaxel either alone (222 patients from 5 studies) or in combination with capecitabine (46 patients from three studies). ***The most common Grade ≥3 (severe or serious) treatment-related adverse event ("AE") was neutropenia*** (low level of neutrophils, a type of white blood cell), which ***occurred in 37% of patients receiving tesetaxel alone and 43% of patients receiving tesetaxel in combination with capecitabine and was generally reversible and manageable with supportive measures***. ***Six percent (6%) of patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced***

1
2

***treatment-related febrile neutropenia*** (fever coinciding with neutropenia).

3
4

Overall, ***there was no non-hematologic Grade ≥3 treatment-related AE that occurred in more than 6% of patients***. ***Three percent (3%) of patients receiving tesetaxel alone and 2% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥3 treatment-related peripheral neuropathy*** (weakness, numbness and/or pain from damage to the nerves). ***No patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥3 treatment-related hand-foot syndrome*** (redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulceration). Six percent (6%) of patients receiving tesetaxel alone and 7% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related diarrhea. Seventeen percent (17%) of patients receiving tesetaxel alone and 9% of patients receiving tesetaxel in combination with capecitabine experienced any grade of treatment-related alopecia (hair loss).

5
6
7
8
9
10
11
12
13
14

(i)    Beneath the header "Tesataxel Plus a Reduced Dose of Capecitabine Generally Well Tolerated in Phase 1 Study (TOST107)," the Registration Statement stated, "In a Phase 1 study (TOST107), which was conducted … from 2011 to 2012, the safety and tolerability of tesetaxel plus a reduced dose of capecitabine was evaluated in patients with advanced solid tumors. Eight (8) patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 1,750 mg/m$^2$/day orally on days 1-14 of each 21-day cycle, and 9 patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 2,000 mg/m$^2$/day orally on Days 1-14 of each 21-day cycle."  In this study, "***Tesetaxel in combination with capecitabine at either***

15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*1,750 mg/m²/day or 2,000 mg/m²/day was generally well tolerated with no indication of overlapping toxicity*." It added, "***The most common Grade ≥3 AE was neutropenia (47% of patients), which was reversible and manageable with supportive measures. There was a low rate of febrile neutropenia (6% of patients), which only occurred in the tesetaxel 27 mg/m² plus capecitabine 2,000 mg/m²/day group. The incidence of Grade ≥3 peripheral neuropathy was 6%, Grade ≥3 hand-foot syndrome was 6%, and Grade ≥3 diarrhea was 6%. There was no Grade 2 alopecia, and there were no hypersensitivity reactions***." It added a chart comparing the "frequency and extent of dose reductions in Study TOST107 as compared to those in the Phase 3 study that served as the basis for approval for capecitabine combined with docetaxel in the treatment of MBC":

**Dose Reductions for Tesetaxel plus Reduced Dose of Capecitabine Compared to Those for Docetaxel plus the Approved Dose of Capecitabine**

| | Tesetaxel 27 mg/m²[1] + Capecitabine 1,750/2,000 mg/m²/day[2] (N=17)[3] | | Docetaxel 75 mg/m²[1] + Capecitabine 2,500 mg/m²/day[2] (N=255)[4] | |
|---|---|---|---|---|
| | Tesetaxel | Capecitabine | Docetaxel | Capecitabine |
| First dose reduction to: | 89% of starting dose | 75% of starting dose | 75% of starting dose | 75% of starting dose |
| Patients | 24% | 47% | 59% | 51% |
| Median months to reduction | 2.0 | 1.9 | 1.4 | 1.5 |
| Second dose reduction to: | 78% of starting dose | 50% of starting dose | 50% of starting dose | 50% of starting dose |
| Patients | 0% | 6% | 4% | 18% |
| Median months to reduction | NA | 3.5 | 2.3 | 2.8 |

(1)   Day 1 of a 21-day cycle
(2)   Days 1-14 of a 21-day cycle
(3)   TOST107/107XT
(4)   O'Shaughnessy at al, *Journal of Clinical Oncology* 2002

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

59.     The Registration Statement also described the CONTESSA trial and its purported rationales, stating:

(a)     "We are initiating a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that will compare tesetaxel (27 mg/m$^2$ on the first day of a 21-day cycle) plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on days 1–14 of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on days 1–14 of a 21-day cycle) in patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."

(b)     "CONTESSA is designed to evaluate whether tesetaxel plus a reduced dose of capecitabine results in improved PFS with manageable toxicity and favorable quality-of-life compared to the approved dose of capecitabine alone. Tesetaxel plus a reduced dose of capecitabine incorporates two agents with synergistic mechanisms of action and is an all-oral regimen that requires a pill burden that is approximately 30% less than the approved dose of capecitabine alone."

(c)     "Our rationale for the CONTESSA study design includes the following points": "Capecitabine is a preferred agent as a first- or second-line chemotherapy treatment for patients with HER2 negative, HR positive MBC.

35

Therefore, capecitabine, at the approved dose, is an appropriate control regimen for a registration-enabling Phase 3 study"; "There is a high unmet medical need for combination chemotherapy regimens with improved benefit-risk profiles"; "Combining the approved dose of capecitabine with currently available taxanes results in improved efficacy but with significant toxicity"; "Preclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy"; "Single-agent tesetaxel had demonstrated antitumor activity in two Phase 2 studies in MBC: TOB203 (first-line chemotherapy) and 927E-PRT005 (mixed-line chemotherapy)"; and "***In a Phase 1 study, the combination of tesetaxel plus a reduced dose of capecitabine was associated with a tolerable AE profile, with minimal overlapping toxicity***."

(d)    "We expect to begin enrolling patients in our multinational, multicenter, randomized, Phase 3 study in MDB, known as CONTESSA, in the fourth quarter of 2017 and report top-line results from this study in 2020."

60.    The misrepresentations and omissions from the Registration Statements, as alleged in ¶¶57-59, *supra*, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AEs, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.

61.    On December 28, 2017, Odonate issued a press release (the "12/28/2017 Press Release") announcing the initiation of CONTESSA, its Phase 3 study of tesetaxel in patients with locally advanced or metastatic breast cancer, which **touted tesetaxel and its tolerability**, stating that it has "**several potential therapeutic advantages over currently available taxanes**" including having a "**formulation that does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions**."

62.    The misrepresentations and omissions in the 12/28/2017 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.

63.    Odonate announced is Q4 2017 quarterly and 2017 annual results in a series of public statements on February 14, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.  That day, Odonate issued an earnings press release (the "2/14/2018 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2017.  The 2/14/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He further stated that tesetaxel's "***lack of history of hypersensitivity reactions***" "may translate into significant benefits for patients."

64.    Also on February 14, 2018, Odonate filed its first annual report on Form 10-K with the SEC, reporting Odonate's financial and operating results for

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Q4 and full year ended December 31, 2017 (the "2017 10-K"), which was signed and accompanied by SOX certifications by Defendants Tang and Lemkey.  The 2017 10-K touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel has "*unique*" properties over other taxanes that "may translate into *significant benefits for patients*" including "[a] formulation that does not contain polyoxyethylated castor oil or polysorbate 80, solubilizing agents contained in other taxane formulations known to cause hypersensitivity reactions."  The 2017 10-K also stated that "*[t]esetaxel has been generally well tolerated in clinical studies* and has demonstrated robust single-agent antitumor activity in two Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC")."

65.    The 2017 10-K extensively touted tesetaxel's tolerability both alone and in combination with capecitabine across all studies.

(a)    The 2017 10-K stated:

*Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated*. In the 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final study data are available, a total of 268 patients received tesetaxel either alone (222 patients from 5 studies) or in combination with capecitabine (46 patients from three studies). *The most common Grade ≥ 3 (severe or serious) treatment-related adverse event ("AE") was neutropenia* (low level of neutrophils, a type of white blood cell), *which occurred in 37% of patients receiving tesetaxel alone and 43% of patients receiving tesetaxel in combination with capecitabine* and *was generally reversible and manageable with supportive measures*. *Six percent (6%) of patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced*

39

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*treatment-related febrile neutropenia* (fever coinciding with neutropenia).

*Overall, there was no non-hematologic Grade ≥ 3 treatment-related AE that occurred in more than 6% of patients*. *Three percent (3%) of patients receiving tesetaxel alone and 2% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related peripheral neuropathy* (weakness, numbness and/or pain from damage to the nerves). *No patients receiving tesetaxel alone and 11% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related hand-foot syndrome* (redness and swelling of the palms and soles, which may progress to dryness, scaling, pain, itching and sometimes blisters and ulceration). *Six percent (6%) of patients receiving tesetaxel alone and 7% of patients receiving tesetaxel in combination with capecitabine experienced Grade ≥ 3 treatment-related diarrhea*. *Seventeen percent (17%) of patients receiving tesetaxel alone and 9% of patients receiving tesetaxel in combination with capecitabine experienced any grade of treatment-related alopecia* (hair loss).

      (b)    The 2017 10-K also depicted results across all completed studies in the following chart:



Adverse Event Profile Across All Completed Studies[1]

**N = 268 (222 Received Tesetaxel Alone and 46 Received Tesetaxel plus Capecitabine)**

- The most common Grade ≥ 3 treatment-related adverse event was neutropenia (38% overall; 37% tesetaxel alone; 43% tesetaxel plus capecitabine)

- No non-hematologic Grade ≥ 3 treatment-related adverse event occurred in more than 6% of patients
  - Peripheral neuropathy (3% overall; 3% tesetaxel alone; 2% tesetaxel plus capecitabine)
  - HFS (2% overall; 0% tesetaxel alone; 11% tesetaxel plus capecitabine)
  - Diarrhea (6% overall; 6% tesetaxel alone; 7% tesetaxel plus capecitabine)

- Treatment-related alopecia (any grade) occurred in 16% of patients overall (17% receiving tesetaxel alone; 9% receiving tesetaxel plus capecitabine)

- There were no hypersensitivity reactions

(1) 927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

66.     The 2017 10-K also stated results from a 46-patient Phase 2 clinical study of tesetaxel monotherapy for MBC (TOB203), administered orally at 27 mg/m2, which is the same dosage administered for the Phase 3 CONTESSA study.

(a)     Regarding tesetaxel's tolerance and AE rate, the 2017 10-K stated:

> ***Tesetaxel was generally well tolerated***.  The starting tesetaxel dose (27 mg/m$^2$) was escalated to 35 mg/m$^2$ in 19 of 46 patients. CONTESSA, our Phase 3 study, is using a dose of 27 mg/m$^2$. ***The most common Grade ≥ 3 AE was neutropenia***, which ***was more common in the escalated dose (26% of patients in the non-escalated 27 mg/m$^2$ dose group and 42% in the 27 mg/m$^2$ escalated to 35 mg/m$^2$ dose group***). ***The incidence of Grade ≥ 3 febrile neutropenia was 4%***. ***There was no Grade ≥ 3 peripheral neuropathy observed in the non-escalated 27 mg/m$^2$ dose group***. ***The incidence of Grade 2 alopecia (significant hair loss) was 15%*** and similar ***in both dose groups***. ***There were no hypersensitivity reactions***.

(b)     It also summarized the results for Grade ≥ 3 AEs in this chart:

| Grade ≥3 Adverse Events in 2 or More Patients | 27 mg/m² (N = 27) n (%) | | 27 mg/m² Escalated to 35 mg/m² (N = 19) n (%) | |
|---|---|---|---|---|
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 4 (15) | 3 (11) | 2 (11) | 6 (32) |
| Thrombocytopenia[1] | 2 (7) | 0 | 0 | 0 |
| Fatigue | 2 (7) | 0 | 2 (11) | 0 |
| Hypokalemia[2] | 0 | 0 | 3 (16) | 0 |
| Peripheral Neuropathy | 0 | 0 | 3 (16) | 0 |
| Decreased Appetite | 2 (7) | 0 | 0 | 0 |
| Pain in Extremity | 1 (4) | 0 | 1 (5) | 0 |
| Muscular Weakness | 1 (4) | 0 | 1 (5) | 0 |
| Vomiting | 1 (4) | 0 | 1 (5) | 0 |

TOB203: Grade ≥ 3 Adverse Events

(1) Low level of platelets, a type of blood cell
(2) Low level of potassium

67.     The 2017 10-K also stated results from a 34-patient Phase 2 clinical study (927E-PRT005) of tesetaxel as a mixed-line therapy for MBC.

41

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     Regarding tesetaxel's tolerance and AE rate, the 2017 10-K stated:

> ***Tesetaxel was generally well tolerated***. ***The most common Grade ≥ 3 AE was neutropenia (35% of patients)***. **The incidence of Grade ≥ 3 febrile neutropenia was 3%, the incidence of Grade ≥ 3 peripheral sensory neuropathy** (numbness and/or pain from damage to the nerves) **was 3%**, and **the incidence of Grade 2 alopecia was 18%**. ***There were no hypersensitivity reactions***.

(b)     It also summarized the results for Grade ≥ 3 AEs in this chart:

| 927E-PRT005: Grade ≥ 3 Adverse Events | | |
|---|---|---|
| **Grade ≥3 Adverse Events in 2 or More Patients** | **All Patients (N = 34) n (%)** | |
| | **Grade 3** | **Grade 4** |
| Neutropenia | 4 (12) | 8 (24) |
| Leukopenia[1] | 1 (3) | 4 (12) |
| Anemia[2] | 2 (6) | 0 |
| Constipation | 2 (6) | 1 (3) |
| Vomiting | 2 (6) | 0 |
| Anorexia | 2 (6) | 0 |
| Hypokalemia | 2 (6) | 0 |

(1) Low level of leukocytes, a type of white blood cell
(2) Low level of red blood cells

68.     The 2017 10-K also described the results of a Phase 1 study (TOST107) that combined tesetaxel with capecitabine, under a heading declaring, "Tesetaxel Plus a Reduced Dose of Capecitabine Generally Well Tolerated in Phase 1 Study (TOST107)."  It stated as follows:

(a)     The 2017 10-K touted the safety and tolerability of tesetaxel:

> In a Phase 1 study (TOST107), the safety and tolerability of tesetaxel plus a reduced dose of capecitabine was evaluated in patients with advanced solid tumors. Eight (8) patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at

42

1,750 mg/m$^2$/day orally on days 1-14 of each 21-day cycle, and 9 patients received tesetaxel at 27 mg/m$^2$ orally on the first day of each 21-day cycle plus capecitabine at 2,000 mg/m$^2$/day orally on Days 1-14 of each 21-day cycle.

***Tesetaxel in combination with capecitabine at either 1,750 mg/m$^2$/day or 2,000 mg/m$^2$/day was generally well tolerated with no indication of overlapping toxicity. The most common Grade ≥ 3 AE was neutropenia (47% of patients), which was reversible and manageable with supportive measures. There was a low rate of febrile neutropenia (6% of patients), which only occurred in the tesetaxel 27 mg/m$^2$ plus capecitabine 2,000 mg/m$^2$/day group. The incidence of Grade ≥ 3 peripheral neuropathy was 6%, Grade ≥ 3 hand-foot syndrome was 6%, and Grade ≥ 3 diarrhea was 6%. There was no Grade 2 alopecia, and there were no hypersensitivity reactions.***

(b)     It also presented a favorable depiction as to the rate of dose reduction among patients in the study, comparing the frequency and extent of dose reductions in study TOST107 to those in a Phase 3 study that was the basis for approving capecitabine combined with docetaxel for treatment of MBC:

**Dose Reductions for Tesetaxel plus Reduced Dose of Capecitabine Compared to Those for Docetaxel plus the Approved Dose of Capecitabine**

| | Tesetaxel 27 mg/m$^{2(1)}$ + Capecitabine 1,750/2,000 mg/m$^2$/day$^{(2)}$ (N=17)$^{(3)}$ | | Docetaxel 75 mg/m$^{2(1)}$ + Capecitabine 2,500 mg/m$^2$/day$^{(2)}$ (N=255)$^{(4)}$ | |
|---|---|---|---|---|
| | Tesetaxel | Capecitabine | Docetaxel | Capecitabine |
| First dose reduction to: | 89% of starting dose | 75% of starting dose | 75% of starting dose | 75% of starting dose |
| Patients | 24% | 47% | 59% | 51% |
| Median months to reduction | 2.0 | 1.9 | 1.4 | 1.5 |
| Second dose reduction to: | 78% of starting dose | 50% of starting dose | 50% of starting dose | 50% of starting dose |
| Patients | 0% | 6% | 4% | 18% |
| Median months to reduction | NA | 3.5 | 2.3 | 2.8 |

(1) Day 1 of a 21-day cycle
(2) Days 1-14 of a 21-day cycle
(3) TOST107/107XT
(4) O'Shaughnessy et al, *Journal of Clinical Oncology* 2002;20(12):2812-2823

43

69.     The 2017 10-K also described the CONTESSA trial, stating, "We are conducting a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that will compare tesetaxel (27 mg/m$^2$ on the first day of a 21-day cycle) plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on days 1-14 of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on days 1-14 of a 21-day cycle) in patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."  It stated, "we expect to report top-line results from this study in 2020."  The 2017 10-K reiterated the same rationales for the CONTESSA study as had been described in the Registration Statement, including that "*[i]n a Phase 1 study (TOST107), the combination of tesetaxel plus a reduced dose of capecitabine was associated with a tolerable AE profile, with minimal overlapping toxicity*."  The 2017 10-K also cited to a researcher, Alain Lortholary, claiming that "the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability."  The 2017 10-K added, "we believe that the data support the investigation of tesetaxel at 27 mg/m$^2$ on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle as a novel,

44

all-oral regimen with a potentially favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive MBC."

70.     The misrepresentations and omissions from the 2/14/2018 Earnings Release and the 2017 10-K, as alleged in ¶¶63-69, *supra*, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq$3 treatment-emergent AE, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.

71.     Odonate announced its Q1 2018 quarterly results in a series of public statements on May 3, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)     On May 3, 2018, Odonate issued an earnings press release (the "5/3/2018 Earnings Release") announcing its financial and operating results for the

45

three months ended March 31, 2018. The 5/3/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer." He further stated that tesetaxel's "***lack of history of hypersensitivity reactions***" "may translate into **significant benefits for patients**."

(b)     Also on May 3, 2018, Odonate also filed a Form 10-Q with the SEC for the first quarter of 2018 (the "Q1 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey. The Q1 2018 10-Q touted tesetaxel as having "a formulation that ***does not contain solubilizing agents that are known to cause hypersensitivity (allergic) reactions***" and further stated that "***[t]esetaxel has been generally well tolerated in clinical studies***." It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

72.     The misrepresentations and omissions in the 5/3/2018 Earnings Release and the Q1 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when

46

combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel. As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

73.     On May 16, 2018, Odonate issued a press release (the "5/16/2018 Press Release) announcing presentations at the 2018 American Society of Clinical

Oncology (ASCO) meeting to be held June 1-5, 2018, which provided links to the abstracts of the presentations. The 5/16/2018 Press Release provided a link to Abstract 1042 (Poster Board #123) for the presentation titled "Activity of Tesetaxel, an Oral Taxane, Given as a Single-agent in Patients (Pts) with HER2-, Hormone Receptor + (HR+) Locally Advanced or Metastatic Breast Cancer (MBC) in a Phase 2 Study," which provided background for tesetaxel, stating that it has "***no history of hypersensitivity reactions*** (HSRs)," that patients in the TOB203 Phase 2 study receiving tesetaxel were the same "population being enrolled in CONTESSA, an ongoing Phase 3 study," and that:

> In the 24 HR+ pts receiving 27 mg/m$^2$ without escalation, ***Grade ≥ 3 neutropenia, the most common Grade ≥ 3 AE, occurred in 29% of pts*** (febrile neutropenia 4%), ***there were no cases of Grade ≥ 3 peripheral neuropathy***, and ***the incidence of Grade 1/2 alopecia was 29% / 21%. There were no HSRs or study drug-related deaths***.

74.     The misrepresentations and omissions in the 5/16/2018 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

75.     On June 2, 2018, Odonate issued a press release (the "6/2/2018 Press Release") announcing results from the TOB203 Phase 2 study of tesetaxel, which were presented at the 2018 ASCO Annual Meeting.  The 6/2/2018 Press Release reported on adverse events, stating:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Neutropenia was the most common Grade ≥3 adverse event and occurred in 25% of the 24 patients who were not dose-escalated* beyond the 27 mg/m² starting dose (the dose selected for CONTESSA, our ongoing Phase 3 study (Poster Board #184a; Abstract #TPS1106); in these patients, *febrile neutropenia occurred in 1 patient (4%)* and *Grade ≥3 neuropathy occurred in 1 patient (4%). There were no hypersensitivity reactions or drug-related deaths*, and the *rate of Grade 2 alopecia (hair loss) was 18%*.

76.     The misrepresentations and omissions in the 6/2/2018 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by

50

concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

77.     Odonate announced its Q2 1028 quarterly results in a series of public statements on July 30, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)     That day, Odonate issued an earnings press release (the "7/30/2018 Earnings Release") announcing its financial and operating results for the three and six months ended June 30, 2018.  The 7/30/2018 Earnings Release touted tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "Results from our multicenter Phase 2 study of tesetaxel were recently presented at the 2018 ASCO Annual Meeting.  In this study, tesetaxel, administered orally as a single agent, resulted in 45% confirmed response rate in patients with HER2 negative, HR positive, metastatic breast cancer.  With these

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

results, we look forward to further characterizing tesetaxel's therapeutic profile in CONTESSA."

(b)     Also on July 30, 2018, Odonate filed a Form 10-Q with the SEC for the second quarter of 2018 (the "Q2 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey.  The Q2 2018 10-Q touted tesetaxel as "***unique among taxanes***" with "***no history of hypersensitivity (allergic) reactions***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

78.     The misrepresentations and omissions in the 7/30/2018 Earnings Release and the Q2 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment

alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

79.    Odonate announced its Q3 2018 quarterly results in a series of public statements on October 23, 2018, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)    That day, Odonate issued an earnings press release (the "10/23/2018 Earnings Release") announcing its financial and operating results for the three and nine months ended September 30, 2018.  The 10/23/2018 Earnings Release touted

53

tesetaxel and the initiation of the CONTESSA Phase 3 clinical trial, stating that tesetaxel is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions)***."

(b)   The same day Odonate filed a Form 10-Q with the SEC for the third quarter of 2018 (the "Q3 2018 10-Q") signed and SOX-certified by Defendants Tang and Lemkey.  The Q3 2018 10-Q touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

80.   The misrepresentations and omissions in the 10/23/2018 Earnings Release and the Q3 2018 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and

54

anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

81.   Odonate announced its Q4 2018 and 2018 annual results in a series of public statements on February 22, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.  That day, Odonate issued an earnings press release (the "2/22/2019 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2018.  The 2/22/2019 Earnings Release touted

tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions)***."   Defendant Tang is quoted as stating, "[w]e remain committed to developing novel therapies that improve the lives of patients with cancer…Tesetaxel, our investigational, orally administered taxane, has been shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies and ***may provide significant quality-of-life advantages over other chemotherapy options***. ***We expect to complete enrollment in CONTESSA***, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, ***in the second half of 2019*** and report top-line results in 2020."

82.   On February 22, 2019, Odonate filed an annual report on Form 10-K with the SEC, reporting Odonate's financial and operating results for Q4 and full year ended December 31, 2018 (the "2018 10-K"), which was signed and SOX certified by Defendants Tang and Hearne.  The 2018 10-K touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel is "***unique among taxanes***" with "***no history of hypersensitivity (allergic) reactions***."

83.   The 2018 10-K touted tesetaxel's tolerability both alone and in combination with capecitabine.

(a)   The 2018 10-K touted clinical results, stating:

***Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated***. In the 8 studies (927A-

56

PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT) for which final study data are available, a total of 187 patients were treated with tesetaxel at 27 mg/m$^2$ once every three weeks as monotherapy (N=156) or in combination with capecitabine at 1,750-2,500 mg/m$^2$ (N=31). In this population, ***the most common Grade ≥3 (severe or serious) treatment-related adverse event ("AE") was neutropenia*** (low level of neutrophils, a type of white blood cell), ***(33%) febrile neutropenia*** (fever coinciding with neutropenia) ***occurred in 5% of patients***. ***The most common non-hematologic Grade ≥3 treatment-related AEs were: dehydration (5%); diarrhea (5%); fatigue (5%); and anorexia (4%). Other non-hematologic Grade ≥ 3 treatment-related AEs include: nausea (3%); peripheral neuropathy (weakness, numbness and/or pain from damage to the nerves) (3%); and vomiting (2%). Treatment-related alopecia (hair loss) (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients. There were no hypersensitivity reactions***.

(b)     Tesetaxel's adverse event profile across all completed studies

was shown in this chart:

**Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA**

**187 patients treated with tesetaxel at 27 mg/m² once every 3 weeks as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31)**

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)

- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)

- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients

- There were no hypersensitivity reactions

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

84.     The 2018 10-K also stated results from a Phase 2 clinical study of tesetaxel monotherapy for MBC (TOB203), administered orally at 27 mg/m2, which is the same dosage administered for the Phase 3 CONTESSA study. Similarly, for the TOB203 Phase 2 study, the 2018 10-K touted, "***Tesetaxel was generally well tolerated***," adding:

> ***Neutropenia was the most common Grade ≥3 AE and occurred in 25% of the 24 patients who were not dose-escalated*** beyond the 27 mg/m$^2$ starting dose (the dose selected for CONTESSA, our ongoing Phase 3 study); in these patients, ***febrile neutropenia occurred in one patient (4%) and Grade ≥3 neuropathy occurred in one patient (4%)***. ***There were no hypersensitivity reactions or drug-related deaths***, and ***the rate of Grade 2 alopecia*** (significant hair loss) ***was 18%***.

A summary of Grade ≥ 3 AEs regardless of relationship is shown in the following table:

Grade ≥3 Adverse Events Regardless of Relationship

| Adverse Events in 2 or More Patients | 27 mg/m² (n=24) n (%) | | 27 mg/m² Escalated to 35 mg/m² (n=14) n (%) | |
|---|---|---|---|---|
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 3 (13) | 3 (13) | 0 (0) | 6 (43) |
| Febrile neutropenia | 1 (4) | 0 (0) | 0 (0) | 1 (7) |
| Thrombocytopenia | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Neuropathy | 1 (4) | 0 (0) | 4 (29) | 0 (0) |
| Fatigue | 2 (8) | 0 (0) | 2 (14) | 0 (0) |
| Pain in extremity | 1 (4) | 0 (0) | 2 (14) | 0 (0) |
| ALT increased | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Diarrhea | 0 (0) | 1 (4) | 1 (7) | 0 (0) |
| Muscle weakness | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Pyrexia | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Sepsis | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Vomiting | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Hypokalemia | 0 (0) | 0 (0) | 2 (14) | 0 (0) |
| AST increased | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Decreased appetite | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Dehydration | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Renal failure acute | 2 (8) | 0 (0) | 0 (0) | 0 (0) |

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

85.     The 2018 10-K stated, "We are conducting a 600-patient, multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that is comparing tesetaxel dosed orally at 27 mg/m$^2$ on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on the first 14 days of a 21-day cycle) in patients with HER2 negative, HR positive LA/MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting."  It added, "[W]e expect to report top-line results from this study in 2020."  It described the "rationale for the CONTESSA study design includes" that "*[n]onclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy*."  The 2018 10-K also cited to a researcher, Alain Lortholary, who stated that "*the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity*, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability."  The 2018 10-K further stated, "we believe that the data support the investigation of tesetaxel at 27 mg/m$^2$ on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle as a novel, all-oral regimen with a potentially

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive LA/MBC."

86.    The misrepresentations and omissions from the 2/22/2019 Earnings Release and the 2018 10-K, as alleged in ¶¶81-85, *supra*, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

87.     On February 22, 2019, Odonate filed a prospectus on Form S-3 with the SEC, signed by Defendants Tang and Hearne, which became effective February 28, 2019 (the "February 2019 Form S-3"), offering to sell up to an aggregate of $150 million of common stock to fund the study of its only drug, tesetaxel.  The prospectus again touted tesetaxel as "***unique among taxanes***" and "***generally well tolerated in clinical studies***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

88.     The misrepresentations and omissions in the February 2019 Form S-3, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the

61

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

89.     Between February 28, 2019 and April 2, 2019, Odonate made a series of public statements focused on recent clinical milestones regarding tesetaxel.

(a)     On February 28, 2019, Odonate issued a press release (the "2/28/2019 Press Release) announcing a presentation by Defendant Tang and others at the American Association for Cancer Research (AACR) Annual Meeting 2019 to be held March 29-April 3, 2019, which provided links to the abstract of the presentation, Abstract 3078 (Poster Board #12), titled "Tesetaxel, a novel, oral taxane, crosses, intact blood-brain (BBB) at therapeutically relevant concentrations" (regarding a preclinical study on animals), which stated that tesetaxel has "*no history of hypersensitivity reactions*."

(b)     On March 4, 2019, Odonate issued a press release (the "3/4/2019 Press Release") announcing the initiation of CONTESSA 2, a Phase 2 study of tesetaxel in patients with locally advanced or metastatic breast cancer who have not previously received a taxane.  The 3/4/2019 Press Release stated that CONTESSA 2 is designed to complement the Phase 3 CONTESSA study by investigating the same tesetaxel-containing regimen in patients who have not previously received a taxane.  The 3/4/2019 Press Release stated that tesetaxel is "*unique among taxanes*" including that it has "*no history of hypersensitivity (allergic) reactions*."

(c)     On March 28, 2019, Odonate issued a press release (the "3/28/2019 Press Release") announcing the initiation of CONTESSA TRIO, a multi-cohort and

63

multicenter Phase 2 study, which is the first randomized clinical study to compare three approved PD-(L)1 inhibitors, investigating tesetaxel-immuno-oncology combinations in patients with metastatic triple-negative breast cancer, and investigating tesetaxel monotherapy in elderly patients with HER2 negative MBC. It touted the tolerability of tesetaxel stating that is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

(d)     On April 2, 2019, Odonate issued a press release (the "4/2/2019 Press Release") announcing that it presented results of the preclinical studies of tesetaxel at the AACR 2019 annual meeting.   The 4/2/2019 Press Release touted the tolerability of tesetaxel stating that it has "***no history of hypersensitivity reactions***."

90.     The misrepresentations and omissions in the 2/28/2019 Press Release, the 3/4/2019 Press Release, the 3/28/2019 Press Release, and the 4/2/2019 Press Release and abstract, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

91.  Odonate announced its Q1 2019 quarterly results in a series of public statements on April 25, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)  That day, Odonate issued an earnings press release (the "4/25/2019 Earnings Release") announcing its financial and operating results for the three

months ended March 31, 2019.  The 4/25/2019 Earnings Release touted the progress and efficacy of the CONTESSA trials.  Defendant Tang was quoted as stating, "[i]n the first quarter of 2019, ***we expanded the development of tesetaxel*** by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO, the first study to investigate tesetaxel in combination with PD-(L)1 inhibitors…***We continue to expect to complete enrollment in CONTESSA***, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, ***in the second half of 2019*** and report top-line results in 2020."  The 4/25/2019 Earnings Release also touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity reactions***."

(b)     Also on April 25, 2019, Odonate filed a Form 10-Q with the SEC for the first quarter of 2019 (the "Q1 2019 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  The Q1 2019 10-Q touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are currently conducting multiple studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA. We expect to report top-line results from

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CONTESSA in 2020." It described the ongoing clinical trials of tesetaxel in this chart:

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

92.   The misrepresentations and omissions in the 4/25/2019 Earnings Release and the Q1 20129 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and

67

anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel. As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

93.   On May 6, 2019, Odonate gave an investor presentation that included a slide deck titled "Corporate Presentation May 2019" (the "May 2019 Presentation"). It described tesetaxel as follows: "Tesetaxel: An Orally Administered Taxane with Improved Pharmacologic Properties." In addition:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)    The May 2019 Presentation stated, "***Tesetaxel has been generally well tolerated in clinical studies***…." It summarized AE rates from prior clinical study in this chart:



## Grade ≥3 Adverse Events Regardless of Relationship

- There were no adverse events leading to death

- There were no hypersensitivity reactions

- <u>The incidence of Grade 2 alopecia was 18%</u>

| Adverse Events in 2 or More Patients | 27 mg/m² (n=24) n (%) | | 27 mg/m² Escalated to 35 mg/m² (n=14) n (%) | |
|---|---|---|---|---|
| | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Neutropenia | 3 (13) | 3 (13) | 0 (0) | 6 (43) |
| Febrile neutropenia | 1 (4) | 0 (0) | 0 (0) | 1 (7) |
| Thrombocytopenia | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Neuropathy | 1 (4) | 0 (0) | 4 (29) | 0 (0) |
| Fatigue | 2 (8) | 0 (0) | 2 (14) | 0 (0) |
| Pain in extremity | 1 (4) | 0 (0) | 2 (14) | 0 (0) |
| ALT increased | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Diarrhea | 0 (0) | 1 (4) | 1 (7) | 0 (0) |
| Muscle weakness | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Pyrexia | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Sepsis | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Vomiting | 1 (4) | 0 (0) | 1 (7) | 0 (0) |
| Hypokalemia | 0 (0) | 0 (0) | 2 (14) | 0 (0) |
| AST increased | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Decreased appetite | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Dehydration | 2 (8) | 0 (0) | 0 (0) | 0 (0) |
| Renal failure acute | 2 (8) | 0 (0) | 0 (0) | 0 (0) |

(b)    The May 2019 Presentation also added, "We are conducting a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA." It described the hypothesis behind CONTESSA as being: "The all-oral regimen of tesetaxel plus a reduced dose of capecitabine will lengthen PFS ***while being well-tolerated as compared to capecitabine alone***." It included a chart illustrating the ongoing tesetaxel studies:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

94.     The misrepresentations and omissions in the May 2019 Presentation, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as

May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

95.    On June 7, 2019, Odonate gave an investor presentation that included a slide deck titled "Corporate Presentation June 2019" (the "June 2019 Presentation"). It described tesetaxel as follows: "Tesetaxel: An Orally Administered Taxane with Improved Pharmacologic Properties." In addition:

(a)    The June 2019 Presentation stated, "***Tesetaxel has been generally well tolerated in clinical studies***...." It summarized AE rates from prior clinical study in this chart:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS



## Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA

**187 patients treated with tesetaxel at 27 mg/m² Q3W as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31)**

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)

- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)

- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients

- There were no hypersensitivity reactions

(b)     The June 2019 Presentation also added, "We are conducting a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA."  It described the hypothesis behind CONTESSA as being: "The all-oral regimen of tesetaxel plus a reduced dose of capecitabine will lengthen PFS *while being well-tolerated as compared to capecitabine alone*."  It included a chart illustrating the ongoing tesetaxel studies:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

96.    The misrepresentations and omissions in the June 2019 Presentation, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as

May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

97.   In late June 2019, Defendants made several public statements in furtherance of the June 2019 Offering.

(a)   On June 25, 2019, Odonate issued a press release (the "6/25/2019 Press Release") announcing that it commenced the June 2019 Offering.  The 6/25/2019 Press Release stated that Odonate intended to use the proceeds from the offering "for development and regulatory activities relating to tesetaxel."

(b)   The same day, Odonate filed a preliminary prospectus supplement (the "6/25/2019 Prospectus Supplement") for the June 2019 Offering to fund the study

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of tesetaxel. The prospectus supplement touted tesetaxel as "**unique among taxanes**" because, among other things, it has **no history of hypersensitivity (allergic) reactions**." The 6/25/2019 Prospectus Supplement described CONTESSA, stating, "We are currently conducting multiple studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with HER2 negative, hormone receptor positive metastatic breast cancer, known as CONTESSA. **We expect to complete enrollment of CONTESSA in the second half of 2019 and to report topline results in 2020**."

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

(c)    On June 27, 2019, Odonate filed a prospectus supplement on Form 424B5 offering 4,750,000 of shares of common stock, making substantially the same statements as contained in the 6/25/2019 Prospectus Supplement.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

98.    The misrepresentations and omissions pertaining to the June 2019 Offering, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-

76

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

99.     Odonate announced its Q2 2019 quarterly results in a series of public statements on July 24, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)     That day, Odonate issued an earnings press release (the "7/24/2019 Earnings Release") announcing its financial and operating results for the three and six months ended June 30, 2019.   The 7/24/2019 Earnings Release touted the progress of the CONTESSA trials.   Defendant Tang was quoted as stating, "In March 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO…" and "*[w]e continue to expect to complete enrollment in CONTESSA…in the second half of 2019* and report top-line results in 2020."   The 7/24/2019 Earnings Release also touted the tolerability of tesetaxel stating that it is "*unique among taxanes*" including that it has "*no history of hypersensitivity reactions*."

(b)     The same day, Odonate also filed a Form 10-Q with the SEC for the second quarter of 2019 (the "Q2 2019 10-Q") signed and SOX-certified by Defendants Tang and Hearne.   The Q2 2019 10-Q touted tesetaxel as "*unique*

77

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*among taxanes*" because, *inter alia*, it has "***no history of hypersensitivity (allergic)***

***reactions***." The Q2 2019 10-Q described the CONTESSA trial, touted its efficacy,

and said, "***We expect to complete enrollment of CONTESSA in the second half of***

***2019 and report top-line results from CONTESSA in 2020***." It also described the

then-ongoing clinical trials of tesetaxel and listed them in this chart:

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

100. The misrepresentations and omissions in the 7/24/2019 Earnings

Release and the Q2 2019 10-Q, as alleged in the preceding paragraph, were

materially false and misleading, because as more fully described in the

"Undisclosed, Material, Negative Facts" section *supra*, the "Defendants'

Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth

in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when

combined with capecitabine raised significant safety concerns, in the form of highly

elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*,

78

neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

101.   On September 27, 2019, Odonate filed a prospectus on Form S-3 with the SEC, signed by Defendants Tang and Hearne, which became effective October 18, 2019 (the "October 2019 Form S-3"), offering to sell up to an aggregate of $200 million of common stock to fund the study of tesetaxel.  The October 2019 Form S-

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3 touted tesetaxel as "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."  It also touted the clinical trial progress of tesetaxel, stating, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA. ***We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020***."  It displayed the clinical trials in the following chart:

### Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

102.   The misrepresentations and omissions in the October 2019 Form S-3, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section

80

*supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant

Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

103.   On October 21, 2019, Odonate issued a press release (the "10/21/2019 Press Release") announcing completion of enrollment in the CONTESSA Phase 3 Study.  It stated that Odonate "today announced ***the completion of enrollment in CONTESSA***, a multinational, multicenter, randomized, Phase 3 study investigating tesetaxel as a potential treatment for patients with HER2 negative, hormone receptor positive metastatic breast cancer" and that it "***expects to report top-line results from CONTESSA in the third quarter of 2020***."  The 10/21/2019 Press Release reiterated Odonate's longstanding boasts that tesetaxel was "***unique among taxanes***," due to factors including that it has "***no history of hypersensitivity (allergic) reactions***."

104.  The misrepresentations and omissions in the 10/21/2019 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

105.   Odonate announced its Q3 2019 quarterly results in a series of public statements on November 6, 2019, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2   (a)   That day, Odonate issued an earnings press release (the "11/6/2019

3   Earnings Release") announcing its financial and operating results for the three and

4   nine months ended September 30, 2019.  The 11/6/2019 Earnings Release touted

5   the progress and efficacy of the CONTESSA trials.  Defendant Tang was quoted as

6   stating, "*We are pleased to have recently announced the completion of enrollment*

7   *in CONTESSA…We expect to report top-line results from CONTESSA in the*

8   *third quarter of 2020*."  The 11/6/2019 Earnings Release also again touted the

9   tolerability of tesetaxel stating that it is "*unique among taxanes*" for reasons

10   including that it has "*no history of hypersensitivity reactions*."

11   (b)   Also on November 6, 2019, Odonate filed a Form 10-Q with the SEC

12   for the third quarter of 2019 (the "Q3 2019 10-Q") signed and SOX-certified by

13   Defendants Tang and Hearne.  The Q3 2019 10-Q again touted tesetaxel as "*unique*

14   *among taxanes*" because, among other things, it has "*no history of hypersensitivity*

15   *(allergic) reactions*."   The Q3 2019 10-Q also touted the progress of the

16   CONTESSA clinical trial, stating in relevant part, "We are currently conducting

17   three studies in breast cancer, as shown in the following table, including a

18   multinational, multicenter, randomized, Phase 3 study in patients with human

19   epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR")

20   positive metastatic breast cancer ("MBC"), known as CONTESSA. *Enrollment in*

21   *CONTESSA is complete, and we expect to report top-line results from*

84

*CONTESSA in the third quarter of 2020*."  It displayed the progress of clinical trials in this chart:

### Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

106.   The misrepresentations and omissions in the 11/6/2019 Earnings Release and the Q3 2019 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and

85

anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

107.   Odonate announced its Q4 2019 quarterly and 2019 annual results in a series of public statements on February 20, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.  That day, Odonate issued an earnings press release (the "2/20/2020 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2019.  The 2/20/2020 Earnings

Release touted the progress of the CONTESSA trials.  Defendant Tang was once again quoted as stating, "*We are pleased to have recently announced the completion of enrollment in CONTESSA…We expect to report top-line results from CONTESSA in the third quarter of 2020*."  The 2/20/2020 Earnings Release again touted the tolerability of tesetaxel stating that it is "*unique among taxanes*" including that it has "*no history of hypersensitivity (allergic) reactions*."

108.   Also on February 20, 2020, Odonate filed its 2019 10-K, which was signed and SOX certified by Defendants Tang and Hearne.  The 2019 10-K once again touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel is "*unique among taxanes*" with "*no history of hypersensitivity (allergic) reactions*."

109.   The 2019 10-K also touted tesetaxel's tolerability both alone and in combination with capecitabine.

(a)   The 2019 10-K touted clinical results, stating:

*Tesetaxel, administered both alone and in combination with capecitabine, has been generally well tolerated*. In 8 studies (927A-PRT001, 927A-PRT004, 927E-PRT003, 927E-PRT005, 927E-PRT007, 927A-PRT006, TOST107 and TOST107XT), a total of 187 patients were treated with tesetaxel at 27 mg/m$^2$ once every three weeks as monotherapy (N=156) or in combination with capecitabine at 1,750-2,500 mg/m$^2$ (N=31).

(b)   Tesetaxel's adverse event profile across all studies to date was summarized in the following table:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Adverse Event Profile of 187 Patients at Doses Consistent with CONTESSA**

| 187 patients treated with tesetaxel at 27 mg/m² once every 3 weeks as monotherapy (N=156) or in combination with capecitabine at 1,750–2,500 mg/m² (N=31) |
| --- |

- The most common Grade ≥3 treatment-related adverse event was neutropenia (33%):
  - Febrile neutropenia (5%)

- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
  - Dehydration (5%)
  - Diarrhea (5%)
  - Fatigue (5%)
  - Anorexia (4%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
  - Nausea (3%)
  - Peripheral neuropathy (3%)
  - Vomiting (2%)

- Treatment-related alopecia (any grade) occurred in 14% of patients overall, and Grade 2 treatment-related alopecia occurred in 3% of patients

- There were no hypersensitivity reactions

110. The 2019 10-K stated, "We are conducting a multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that is comparing tesetaxel dosed orally at 27 mg/m² on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m²/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m²/day on the first 14 days of a 21-day cycle) in approximately 600 patients with HER2 negative, HR positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It added, "In October 2019, we announced that **enrollment in CONTESSA was complete**. We **expect to report top-line results from CONTESSA in the third quarter of 2020**." It added, "We are currently conducting three clinical studies in breast cancer, including CONTESSA, a multinational, multicenter, randomized Phase 3 study of tesetaxel in patients with MBC, as shown in the following table."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC= metastatic breast cancer; TNBC=triple-negative breast cancer

111.   The 2019 10-K described the rationale underlying CONTESSA: "***Clinical studies support investigating the combination of a taxane with a reduced dose of capecitabine such as 1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle, the dose of capecitabine chosen for combination with tesetaxel in CONTESSA***. In a review of 18 first-line MBC studies of taxane plus capecitabine combinations shown in the following table, there was no apparent loss of efficacy when comparing capecitabine at 1,650 mg/m$^2$/day to capecitabine at 2,000 mg/m$^2$/day (on the first 14 days of a 21-day cycle). Among these studies, the capecitabine 1,650 mg/m$^2$/day dose was the most studied dose less than 2,000 mg/m$^2$/day (5/8 studies)."

**Support for Combining Capecitabine at 1,650 mg/m²/day[1] with a Taxane**

| Taxane+Capecitabine Studies Conducted at a Capecitabine Dose of: | # of Studies | # of Patients | ORR | PFS (months) | OS (months) |
|---|---|---|---|---|---|
| 1,900-2,000 mg/m²/day[1],[2] | 10 | 498 | 53% | 10.5 | 27.4 |
| 1,800 mg/m²/day[1],[3] | 2 | 195 | 55% | 10.4 | 25.9 |
| 1,650 mg/m²/day[1],[4] | 5 | 436 | 64% | 11.8 | 27.2 |
| 1,500 mg/m²/day[1],[5] | 1 | 37 | 50% | NA | NA |

ORR=objective response rate; OS=overall survival; PFS=progression-free survival
(1)  Days 1-14 of a 21-day cycle
(2)  Bachelot et al., *Oncology* 2011;80(3-4):262-268; Campone et al., *The Breast Journal* 2013;19(3):240-249; Chitapanarux et al., *Asia-Pacific Journal of Clinical Oncology* 2012;8:76-82; Fan et al., *Annals of Oncology* 2013;24:1219-1225; Liao et al., *Chemotherapy* 2013;59:207-213; Michalaki et al., *Anti-Cancer Drugs* 2009;20(3):204-207; Michalaki et al., *Anticancer Research* 2010;30:3051-3054; Venturini et al., *Cancer* 2003;97(5):1174-1180; Wang et al., *Cancer* 2015;121:3412; Wardley et al., *Journal of Clinical Oncology* 2010;28(6):976-983
(3)  Bisagni et al., *Cancer Chemotherapy and Pharmacology* 2013;71(4):1051-1057; Luck et al., *Breast Cancer Research and Treatment* 2015;149:141-149
(4)  Hatschek et al., *Breast Cancer Research and Treatment* 2012;131(3):939-947; Lam et al., *European Journal of Cancer* 2014;50(18):3077-3088; Perez et al., *Annals of Oncology* 2010;21(2):269-274; Schwartzberg et al., *Clinical Breast Cancer* 2012;12(2):87-93; Tonyali et al., *Journal of Cancer Research and Clinical Oncology* 2013;139(6):981-986
(5)  Silva et al., *Clinical Breast Cancer* 2008;8(2):162-167

112.   The 2019 10-K also cited to a researcher, Alain Lortholary, who stated that "***the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity***, and highlights the importance of administering capecitabine using a schedule that optimizes dose intensity and tolerability."  The 2019 10-K further stated, "we believe that the data support the investigation of tesetaxel at 27 mg/m² on the first day of a 21-day cycle plus capecitabine at 1,650 mg/m²/day on the first 14 days of a 21-day cycle as a novel, all-oral regimen with a potentially favorable benefit-risk profile for the treatment of patients with HER2 negative, HR positive MBC."

113.   The misrepresentations and omissions from the 2/20/2020 Earnings Release and the 2019 10-K, as alleged in ¶¶107-112, *supra*, were materially false

and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

114.   Odonate announced its Q1 2020 quarterly results in a series of public statements on April 28, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)   That day, Odonate issued an earnings release (the "4/28/2020 Earnings Release") announcing its financial and operating results for the three months ended March 31, 2020.   The 4/28/2020 Earnings Release touted the progress of the CONTESSA trials.  Defendant Tang was quoted as stating, "***We continue to expect to report top-line results from CONTESSA…in the third quarter of 2020***."   The 4/28/2020 Earnings Release also touted the tolerability of tesetaxel stating that it is "***unique among taxanes***" including that it has "***no history of hypersensitivity (allergic) reactions***."

(b)   Also on April 28, 2020, Odonate filed a form 10-Q with the SEC for the first quarter of 2020 (the "Q1 2020 10-Q) signed and SOX-certified by Defendants Tang and Hearne.  The Q1 2020 10-Q again touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."   It reiterated, referencing the table shown below, "We are currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

with MBC, known as CONTESSA." It elaborated, stating, "We are conducting a multinational, multicenter, randomized, Phase 3 study, known as CONTESSA, that is comparing tesetaxel dosed orally at 27 mg/m$^2$ on the first day of a 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m$^2$/day on the first 14 days of a 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day on the first 14 days of a 21-day cycle) in approximately 600 patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It added, "In October 2019, we announced that **enrollment in CONTESSA was complete**. **We expect to report top-line results from CONTESSA in the third quarter of 2020**."

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

93

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

115. The misrepresentations and omissions in the 4/28/2020 Earnings Release and the Q1 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-

94

weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

116.   Odonate announced its Q2 2020 quarterly results in a series of public statements on July 30, 2020, which discussed tesetaxel and clinical study progress to date, including developments regarding Odonate's CONTESSA clinical trials.

(a)   That day, Odonate issued an earnings release (the "7/30/2020 Earnings Release") announcing its financial and operating results for the three and six months ended June 30, 2020.  The 7/30/2020 Earnings Release touted the progress of the CONTESSA trials.  Defendant Tang was again quoted as stating, "***We continue to expect to report top-line results from CONTESSA…in the third quarter of 2020***."  The 7/30/2020 Earnings Release also reiterated positive characterizations of the tolerability of tesetaxel, stating that it is "***unique among taxanes***" for reasons including that it has "***no history of hypersensitivity (allergic) reactions***."

(b)   On the same day, Odonate filed a form 10-Q with the SEC for the second quarter of 2020 ("the Q2 2020 10-Q") signed and SOX-certified by Defendants Tang and Hearne.  It once again touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."  It reiterated, referencing the table shown below, "We are

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

currently conducting three studies in breast cancer, as shown in the following table, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA." It elaborated, stating, "CONTESSA is a multinational, multicenter, randomized, Phase 3 study of tesetaxel, an investigational, orally administered taxane, in patients with MBC. CONTESSA is comparing tesetaxel dosed orally at 27 mg/m$^2$ on the first day of each 21-day cycle plus a reduced dose of capecitabine (1,650 mg/m$^2$/day dosed orally for 14 days of each 21-day cycle) to the approved dose of capecitabine alone (2,500 mg/m$^2$/day dosed orally for 14 days of each 21-day cycle) in approximately 600 patients randomized 1:1 with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive MBC previously treated with a taxane in the neoadjuvant (prior to surgery) or adjuvant (immediately following surgery) setting." It added, "In October 2019, we announced that *enrollment in CONTESSA was complete*. *We expect to report top-line results from CONTESSA in the third quarter of 2020*."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### Ongoing Tesetaxel Clinical Studies

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 600 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2= human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

117. The misrepresentations and omissions in the 7/30/2020 Earnings Release and the Q2 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse

97

approval of any NDA of tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

118.   In late August 2020, Defendants made several public statements in furtherance of the September 2020 Offering.

(a)   On August 26, 2020, Odonate issued a press release (the "8/26/2020 Press Release") announcing that it commenced the September 2020 Offering.  The 8/26/2020 Press Release stated that Odonate intended to use the proceeds from the offering "for development, regulatory and commercial preparation activities relating to tesetaxel."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)     The same day, Defendants caused to be filed Odonate's preliminary prospectus supplement (the "8/26/2020 Prospectus Supplement") with the SEC for the September 2020 Offering. It touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***." It added, "We are currently conducting three studies in breast cancer, as shown in the following table.  We have announced positive top-line results from a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA.   Our goal for tesetaxel is to develop an effective chemotherapy choice for patients that provides quality-of-life advantages over current alternatives.  ***We plan to submit a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") in mid-2021.***"  It described the CONTESSA top-line results as revealing Grade ≥3 treatment-emergent AEs that occurred in ≥5% of patients included neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (12.8% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in ≥1% of patients included neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

patients treated with capecitabine alone, before ***muting the impacts*** of these AE

disclosures by adding, "Tesetaxel plus capecitabine was associated with what we

believe are ***manageable side effects***." The 8/26/2020 Prospectus Supplement

added, "While [Overall Survival (OS)] data are not mature, a recent interim analysis

indicated the ***absence of an adverse effect*** on OS for tesetaxel plus a reduced dose

of capecitabine. A final analysis of OS is expected to occur in 2022…***We plan to

submit an NDA for tesetaxel to the FDA in mid-2021***." It also stated that clinical

trials remain ongoing, including trials of tesetaxel as a monotherapy, as shown in

the following chart:

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

(c)   On August 31, 2020, Defendant caused to be filed with the SEC

Odonate's prospectus supplement on Form 424B5 ("the 8/31/2020 Prospectus

Supplement") offering 5,614,036 of shares of common stock. Like the 8/26/2020

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Prospectus Supplement, it touted tesetaxel as "***unique among taxanes***" because, among other things, it has "***no history of hypersensitivity (allergic) reactions***."  It added, "We are currently conducting three studies in breast cancer, as shown in the following table.  We have announced positive top-line results from a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA.  Our goal for tesetaxel is to develop an effective chemotherapy choice for patients that provides quality-of-life advantages over current alternatives.  ***We plan to submit a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") in mid-2021.***"  Like the 8/26/2020 Prospectus Supplement, it described the CONTESSA top-line results as revealing Grade $\geq 3$ treatment-emergent AEs that occurred in $\geq 5\%$ of patients included neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (12.8% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in $\geq 1\%$ of patients included neutropenia or febrile neutropenia (4.2 for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone, before ***muting the impacts*** of these AE disclosures by adding, "Tesetaxel plus capecitabine was associated with what we

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

believe are ***manageable side effects***." The 8/31/2020 Prospectus Supplement added, "While [Overall Survival (OS)] data are not mature, a recent interim analysis indicated the ***absence of an adverse effect*** on OS for tesetaxel plus a reduced dose of capecitabine. A final analysis of OS is expected to occur in 2022…***We plan to submit an NDA for tesetaxel to the FDA in mid-2021.***" It also stated that clinical trials remain ongoing, including trials of tesetaxel as a monotherapy, as shown in the following chart:

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer;
TNBC=triple-negative breast cancer

119. The misrepresentations and omissions pertaining to the September 2020 Offering, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless

102

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

120.   Odonate announced its Q3 2020 quarterly results in a series of public statements on October 28, 2020, which discussed tesetaxel, clinical trial progress and purportedly positive CONTESSA top-line results, and Odonate's purported continuing plans to submit a New Drug Application ("NDA") to FDA seeking tesetaxel's approval.

(a)   On October 28, 2020, Odonate issued an earnings press release (the "10/28/2020 Earnings Release") announcing its financial and operating results for the three and nine months ended September 30, 2020.  The 10/28/2020 Earnings Release touted tesetaxel and the purportedly positive top-line results of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are pleased to have recently announced **positive top-line results from CONTESSA**, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer."  He also stated, "***We continue to plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021.***"

(b)   Also on October 28, 2020, Odonate also filed a Form 10-Q with the SEC for the third quarter of 2020 (the "Q3 2020 10-Q"), signed and SOX-certified by Defendants Tang and Hearne.  It touted tesetaxel as having "***no history of hypersensitivity (allergic) reactions***."  It added, "In August 2020, the Company announced **positive top-line results** from a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA.  **We plan to submit a**

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*New Drug Application ("NDA") for tesetaxel to the U.S. Food and Drug Administration ("FDA") in mid-2021*."  It described the CONTESSA top-line results as revealing Grade ≥3 treatment-emergent AEs that occurred in ≥5% of patients included neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (12.8% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in ≥1% of patients included neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone, before *muting the impacts* of the AE disclosures by adding, "Tesetaxel plus capecitabine was associated with what we believe are *manageable side effects.*"  It added, "While [Overall Survival (OS)] data are immature, a recent interim analysis indicated the *absence of an adverse effect* on OS for tesetaxel plus a reduced dose of capecitabine.  A protocol-specified final analysis of OS is expected to occur in 2022.  It also stated that clinical trials remain ongoing, including trials of tesetaxel as a monotherapy, as shown in the following chart:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer

121. The misrepresentations and omissions in the 10/28/2020 Earnings Release and the Q3 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment

106

alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

122.   On November 27, 2020, Odonate filed a prospectus on Form S-3 with the SEC, signed by Defendants Tang and Hearne, which became effective December 8, 2020 (the "2020 Form S-3"), offering to sell up to an aggregate of $150,000,000 of common stock to fund tesetaxel's study.  The 2020 Form S-3 touted tesetaxel as "***unique among taxanes***," including that it has "***no history of hypersensitivity (allergic) reactions***."  It stated, "In August 2020, we announced

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*positive top-line results* from a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA. ***We plan to submit a New Drug Application for tesetaxel to the U.S. Food and Drug Administration ("FDA") in mid-2021."*** The 2020 Form S-3 described the CONTESSA top-line results as revealing Grade ≥3 treatment-emergent AEs that occurred in ≥5% of patients included neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (12.8% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in ≥1% of patients included neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone, before ***muting the impacts*** of the AE disclosures by adding, "Tesetaxel plus capecitabine was associated with what we believe are ***manageable side effects.***" It added, "While [Overall Survival (OS)] data are immature, a recent interim analysis indicated the ***absence of an adverse effect*** on OS for tesetaxel plus a reduced dose of capecitabine. A protocol-specified final analysis of OS is expected to occur in 2022. It also stated that clinical trials remain ongoing, including trials of tesetaxel as a monotherapy, as shown in the following chart:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Tesetaxel Clinical Studies**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HER2 negative, HR positive MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 125 | HER2 negative, HR positive MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 90-150 | Metastatic TNBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 40-60 | Elderly (≥ 65 years old) with HER2 negative MBC | Tesetaxel monotherapy |

HER2=human epidermal growth factor receptor 2; HR=hormone receptor; MBC=metastatic breast cancer; TNBC=triple-negative breast cancer.

123.   The misrepresentations and omissions in the 2020 Form S-3, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or

109

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel. As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

124. On December 7, 2020, Odonate issued a press release (the "12/7/2020 Press Release") announcing its initiating Cohort 3 of CONTESSA TRIO to evaluate tesetaxel monotherapy in patients with metastatic breast cancer. The 12/7/2020 press release stated:

> Cohort 3 of CONTESSA TRIO will complement Cohort 2 of CONTESSA TRIO, which is evaluating tesetaxel monotherapy in approximately 60 elderly patients with HER2-negative MBC.
>
> Cohorts 2 and 3 of CONTESSA TRIO will expand on results from TOB203, a Phase 2 study that evaluated tesetaxel monotherapy in 38

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

patients with hormone receptor-positive, HER2-negative MBC. In this study, the confirmed response rate was 45%. ***Neutropenia was the most common Grade ≥3 adverse event and occurred in 32% of patients, and febrile neutropenia occurred in 5% of patients***. The results of TOB203 were presented at the 2018 American Society of Clinical Oncology (ASCO) Annual Meeting.

"Taken together, TOB203 and CONTESSA TRIO will evaluate tesetaxel monotherapy in more than 150 patients with metastatic breast cancer," said Lee Schwartzberg, M.D., FACP, Chief Medical Director, West Cancer Center & Research Institute. "***The promising clinical results to date, combined with tesetaxel's unique, once-every-three-weeks oral dosing regimen, make this investigational agent an exciting potential new treatment option for patients***."

125.    The misrepresentations and omissions in the 12/7/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August

111

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

126. On December 11, 2020, Odonate issued a press release (the "12/11/2020 Press Release") that it filed with the SEC on December 14, 2020 as Exhibit 99.1 to Form 8-K signed by Defendant Hearne (the "12/14/2020 Form 8-K"), announcing that purportedly "*positive results from CONTESSA*" were presented at the 2020 San Antonio Breast Cancer Symposium (SABCS). The 12/11/2020 Press Release touted tesetaxel as "*unique among taxanes*" with "*no history of hypersensitivity (allergic) reactions*." It described the CONTESSA top-line results (deviating slightly from prior-reported figures) as revealing Grade ≥3 treatment-emergent AEs that occurred in ≥5% of patients included neutropenia

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(70.9% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (13.1% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in ≥1% of patients included neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone, before *muting the impacts* of the AE disclosures by adding, "Tesetaxel plus capecitabine was associated with a *manageable side effect profile.*"  The 12/11/2020 Press Release also stated that there were "*low rates of clinically significant* hair loss and *neuropathy*."  It added, "While [Overall Survival (OS)] data are immature, a recent interim analysis indicated the *absence of an adverse effect* on OS for tesetaxel plus a reduced dose of capecitabine.  A protocol-specified final analysis of OS is expected to occur in 2022."  Defendant Tang specifically assured investors that tesetaxel was on track for approval, stating, "We look forward to working closely with global regulatory authorities to make tesetaxel available to patients with metastatic breast cancer. *We plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021.*"

127.   The 12/11/2020 Press Release attached slides from the SABCS presentation (the "2020 SABCS Slides") entitled "*Results from CONTESSA: A*

113

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Phase 3 study of tesetaxel plus a reduced dose of capecitabine versus capecitabine alone in patients with HER2- , hormone receptor + (HR+) metastatic breast cancer (MBC) who have previously received a taxane*."  The 2020 SABCS Slides made materially false and misleading statements regarding CONTESSA and tesetaxel's clinical trial progress, as follows:

(a)     Before presenting CONTESSA results, the 2020 SABCS Slides touted prior Phase 1 and Phase 2 results of tesetaxel as a monotherapy stating that "Grade ≥ 3 neuropathy = 3%", "Grade 2 alopecia = 5%", and "***No hypersensitivity reactions***."

(b)     Regarding the CONTESSA top-line results, the 2020 SABCS Slides reported all Grade treatment-emergent AEs that occurred in ≥ 20% of patients which included, *inter alia*, neutropenia (76.9% for tesetaxel plus capecitabine vs. 22.6% for capecitabine alone) and neuropathy (48.1% for tesetaxel plus capecitabine vs. 13.6% for capecitabine alone).

(c)     The 2020 SABCS Slides further divided the aggregate AE data into Grade categories, reporting Grade ≥3 and Grade ≥4 treatment-emergent AEs that occurred in ≥5% of patients, including, *inter alia*, neutropenia (Grade 3 of 32.6% and Grade 4 of 38.3% for tesetaxel plus capecitabine vs. Grade 3 of 7.4% and Grade 4 of 0.9% for capecitabine alone), febrile neutropenia (Grade 3 of 10.4% and Grade

4 of 2.7% for tesetaxel plus capecitabine vs. Grade 3 of 0.3% and Grade 4 of 0.9% for capecitabine alone).

(d)     The 2020 SABCS Slides also reported that AE events resulting in treatment discontinuation in ≥1% of patients for neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone) and that treatment discontinuation due to any adverse event occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone.

(e)     The 2020 SABCS Slides also muted the impacts of the AE disclosures by stating that neutropenia was "***generally manageable***."

128.   The misrepresentations and omissions in the 12/11/2020 Press Release and the 2020 SABCS Slides, as alleged in the preceding two paragraphs, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%),

115

diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

129.  On December 11, 2020, Odonate also held a "Virtual Investor and Analyst Event" (the "12/11/2020 VIA Event"), during which Defendant Tang discussed with analysts CONTESSA's results that were presented earlier that day at the 2020 San Antonio Breast Cancer Symposium.  Defendant Tang also

referenced presentation slides entitled "*Virtual Investor and Analyst Event*" (the "12/11/2020 VIA Event Slides") that Odonate filed with the SEC on December 15, 2020 as an exhibit to a Form 8-K signed by Defendant Hearne.  During the 12/11/2020 VIA Event, Defendants made several materially false and misleading misstatements and omissions, including:

(a)     In prepared remarks, Defendant Tang touted tesetaxel's Phase 1 and Phase 2 trial results, particularly its use as a monotherapy and that the purportedly positive results from those trials, including neutropenia rates, were the drivers for the initiation of the CONTESSA trials.  Moreover, Defendant Tang told analysts that Odonate was ***engaged in discussions with the FDA***, without any mention of skepticism, hesitancy, or concern by FDA.  Defendant Tang stated:

> Now importantly, as mentioned on that slide at the beginning, efficacy needs to be measured in the context of tolerability and here, we show all of the data from the entire Phase 1 and 3 program of tesetaxel monotherapy at the Phase 3 dose of 27 mgs per meter squared given once every three weeks. And what you can see is neutropenia is, in fact, the dose-limiting toxicity. ***In 32% of patients, there was Grade 3 or higher neutropenia that is consistent with other taxanes, febrile neutropenia rate of about 3%.*** And you can see ***notably the non-hematologic adverse events were quite low with very low rates of neuropathy***, GI toxicity and clinically significant alopecia, grade 2 alopecia, all in the low to mid-single digits.
>
> ***So with this positive experience, the company went to the FDA to discuss registration study***, and we're very pleased to the reporting on Dr. O'Shaughnessy's report this morning of CONTESSA, the results of CONTESSA that were presented in an oral presentation at San Antonio this morning.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)      Defendant Tang also presented the results of the CONTESSA trials, including AE data, stating:

> If you look at neuropathy on the bottom of the table, in the combination arm, it occurred in Grade 3 neuropathy for -- in 5.3% of patients, and Grade 4 occurred in 0.6% of patients. We will come back to that in a couple of slides.
>
> So with regard to the neutropenia, we think it is notable to mention that **only 4.2% of patients discontinued treatments due to neutropenia or febrile neutropenia in the doublet arm or the combination arm.** This compares to 1.5% in the capecitabine alone arm. Sepsis or septic shock was 1.8% versus 0.6%. And then hand-foot syndrome, you can see was higher on the capecitabine alone arm, 0.6% on the combination versus 2.1% on the monotherapy arm.
>
> *******
>
> **The treatment discontinuation rate due to neutropenia was low**, and **the rates of clinically significant neuropathy** or hair loss **were also low in the single digits**. And so therefore, **this study would suggest that tesetaxel plus a reduced dose of capecitabine may represent a new treatment option** for patients with hormone receptor positive HER2-negative metastatic breast cancer.

(c)      Further muting the AE data, Defendant Tang stated, "**Neutropenia** was the most frequent Grade 3 or higher TEAE, that adverse effect **was generally manageable,** primarily with dose reductions, but also with GCSF [growth factor] as needed" and "**[n]otably, all of these adverse events with the single exception of neutropenia were primarily Grade 1 or 2**."

(d)      Defendant Tang presented information to specifically address concerns about the high rate of neutropenia in the CONTESSA trials, stating:

118

*We're often asked why is the neutropenia rate so much higher in CONTESSA than in the prior studies?* If you remember, in the monotherapy studies, the rate of Grade 3 or 4 neutropenia with tesetaxel is about 30% to 35%. And in CONTESSA, it was about 70%. Here, you can see that, *of course, when you combine two chemotherapies, both of which have an effect on neutrophils, it is not surprising then that giving them together, you're going to have a higher rate of Grade 3 or 4 neutropenia.*

This is just to show you data from CONTESSA itself that the capecitabine alone arm led to about a 50% reduction in the absolute neutrophil count, which then makes it unsurprising that when you add tesetaxel, you have a further reduction in the neutrophil count -- absolute neutrophil count.

This parenthetically is very consistent. *If* you go back to the prior slide, and *you were to look up the rates in these other studies, you also see rates of about 70% of Grade 3 or 4 neutropenia with the doublets*.

This is a slide on the time course of the neutropenia. And we were very pleased to see that quite reliably in each cycle, the median AMC Mater, the low point, has reached at about day 8 or day 9, and the median day of recovery is day 15. And *so this time course is both consistent with what you see with other taxanes when you give them once every three weeks, and it's also consistent with the choice of a 20-day -- 21-day treatment cycle for tesetaxel, i.e. in the vast majority of cases, the neutrophils recover before day 21 when you're considering giving the next cycle of therapy.*

One more slide on neutropenia. This is just to show that *when it occurred in CONTESSA, it tended to occur early*, you can see *the vast majority of cases of Grade 3, 4 neutropenia occurred in cycles 1 or 2, and then they tended to last for a median of two cycles.* So *they occur early and then don't -- do not persist for very long or they persist for a median of two cycles, which is, again, consistent with the conclusion that the neutropenia was manageable with those adjustments and growth factor, and that's also consistent with the 4% discontinuation rate in the study due to neutropenia.*

(e)     Defendant Tang further assured investors of the continued viability of

tesetaxel and its prospect for FDA approval by touting the positive results of prior

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Phase 1 and Phase 2 tesetaxel monotherapy trials and continued trials of tesetaxel,

particularly as a monotherapy, stating:

> Lastly, I do want to mention our investigation of tesetaxel continues. You can see the studies listed here **there's obviously a lot of interest in tesetaxel monotherapy, thanks to the positive results from the Phase 2 monotherapy study** shown earlier. And **for that reason, we are expanding our clinical experience with cohorts 2 and cohorts 3 of CONTESSA Trio**, the bottom two rows here where we are enrolling 120 patients with HER2-negative metastatic breast cancer and giving them tesetaxel at the same 27 mgs per square meter squared Q3 weekly dosing regimen as was given in our pivotal Phase 3 study. So we plan to continue with these studies and, of course, make these studies available the results when these studies available at medical meetings and through publications so that physicians get a more full understanding of how the drug can be used in metastatic breast cancer.

(f)    In the Q & A portion of the 12/11/2020 Conference Call, Defendant

Tang assured investors of tesetaxel's continued viability during the following

exchange with an analyst:

> [Analyst]: Two questions for me, one for the doctors and one for the company. For the doctors, given that CDK 4/6 is standard of care, as has been referenced previously, but then in the forest plot, it didn't -- it just missed showing a statistically significant result in that population, recognizing the study size. Do you feel comfortable using it, tesetaxel here in a post CDK 4/6 population? **And my question for the company is, can you maybe provide any update on whether you've had a post Phase 3 or pre-NDA discussion and the status of your drug-drug interaction study**.
>
> *****
>
> [Defendant Tang]: Okay. On your second question, what we've said is we plan to submit to the FDA an NDA in the middle of next year. We are obviously busy at work compiling as thorough of an NDA as possible. And if there are material updates on kind of our regulatory

120

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

status, we will, of course, disclose those as appropriate. ***But I can say, as of now, we're on track with our goal to submit an NDA in the middle of next year.***

On the DDI study, if you remember on our last call in August, we had mentioned, we are through the prespecified interim look, and that indicated no effect -- no QT effect. I can now confirm that study is finished. And in fact, there was no QT effect. So that is also being busily compiled and will be written up for part of the NDA.

(g)     The 12/11/2020 VIA Event Slides included the 2020 SABCS Slides, and therefore repeated the misstatements and omissions set forth therein, as alleged in ¶129(a)-(f), *supra*.   Like the 2020 SABCS Slides, the 12/11/2020 VIA Event Slides muted the impacts of the AE disclosures by stating that neutropenia was "***generally manageable***."   They added for patients in the CONTESSA trials who experienced Grade 3 neutropenia, the median duration was 2 cycles as shown in the chart below:



SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(h)     The 12/11/2020 VIA Event Slides also touted tesetaxel's potential as a monotherapy, stating results of prior Phase 1 and Phase 2 studies, including tesetaxel's AE profile across all completed studies:



**Adverse Event Profile of Patients Treated with Tesetaxel Monotherapy at the Dose Used in CONTESSA**

187 patients treated with tesetaxel monotherapy at 27 mg/m² Q3W in completed Phase 1 and Phase 2 studies

- The most common Grade ≥3 treatment-related adverse event was neutropenia (32%):
    - Febrile neutropenia (3%)
- The most common non-hematologic Grade ≥3 treatment-related adverse events were:
    - Diarrhea (6%)
    - Decreased appetite (5%)
    - Dehydration (5%)
    - Fatigue (5%)
- Other non-hematologic Grade ≥3 treatment-related adverse events include:
    - Peripheral neuropathy (3%)
    - Nausea (3%)
    - Vomiting (2%)
- Any grade treatment-related alopecia (hair loss) occurred in 19% of patients overall, and Grade 2 treatment-related alopecia (hair loss) occurred in 5% of patients
- There were no hypersensitivity reactions

odonate

17

The slides also highlighted the percentages for grade ≥ 3 neuropathy (3%) and grade 2 alopecia (5%) for the patients treated with tesetaxel monotherapy, while stating that there were ***"no hypersensitivity reactions."***

(i)     The 12/11/2020 VIA Event Slides continued to tout tesetaxel's viability as an FDA-approved treatment for MBC, even after the CONTESSA top-line results announcement, stating, "Tesetaxel plus a reduced dose of capecitabine is a potential new treatment option for patients with HR positive, HER2 negative MBC." They showcased ongoing clinical trials, including as a monotherapy:

122

Ongoing Clinical Studies of Tesetaxel in Patients with MBC

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HR-positive, HER2-negative MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 149 | HR-positive, HER2-negative MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 200* | Triple-negative MBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 60* | Elderly (≥65 years old) with HER2-negative MBC | Tesetaxel monotherapy |
| CONTESSA TRIO Cohort 3 | 2 | 60* | Non-elderly (≥18 to <65 years old) with HER2-negative MBC | Tesetaxel monotherapy |

odonate   * Planned

42

130.   The misrepresentations and omissions in the 12/11/2020 VIA Event and the 12/11/2020 VIA Event Slides described in the preceding paragraph were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were

123

grounds for the FDA, with which Defendants were admittedly in discussions by this point, to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

131.   Defendants' misrepresentations and omissions in early December 2020 had their intended effect.  For example, a December 11, 2020 Cowen report entitled "*SABCS Presentation Reinforces Tesetaxel is a Better Taxane*," stated that it found "incremental details around neutropenia reassuring that tesetaxel has an improved profile relative to infused taxanes" and "therefore continue to expect CONTESSA to support FDA approval."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

132.   Odonate announced is Q4 2020 and 2020 annual results in a series of public statements on February 23, 2021, which discussed tesetaxel and the purportedly positive CONTESSA top-line clinical trial results and continued plans to submit an NDA for tesetaxel.  That day, Odonate issued an earnings press release (the "2/23/2021 Earnings Release") announcing its financial and operating results for the three and twelve months ended December 31, 2020.  It touted tesetaxel as "*unique among taxanes*" with "*no history of hypersensitivity (allergic) reactions)*."  It quoted Defendant Tang as stating, "Positive results of CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer, were recently presented at the 2020 San Antonio Breast Cancer Symposium."  Tang also stated, *"We continue to plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021*."

133.   On February 23, 2021, Odonate also filed an annual report on Form 10-K with the SEC, reporting Odonate's financial and operating results for Q4 and full year ended December 31, 2020 (the "2020 10-K"), which was signed and SOX certified by Defendants Tang and Hearne.  The 2020 10-K touted tesetaxel's safety and tolerability profile, stating, in relevant part, that tesetaxel is "*unique among taxanes*" with "*no history of hypersensitivity (allergic) reactions*."  The 2020 10-K discussed CONTESSA results, stating that "the most common Grade ≥3 treatment-emergent adverse events ("TEAEs") associated with tesetaxel plus

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

capecitabine was neutropenia," that AEs resulting in treatment discontinuation in ≥1% of patients were due to neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) or neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone), and that treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone.  The 2020 10-K muted these statements by stating that the "[r]ates of Grade ≥3 neuropathy and Grade 2 alopecia (hair loss) were low," stating that "[t]here were *no treatment-related hypersensitivity reactions*," and disaggregating AEs into Grade 3 and Grade 4 results, as shown on this chart:

**Grade ≥3 TEAEs That Occurred in ≥5% of Patients in Either Arm**

| System Organ Class | TEAE | Tesetaxel plus Capecitabine (N=337) (%) | | Capecitabine Alone (N=337) (%) | |
|---|---|---|---|---|---|
| | | Grade 3 | Grade 4 | Grade 3 | Grade 4 |
| Hematologic | Neutropenia | 32.6 | 38.3 | 7.4 | 0.9 |
| | Febrile neutropenia | 10.4 | 2.7 | 0.3 | 0.9 |
| | Anemia | 8.0 | 0.0 | 2.4 | 0.0 |
| | Leukopenia | 6.8 | 3.0 | 0.6 | 0.3 |
| Gastrointestinal | Diarrhea | 12.5 | 0.6 | 8.9 | 0.0 |
| | Nausea | 6.2 | 0.0 | 2.1 | 0.0 |
| Other | Fatigue | 8.6 | 0.0 | 4.5 | 0.0 |
| | Hypokalemia | 8.0 | 0.6 | 2.7 | 0.0 |
| | Hand-foot syndrome | 6.8 | 0.0 | 12.2 | 0.0 |
| | Neuropathy[1] | 5.3 | 0.6 | 0.9 | 0.0 |

Grade 2 alopecia (hair loss) (tesetaxel plus capecitabine vs. capecitabine alone): 8.0% vs. 0.3%

No treatment-related hypersensitivity reactions

[1] Pooled term includes: paraesthesia, peripheral sensory neuropathy, polyneuropathy, neuropathy peripheral and peripheral motor neuropathy for all tables
Note: Safety population includes 674 patients who were randomized and treated

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

134.   The 2020 10-K also highlighted tesetaxel's tolerability as a monotherapy, based on tesetaxel's AE profile from Phase 1 and Phase 2 study results, as shown in this chart:

**AE Profile of Patients Treated with Tesetaxel Monotherapy at the Dose Used in CONTESSA**

| 187 patients treated with tesetaxel monotherapy at 27 mg/m$^2$ Q3W in completed Phase 1 and Phase 2 studies |
|---|

- The most common Grade ≥3 treatment-related adverse event ("TEAE") was neutropenia (32%):
  - Febrile neutropenia (3%)
- The most common non-hematologic Grade ≥3 TEAEs were:
  - Diarrhea (6%)
  - Decreased appetite (5%)
  - Dehydration (5%)
  - Fatigue (5%)
- Other non-hematologic Grade ≥3 TEAEs include:
  - Peripheral neuropathy (3%)
  - Nausea (3%)
  - Vomiting (2%)
- Any grade treatment-related alopecia (hair loss) occurred in 19% of patients overall, and Grade 2 treatment-related alopecia (hair loss) occurred in 5% of patients
- There were no hypersensitivity reactions

135.   The 2020 10-K also touted the viability of tesetaxel for FDA approval by stating, "While OS data are immature, a protocol-specified interim analysis indicated the ***absence of an adverse effect*** on OS for tesetaxel plus a reduced dose of capecitabine." It added that a "protocol-specified final analysis of OS is expected in 2022." The 2020 10-K also stated that tesetaxel trials remained ongoing, including monotherapy trial, as shown on the following chart:

127

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Ongoing Clinical Studies of Tesetaxel in Patients with MBC**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HR-positive, HER2-negative MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 150 | HR-positive, HER2-negative MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 200[(1)] | Triple-negative MBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 69 | Elderly (≥65 years old) with HER2-negative MBC | Tesetaxel monotherapy |
| CONTESSA TRIO Cohort 3 | 2 | 60[(1)] | Non-elderly (≥18 to <65 years old) with HER2-negative MBC | Tesetaxel monotherapy |

(1)   Planned

136.   The misrepresentations and omissions from the 2/23/2020 Earnings Release and the 2020 10-K, as alleged in ¶¶132-135, *supra*, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for

128

the FDA, with which Defendants were admittedly in discussions by this point, to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

137.  On February 23, 2021, Odonate filed with the SEC a Form 8-K (the "2/23/2021 Form 8-K"), signed by Defendant Hearne, announcing that it had entered into an Open Market Sale Agreement with Jefferies LLC, pursuant to which it could offer and sell up to $100 million in common shares, from time to time, in "at the market" offerings through Jefferies, pursuant to the Registration Statement that became effective October 18, 2019.  The same day, Odonate filed a prospectus supplement with the SEC on Form 424B5 (the "2/23/2021 Prospectus Supplement")

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

offering to sell up to $100 million of common shares under the Open Market Sale Agreement.  It touted tesetaxel as "***unique among taxanes***" with "***no history of hypersensitivity (allergic) reactions***."  It added, "Tesetaxel currently is the subject of three studies in MBC, including a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA.   Positive results of CONTESSA were presented at the 2020 San Antonio Breast Cancer Symposium ("SABCS").  ***We plan to submit a New Drug Application for tesetaxel to the U.S. Food and Drug Administration ("FDA") in mid-2021.***"  It described the CONTESSA top-line results as revealing Grade ≥3 treatment-emergent AEs that occurred in ≥5% of patients included neutropenia (70.9% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone) and febrile neutropenia (13.1% for tesetaxel plus capecitabine vs. 1.2% for capecitabine alone); stated that AEs resulting in treatment discontinuation in ≥1% of patients included neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone) and neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); and reported treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone, before ***muting the impacts*** of the AE disclosures by adding, "While [Overall Survival (OS)] data are immature, a protocol-specified interim ***absence of an adverse effect*** on OS with tesetaxel plus

130

a reduced dose of capecitabine.   A protocol-specified final analysis of OS is expected to occur in 2022.   It also stated that clinical trials remain ongoing, including trials of tesetaxel as a monotherapy, as shown in the following chart:

**Ongoing Clinical Studies of Tesetaxel in Patients with MBC**

| Study Name | Phase | N | Patient Population | Regimen |
|---|---|---|---|---|
| CONTESSA | 3 | 685 | HR-positive, HER2-negative MBC with prior taxane | Tesetaxel + capecitabine vs. capecitabine |
| CONTESSA 2 | 2 | 150 | HR-positive, HER2-negative MBC with no prior taxane | Tesetaxel + capecitabine |
| CONTESSA TRIO Cohort 1 | 2 | 200[(1)] | Triple-negative MBC | Tesetaxel + nivolumab vs. tesetaxel + pembrolizumab vs. tesetaxel + atezolizumab |
| CONTESSA TRIO Cohort 2 | 2 | 69 | Elderly (≥65 years old) with HER2-negative MBC | Tesetaxel monotherapy |
| CONTESSA TRIO Cohort 3 | 2 | 60[(1)] | Non-elderly (≥18 to <65 years old) with HER2-negative MBC | Tesetaxel monotherapy |

(1)   Planned

138.   The misrepresentations and omissions pertaining to the Open Market Sale Agreement in the 2/23/2021 Form 8-K and the 2/23/2021 Prospectus Supplement, as alleged in the preceding paragraph, were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA, with which Defendants were admittedly in discussions by this point, to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site, by regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey, and by the CONTESSA clinical trial safety board, which compiled reports given to Defendant Tang, other top Odonate executives, and the FDA on an ongoing basis at regular intervals.

### *Reported Results Fraud*

132

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

139.   Odonate made a series of filings and public statements reporting revenues, net income, and earnings without disclosing that they were being generated and artificially inflated through improper practices, unreported operational setbacks, and undisclosed negative trends.  These statements also touted Odonate's progress in advancing toward necessary FDA approvals as a primary factor underlying these results, without disclosing that its clinical trials for tesetaxel were encountering significant issues and setbacks, including, *inter alia*, serious adverse events and high discontinuation rates among trial participants.  These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).   The "Reported Results Fraud" included the following misstatements.

140.   Odonate announced its Q4 and full year 2017 financial results in a series of releases and filings made on February 14, 2018, including the following:

(a)   On February 14, 2018, Odonate issued the 2/14/2018 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2017.  In it, Odonate reported Q4 2017 quarterly net loss of $15.7 million, or $0.81 per share, and full year loss of $32.7 million, or $2.31 per share, as well as $198.1 million in cash on hand as of December 31, 2017.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang

133

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer." He specifically cited tesetaxel's "lack of history of hypersensitivity reactions" as a favorable metric in assessing the CONTESSA trial initiation.

(b)     Also on February 14, 2018, Odonate filed the 2017 10-K, executed by Defendants Tang and Lemkey. The 2017 10-K reported the same financial and operating results and cash position as were reported in the 2/14/2018 Earnings Release Earnings Release. It explained, "Our net loss was $32.7 million and $3.1 million for the years ended December 31, 2017 and 2016, respectively. As of December 31, 2017 and December 31, 2016, we had an accumulated deficit of $39.3 million and $6.5 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations." In addition, its MD&A section stated, "All of our research and development expenses to date have been incurred in connection with tesetaxel. We expect our research and development expenses to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA." It added, "Research and development expense was $27.9 million and $2.6 million for the years ended December 31, 2017

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and 2016, respectively. The increase of $25.3 million was primarily due to increased activities in connection with our tesetaxel clinical development program, including the initiation of CONTESSA, resulting in increased clinical development costs of $16.9 million, increased personnel and related costs of $5.7 million and increased equity-based compensation expense of $2.6 million."  It also stated, "Tesetaxel has been generally well tolerated in clinical studies and has demonstrated robust single-agent antitumor activity in two multicenter, Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC"). We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the 2017 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated February 14, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated February 14, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

141.   Odonate announced its Q1 2018 financial results in a series of releases and filings made on May 3, 2018 including the following:

(a)   On May 3, 2018, Odonate issued the 5/3/2018 Earnings Release announcing its financial and operating results for the three months ended March 31, 2018.  In it, Odonate reported Q1 2018 quarterly net loss of $16.9 million, or $0.69 per share, as well as $195.2 million in cash on hand as of March 31, 2018. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are excited to have recently initiated CONTESSA, our Phase 3 study investigating tesetaxel in the treatment of locally advanced or metastatic breast cancer."  He specifically cited tesetaxel's "lack of history of hypersensitivity reactions" as a favorable metric in assessing the CONTESSA trial initiation.

(b)   The same day, Odonate filed the Q1 2018 10-Q executed by Defendants Tang and Lemkey.  The Q1 2018 10-Q reported the same financial and operating results and cash position as were reported in the 5/3/2018 Earnings Release.  It explained, "Our net loss was $16.9 million and $2.7 million for the three months ended March 31, 2018 and 2017, respectively. As of March 31, 2018 and December 31, 2017, we had an accumulated deficit of $56.2 million and $39.3 million, respectively. Substantially all of our operating losses resulted from

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $14.5 million and $2.5 million for the three months ended March 31, 2018 and 2017, respectively. The increase of $12.0 million was primarily due to increased activities in connection with our tesetaxel clinical development program." It also stated, "Tesetaxel has been generally well tolerated in clinical studies and has demonstrated robust single-agent antitumor activity in two multicenter, Phase 2 studies in patients with locally advanced or metastatic breast cancer ("MBC"). We are conducting a multinational, multicenter, randomized, Phase 3 study in MBC, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the Q1 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated May 3, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange

137

Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated May 3, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

142.   Odonate announced its Q2 2018 financial results in a series of releases and filings made on July 30, 2018 including the following:

(a)   On July 30, 2018, Odonate issued the 7/30/2018 Earnings Release announcing its financial and operating results for the three and six months ended June 30, 2018.  In it, Odonate reported Q2 2018 net loss for the three and six months ended June 30, 2018 of $19.4 million and $36.3 million, or $0.79 per share and $1.49 per share respectively, as well as $177.4 million in cash on hand as of June 30, 2018.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial. Defendant Tang was quoted as saying, "Results from our multicenter Phase 2 study of tesetaxel were recently presented at the 2018 ASCO Annual Meeting.  In this study, tesetaxel, administered orally as a single agent, resulted in 45% confirmed response rate in patients with HER2 negative, HR positive, metastatic breast cancer. With these results, we look forward to further characterizing tesetaxel's therapeutic profile in CONTESSA."  He specifically cited tesetaxel's "45% confirmed response rate" as a favorable metric in assessing the CONTESSA trial progress.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)     The same day, Odonate filed the Q2 2018 10-Q executed by Defendants Tang and Lemkey.  The Q2 2018 10-Q reported the same financial and operating results and cash position as were reported in the 7/30/2018 Earnings Release.  It explained, "Our net loss was $19.4 million and $36.3 million for the three and six months ended June 30, 2018, respectively, compared to $3.9 million [and] $6.6 million for the same periods in 2017, respectively.  As of June 30, 2018 and December 31, 2017, we had an accumulated deficit of $75.6 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $17.0 million and $31.5 million for the three and six months ended June 30, 2018, respectively, compared to $3.3 million and $5.7 million for the same periods in 2017. The increase in research and development was due to increased activities in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

significant, single-agent antitumor activity in two, multicenter, Phase 2 studies. We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the Q2 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Lemkey executed a Section 906 Certification, dated July 30, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated July 30, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

143.   Odonate announced its Q3 2018 financial results in a series of releases and filings made on October 23, 2018 including the following:

(a)     On October 23, 2018, Odonate issued the 10/23/2018 Earnings Release announcing its financial and operating results for the three and nine months ended September 30, 2018. In it, Odonate reported Q3 2018 net loss for the three and nine months ended September 30, 2018 of $23.9 million and $60.2 million, or $0.98 per share and $2.47 per share respectively, as well as $161.0 million in cash on hand as of September 30, 2018. Underlying these results was Odonate's progress

140

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.

(b)     The same day, Odonate filed the Q3 2018 10-Q executed by Defendants Tang and Lemkey.  The Q3 2018 10-Q reported the same financial and operating results and cash position as were reported in the 10/23/2018 Earnings Release.  It explained, "Our net loss was $23.9 million and $60.2 million for the three and nine months ended September 30, 2018, respectively, compared to $10.4 million and $17.0 million for the same periods in 2017, respectively.  As of September 30, 2018 and December 31, 2017, we had an accumulated deficit of $99.5 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase for as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $21.7 million and $53.2 million for the three and nine months ended September 30, 2018, respectively, compared to $9.1 million and $14.9 million for the same periods in 2017, respectively. The increase in research and development

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

expense was due to increased activities in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two, multicenter, Phase 2 studies.  The Company is conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

(c)     Accompanying the Q3 2018 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Lemkey executed a Section 906 Certification, dated October 23, 2018, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification, dated October 23, 2018, as quoted and discussed in the Internal Controls Fraud section herein.

144.   Odonate announced its Q4 and full year 2018 financial results in a series of releases and filings made on February 22, 2019, including the following:

(a)     On February 22, 2019, Odonate issued the 2/22/2019 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2018.  In it, Odonate reported Q4 2017 quarterly net

142

loss of $28.8 million, or $1.17 per share, and full year loss of $89.0 million, or $3.64 per share, as well as $139.1 million in cash on hand as of December 31, 2018. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We expect to complete enrollment in CONTESSA, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, in the second half of 2019 and report top-line results in 2020."   He specifically cited tesetaxel's "significant, single-agent antitumor activity in two multicenter, Phase 2 studies" as a favorable metric in assessing the CONTESSA trial initiation.

(b)     Also on February 22, 2019, Odonate filed the 2018 10-K, executed by Defendants Tang and Hearne.   The 2018 10-K reported the same financial and operating results and cash position as were reported in the 2/22/2019 Earnings Release.  It explained, "Our net loss was $89.0 million and $32.7 million for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018 and 2017, we had an accumulated deficit of $128.3 million and $39.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to

143

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

date has been incurred in connection with tesetaxel. We expect our research and development expense to increase for the foreseeable future as we advance tesetaxel through clinical development, including the conduct of our ongoing Phase 3 study, CONTESSA."  It added, "Research and development expense was $79.9 million and $27.9 million for the years ended December 31, 2018 and 2017, respectively. The increase of $52.0 million was primarily due to increased activities in connection with our tesetaxel clinical development program, resulting in increased clinical development costs of $34.4 million, increased personnel and related costs of $14.2 million and increased equity-based compensation expense of $3.0 million."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  We are conducting a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA, and we expect to report top-line results from this study in 2020."

       (c)    Accompanying the 2018 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated February 22, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

They also executed a Section 302 Certification, dated February 22, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

145.   Odonate announced its Q1 2019 financial results in a series of releases and filings made on April 25, 2019 including the following:

(a)   On April 25, 2019, Odonate issued the 4/25/2019 Earnings Release announcing its financial and operating results for the three months ended March 31, 2019.  In it, Odonate reported Q1 2019 net loss for the three months ended March 31, 2019 of $28.6 million, or $1.16 per share, as well as $112.1 million in cash on hand as of December 31, 2018.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "In the first quarter of 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO, the first study to investigate tesetaxel in combination with PD-(L)1 inhibitors.   We expect to complete enrollment in CONTESSA, our ongoing multinational, multicenter, randomized, Phase 3 study of tesetaxel in patients with metastatic breast cancer, in the second half of 2019 and report top-line results in 2020."  He specifically cited the initiation of the "first study to investigate tesetaxel in combination with PD-(L)1 inhibitors" as a favorable metric in assessing the CONTESSA trial progress.

145

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)     The same day, Odonate filed the Q1 2019 10-Q executed by Defendants Tang and Hearne.  The Q1 2019 10-Q reported the same financial and operating results and cash position as were reported in the 4/25/2019 Earnings Release.  It explained, "Our net loss was $28.6 million and $16.9 million for the three months ended March 31, 2019 and 2018, respectively.  As of March 31, 2019 and December 31, 2018, we had an accumulated deficit of $156.9 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense to date has been incurred in connection with the development of tesetaxel."  It added, "Research and development expense was $26.6 million and $14.5 million for the three months ended March 31, 2019 and 2018, respectively.  The increase of $12.1 million was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two, multicenter, Phase 2 studies. The Company is conducting multiple studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with locally advanced or metastatic breast cancer, known as CONTESSA."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c)     Accompanying the Q1 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated April 25, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated April 25, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

146.   Odonate announced its Q2 2019 financial results in a series of releases and filings made on July 24, 2019 including the following:

(a)     On July 24, 2019, Odonate issued the 7/24/2019 Earnings Release announcing its financial and operating results for the three and six months ended June 30, 2019.  In it, Odonate reported Q2 2019 net loss for the three and six months ended June 30, 2019 of $28.7 million and $57.3 million, or $1.15 per share and $2.31 per share, respectively as well as $206.9 million in cash on hand as of June 30, 2019.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "In March 2019, we expanded the development of tesetaxel by initiating two new clinical studies, CONTESSA 2 and CONTESSA TRIO, and, in June 2019, the Independent Data Monitoring Committee for

147

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer, recommended that the study continue with no modifications following a planned interim efficacy futility analysis.  We continue to expect to complete enrollment in CONTESSA in the second half of 2019 and report top-line results in 2020."  He specifically cited the Independent Data Monitoring Committee recommendation that the "study continue with no modifications" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q2 2019 10-Q executed by Defendants Tang and Hearne.  The Q2 2019 10-Q reported the same financial and operating results and cash position as were reported in the 7/24/2019 Earnings Release.  It explained, "Our net loss was $28.7 million and $57.3 million for the three months and six ended June 30, 2019, respectively, compared to $19.4 million and $36.3 million, respectively, for the same periods in 2018.  As of June 30, 2019 and December 31, 2018, we had an accumulated deficit of $185.6 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

It added, "Research and development expense was $26.5 million and $53.1 million for the three and six months ended June 30, 2019, respectively, compared to $17.0 million and $31.5 million, respectively, for the same periods in 2018.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  We are currently conducting three studies in breast cancer, [] including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2") negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA.  We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020."

(c)     Accompanying the Q2 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated July 24, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2      They also executed a Section 302 Certification, dated July 24, 2019, as quoted and

3      discussed in the Internal Controls Fraud section herein.

4          147.   Odonate announced its Q3 2019 financial results in a series of releases

5      and filings made on November 6, 2019 including the following:

6          (a)    On November 6, 2019, Odonate issued the 11/6/2019 Earnings

7      Release announcing its financial and operating results for the three and nine months

8      ended September 30, 2019.  In it, Odonate reported Q3 2019 net loss for the three

9      and nine months ended September 30, 2019 of $26.6 million and $84.0 million, or

10     $0.88 per share and $3.15 per share, respectively as well as $204.2 million in cash

11     on hand as of September 30, 2019.  Underlying these results was Odonate's progress

12     in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical

13     studies.  Defendant Tang was quoted as saying, "We are pleased to have recently

14     announced the completion of enrollment in CONTESSA, Odonate's Phase 3 study

15     investigating tesetaxel as a potential treatment for patients with metastatic breast

16     cancer.  We expect to report top-line results from CONTESSA in the third quarter

17     of 2020."  He specifically cited the "completion of enrollment in CONTESSA" as

18     a favorable metric in assessing the CONTESSA trial progress.

19         (b)    The same day, Odonate filed the Q3 2019 10-Q executed by

20     Defendants Tang and Hearne.  The Q3 2019 10-Q reported the same financial and

21     operating results and cash position as were reported in the 11/6/2019 Earnings

28                                    150

Release.  It explained, "Our net loss was $26.6 million and $84.0 million for the three months and nine ended September 30, 2019, respectively, compared to $23.9 million and $60.2 million, respectively, for the same periods in 2018.  As of September 30, 2019 and December 31, 2018, we had an accumulated deficit of $212.2 million and $128.3 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel."  It added, "Research and development expense was $25.1 million and $78.2 million for the three and nine months ended September 30, 2019, respectively, compared to $21.7 million and $53.2 million, respectively, for the same periods in 2018.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer, tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with human epidermal growth factor receptor 2 ("HER2")

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

negative, hormone receptor ("HR") positive metastatic breast cancer ("MBC"), known as CONTESSA."

(c)     Accompanying the Q3 2019 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated November 6, 2019, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification, dated November 6, 2019, as quoted and discussed in the Internal Controls Fraud section herein.

148.   Odonate announced its Q4 and full year 2019 financial results in a series of releases and filings made on February 20, 2020, including the following:

(a)     On February 20, 2020, Odonate issued the 2/20/2020 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2019.  In it, Odonate reported Q4 2019 quarterly net loss of $27.9 million, or $0.91 per share, and full year loss of $111.8 million, or $4.05 per share, as well as $180.5 million in cash on hand as of December 31, 2019.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of the CONTESSA Phase 3 clinical trial.  Defendant Tang was quoted as saying, "We are pleased to have recently announced the completion

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of enrollment in CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer.  We expect to report top-line results from CONTESSA in the third quarter of 2020."  He specifically cited the "completion of enrollment in CONTESSA" as a favorable metric in assessing the CONTESSA trial progress.

(b)     Also on February 20, 2020, Odonate filed its 2019 10-K, executed by Defendants Tang and Hearne.  The 2019 10-K reported the same financial and operating results and cash position as were reported in the 2/20/2020 Earnings Release.  It explained, "Our net loss was $111.8 million and $89.0 million for the years ended December 31, 2019 and 2018, respectively. As of December 31, 2019 and 2018, we had an accumulated deficit of $240.1 million and $128.3 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase in the near term in connection with the development of tesetaxel.  It added, "Research and development expense was $104.0 million and $79.9 million for the years ended December 31, 2019 and 2018, respectively. The increase of $24.1 million was

153

primarily due to increased activities and headcount in connection with our tesetaxel clinical development program, resulting in increased clinical development costs of $11.3 million, increased personnel and related costs of $7.0 million and increased equity-based compensation expense of $4.3 million." It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies. We are conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA. Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c) Accompanying the 2019 10-K were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Hearne executed a Section 906 Certification, dated February 20, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated February 20, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

149. Odonate announced its Q1 2020 financial results in a series of releases and filings made on April 28, 2020 including the following:

154

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     On April 28, 2020, Odonate issued the 4/28/2020 Earnings Release announcing its financial and operating results for the three months ended March 31, 2020.  In it, Odonate reported Q1 2020 net loss for the three months ended March 31, 2020 of $30.2 million, or $0.99 per share, as well as $153.1 million in cash on hand as of March 31, 2020.  Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "We continue to expect to report top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel, an investigational, orally administered chemotherapy as a potential treatment for patients with metastatic breast cancer, in the third quarter of 2020." He specifically cited Odonate's reporting of top-line results from CONTESSA "in the third quarter of 2020" as a favorable metric in assessing the CONTESSA trial progress.

(b)     The same day, Odonate filed the Q1 2020 10-Q executed by Defendants Tang and Hearne.  The Q1 2020 10-Q reported the same financial and operating results and cash position as were reported in the 4/28/2020 Earnings Release.  It explained, "Our net loss was $30.2 million and $28.6 million for the three months ended March 31, 2020 and 2019, respectively.  As of March 31, 2020 and December 31, 2019, we had an accumulated deficit of $270.2 million and $240.1 million, respectively.  Substantially all of our operating losses resulted from

155

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations." In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase in the near term in connection with the development of tesetaxel." It added, "Research and development expense was $27.9 million and $26.6 million for the three months ended March 31, 2020 and 2019, respectively. The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program." It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies. The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA. Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c)     Accompanying the Q1 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC. Defendants Tang and Hearne executed a Section 906 Certification, dated April 28, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated April 28, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

150.    Odonate announced its Q2 2020 financial results in a series of releases and filings made on July 30, 2020 including the following:

(a)    On July 30, 2020, Odonate issued the 7/30/2020 Earnings Release announcing its financial and operating results for the three and six months ended June 30, 2020.  In it, Odonate reported Q2 2020 net loss for the three and six months ended June 30, 2020 of $33.4 million and $63.6, or $1.09 per share and $2.07 per share, as well as $125.4 million in cash on hand as of June 30, 2020. Underlying these results was Odonate's progress in seeking FDA approval for tesetaxel and its initiation of CONTESSA clinical studies.  Defendant Tang was quoted as saying, "We continue to expect to report top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel, an investigational, orally administered chemotherapy as a potential treatment for patients with metastatic breast cancer, in the third quarter of 2020."  He specifically cited Odonate's reporting of top-line results from CONTESSA "in the third quarter of 2020" as a favorable metric in assessing the CONTESSA trial progress.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)     The same day, Odonate filed the Q2 2020 10-Q executed by Defendants Tang and Hearne.  The Q2 2020 10-Q reported the same financial and operating results and cash position as were reported in the 7/30/2020 Earnings Release.  It explained, "Our net loss was $33.4 million and $63.6 million for the three and six months ended June 30, 2020, respectively, compared to $28.7 million and $57.3 million, respectively, for the same periods in 2019.  As of June 30, 2020 and December 31, 2019, we had an accumulated deficit of $303.7 million and $240.1 million, respectively.  Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  In addition, its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel. We expect our research and development expense to increase in the near term in connection with the development of tesetaxel."  It added, "Research and development expense was $30.8 million and $58.7 million for the three and six months ended June 3, 2020, respectively, compared to $26.5 million and $53.1 million, respectively, for the same periods in 2019.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  The Company is currently conducting three studies in breast cancer, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA.  Enrollment in CONTESSA is complete, and we expect to report top-line results from this study in the third quarter of 2020."

(c)     Accompanying the Q2 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated July 30, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated July 30, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

151.   Odonate announced its Q3 2020 financial results in a series of releases and filings made on October 28, 2020 including the following:

(a)     On October 28, 2020, Odonate issued the 10/28/2020 Earnings Release announcing its financial and operating results for the three and nine months ended September 30, 2020.  In it, Odonate reported Q3 2020 net loss for the three and nine months ended September 30, 2020 of $30.5 million and $94.1 million, or $0.93 per share and $3.00 per share, respectively, as well as $188.3 million in cash on hand

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

as of September 30, 2020.   Underlying these results was Odonate's purported progress in seeking FDA approval for tesetaxel.   Defendant Tang was quoted as saying, "We are pleased to have recently announced positive top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer."   He added, "We continue to plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021."

(b)   The same day, Odonate filed its Q3 2020 10-Q executed by Defendants Tang and Hearne.   The Q3 2020 10-Q reported the same financial and operating results and cash position as were reported in the 10/28/2020 Earnings Release.   It explained, "Our net loss was $30.5 million and $94.1 million for the three and nine months ended September 30, 2020, respectively, compared to $26.6 million and $84.0 million, respectively, for the same periods in 2019.   As of September 30, 2020 and December 31, 2019, we had an accumulated deficit of $334.1 million and $240.1 million, respectively.   Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."   Its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel."   It added, "Research and development expense was $28.2 million and $87.0 million for the three and nine months ended September 30, 2020, respectively, compared to $25.1

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

million and $78.2 million, respectively, for the same periods in 2019.  The increase in research and development expense was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies. We are currently conducting three studies in breast cancer…In August 2020, we announced positive top-line results from a multinational, multicenter, randomized, Phase 3 study of tesetaxel in MBC, known as CONTESSA.  We plan to submit a New Drug Application ("NDA") for tesetaxel to the U.S. Food and Drug Administration ("FDA") in mid-2021."  To mute the impacts of disclosures of adverse events in top-line clinical results, it added, "Tesetaxel plus capecitabine was associated with a manageable side effect profile" and "[w]hile [Overall Survival (OS)] data are immature, a recent interim analysis indicated the absence of an adverse effect on OS for tesetaxel plus a reduced dose of capecitabine."

(c)      Accompanying the Q3 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated October 28, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

They also executed a Section 302 Certification, dated October 28, 2020, as quoted and discussed in the Internal Controls Fraud section herein

152.   Odonate announced its Q4 and full year 2020 financial results in a series of releases and filings made on February 23, 2021, including the following:

(a)   On February 23, 2021, Odonate issued the 2/23/2021 Earnings Release announcing its financial and operating results for the three and twelve months ended December 31, 2020.  In it, Odonate reported Q4 2020 quarterly net loss of $32.3 million, or $0.87 per share, and full year loss of $126.4 million, or $3.84 per share, as well as $157.3 million in cash on hand as of December 31, 2020.  Underlying these results was Odonate's purported "positive results of CONTESSA," which it presented at a 2020 San Antonio Breast Cancer Symposium, and its continued plan to get FDA approval for tesetaxel.  Defendant Tang was quoted as saying, "Positive results of CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer were recently presented at the 2020 San Antonio Breast Cancer Symposium.  We continue to plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021."  He specifically cited the purported "positive results of CONTESSA" and "continue[d] plan to submit a New Drug Application" for tesetaxel as favorable metrics in assessing Odonate's operating performance.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)      Also on February 23, 2021, Odonate filed its 2020 10-K, executed by Defendants Tang and Hearne.  The 2020 10-K reported the same financial and operating results and cash position as were reported in the 2/23/2021 Earnings Release.  It explained, "Our net loss was $126.4 million and $111.8 million for the years ended December 31, 2020 and 2019, respectively. As of December 31, 2020 and 2019, we had an accumulated deficit of $366.4 million and $240.1 million, respectively. Substantially all of our operating losses resulted from expenses incurred in connection with advancing tesetaxel through development activities and general and administrative costs associated with our operations."  Its MD&A section stated, "All of our research and development expense incurred to date has been incurred in connection with the development of tesetaxel."  It added, "Research and development expense was $117.0 million and $104.0 million for the years ended December 31, 2020 and 2019, respectively.  The increase in research and development expense of $13.0 million was due primarily to increased activities and headcount in connection with our tesetaxel clinical development program."  It also stated, "In patients with metastatic breast cancer ("MBC"), tesetaxel was shown to have significant, single-agent antitumor activity in two multicenter, Phase 2 studies.  Tesetaxel currently is the subject of three studies in MBC, including a multinational, multicenter, randomized, Phase 3 study in patients with MBC, known as CONTESSA.  Positive results of CONTESSA were presented at the 2020 San

163

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Antonio Breast Cancer Symposium ("SABCS").  We plan to submit a New Drug Application ("NDA") for tesetaxel to the U.S. Food and Drug Administration ("FDA") in mid-2021."

(c)     Accompanying the 2020 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Tang and Hearne executed a Section 906 Certification, dated February 23, 2021, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification, dated February 23, 2021, as quoted and discussed in the Internal Controls Fraud section herein.

153.   The foregoing statements in ¶¶139-152 were materially false and misleading because they reported financial metrics and results like net loss, loss per share, research and development expenses, and cash position for Odonate without disclosing that these results were generated through improper practices, unreported operational setbacks, and undisclosed negative trends, including those detailed by the CW accounts set forth herein in the "Undisclosed, Material, Negative Facts" section *supra* and the "Defendants' Knowledge Or Reckless Disregard" section *infra*.  Those sections, along with the "Truth Begins To Emerge" section *infra*, illustrate, *inter alia*, that tesetaxel when combined with capecitabine raised

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone, were not "positive" or "manageable," and were grounds for the FDA to refuse approval of any NDA for tesetaxel.  As early as May/June 2018 and by no later than August 2018, these risks had manifested themselves in the CONTESSA trial, as regularly discussed at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.  The statements ¶¶139-152 also touted Odonate's positive progress advancing toward necessary FDA approvals through ongoing clinical trials as a primary factor underlying its reported results, without disclosing that its clinical trials for tesetaxel were in actuality encountering significant issues and setbacks, including, *inter alia*, serious adverse events and high discontinuation rates among trial participants, the scope and extent of which were concealed from investors.  Specifically, as described by the CWs, beginning in August 2018, CONTESSA had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter*

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site.     It was materially false and misleading to reference positive metrics, developments, and milestones in the clinical development and evaluation of tesetaxel and its progress toward FDA approval, while omitting timely and fulsome disclosure of the negative developments, setbacks, adverse events, discontinuations, and other undisclosed risks arising during clinical trials.  It was also materially false and misleading to highlight progress toward FDA approval of tesetaxel, particularly by the time Defendants were engaged in active discussions with the FDA, without disclosing that the CONTESSA clinical trial safety board was compiling AE reports and giving them to the FDA at regular intervals and that the FDA had concerns about any proposed approval of tesetaxel.  As such, these misstatements and omissions in ¶¶139-152 violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

### *Internal Controls Fraud*

154.   During the Class Period, Defendants also made a series of public statements and filings regarding Odonate's internal controls that were materially false and misleading.  Specifically, Defendants Tang, Lemkey, and Hearne signed and SOX certified quarterly and annual reports by Defendant Odonate, and in doing so, made materially false and misleading statements and omissions.

166

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

155.   Odonate's 2017 10-K, filed with the SEC on February 14, 2018, was signed and SOX certified by Defendants Tang and Lemkey and stated that the financial information contained in the 2017 10-K was accurate and disclosed any material changes to Odonate's internal control over financial reporting. Specifically, Defendants Tang and Lemkey certified:

I, [Kevin C. Tang and John G. Lemkey], certify that:

1.   I have reviewed this Annual Report on Form 10-K of Odonate Therapeutics, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

167

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):*

a. *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b. *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*

156. On February 22, 2019, Odonate filed the 2018 10-K, signed and SOX certified by Defendants Tang and Hearne, representing that the financial information contained in Odonate's 2018 10-K was accurate and disclosed any material changes to Odonate's internal control over financial reporting. Specifically, Defendants Tang and Hearne certified:

I, [Kevin C. Tang and Michael Hearne], certify that:

168

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1.  I have reviewed this Annual Report on Form 10-K of Odonate Therapeutics, Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(f)) for the registrant and have:

    a.  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statement for external purposes in accordance with generally accepted accounting principles;

    c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

d.   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

a.   ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

157.   On February 20, 2020, Odonate filed the 2019 10-K, and on February 23, 2021, Odonate filed the 2020 10-K, which were likewise signed and SOX certified by Defendants Tang and Hearne with the same language as used in the 2018 10-K certifications alleged above, stating the financial information contained in Odonate's 2019 10-K and 2020 10-K was accurate and disclosed any material changes to Odonate's internal control over financial reporting.

158.   On May 3, 2018, Odonate filed the Q1 2018 10-Q, with SOX certifications signed by Defendants Tang and Lemkey certifying that the financial

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

information contained in Odonate's Q1 2018 10-Q was accurate and disclosed any material changes to Odonate's internal control over financial reporting. Specifically, Defendants Tang and Lemkey certified:

I, [Kevin C. Tang and John G. Lemkey], certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Odonate Therapeutics, Inc.;

2. *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

c.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

159.   Defendants Tang and Lemkey signed identical SOX certifications as those accompanying Odonate's Q1 2018 10-Q alleged above, certifying that the financial information contained in Odonate's Q2 2018 10-Q, filed with the SEC on July 30, 2018, and in Odonate's Q3 2018 10-Q, filed with the SEC on October 23, 2018, were accurate and disclosed any material changes to Odonate's internal control over financial reporting during those reporting periods.

160.   On April 25, 2019, Odonate filed the Q1 2019 10-Q, accompanied by SOX certifications signed by Defendants Tang and Hearne certifying that the

172

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

financial information contained in Odonate's Q1 2019 10-Q was accurate and disclosed any material changes to Odonate's internal control over financial reporting.  Specifically, Defendants Tang and Hearne certified:

I, [Kevin C. Tang and Michael Hearne], certify that:

5.   I have reviewed this Quarterly Report on Form 10-Q of Odonate Therapeutics, Inc.;

6.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

7.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

8.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(f)) for the registrant and have:

    a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

173

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

preparation of financial statement for external purposes in accordance with generally accepted accounting principles;

c.      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):*

a.      *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.      *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*

161.   Defendants Tang and Hearne signed identical SOX certifications as those accompanying Odonate's Q1 2019 10-Q alleged above, certifying that the financial information contained in Odonate's Q2 2019 10-Q, filed with the SEC on July 24, 2019, its Q3 2019 10-Q, filed with the SEC on November 6, 2019, its Q1

174

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2020 10-Q, filed with the SEC on April 28, 2020, its Q2 2020 10-Q, filed with the SEC on July 30, 2020, and its Q3 2020 10-Q, filed with the SEC on October 28, 2020, were accurate and disclosed any material changes to Odonate's internal control over financial reporting during those reporting periods.

162.   The foregoing statements in ¶¶154-161 were materially false and misleading because, *inter alia*: (a) the SEC filings in which they were made did, in fact, contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered and (b) the fraud alleged herein involved management and other employees with a significant role in Odonate's internal controls over financial reporting, and yet, it was not disclosed to Odonate's auditors or to the audit committee of Odonate's Board of Directors.   As more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, the undisclosed fraud, and the associated material misstatements and omissions, arose from the fact that tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade $\geq 3$ treatment-emergent AE, including, *inter alia*, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%),

175

diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone.  By no later than August 2018, these risks had manifested themselves in the CONTESSA trial, which had elevated patient discontinuation rates due to AE events generally (23.1%), including AE events from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%) specifically, as reported by concerned doctors and trial sites, many of which withdrew from CONTESSA, prompting, *inter alia*, Odonate's urgent, "all hands on deck" program to stop trial withdrawals due to neutropenia and diarrhea by making presentations to every trial site and regular discussion of AE rates at weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey.

### The Truth Begins To Emerge

163.   During the Class Period, before the truth of Defendants' fraud was partially revealed, the market as a whole remained in the dark as to the CONTESSA clinical problems with tesetaxel, including elevated incidents of AE and high discontinuation rates.  The market, including analysts following Odonate, expected it to report positive top-line results.

164.   For example, on August 10, 2020, a Cowen analyst stated,

We expect investors to evaluate the PFS primary endpoint data to ensure taxane-like efficacy, but also give extensive focus to tesetaxel's AE profile.

*****

176

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Thus, should tesetaxel+capecitabine produce alopecia in the low teens, neuropathy in the teens on an all-grade basis, and very low single digits to 0 on a grade 3 basis (consistent with the Phase 2 experience), we believe the drug would be viewed as superior to IV taxanes.

\* \* \* \* \*

Our conversations and recent Biotech Sentimometer indicate investors are anticipating CONTESSA to report an all-grade neuropathy in the mid-teens and a grade 3+ neuropathy rate in the low single digits.

165.   Thus, the market was shocked on August 24, 2020 when Odonate, during pre-market hours, issued a press release that was filed with the SEC as an attachment to a Form 8-K signed by Hearne, announcing top-line results from the CONTESSA trial.  Although the study met its primary endpoint, tesetaxel plus capecitabine was associated with Grade 3 or higher neutropenia (low levels of white blood cells) that occurred in **71.2%** of patients with the combination treatment versus **8.3%** for capecitabine alone.  Various other Grade 3 or higher treatment-emergent AEs were also associated with tesetaxel plus capecitabine versus capecitabine alone, and discontinuation rates were 4.2% from neutropenia and 3.6% from neuropathy, while the ***overall discontinuation rate was 23.1% in the treatment group compared to 11.9% in the capecitabine alone group.*** Specifically, that press release disclosed, in relevant part:

> ***Grade ≥3 treatment-emergent adverse events (TEAEs) that occurred in ≥5% of patients were: neutropenia (71.2% for tesetaxel plus capecitabine vs. 8.3% for capecitabine alone);*** diarrhea (13.4% for tesetaxel plus capecitabine vs. 8.9% for capecitabine alone); hand-foot syndrome (6.8% for tesetaxel plus capecitabine vs. 12.2% for capecitabine alone); ***febrile neutropenia (12.8% for tesetaxel plus***

177

***capecitabine vs. 1.2% for capecitabine alone);*** fatigue (8.6% for tesetaxel plus capecitabine vs. 4.5% for capecitabine alone); hypokalemia (8.6% for tesetaxel plus capecitabine vs. 2.7% for capecitabine alone); leukopenia (10.1% for tesetaxel plus capecitabine vs. 0.9% for capecitabine alone); and anemia (8.0% for tesetaxel plus capecitabine vs. 2.1% for capecitabine alone).

[AEs] resulting in treatment discontinuation in ≥1% of patients were: neutropenia or febrile neutropenia (4.2% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone); neuropathy (3.6% for tesetaxel plus capecitabine vs. 0.3% for capecitabine alone); diarrhea (0.9% for tesetaxel plus capecitabine vs. 1.5% for capecitabine alone); and hand-foot syndrome (0.6% for tesetaxel plus capecitabine vs. 2.1% for capecitabine alone). ***Treatment discontinuation due to any adverse event occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone***.

Grade 2 alopecia (hair loss) occurred in 8.0% of patients treated with tesetaxel plus capecitabine versus 0.3% of patients treated with capecitabine alone. ***Grade ≥3 neuropathy occurred in 5.9% of patients treated with tesetaxel plus capecitabine versus 0.9% of patients treated with capecitabine alone.***

166.   On this news, Odonate's stock price fell $15.21 per share, or 45.35%, to close at $18.33 per share on August 24, 2020.

167.   As alleged herein, Defendants' ongoing misrepresentations and omissions extended the fraud, muting the effects of the August 24, 2020 partial corrective disclosure and maintaining artificial inflation in Odonate's stock price.

168.   On March 22, 2021, Odonate issued a press release announcing Odonate's discontinuation of the tesetaxel's development, stating in relevant part:

Following feedback from the U.S. Food and Drug Administration (FDA) in a pre-New Drug Application meeting, Odonate Therapeutics, Inc. (NASDAQ: ODT) has concluded that the clinical data package for

178

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

tesetaxel is unlikely to support FDA approval. Therefore, Odonate is discontinuing the development of tesetaxel and will wind down the operations of the Company. The Company will work with clinical sites to transition patients in ongoing tesetaxel clinical studies to appropriate alternative therapies.

169.   On this news, Odonate's stock price plummeted $15.07 per share, or 79%, to close at $3.96 per share on March 22, 2021.

170.   On March 25, 2021, Odonate filed after hours with the SEC a Form 8-K (the "3/25/21 Form 8-K") signed by Defendant Hearne providing more details about Odonate's discontinuation of tesetaxel's development, the wind-down of Odonate's operations, the termination of its employees working on tesetaxel's development, and the associated costs.  The 3/25/21 Form 8-K stated:

> On March 19, 2021, Odonate Therapeutics, Inc. ("Odonate" or the "Company") committed to a plan of termination involving the termination of certain employees previously supporting the development of tesetaxel (the "Restructuring"). As previously announced on March 22, 2021, following feedback from the U.S. Food and Drug Administration ("FDA") in a pre-New Drug Application meeting, Odonate concluded that its clinical data package for tesetaxel is unlikely to support FDA approval. Therefore, Odonate is discontinuing the development of tesetaxel and will wind down the operations of the Company. Odonate estimates that the Restructuring will be substantially complete by June 30, 2021 and that costs incurred in connection with the Restructuring will be approximately $14 million.

171.   On this news, the next trading day, Odonate's stock price fell $0.52, or 14.4%, to close at $3.09 per share on March 26, 2021.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

172.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Odonate's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## Additional Facts Probative Of Scienter

173.   A strong inference of Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

### *Defendants' Knowledge Or Reckless Disregard*
### *Of Red Flags Demonstrates Scienter*

174.   As described in the "Undisclosed, Material, Negative Facts" section *supra*, and the CW statements set forth therein, during the Class Period, Defendants knew that tesetaxel, whether as a monotherapy or when used in combination with capecitabine, raised ***significant safety concerns***, which manifested themselves in elevated AE risks and high discontinuation rates early in the CONTESSA trials, which were evidenced in reports distributed to the Individual Defendants and to the FDA, and which prompted the FDA to indicate that it would not approve any NDA for tesetaxel.

175.   Defendants knew or recklessly disregarded that tesetaxel when combined with capecitabine, yielded highly elevated incidences of Grade $\geq 3$ treatment-emergent AEs, including, *inter alia*, neutropenia (71.2%), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%).   These rates

180

compared unfavorably against those arising from other treatment alternatives, including capecitabine alone and were not, as Defendants publicly characterized, "positive" or "manageable."   Defendants knew or recklessly disregarded that clinical trial patients who received tesetaxel combined with capecitabine discontinued trial participation at elevated rates due to AE events (23.1%) in general, including specifically AEs concerning neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%).

176.   CW1 and CW2 established that elevated rates of these AEs manifested themselves no later than the earliest stages of the CONTESSA trial, in which patients began receiving tesetaxel doses in "early 2018," or by May/June/July 2018 at the latest.  CW1, corroborated by CW2, said that by August 2018, trial sites were already reporting back to Odonate a higher-than-expected rate of neutropenia, including febrile neutropenia, doctors were angry and expressing concerns over the unexpectedly high rate of neutropenia, and patients were withdrawing from CONTESSA, both voluntarily and after removal by their doctors, due to neutropenia and diarrhea.  CW1 described the "urgent" teleconference in mid- to late-August 2018, where Odonate CMO O'Connell and VP of Site Management Jill Krause discussed the higher-than-expected neutropenia rates and related patient withdrawals from CONTESSA and announced an urgent, "all hands on deck" program to decrease the number of patient discontinuations due to neutropenia,

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

corroborated by CW2, whereby three clinical site management team members received training, gave a practice presentation to company leadership including Defendants Tang and Lemkey, and then presented to all 100-120 then-existing trial sites in roughly two weeks.  CW1 said that Odonate initiated a similar program to stem the patient discontinuation rate from CONTESSA due to diarrhea.  CW1 was told by Krause that Defendant Tang, Defendant Lemkey, and CMO O'Connell gave the directive for this response, adding that top leaders were involved in and signed off on any significant activities.  Despite this program, CW1 said that 10 trial sites (roughly 10% of the total) withdrew from CONTESSA in its first months, due to higher-than-expected neutropenia rates, an unusually high rate.

177.   These events established, by August 2018 at the latest, the undisclosed, elevated rates of AEs and clinical trial discontinuations in patients receiving tesetaxel plus capecitabine, which led to an unusually high rate of clinical trial site withdrawals in the first months of CONTESSA.

178. CW3 described the regularly scheduled, weekly or bi-weekly executive management meetings, at which Odonate department heads provided updates, including CMO O'Connell's presentation of CONTESSA updates, including reports of AEs that began during CONTESSA's early stages, including those regarding neutropenia, diarrhea, hand-foot syndrome, and other AEs.  CW3 described Defendant Tang's close attention paid to the AE reports, including his

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

questions and his angry reactions to negative trial updates.  CW3 took notes of every meeting, which were typed into meeting minutes reviewed and edited by VP of Program Management and Regulatory Operations Bartasch-Price, who oversaw the meetings and sent all participants pre-meeting agendas and post-meeting copies of the minutes.  In addition to Defendant Tang, CW3 said that Defendant Lemkey, CMO O'Connell, VP of Program Management and Regulatory Operations Bartasch-Price, VP of Clinical Operations Legagneur, Odonate Co-Founder and Vice Chair Vacirca, CDO Kroll, CSO Wei, and potentially Associate Director of Program Management Dillon attended these meetings.  CW3 also loaded the meeting minutes to a shared access file on Odonate's internal computer system, to which executive management, including the C-suite executives, had access.

179.   CW1 also explained how Defendants Tang and Lemkey and Odonate CMO O'Connell knew of the higher-than-expected neutropenia numbers in real time, from unblinded raw trial data and information entered by trial sites into local software and provided, once or twice a month, first to the CONTESSA CRO and later to Odonate.   CW1 also explained that serious AE events causing hospitalization, like febrile neutropenia, required expedited reporting within 2-3 days to Odonate leadership, including Defendants Tang and Lemkey and CMO O'Connell, and that such reports began in the first few months of CONTESSA.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CW4 added that Odonate maintained a clinical trial database with all CONTESSA trial data, to which top Odonate executives had access.

180.   As alleged *supra*, Defendant Tang himself stated during the 12/11/2020 VIA Event that Odonate was, as of December 11, 2020, already engaged in ongoing discussions with the FDA regarding the clinical studies of tesetaxel.   Moreover, CW5 said that the CONTESSA clinical trial safety board had been compiling AE data on an ongoing basis at regular intervals throughout the trial and had provided AE reports roughly every six months to not only Defendant Tang and other top Odonate executives, but also to the FDA.

181.   Given   the   foregoing,   Defendants   knew   that   their   public misrepresentations and omissions, as pled in herein, would mislead investors or were deliberately reckless as to the danger of misleading investors, which was known to them or was so obvious that they must have been aware of it.

### Defendants Suppressed Information From Employees
### Who Endured Rebukes, A Toxic Work Environment, And Retaliatory Firings

182.   As described in the "Undisclosed, Material, Negative Facts" section *supra*, and the CW statements set forth therein, during the Class Period, Defendants tightly controlled access to information about the CONTESSA trial.  CW1 said that Defendant Tang fired the CRO within months of CONTESSA's start to shift the trial management in-house, which was completed by early 2019 at the latest.  CW2 said that Odonate's top leadership was "not transparent" and internally restricted

184

and blocked employee access to large parts of the CONTESSA data.  CW4 stated that Odonate restricted employee access to the CONTESSA clinical trial database, and added that while CMO O'Connell's discussions with site doctors would have covered topics like protocols, data management, and AE issues, O'Connell did not share the substance of his site doctor communications with CW4.

183.   CW2 also described a "toxic" environment in which Odonate's "principals" overruled employees with greater experience on matters of trial data, leading to CW2's retaliatory firing for seeking to correct errors in the CONTESSA tumor data.  CW3 corroborated that the work environment was stressful, with abrupt, unexplained firings of needed employees, such as CW3, whose position as an Executive Assistant to a Chief Medical Office was necessary to support a clinical trial.

184.   Defendants' internal suppression of clinical trial data from employees, including those who designed and oversaw aspects of the CONTESSA trial, and their retaliatory firings of employees working to advance the trial further evidence their scienter.

### *Defendants Had Motive And Opportunity To Commit The Fraud*

185.   Before the Class Period, TCM, through TCP, held over 10.9 million Odonate shares, a number that swelled to over 12.2 million shares after Odonate's IPO, a stake valued at over $300 million – over 47.5% of TCM's portfolio value.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

TCM had another $263 million in holdings in Heron and La Jolla, accounting for over 41.5% of its portfolio value.  Thus, TCM had nearly 90% of its portfolio committed to massive, illiquid stakes in just three biopharmaceutical companies.

186.   Hundreds of millions of dollars were needed to fund the CONTESSA trial and to obtain FDA approval of tesetaxel, an amount that TCM could not commit without tapping the public equities markets multiple times.  To do so, Defendants were motivated to misrepresent the true risk profile of tesetaxel and the CONTESSA trial and to conceal negative information known to them about tesetaxel and the CONTESSA trial, both to permit Odonate's IPO and secondary offerings to draw sufficient investor interest and to inflate the value of Odonate's stock, thereby maximizing proceeds from the offerings while minimizing dilution of Defendant's massive ownership stake.

187.   The Individual Defendants all shared this motivation.  The vast majority of each of their reported Odonate stock holdings were indirectly held beneficial ownership stakes through TCP.  Their small directly held positions were acquired at below-market, discounted prices, and their Odonate stock options were unvested prior to FDA approval of tesetaxel.

188.   During the Class Period, Odonate indeed raised hundreds of millions of dollars in funds while its stock traded at prices elevated by the fraud alleged herein.  First, Odonate's IPO sold 6.25 million shares at $24.00 per share, for gross

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

proceeds of $160.6 million and net proceeds of $147.3 million.  Second, Odonate's June 2019 secondary offering sold 4.75 million shares at $26.00 per share, for gross proceeds of $142 million and net proceeds of $135.1 million.  Third, Odonate filed its October 2019 Form S-3 to permit sale of up to $200 million more in stock.  Fourth, Odonate's September 1, 2020 public offering sold 6.456 million shares at $14.25 per share, for gross proceeds of $92 million and net proceeds of $87.4 million.  Fifth, Odonate filed its 2020 Form S-3 to permit sale of up to $150 million more in stock.  Last, on February 23, 2021, Odonate entered into an Open Market Sale Agreement with Jefferies LLC to sell common stock having an aggregate offering price of up to $100 million more in "at the market" offerings.

189.   As discussed herein, the related SEC filings contained materially false and misleading misstatements and omissions in furtherance of the alleged fraud.

190.   These Class Period offerings, during the fraud alleged herein, strongly evidence Defendants' scienter, including Odonate's corporate scienter.

### *The Fraud Implicated Core Operations*

191.   The fraud alleged herein implicates the core operations of Odonate.  Odonate is a small biotech company attempting to win FDA approval for tesetaxel, Odonate's sole product candidate.  The alleged misconduct directly implicated adverse events, a key indicator of tesetaxel's success.  Moreover, the CW statements alleged herein conclusively demonstrate that executives, including Defendants

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Tang, Lemkey, and Hearne, had a hands-on role in the everyday activities of Odonate, oversaw management and progress of the tesetaxel trials, including that they received all reports of severe adverse events and patient withdrawals from trials, and they also signed off on all significant trial activities. As CW4 said, for example, "Nothing happened at that company without Kevin [Tang] knowing about it." As the Class Period progressed, Defendants Tang, Lemkey, and Hearne were in regular communications and had meetings with the FDA regarding the FDA's views of the clinical data regarding tesetaxel and its insufficiency to support tesetaxel's approval by the FDA.

192.   In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Odonate, and the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including by the CW statements.

### *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements*

193.   As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Tang, Lemkey, and Hearne were under an obligation to familiarize themselves with the

subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

194.   As the individuals who SOX certified SEC filings as described above, Defendants Tang, Lemkey, and Hearne were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

### *The Fraud Violated Odonate's Corporate Code Of Conduct*

195.   Odonate's Employee Code of Conduct ("Code of Conduct"), published on its website throughout the Class Period, barred all of the misconduct detailed by the CW statements set forth above.

196.   Odonate's Code of Conduct makes clear that it was binding upon all employees and Defendant Hearne, as Odonate's Compliance Officer, was charged with overseeing application of the Code of Conduct, stating:

> ***Odonate conducts its business in accordance with the highest ethical standards of corporate leadership and citizenship and expects all of its employees to act in accordance with the highest standards of personal and professional integrity. This Code of Conduct (the "Code") applies to all employees of Odonate***, including any subsidiaries. In the conduct of Odonate business, all employees shall be guided by the principles described in this Code.
>
> \*\*\*\*\*
>
> ***Employees are responsible for adhering to the standards in the Code,*** for raising questions if they are in doubt about the best course of action and for reporting possible misconduct promptly after it comes to their

189

attention. **Odonate's Compliance Officer, Michael Hearne, is responsible for interpreting and overseeing the application of the Code.**

197.   Odonate's Code of Conduct also makes clear that every employee must adhere not only to its provisions, but also to all applicable laws, stating "It is Odonate's policy to comply with all laws, rules, regulations and Odonate policies. It is the personal responsibility of employees to adhere honestly and in good faith to the standards and restrictions imposed by those laws, rules, regulations and Odonate policies."

198.   The Code of Conduct makes clear that employees should not engage in illegal business practices or misrepresent facts in order for Odonate to be a successful company, stating:

> Odonate seeks to obtain competitive advantages through superior performance, never through unethical or illegal business practices. Employees should not take unfair advantage of anyone through manipulation, exaggeration, concealment, misrepresentation of facts, abuse of confidential or privileged information or like practices.

199.   Odonate's Code of Conduct further states that books, records, and SEC filings must be accurate, full, and complete, stating:

> Employees are expected to **maintain books and records in appropriate detail to reflect Odonate's transactions accurately, fairly and completely. Odonate's policy of accurate, fair and complete recordkeeping applies to all Odonate records.** Documentation relating to a transaction should fully and accurately describe the nature of the transaction.

190

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Odonate is required to file financial statements and other information with the U.S. Securities and Exchange Commission ("SEC"). Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to Odonate. ***Reports and other documents that Odonate files with or submits to the SEC, and other public communications, should contain full, fair, accurate, timely and understandable disclosure.***

200.   Odonate's Code of Conduct, as detailed herein, barred the Defendants' misrepresentations and omissions as alleged herein.  Defendants' violation of this express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge of their recklessness.

### *Insider Resignations and Employment Status Changes Evidence Scienter*

201.   Another indicator of Defendants' scienter is the removal, resignation, or departure of key executives during or shortly after the Class Period.   On December 10, 2020, Defendant Lemkey resigned as Chief Operating Officer of Odonate.  His resignation was suspect in timing and strongly supports scienter.

202.   At the end of the Class Period, Odonate announced it was winding down operations, amounting to *de facto* resignations and departures, en masse, by the company's insider executives, including Defendants Tang and Hearne, who have departed or will depart Odonate within Q2 2021.  These developments also were suspect in timing and strongly support scienter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NO SAFE HARBOR**

203.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Odonate's then-ongoing misconduct.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Odonate who knew that those statements were false when made.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

204.   For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## THE CLAIMS ARE TIMELY

205.   The claims set forth herein were timely filed.

206.   The market was not arguably aware until August 24, 2020, at the earliest, that credible allegations existed to the effect that Odonate misrepresented and failed to disclose that its business practices during the Class Period were improper and illegal.

207.   It was also not until August 24, 2020 that Lead Plaintiff was first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period.   In the absence of publicly available information prior to then suggesting that Odonate's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Plaintiffs were not under any duty to inquire as to the truthfulness of Odonate's public statements.   Therefore, Lead Plaintiff's duty in that regard arose no earlier than August 24, 2020.

208.   Prior to August 24, 2020, Lead Plaintiff and Class members could not have been on any inquiry notice of possible claims under the Securities Exchange Act.   Even assuming this early date for inquiry notice, Lead Plaintiff's Securities

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Exchange Act claims against Defendants were brought within two years. Therefore, Lead Plaintiff has complied with the requirements of 28 U.S.C. § 1658(b).

## LOSS CAUSATION / ECONOMIC LOSS

209. The market for Odonate shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Odonate shares and operated as a fraud or deceit on Class Period purchasers of Odonate shares by misrepresenting the material facts detailed herein. As detailed above, during and at the end of the Class Period, when Defendants' prior misrepresentations became known to the public through a series of partial corrective disclosures, the price of Odonate shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Odonate share during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

210. During the Class Period, Defendants presented a misleading picture of Odonate's financial condition, revenues, growth, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Odonate shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

211.   As detailed herein, the price of Odonate shares sharply dropped, on high volume, in response to each of the following: (a) the issuance of the corrective press release and SEC filing on August 24, 2020, (b) the issuance of the press release on March 22, 2021, and (c) the after-hours SEC filing on March 25, 2021. Each of these stock drops partially removed inflation from the price of Odonate shares, causing real economic loss to investors who had purchased Odonate shares during the Class Period.

212.   These decline were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price declines in Odonate shares negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors or Odonate-specific facts unrelated to Defendants' fraudulent conduct.

213.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Odonate share price and the subsequent significant declines in the value of Odonate shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## **PRESUMPTION OF RELIANCE**

214.  At all times, the market for Odonate shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)  Odonate met the requirements for listing, and was listed and actively traded on the NASDAQ under the ticker symbol "ODT", a highly efficient and automated market;

(b)  Odonate had approximately 14,169,464 shares outstanding as of December 31, 2017, such that its stock was liquid.  During the Class Period, numerous shares of Odonate stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Odonate stock and permitting a strong presumption of an efficient market;

(c)  As a regulated issuer, Odonate filed periodic public reports with the SEC;

(d)  Odonate regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(e)    Odonate was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)    Unexpected material news about Odonate was rapidly reflected and incorporated into Odonate's stock price during the Class Period.

215.   As a result of the foregoing, the market for Odonate stock promptly digested current information regarding Odonate from all publicly available sources and reflected such information in the prices of the stock.   Under these circumstances, all purchasers of Odonate stock during the Class Period suffered similar injury through their purchase of Odonate stock at artificially inflated prices and a presumption of reliance applies.

216.   Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

217.   Lead Plaintiff brings this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class,

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consisting of a class (the "Class") of all persons and entities, other than Defendants, their family members and their affiliates, who purchased or otherwise acquired the stock of Odonate (NASDAQ:ODT) between December 7, 2017 and March 19, 2021, both dates inclusive (the "Class Period").

218.   Excluded from the Class are Defendants herein, the officers and directors of Odonate at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

219.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Odonate securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Odonate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

221.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

222.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Odonate;

- whether the Individual Defendants caused Odonate to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Odonate securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

223.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members

199

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

224.   As alleged herein, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine insomuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Odonate's securities; and Lead Plaintiff and members of the Class purchased or otherwise acquired Odonate securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

**(Against All Defendants for Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

225.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

226.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

227.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Odonate securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Odonate securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

228.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Odonate

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Odonate's finances and business prospects.

229.   Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Odonate, and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

230.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Odonate securities.

231.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

managers and/or directors of Odonate, the Individual Defendants had knowledge of the details of Odonate's internal affairs.

232.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Odonate.   As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Odonate's businesses, operations, future financial condition, and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Odonate securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Odonate's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Odonate securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

233.   During the Class Period, Odonate securities were traded on an active and efficient market.   Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Odonate securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Odonate securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class.  The market price of Odonate securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

234.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

235.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that Odonate had been disseminating misrepresented financial statements to the investing public.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

236.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

237.   During the Class Period, the Individual Defendants participated in the operation and management of Odonate, and conducted and participated, directly and indirectly, in the conduct of Odonate's business affairs.  Because of their senior positions, they knew the adverse non-public information about Odonate's finances, operations, finances, and prospects.

238.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Odonate's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by Odonate which had become materially false or misleading.

239.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Odonate disseminated in the marketplace during the Class Period concerning Odonate's business, operations, financial condition, results of operations, and prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause

205

Odonate to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Odonate within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Odonate securities.

240.   Each of the Individual Defendants, therefore, acted as a controlling person of Odonate.  By reason of their senior management positions and/or being directors of Odonate, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Odonate to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of Odonate and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

241.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Odonate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Lead Plaintiff hereby demands a trial by jury.

Dated:  April 13, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Matthew L. Tuccillo*

Matthew L. Tuccillo (admitted *pro hac vice*) (NY Bar # 5008750)
Jennifer Banner Sobers (admitted *pro hac vice*) (NY Bar # 4411922)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:    (917) 463-1044
Email: mltuccillo@pomlaw.com
          jbsobers@pomlaw.com

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer (admitted *pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff*

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS