1  COOLEY LLP
2  KOJI F. FUKUMURA (189719)
   (kfukumura@cooley.com)
3  RYAN E. BLAIR (246724)
   (rblair@cooley.com)
4  STEPHEN RICHARDS (308868)
   (srichards@cooley.com)
5  4401 Eastgate Mall
   San Diego, California 92121-1909
6  Telephone:  +1 858 550 6000
   Facsimile:   +1 858 550-6420
7

8  Attorneys for Defendants
   Odonate Therapeutics, Inc., Kevin C. Tang,
9  Michael Hearne and John G. Lemkey

10

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13

14  KEVIN KENDALL, Individually and        Case No. 3:20-cv-01828-H-LL
    On Behalf of All Others Similarly
15  Situated,                              CLASS ACTION

16              Plaintiff,                 **MEMORANDUM OF POINTS AND
                                           AUTHORITIES IN SUPPORT OF
17     v.                                  DEFENDANTS' MOTION TO DISMISS
                                           PLAINTIFF'S SECOND AMENDED
18  ODONATE THERAPEUTICS, INC.,            COMPLAINT FOR VIOLATIONS OF
    KEVIN C. TANG, MICHAEL                 THE FEDERAL SECURITIES LAWS**
19  HEARNE, and JOHN G. LEMKEY,
                                           Date: August 16, 2021
20              Defendants.                Time: 10:30 a.m.
                                           Courtroom: 15A
21                                         Judge: Hon. Marilyn L. Huff

22                                         **Oral Argument Requested**

23                                         <u>**Demand for Jury Trial**</u>

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................. 1

II.   Statement of Facts ........................................................................ 4

    A.    Odonate ............................................................................... 4

    B.    FDA Regulatory Process ...................................................... 4

    C.    Tesetaxel ............................................................................. 4

    D.    CONTESSA ........................................................................ 5

    E.    Top-Line Results from CONTESSA ..................................... 6

    F.    Discontinuation of Development of Tesetaxel ....................... 8

    G.    Litigation ............................................................................. 8

III.  Legal Standards ........................................................................... 8

IV.   Plaintiff's Section 10(b) Claim Fails............................................ 9

    A.    The SAC Fails to Meet Federal Pleading Requirements ...................... 9

        1.    The SAC Is Puzzle-Pled .......................................... 10

        2.    The SAC Defines a Facially Overbroad Class Period............. 11

        3.    Plaintiff Fails to Adequately Plead Any Fraud Theory ........... 12

    B.    Plaintiff Fails to Plead Falsity with Particularity................................ 12

        1.    Plaintiff's Omission-Based Fraud Theory Fails ..................... 12

            a.    Statements about Tesetaxel's Pharmacological Properties and Performance in Prior Studies ................ 14

            b.    Statements about the Hypothesis of CONTESSA and Observations from Published Studies that Did Not Include Tesetaxel.................... 16

            c.    Statements about the Timing of Enrollment and the Disclosure of Top-Line Results from CONTESSA ....... 17

            d.    Statements Made when Top-Line Results from CONTESSA Were Announced and Thereafter.............. 17

    C.    Plaintiff Fails to Plead a Strong Inference of Scienter ...................... 19

        1.    Plaintiff's CW Allegations Should Be Disregarded................. 19

        2.    Plaintiff's "Red Flag" Theory Fails................................... 21

        3.    Plaintiff's Remaining Theories of Scienter Fail..................... 22

        4.    Plaintiff's Theories of Scienter Fail Under Holistic Examination ......................... 24

V.    Plaintiff's Section 20(a) Claim Fails............................................ 25

VI.   Conclusion.................................................................................... 25

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arrowhead Pharm., Inc. Sec. Litig.*,
   2017 WL 5635422 (C.D. Cal. Sept. 20, 2017).....................................15

*In re Arrowhead Pharm., Inc. Sec. Litig.*,
   782 F. App'x 572 (9th Cir. 2019)......................................................23

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008) ...............................................16

*Biondolillo v. Roche Holding AG*,
   2018 WL 4562464 (D.N.J. Sept. 24, 2018).........................................18

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...........................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters
   Corp.*,
   632 F.3d 751 (1st Cir. 2011) ...........................................................21

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) ...........................................................23

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) .........................................................................8

*Gompper v. Visx, Inc.*,
   298 F.3d 893 (9th Cir. 2002) ...........................................................19

*Huang v. Avalanche Biotechnologies, Inc.*,
   2016 WL 6524401 (N.D. Cal. Nov. 3, 2016)................................13, 14

*Lifschitz v. NextWave Wireless Inc.*,
   2010 WL 11512356 (S.D. Cal. Mar. 5, 2010)......................................11

*Lipton v. PathoGenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) .........................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .........................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mauss v. NuVasive, Inc.*,
   2014 WL 4161431 (S.D. Cal. Aug. 19, 2014) .................................................... 11

*In re Maxwell Techs., Inc. Sec. Litig.*,
   18 F. Supp. 3d 1023 (S.D. Cal. 2014) .............................................................. 22

*Neborsky v. Valley Forge Composite Techs., Inc.*,
   2014 WL 1705522 (S.D. Cal. Apr. 28, 2014) .................................................... 10

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ................................................................... 9, 19, 23

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ....................................................................... 9, 12

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ............................................................................. 9

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................. 9

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...................................................................*passim*

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ......................................................... 24

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................ 9, 22

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ......................................................... 2, 15, 18

*In re Silicon Graphics, Inc.*,
   183 F.3d 970 (9th Cir. 1999) .......................................................................... 19

*Smith v. Antares Pharma, Inc.*,
   2020 WL 2041752 (D.N.J. Apr. 28, 2020)................................................... 15, 18

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001)...................................................... 10, 11

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii

MPA ISO MOT. TO DISMISS SAC
CASE NO. 3:20-CV-01828-H-LL

1

2

# TABLE OF AUTHORITIES
(continued)

Page(s)

3

4

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ......................................................................... 8

5

6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................ 9, 19

7

8

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) .................................................................... 2, 18

9

10

*Union Asset Mgmt. Holding AG v. Sandisk Corp.*,
2016 WL 406283 (N.D. Cal. Jan. 22, 2016) .............................................. 12

11

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .................................................................... 12

12

13

*In re Vical Inc. Sec. Litig.*,
2015 WL 1013827 (S.D. Cal. Mar. 9, 2015) ................................................ 3

14

15

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......................................................... 8, 19, 20, 24

16

**Statutes**

17

17 C.F.R. § 229.303(a)(3)(i)-(ii) and (b)(2) .................................................... 12

18

19

21 C.F.R. §§ 312.32(c)(1) & 312.64(b) ............................................................ 4

20

15 U.S.C.
§ 78j(b) ......................................................................................................... 8
§ 78t .............................................................................................................. 8

21

§ 78u-4(b)(1)(B) .......................................................................................... 11

22

23

**Rules**

24

Federal Rules of Civil Procedure
8(a)(2) ........................................................................................................... 9

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

## I.    INTRODUCTION

Defendant Odonate Therapeutics, Inc. ("Odonate") is a pharmaceutical company formerly focused on the development of an experimental drug called tesetaxel to treat patients with metastatic breast cancer ("MBC").   In August 2020, Odonate announced top-line results from a Phase 3 study of tesetaxel called CONTESSA.   These results showed that CONTESSA met its primary efficacy endpoint and that certain side effects such as neutropenia (a low level of neutrophils, a type of white blood cell) and patient discontinuation rates were consistent with studies of similar drugs approved by the U.S. Food and Drug Administration ("FDA").   In March 2021, however, Odonate announced that, following feedback received from the FDA, the clinical data package for tesetaxel was unlikely to support FDA approval.   Plaintiff filed this putative securities fraud class action complaint against Odonate and three of its executives because Odonate's stock dropped following both the August 2020 and March 2021 announcements.

Plaintiff's Second Amended Complaint for Violations of the Federal Securities Laws ("SAC")[1] is more than 200 pages and is difficult to follow.   Plaintiff's theory of fraud appears to be that Odonate's public statements—none of which described, previewed, or contextualized CONTESSA's interim safety results or made any predictions of what the future results of CONTESSA would be—nevertheless became false and misleading when Odonate did not disclose interim reports of side effects experienced by individual patients while CONTESSA was still ongoing.

This theory runs afoul of controlling precedent.   The Ninth Circuit has made clear that "a company is not required to disclose every safety-related result from a clinical trial . . . even if investors would consider the omitted information significant," so long as the omitted results "do not make the actual statements" made by the company "misleading." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8

---

[1] Citations to "¶ _" are to the SAC.   (Dkt. 24.)   Citations to "Ex. _" are to the Declaration of Ryan E. Blair, filed concurrently herewith.   Citations and quotations are omitted, and emphasis added, unless otherwise noted.

(9th Cir. 2012). Here, because *none* of the statements challenged in the SAC concerned CONTESSA's ongoing safety data, omitting interim individual-patient safety results, including side effects (otherwise known as "adverse events," or "AEs"), could not render those statements misleading. That is the beginning and end of this case, and Plaintiff's claims should be dismissed for three independent reasons.

*First*, the SAC violates basic pleading rules. Rather than (1) identifying the specific statements Plaintiff believes were misleading, and (2) explaining why those statements are misleading, the SAC includes more than 150 pages of repetitive quotations of Odonate's public statements—none of which concerned CONTESSA's ongoing safety data—combined with non-specific allegations of falsity. Courts call this tactic "puzzle pleading," and they dismiss complaints that employ it. Plaintiff also adopts a facially overbroad Class Period and alleges redundant theories of fraud.

*Second*, Plaintiff fails to plead a single false or misleading statement. Each of the statements Plaintiff challenges is either *true* or an *inactionable opinion*. For example, tesetaxel is in fact "unique" among drugs in its class (taxanes) because it is taken orally, whereas all of the FDA-approved taxanes are administered intravenously ("IV"). Tesetaxel does indeed have "no history of hypersensitivity reactions" because there have been zero cases of tesetaxel-related hypersensitivity reactions in more than 1,200 patients. And, Odonate's statements that tesetaxel "*was*" or "*has been*" "generally well tolerated" in clinical studies are inactionable for two reasons. First, each of these statements explicitly relates to clinical studies conducted *before* CONTESSA, not CONTESSA itself. Second, "[c]ourts have repeatedly held publicly stated interpretations of [clinical study results] to be opinions . . . ." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)). And in any case, to ensure that investors were well informed, Odonate consistently cautioned investors that FDA approval of tesetaxel was not assured: clinical trials of the drug could reveal unacceptable levels of side effects, and either the FDA or Odonate could halt

1  CONTESSA at any time.   Indeed, Odonate expressly and repeatedly warned

2  investors that the FDA had previously placed tesetaxel on clinical hold in 2007 due

3  to patient deaths associated with severe neutropenia, a recognized side effect of all

4  taxanes, including tesetaxel.

5      These specific disclosures laid bare what reasonable investors already know:

6  "investments in experimental drugs are inherently speculative," and the federal

7  securities laws are not meant to permit Plaintiff to "hedge [his] investment by

8  initiating litigation attacking perfectly reasonable" statements about tesetaxel.  *In re*

9  *Vical Inc. Sec. Litig.*, 2015 WL 1013827, at *8 (S.D. Cal. Mar. 9, 2015) (Bashant,

10  J.).

11      ***Third***, Plaintiff does not plead a strong inference of scienter.  Plaintiff alleges

12  that Defendants were aware of "red flags" during CONTESSA: namely, purportedly

13  "higher-than-expected" rates of certain AEs or of patients discontinuing treatment in

14  the study.  But as Plaintiff concedes, an ***independent*** committee of cancer physicians

15  and statisticians charged with ensuring patient safety (the Independent Data

16  Monitoring Committee) reviewed CONTESSA data on a regular basis and repeatedly

17  advised Odonate to continue CONTESSA as planned.   Additionally, the FDA

18  received safety reports on an ongoing basis and never placed a hold on CONTESSA.

19  Plaintiff nowhere alleges that either the Independent Data Monitoring Committee or

20  the FDA ever expressed any concern about CONTESSA's interim data, let alone

21  required a pause in the study—even though the FDA had previously halted a different

22  study of tesetaxel.  Plaintiff's scienter theory is also nonsensical as an economic

23  matter: Plaintiff asks the Court to believe that Defendants knew the interim

24  CONTESSA data was a death knell for tesetaxel as early as August 2018, but that

25  Odonate's CEO and his affiliates nonetheless chose to ***invest tens of millions of***

26  ***dollars of their own money*** in a pointless attempt to bring tesetaxel to market.

27  Plaintiff's theory makes no sense, and Plaintiff's claims should be dismissed.

28

Cooley LLP
Attorneys at Law
San Diego

MPA ISO Mot. to Dismiss SAC
Case No. 3:20-cv-01828-H-LL

## II. STATEMENT OF FACTS

### A. Odonate

Odonate is a pharmaceutical company formerly focused on the development of an experimental drug called tesetaxel to treat patients with metastatic breast cancer ("MBC"). Breast cancer is the most common cancer worldwide, and the prognosis for women with MBC is very poor: the 5-year survival rate is below 30%. (Ex. F at 37-38.) Defendant Kevin Tang is Odonate's CEO. Defendant Michael Hearne is its CFO. And Defendant John Lemkey is its former COO.

### B. FDA Regulatory Process

Before a new drug can be sold commercially, the FDA typically requires that the drug undergo clinical studies involving three successive phases (Phases 1, 2, and 3) of human testing involving increasingly larger patient populations. Drug testing is inherently uncertain—only 3.4% of cancer drugs proceed from Phase 1 to FDA approval. (Ex. G at 41.) During clinical studies, investigators are required to report serious adverse events ("SAEs") immediately to the study sponsor, who must then notify the FDA and all participating investigators of certain SAEs as soon as possible. 21 C.F.R. §§ 312.32(c)(1) & 312.64(b).

### C. Tesetaxel

Tesetaxel is a chemotherapy agent that belongs to a class of drugs known as "taxanes," which are widely used in the treatment of cancer. (Ex. E at 24.) Tesetaxel has several properties that make it unique among taxanes, including: (1) oral administration (rather than through an IV) with a low pill burden; (2) a long (~8-day) terminal plasma half-life in humans, which facilitates relatively infrequent dosing; (3) no history of hypersensitivity (allergic) reactions; and (4) significant activity against chemotherapy-resistant tumors. (*Id*.)

Despite these properties, tesetaxel—like all chemotherapies—has significant side effects. Defendants specifically said as much. In its very first public filing— and in every annual or quarterly report thereafter—Odonate cautioned investors:

Our product candidates may cause **undesirable side effects** or have other properties that could **delay or prevent their regulatory approval**, reduce the commercial attractiveness of a prescribing label or result in significant negative consequences following regulatory approval, if approved.  Clinical studies of tesetaxel or other product candidates we may develop could reveal a **high and unacceptable incidence and severity of undesirable side effects**. **Undesirable side effects could adversely affect patient enrollment in clinical studies, cause us or regulatory authorities to interrupt, delay or halt clinical studies or result in the delay, denial or withdrawal of regulatory approval by the FDA**, the EMA or other regulatory authorities. **For example, in 2007, tesetaxel was placed on clinical hold by the FDA while in development by the original sponsor due to the occurrence of several fatalities in the setting of severe neutropenia** (a low level of neutrophils, a type of white blood cell) in patients with advanced cancer.

(Ex. B at 14; Ex. C at 17; Ex. D at 20-21; Ex. E at 34; Ex. F at 39.)  While the clinical hold was lifted in 2008 and tesetaxel subsequently was evaluated in multiple studies, Odonate consistently warned investors that tesetaxel was no sure thing: the FDA could pause any future studies, those studies could yield "negative or inconclusive" results, the FDA could refuse to approve the drug, and "the prevalence and severity of any side effects" could negatively affect how widely tesetaxel is adopted.  (Ex. E at 32-33.)

### D.    CONTESSA

In late 2017, Odonate initiated a Phase 3 study of tesetaxel called CONTESSA in 685 patients with MBC.  Approximately half of the patients in CONTESSA received a combination treatment of tesetaxel plus capecitabine (capecitabine is an established treatment for patients with MBC), and approximately half received the approved dose of capecitabine alone.  (Ex. E at 30.)  CONTESSA's primary efficacy endpoint was progression-free survival ("PFS"), which is the time from when a patient starts on the study to when her/his cancer progresses or she/he dies, whichever occurs first.  CONTESSA was overseen by a committee of independent cancer physicians and statisticians known as the Independent Data Monitoring Committee, whose charge was to ensure the safety of patients in the study.  (*See* ¶ 146(a).)

In November 2017, Odonate announced that it expected to begin enrolling

patients in CONTESSA in the fourth quarter of 2017 and report top-line results from the study in 2020.  (¶ 59(d).)  Over the next two and a half years, Odonate periodically updated investors on this timeline, noting in October 2019 that it had completed enrollment in the study and that it anticipated releasing top-line results in the third quarter of 2020.  (¶ 103.)  But, at no time and in no public presentation, press release, or SEC filing did Odonate describe, preview, or contextualize CONTESSA's interim safety results or make any predictions of what the future results of CONTESSA would be.  Further, the FDA received safety reports on an ongoing basis and never placed a hold on CONTESSA. Plaintiff nowhere alleges that either the Independent Data Monitoring Committee or the FDA ever expressed any concern about CONTESSA's interim data, let alone required a pause in the study—even though the FDA had previously halted a different study of tesetaxel.

### E.    Top-Line Results from CONTESSA

As Odonate neared publication of top-line results from CONTESSA, market analysts were cautious, noting that the study could lead to a wide range of outcomes. Two analysts acknowledged that "assessing [CONTESSA's] likelihood of success . . . is not straightforward," and that possible scenarios included both "home-run" performance and outright "failure."  (Ex. H at 43, 45.)  Another analyst agreed that CONTESSA's "downside scenario" involved "the potential for safety issues to arise . . . ."  (Ex. I at 48.)

On August 24, 2020, Odonate issued a press release announcing top-line results from CONTESSA.  (¶ 8.)  CONTESSA met its primary efficacy endpoint of PFS.  (¶ 8.)  Median PFS was 9.8 months for tesetaxel plus a reduced dose of capecitabine versus 6.9 months for the approved dose of capecitabine alone, an improvement of 2.9 months. (Ex. J at 51.)

The press release included information on AEs that occurred in patients who participated in CONTESSA.  For example: Grade ≥3 neutropenia occurred in 71.2% of patients treated with tesetaxel plus capecitabine versus 8.3% of patients treated

with capecitabine alone; Grade ≥3 febrile neutropenia occurred in 12.8% of patients treated with tesetaxel plus capecitabine versus 1.2% of patients treated with capecitabine alone; Grade 2 alopecia (hair loss) occurred in 8.0% of patients treated with tesetaxel plus capecitabine versus 0.3% of patients treated with capecitabine alone; and Grade ≥3 neuropathy (weakness or numbness, often in the hands or feet) occurred in 5.9% of patients treated with tesetaxel plus capecitabine versus 0.9% of patients treated with capecitabine alone. The press release also reported how many patients discontinued treatment in CONTESSA because of AEs. Treatment discontinuation due to any AE occurred in 23.1% of patients treated with tesetaxel plus capecitabine versus 11.9% of patients treated with capecitabine alone. (*Id.*)

As Odonate explained to investors in a call held shortly after publication of these top-line results, CONTESSA's neutropenia and treatment discontinuation rates were consistent with other combination chemotherapy treatments involving taxanes. (Ex. K at 57 (neutropenia rates were "in line with" "other doublet chemotherapies"; discontinuation rates were "well within the range" of "other Phase [3] registration studies in metastatic breast cancer").) The FDA label for capecitabine, for example, shows that when combined with another taxane, docetaxel, patients exhibit a Grade ≥3 neutropenia rate of 69% and a treatment discontinuation rate of 26%. (Ex. L at 60, 63.) And, the FDA label for docetaxel indicates that neutropenia "occurs in virtually all patients" receiving certain dosages of the drug. (Ex. M at 66.)[2]

Odonate's stock price fell following the announcement of top-line results from CONTESSA.

---

[2] Market analysts, too, noted that tesetaxel showed "classical taxane AEs," and that CONTESSA's discontinuation rate "compare[d] favorably" to other breast cancer chemotherapies. (Ex. N at 68-69.) Plaintiff says that "[a]nalysts" were "shocked" by CONTESSA's neutropenia and discontinuation rates (¶ 9)—though Plaintiff does not identify or quote any shocked analysts. What analysts actually said is that concerns about CONTESSA's neutropenia rate were "profoundly misplaced" because "significant neutropenia is common when using taxanes" and is "routinely treated successfully." (Ex. N at 69.) Plaintiff's allegation that "[a]nalysts" were "shocked" is completely unsupported; Plaintiff quotes **no** analyst reports at all from after the publication of CONTESSA's top-line data.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

### F.     Discontinuation of Development of Tesetaxel

Contemporaneous with the announcement of top-line results from CONTESSA in August 2020, Odonate stated that "[w]e plan to submit a [New Drug Application] to the FDA in middle of [2021]." (Ex. K at 56.)   In March 2021, however, Odonate—for the first time—received feedback from the FDA on the results of CONTESSA and concluded that the clinical data package for tesetaxel was unlikely to support FDA approval. (¶ 168).  On March 22, 2021, Odonate announced that it was "discontinuing the development of tesetaxel and [would] wind down the operations of the Company." *Id.*   Odonate's stock price fell following this announcement.

### G.     Litigation

The SAC, filed in April 2021, alleges that Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t.  The SAC's basic theory of fraud is that Odonate learned partway into CONTESSA that patients were experiencing higher-than-expected rates of AEs (like neutropenia), that some patients dropped out of the study because of these AEs, and that Defendants knew these AEs would prevent FDA approval of tesetaxel.  (¶ 5.)

## III.   LEGAL STANDARDS

To state a claim under Section 10(b), plaintiff must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss or proximate causation, and (6) damages.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  The Court need not accept unsupported or conclusory allegations, allegations based on unwarranted deductions or unreasonable inferences, or allegations that contradict matters properly subject to judicial notice. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  The Court may consider, however, materials incorporated by reference in the complaint and other matters subject to judicial notice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

When alleging Section 10(b) claims, a plaintiff must satisfy the heightened requirements of the Private Securities Litigation Reform Act ("PSLRA").  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).  These requirements present an "elephant-sized boulder" that a plaintiff's factual allegations must overcome.  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014).  Two requirements are pertinent here, both of which must be alleged with "particularity."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

*Falsity*:  The PSLRA requires Plaintiff to identify specifically each statement alleged to have been false or misleading, and to provide the reasons why the statement was false or misleading ***when made***.  *Rigel*, 697 F.3d at 876-77.

*Scienter*:  Plaintiff must also allege facts that give rise to a "strong inference" that the Defendants acted with the intent to deceive shareholders or in reckless disregard of the truth.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Court "must consider plausible, nonculpable explanations" for Defendants' conduct, *id*. at 324-26, as well as the economic plausibility of Plaintiff's claims.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415-16 (9th Cir. 2020).

## IV.   PLAINTIFF'S SECTION 10(b) CLAIM FAILS

Plaintiff's Section 10(b) claim should be dismissed for three reasons: (1) the SAC fails to meet federal pleading requirements, (2) Plaintiff fails to plead falsity with particularity, and (3) Plaintiff fails to plead a strong inference of scienter.

### A.   The SAC Fails to Meet Federal Pleading Requirements

Rather than meet Federal Rule of Civil Procedure 8(a)(2)'s requirement of a "short and plain statement of the claim," the SAC is a 208-page morass of quotations from Odonate's public statements combined with non-specific allegations of falsity.

This approach merits dismissal for three reasons.  *First*, the SAC is "puzzle-pled" (*i.e.*, it fails to link the ***particular*** statements Plaintiff believes were misleading with the ***particular*** reasons those statements were supposedly misleading).  *Second*, the SAC defines a facially overbroad Class Period.  And *third*, although Plaintiff fails to adequately plead ***any*** fraud theory, two of Plaintiff's fraud theories are simply bootstrapped onto the first and do not rest on properly pled facts.

### 1.    The SAC Is Puzzle-Pled

Where, as here, a securities plaintiff fails to link each challenged statement to the facts establishing that the statement was false or misleading when made, federal courts say that the complaint is "puzzle-pled." *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 1705522, at *5 (S.D. Cal. Apr. 28, 2014) (Anello, J.). Puzzle-pled complaints "abuse judicial resources" and should be dismissed.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074-75 (N.D. Cal. 2001).

The SAC is a paradigm of puzzle pleading.  Rather than direct the Court and Defendants to specific statements, the SAC contains over 150 pages of statements drawn from virtually every public statement Odonate made during the Class Period. At one point, Plaintiff rattles off ***thirty-two straight pages*** of allegedly misleading statements—more than ***7,300 words*** in all—taken from every single quarterly and annual filing Odonate made during the Class Period. (¶¶ 139-152.)  Not one of these words is emphasized.  The Court and Defendants are left to guess what Plaintiff believes was misleading, and why.  The SAC also includes dozens of statements that Plaintiff cannot possibly believe are materially false and misleading, like:

- Odonate intended to use the proceeds of its IPO "for development and regulatory activities relating to tesetaxel." (¶ 57.)

- Odonate was "initiating a 600-patient, multinational, multicenter, randomized Phase 3 study, known as CONTESSA." (¶ 59(a).)

- There is a "high unmet medical need for combination chemotherapy regimens with improved benefit-risk profiles." (¶ 59(c).)

Then, rather than state "the reason or reasons why" "each statement" is misleading, 15 U.S.C. § 78u-4(b)(1)(B), Plaintiff states—then repeats, ***more than two dozen times***—a 100-plus-word sentence summarizing the results of CONTESSA and referring the reader to other places in the SAC:

> The misrepresentations . . . were materially false and misleading, because as more fully described in the 'Undisclosed, Material, Negative Facts' section *supra*, the 'Defendants' Knowledge Or Reckless Disregard' section *infra*, and the CW statements set forth in those sections, and the 'Truth Begins to Emerge' section *infra*, tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 treatment-emergent AEs, including, inter alia, neutropenia (71.2% of patients), febrile neutropenia (12.8%), neuropathy (5.9%), diarrhea (13.4%), fatigue (8.6%), hypokalemia (8.6%), leukopenia (10.1%), and anemia (8.0%), which compare unfavorably against such risks from treatment alternatives, like capecitabine alone and were grounds for the FDA to refuse approval of any NDA for tesetaxel." (¶ 60.)[3]

In other words, Plaintiff copies and pastes nearly everything Odonate said during the Class Period, along with a summary having no connection to the challenged statements, then expects Defendants and the Court to "solve the 'puzzle' of interpreting [his] claims." *Splash*, 160 F. Supp. 2d at 1075. This alone is grounds for dismissal. *See, e.g.*, *Lifschitz v. NextWave Wireless Inc.*, 2010 WL 11512356, at *3 (S.D. Cal. Mar. 5, 2010) (Burns, J.) (dismissing complaint that would have required the court to "forage through nearly fifty pages of factual allegations" to "piece together" plaintiff's claims); *Mauss v. NuVasive, Inc.*, 2014 WL 4161431, at *6-7 (S.D. Cal. Aug. 19, 2014) (Miller, J.) (dismissing 93-page puzzle-pled complaint).

## 2.      The SAC Defines a Facially Overbroad Class Period

Plaintiff's deficient pleading approach is exemplified by Plaintiff's definition of the Class Period. Plaintiff says that Odonate learned of "significant safety concerns" regarding CONTESSA "no later than August 2018." (¶ 5.) Yet the alleged Class Period begins in December 2017, ***eight months before*** Plaintiff says

---

[3] Partway through the SAC, Plaintiff adds another 134-word boilerplate sentence, then repeats this sentence dozens of times. (*See, e.g.*, ¶ 72.)

Defendants were even ***aware of*** the information they were supposed to disclose.  The reason for this gambit is apparent: Plaintiff wants the class to include investors who bought Odonate's stock during its 2017 IPO, expanding the potential damages.  (*See* ¶ 188.)  Courts have little patience for such transparent efforts to manipulate the class period.  *See, e.g.*, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (affirming dismissal of a securities fraud complaint and noting that it is often "obvious" why plaintiffs select "unusually long class period[s]"); *Union Asset Mgmt. Holding AG v. Sandisk Corp.*, 2016 WL 406283, at *5 (N.D. Cal. Jan. 22, 2016) (dismissing complaint where plaintiff used "frivolous" allegations to create an "artificially long" class period).

### 3.  Plaintiff Fails to Adequately Plead Any Fraud Theory

Plaintiff attempts to improperly bootstrap two theories of fraud (the "Reported Results Fraud" and "Internal Controls Fraud" theories) onto Plaintiff's primary theory of fraud (the "Clinical Trials & Business Operations Fraud").  But, the "Reported Results"[4] and "Internal Controls" theories do not have any connection whatsoever to the allegedly misleading statements about tesetaxel and CONTESSA.  At best, these theories are entirely derivative of the "Clinical Trials & Business Operations Fraud."  Because Plaintiff does not adequately identify why these statements were misleading, Defendants cannot adequately respond to them.

### B.  Plaintiff Fails to Plead Falsity with Particularity

### 1.  Plaintiff's Omission-Based Fraud Theory Fails

Even if the SAC were coherently pled, Plaintiff still has not plausibly identified a false or misleading statement.  According to Plaintiff, Odonate's failure to disclose interim safety reports on individual patients while CONTESSA was still ongoing

---

[4] Plaintiff's theory for why the "Reported Results Fraud" is actionable at all appears to be that certain statements violated Regulation S-K, Item 303, 17 C.F.R. § 229.303(a)(3)(i)-(ii) and (b)(2).  (¶¶ 139, 153.)  But even if Plaintiff had properly alleged an Item 303 violation (Plaintiff has not), that does not constitute a Section 10(b) violation in the Ninth Circuit.  *See NVIDIA*, 768 F.3d at 1056.

1    rendered misleading every other statement Odonate made.

2         Of critical importance, however, the securities laws create **no affirmative duty**

3    **to disclose information**.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-

4    45 (2011); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)

5    (Rule 10b-5 does not contain "a freestanding completeness requirement").  *Rigel* is

6    particularly instructive.  697 F.3d at 872-73.  There, the company disclosed "key

7    safety results" from a Phase 2 study of its arthritis drug.  *Id.*  Later, after the company

8    disclosed additional safety data and the company's stock dropped, *id*. at 884-85, the

9    plaintiff filed suit claiming that the omission of additional safety data made the initial

10   disclosures misleading.  *Id.* at 880.  After noting that the allegedly omitted data did

11   not contradict the initially disclosed results, the Ninth Circuit held that "even if some

12   investors might have wanted more extensive information . . . that would not be

13   sufficient to make the alleged original statements false or misleading."  *Id.* at 881.

14   As *Rigel* explained, "a company is not required to disclose every safety-related result

15   from a clinical trial, even if the company discloses some safety-related results and

16   even if investors would consider the omitted information significant," so long as the

17   omissions "do not make the actual statements misleading."  *Id.* at 880 n.8.

18        In *Matrixx*, by contrast, the Supreme Court found that the plaintiff **had** met the

19   PSLRA's strict pleading standards because, unlike here, the defendant omitted

20   evidence its drug caused anosmia (loss of smell) while simultaneously calling reports

21   connecting the drug to anosmia "completely unfounded and misleading."  563 U.S.

22   at 47; *see also Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401, at *4-

23   5 (N.D. Cal. Nov. 3, 2016) (dismissing securities fraud claims where defendant stated

24   that drug was "well tolerated" despite significant side effects; "reasonable investors"

25   would not have believed that the defendant was "making predictions as to the final

26   safety or efficacy of the drug") (emphasis removed).

27        As *Rigel*, *Matrixx*, and *Huang* illustrate, the usual question in securities fraud

28   cases involving clinical studies is whether a company that discloses some piece of

*positive* interim study data is required to also disclose other *negative* interim study data.  But here, Plaintiff's allegations are far weaker than those in *Rigel* and *Huang* because Plaintiff does not even allege that Defendants disclosed *positive* interim safety results from CONTESSA or, for that matter, any interim safety results *at all*. Instead, Plaintiff points to various statements regarding tesetaxel having nothing to do with CONTESSA, then alleges in conclusory fashion that these statements were misleading in the absence of a full disclosure of CONTESSA's interim individual-patient safety results.

The statements challenged in the SAC fall broadly into four categories: (a) statements about tesetaxel's pharmacological properties and performance in prior studies; (b) statements about the hypothesis of CONTESSA and observations from published studies that did not include tesetaxel; (c) statements about the timing of enrollment and the timing of top-line results from CONTESSA; and (d) statements made when top-line results from CONTESSA were announced and thereafter.  No statement in any of these four categories is actionable.

### a. Statements about Tesetaxel's Pharmacological Properties and Performance in Prior Studies

Plaintiff alleges that several statements about tesetaxel's pharmacological properties and performance in prior studies were materially false and misleading, including:

- Tesetaxel is "unique among taxanes." (*E.g.*, ¶ 6)

- Tesetaxel has "no history of hypersensitivity reactions." (*E.g.*, ¶ 73)

- Tesetaxel has been "generally well tolerated." (*E.g.*, ¶ 6)

None of these statements are actionable because (1) they are either *true* or *inactionable opinions*, and (2) the SAC does not explain how these statements were made misleading by any allegedly omitted information.  Tesetaxel is in fact unique among taxanes because it is taken orally, whereas all approved taxanes are administered intravenously.  (¶ 2.)  And, tesetaxel has "no history of hypersensitivity

reactions" because there have been zero cases of tesetaxel-related hypersensitivity reactions in more than 1,200 patients.  Plaintiff appears to put particular emphasis on Odonate's statement that tesetaxel "has been generally well tolerated in clinical studies.  (*E.g.*, ¶ 6.)  But this statement, like the others, is plainly inactionable.

**First**, the statement relates only to studies that were completed before CONTESSA, and not CONTESSA itself.   For example, the statement that "[t]esetaxel **has been** generally well tolerated in clinical studies and has demonstrated robust single-agent antitumor activity in two Phase 2 studies . . ." explicitly refers to **previous** Phase 2 studies.  (¶ 64.)  (CONTESSA was a Phase 3 study).  Likewise, Odonate stated that "[t]esetaxel, administered both alone and in combination with capecitabine, **has been** generally well tolerated." (¶ 65(a).)  Reasonable investors would not read "has been generally well tolerated" to apply to anything other than previous studies (before CONTESSA), and statements about the results of **previous** studies are not rendered misleading by not disclosing any results from an **ongoing** study.

**Second**, the statement that tesetaxel has been "generally well tolerated" is an inactionable opinion.  *See In re Arrowhead Pharm., Inc. Sec. Litig.*, 2017 WL 5635422, at *9 (C.D. Cal. Sept. 20, 2017) ("Characterizing the drug as 'well tolerated' is not actionable.").   "Courts have repeatedly held publicly stated interpretations of [clinical study results] to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 543.  And "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *5 (D.N.J. Apr. 28, 2020).  Here, Plaintiff has alleged no facts that suggest Defendants did not "honestly believe" tesetaxel was generally well tolerated. And, in the absence of **any** contemporaneous communications between Odonate and the FDA at the time the challenged statements were made, the FDA's ultimate view

of tesetaxel's clinical data package in March 2021 does not change that fact. *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008) ("If the management of the company releases positive reports about the drug to the public along the way which the management honestly believes to be true . . . then that is not securities fraud, even though at a later point some event occurs which prevents the marketing of the drug or makes it necessary to take the drug off the market.").

> **b.   Statements about the Hypothesis of CONTESSA and Observations from Published Studies that Did Not Include Tesetaxel**

Plaintiff also alleges that several statements about the hypothesis of CONTESSA and observations from published studies that did not even include tesetaxel were materially false and misleading, including:

- The "hypothesis" of CONTESSA was that an "all-oral regimen of tesetaxel plus a reduced dose of capecitabine will lengthen PFS while being well-tolerated as compared to capecitabine alone."[5] (¶ 6)
- "Nonclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy." (*Id.*)
- "[T]he trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity." (¶ 85)

These statements are, once again, either ***true*** or ***inactionable opinions***. Investors know what the word "hypothesis" means, and the ***hypothesis*** of CONTESSA was as stated. (¶ 93(b).) The second statement is an opinion based on published studies of capecitabine and other taxanes (not tesetaxel) conducted by independent cancer physicians. The third statement is a direct quote from an independent cancer physician stating an opinion based on his published study of capecitabine and another taxane (not tesetaxel).

---

[5] On at least one occasion, Plaintiff misleadingly quotes this statement without acknowledging that it was specifically presented as a "***hypothesis***" for CONTESSA. (*Compare* ¶ 6 *with* Ex. S at 81; Ex. T at 84.)

### c.   Statements about the Timing of Enrollment and the Disclosure of Top-Line Results from CONTESSA

Plaintiff similarly alleges that statements about the timing of enrollment and the disclosure of top-line results from CONTESSA were materially false and misleading, including:

- "We expect to complete enrollment of CONTESSA in the second half of 2019 and report top-line results from CONTESSA in 2020." (¶ 101)

- "[Odonate] today announced the completion of enrollment in CONTESSA, a multinational, multicenter, randomized, Phase 3 study investigating tesetaxel as a potential treatment for patients with HER2 negative, hormone receptor positive metastatic breast cancer" and that it "expects to report top-line results from CONTESSA in the third quarter of 2020." (¶ 103)

- "We continue to expect to report top-line results from CONTESSA . . . in the third quarter of 2020." (¶ 116(a))

These statements are all ***true***.  Odonate said it thought it would complete CONTESSA enrollment in the second half of 2019, ***and then it did***. (¶ 103.)  It said it "expect[ed]" to report top-line CONTESSA results in 2020, ***and then it did***. (¶ 8.)

### d.   Statements Made when Top-Line Results from CONTESSA Were Announced and Thereafter

Finally, Plaintiff alleges that several statements made when top-line results from CONTESSA were announced and thereafter were materially false and misleading, including:

- "We continue to plan to submit a New Drug Application for tesetaxel to the FDA in mid-2021." (¶ 151(a).)

- "We are pleased to have recently announced positive top-line results from CONTESSA, Odonate's Phase 3 study investigating tesetaxel as a potential treatment for patients with metastatic breast cancer." (¶ 120(a).)

- "Tesetaxel plus capecitabine was associated with a manageable side effect profile." (¶ 151(b).)

- "While [Overall Survival (OS)] data are immature, a recent interim analysis indicated the absence of an adverse effect on OS for tesetaxel plus a reduced dose of capecitabine." (¶ 151(b).)

These statements are, once again, either ***true*** or ***inactionable opinions***. The first statement was ***true***.  On August 24, 2020, Odonate announced that it planned to submit a New Drug Application ("NDA") in mid-2021. (Ex. K at 56.)  That timeline did not change until March 2021, when Odonate received—for the first time—FDA feedback regarding CONTESSA's results.  (*See* ¶ 11.)  Plaintiff does not allege Defendants ever received any negative feedback on CONTESSA from the FDA prior to March 2021, and Plaintiff has not alleged this statement was not true when made.  *See Tongue,* 816 F.3d at 213 (no false statement where defendant said it expected a decision from the FDA on a drug by the end of the year; the "statement [was] about timing, not about the likelihood of approval.").

The second, third, and fourth statement—that the results of CONTESSA were "positive," that the side effect profile of tesetaxel plus capecitabine was "manageable," and that an interim analysis indicated the absence of an adverse effect on overall survival—are all ***inactionable opinions***.  Odonate investors were free to form their own opinions of the top-line results from CONTESSA.  *See, e.g.*, *Biondolillo v. Roche Holding AG*, 2018 WL 4562464, at *5 (D.N.J. Sept. 24, 2018) ("The press release called the [study] results 'positive,' but such interpretations of trial data are matters of opinion . . . .").  Odonate's opinion that top-line data from CONTESSA were positive was supported by the fact that the study met its primary endpoint of an improvement in progression-free survival ("PFS"), which is the time from when a patient starts on the study to when her/his cancer progresses or she/he dies, whichever occurs first.  Median PFS was 9.8 months for tesetaxel plus a reduced dose of capecitabine versus 6.9 months for the approved dose of capecitabine alone, an improvement of 2.9 months.  Once again, interpretations of clinical study results are opinions, and opinions are only actionable when they are not honestly believed.  *In re Sanofi*, 87 F. Supp. 3d at 543; *Smith*, 2020 WL 2041752, at *5.  Analysts agreed that neutropenia associated with tesetaxel would be "manageable" with "standard" treatment.  (Ex. R at 78.)  And, Plaintiff has alleged no facts that suggest Defendants

1  did not honestly believe these statements.

2  **C.    Plaintiff Fails to Plead a Strong Inference of Scienter**

3  The SAC is separately subject to dismissal because it does not plead a "strong

4  inference" of scienter.  Plaintiff "must plead, in great detail, facts that constitute

5  strong circumstantial evidence of deliberately reckless or conscious misconduct." *In*

6  *re Silicon Graphics, Inc.*, 183 F.3d 970, 974 (9th Cir. 1999).  "[F]acts showing mere

7  recklessness or a motive to commit fraud and [the] opportunity to do so" are

8  insufficient. *Zucco*, 552 F.3d at 990–91.  In omission cases, like this one, the scienter

9  bar is particularly high, requiring "a highly unreasonable omission, involving not

10  merely simple, or even inexcusable negligence, but an ***extreme departure*** from the

11  standards of ordinary care, and which presents a danger of misleading buyers or

12  sellers that is either known to the defendant or is ***so obvious*** that the actor must have

13  been aware of it." *Zucco*, 552 F.3d at 991.  A complaint will survive dismissal "only

14  if a reasonable person would deem the inference of scienter ***cogent and at least as***

15  ***compelling*** as any opposing inference one could draw from the facts alleged."

16  *Tellabs*, 551 U.S. at 324.  Thus, courts "must consider ***all*** reasonable inferences to be

17  drawn from the allegations, including inferences unfavorable to the plaintiffs."

18  *Gompper v. Visx, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).  Scienter allegations should

19  "resonate in common experience," and "the PSLRA neither allows nor requires

20  [courts] to check [their] disbelief at the door." *Endologix*, 962 F.3d at 415.

21  Plaintiff alleges several theories of scienter, relying on statements by five

22  confidential witnesses.  Allegations attributable to these "CWs" should be

23  disregarded, but even if they are not, Plaintiff fails to raise any inference of scienter.

24  **1.    Plaintiff's CW Allegations Should Be Disregarded**

25  A complaint that relies on the statements of CWs to establish scienter must

26  (1) describe the CWs "with sufficient particularity" to establish that their statements

27  are made "with sufficient reliability and personal knowledge" and (2) show that the

28  statements reported by the CWs are "indicative of scienter." *Zucco*, 552 F.3d at 995.

In applying these standards, courts "look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

Here, the allegations based on statements by the CWs are highly suspect. Two of the CWs—CW2 and CW3—appear to have no relevant expertise. CW2's "substantive work focus was on tumor data" in the "European and Asia Pacific regions," which has nothing at all to do with the allegations here.[6] (¶ 26.) CW3 was an executive assistant with no medical training, and his or her connection to CONTESSA is so attenuated that the SAC relies on things CW3 "vaguely recalls" about meetings where adverse events ("AEs") were discussed. (¶ 50.)

CW1 was only employed by Odonate between May 2018 and December 2018, a seven-month period near the beginning of a nearly three-year study. This calls into serious question whether CW1 could have any pertinent information at all. (¶ 25.) Plaintiff also attributes to CW1 statements that CONTESSA's AE and treatment discontinuation rates were "higher than expected," (¶¶ 42, 46), but without explaining the basis for such a claim. What did he or she expect the AE rates to be, and why? What facts suggest that ***Defendants*** expected the AE rates to match CW1's guess? Why didn't CW1 realize that high rates of neutropenia are commonplace with chemotherapy, especially chemotherapy involving taxane combinations? And, why didn't CW1 recognize that ensuring that investigators and study staff at clinical sites are aware of potential side effects and measures that can be taken to mitigate them is consistent with good clinical study conduct? Neither CW1 nor the SAC answers any

---

[6] CW2's purported statements merit skepticism for other reasons, too. CW2 says that "elevated rates" of neutropenia "manifested themselves no later than the earliest stages of the CONTESSA trial," that these rates were known to Defendants by August 2018, and that Odonate established a program to combat neutropenia. (¶ 176.) Yet CW2 also says she was "shocked" when the neutropenia rate she had supposedly known about for two years was disclosed in August 2020. (¶ 55.) Which is it? Did CW2 know of the rate in 2018, or was CW2 "shocked" by the rate in 2020?

of these questions.

Further, none of the CWs' claims are based on firsthand knowledge of any Defendant's mental state, and Plaintiff fails to link Defendants' supposed knowledge of AE and treatment discontinuation rates to any public statement made by Defendants.  For example, CW 4 speculates that Odonate's Chief Medical Officer and CONTESSA study site personnel "would have [discussed] topics like . . . AE issues" but expressly admits that he or she was not privy to the substance of these communications.  (¶ 52.)  CW 5 merely alleges that Odonate took prudent precautions to deal with AEs (¶ 45) and provided AE information to the FDA (¶ 48).  To the extent any CW allegations are critical of Defendants, they are based on assumptions and conjecture—not firsthand knowledge—and therefore should be disregarded.

### 2.    Plaintiff's "Red Flag" Theory Fails

Plaintiff claims that Defendants knew of "red flags" in CONTESSA: namely, purportedly "higher-than-expected" rates of certain AEs, or of patients discontinuing treatment in CONTESSA, which Odonate was aware of "no later than August 2018." (¶¶ 175-76, 5.)  As a result, Odonate held an "'urgent' teleconference, at six o-clock at night," to announce a "program to lower the amount of patients leaving the trial by advising all trial sites on how to identify early signs of neutropenia."  (¶¶ 44-45.) But, whether Defendants were "aware" of AE or treatment discontinuation data is beside the point.  The "key question" for scienter is not whether a defendant has "knowledge of certain undisclosed facts," but rather whether the defendant "knew or should have known that their failure to disclose those presented a danger of misleading buyers or sellers."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011).

Here, *no* facts alleged in the SAC suggest that Defendants thought they were misleading investors by not disclosing interim study data.  On the contrary, when Defendants disclosed top-line CONTESSA data in August 2020, they explained that both neutropenia and discontinuation rates were "in line with," and "well within the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

range of," prior combination chemotherapy studies.  (Ex. K at 56, 57.)

Further, Plaintiff's theory that Defendants meant to mislead investors by not disclosing interim data is completely undercut by the fact that—as Plaintiff acknowledges (*see, e.g.*, ¶¶ 48, 146(a))—an ***independent*** committee of cancer physicians and statisticians charged with ensuring patient safety (the Independent Data Monitoring Committee) reviewed CONTESSA data on a regular basis and repeatedly advised that CONTESSA continue as planned.  Furthermore, the FDA received safety reports on an ongoing basis and never placed a hold on CONTESSA. It makes no sense to say that Defendants intended to mislead investors by not disclosing results that ***independent experts*** did not believe warranted any change in CONTESSA.

Finally, even if Plaintiff's "red flag" allegations were credible, they would not support scienter, because a more "cogent" and "compelling" alternative exists: namely, that Odonate was working to protect the health of patients in CONTESSA by ensuring that study sites could respond effectively to observed neutropenia. Everyone—Odonate, the FDA, and investors—knew neutropenia occurred with tesetaxel.  The fact that Odonate allegedly acted to ensure neutropenia was being treated effectively is indicative of good medical and business ethics, not fraud.

### 3.    Plaintiff's Remaining Theories of Scienter Fail

Plaintiff's remaining theories of scienter are meritless.

***Toxic work environment***.  Plaintiff alleges that Odonate had a "stressful" or "toxic" work environment, and that CW2 was fired in retaliation for attempting to "correct errors in the CONTESSA tumor data"—a topic having nothing at all to do with the AEs that are the Plaintiff's focus.  (¶ 183.)  This is insufficient to plead scienter under the PSLRA.  *See, e.g.*, *Ronconi*, 253 F.3d at 437 ("Calling executives bad managers . . . does not plead fraud . . . ."); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1039 (S.D. Cal. 2014) (Benitez, J.) (no scienter despite allegations of a work culture that was "secretive and isolationist").

***Motive and opportunity***.  Plaintiff says Defendants had a motive to commit fraud because they owned Odonate's stock.  (¶¶ 185-90.)  But scienter requires more than "mere motive and opportunity," *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002), particularly where the alleged motive is driven by "routine corporate objectives."  *In re Arrowhead Pharm., Inc. Sec. Litig.*, 782 F. App'x 572, 575 (9th Cir. 2019).  And, in any event, this theory is nonsensical as an economic matter: if Odonate's CEO made false and misleading statements, he himself was harmed alongside other investors by his own alleged misdeeds.  During the Class Period, Odonate's CEO invested ***more than $90 million*** in Odonate's stock through the Company's public stock offerings and open-market purchases.  (*See* Ex. V.)  He still to this day has not sold a single share of Odonate's stock.  (*Id.*)  Yet Plaintiff asks the Court to believe that Defendants spent years of time, and that Mr. Tang and his affiliates invested huge sums of their own money, developing a drug they knew would never be approved by the FDA.  This is absurd, and the Ninth Circuit recently and soundly rejected an identical theory of scienter.  *See Endologix*, 962 F.3d at 416 ("It is improbable that [a company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.").[7]  Just as in *Endologix*, "[Plaintiff's scienter] theory does not make a whole lot of sense."  *Id.* at 415.

***Core operations***.  Next, Plaintiff says the "core operations" doctrine supports scienter.  (¶¶ 191-92.)  But the core operations doctrine could only possibly support an inference that because Defendants are Odonate's officers, they ***knew*** of interim CONTESSA safety results prior to August 2020.  Such knowledge is meaningless here, where Defendants made no contemporaneous statements regarding CONTESSA safety results.

***SOX Certifications***.  Plaintiff says that Messrs. Tang, Hearne, and Lemkey

---

[7] Plaintiff does not allege that ***any*** Defendant sold a single share of Odonate's stock during the Class Period.  The absence of insider sales is highly relevant and undermines any inference of scienter.  *Rigel*, 697 F.3d at 884–85.

Cooley LLP
Attorneys at Law
San Diego

SOX-certified certain SEC filings and were therefore "obligated to inquire and investigate" the subject matter of those certifications. (¶¶ 193-94.) This theory provides no support for scienter in this case because the SOX-certified statements (1) were true and (2) did not bear on AE or treatment discontinuation rates. Plaintiff's theory would render the PSLRA's heightened scienter pleading requirement a nullity in any case involving SOX certifications.

*Code of Conduct*. Plaintiff quotes several paragraphs from Odonate's Code of Conduct, saying that because it bars illegal practices, Defendants must have acted with intent to deceive because they knew they were not supposed to break the law. (¶¶ 195-200.) This is circular and (like Plaintiff's SOX certification theory) would wipe away the PSLRA scienter requirement for any corporate defendant with a code of conduct. *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017).

*Mr. Lemkey's Resignation*. Finally, Plaintiff says that Mr. Lemkey's resignation from Odonate on December 10, 2020, is "suspect in timing and strongly supports scienter." (¶¶ 201-02.) This conclusory allegation provides no support at all for an inference of scienter. *Zucco*, 552 F.3d at 1002 ("[A] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one.").

### 4. Plaintiff's Theories of Scienter Fail Under Holistic Examination

In a tacit acknowledgment that none of Plaintiff's various theories of scienter individually support a strong inference of scienter, Plaintiff urges a "holistic examination of the facts and circumstances." (¶ 173.) Such an examination does not assist Plaintiff. In conducting a "holistic" review of scienter allegations, "a court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

Here, Odonate's leaders believed so strongly in tesetaxel that the CEO himself invested colossal amounts of money to try to bring the drug to market.  At all times, however, Odonate cautioned investors that FDA approval of tesetaxel was not assured, even specifically warning of past issues with neutropenia.  After reporting top-line results from CONTESSA, which included that the study met its primary endpoint, Odonate approached the FDA to begin the NDA process.  It was only after receiving the FDA's feedback on the CONTESSA results for the first time in March 2021 that Odonate concluded that the clinical data package for tesetaxel was unlikely to support FDA approval.  The *only* plausible inference about Defendants' state of mind is that they truly believed in tesetaxel and conducted Odonate's business earnestly and in good faith.  Yet, Plaintiff asks this Court to accept that Defendants orchestrated an elaborate fraud on investors, over a period of more than three years, only to lose tens of millions of dollars of their own money without ever attempting to cash out when they had the opportunity.  That makes no sense economically, logically, or otherwise—and certainly is not the "cogent" and "compelling" inference required by federal law.

## V.   PLAINTIFF'S SECTION 20(A) CLAIM FAILS

Plaintiff fails to plead a primary violation of section 10(b), so Plaintiff's section 20(a) claim also fails here. *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## VI.   CONCLUSION

For the foregoing reasons, the SAC should be dismissed.

Dated:  May 13, 2021                    COOLEY LLP

By: */s/ Ryan E. Blair*
    Ryan E. Blair

Attorneys for Defendants
Odonate Therapeutics, Inc., Kevin C. Tang, Michael Hearne, and John G. Lemkey