POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN KENDALL, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ODONATE THERAPEUTICS, INC., KEVIN C. TANG, MICHAEL HEARNE, and JOHN G. LEMKEY, <br><br> Defendants. | Case No.  3:20-cv-1828-H-LL <br><br> CLASS ACTION <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DKT NO. 25)** <br><br> Date: August 16, 2021 <br> Time: 10:30 a.m. <br> Courtroom: 15A <br> Judge: Hon. Marilyn L. Huff <br><br> **Oral Argument Requested** <br><br> Trial dates:  None set |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATEMENT OF RELEVANT FACTS ....................................................................2

I.      The Individual Defendants' Large, Illiquid Private Equity Investments ...............2

II.     Odonate's Tesetaxel Trials And Massive Capital Needs .......................................2

III.    Material, Negative Facts Concealed From Investors ..............................................3

    A.      The SAC Relies On Adequately Pled CW Statements ........................3

    B.      The CWs Detail Undisclosed, Material, Negative Facts .............................4

    C.      Tesetaxel's Clinical Package Did Not Support FDA Approval...................6

IV.     Defendants' Materially False Or Misleading Misstatements And Omissions ........6

    A.      Clinical Trials & Business Operations Fraud (¶¶57-138)............................7

        1.      Pre-August 24, 2020 Misstatements And Omissions ........................7

        2.      Misstatements And Omissions On And After August 24, 2020........7

    B.      Reported Results Fraud (¶¶139-153) ......................................................8

    C.      Internal Controls Fraud (¶¶154-162)........................................................9

V.      Odonate Admits Tesetaxel Cannot Be FDA Approved, Ends Operations..............9

VI.     The Strong Inference Of Defendants' Scienter ....................................................10

ARGUMENT ............................................................................................................12

I.      Applicable Legal Standards..................................................................................12

II.     Defendants' "Pleading Requirements" Arguments Lack Merit............................14

III.    The SAC Pleads Material Misstatements And Omissions ....................................16

    A.      Defendants Had A Duty Of Disclosure...............................................16

    B.      Defendants Violated Their Duty ............................................................17

        1.      Tesetaxel Was Not "Generally Well Tolerated" ............................17

        2.      Tesetaxel Did Not Have "Manageable Side Effects" ......................19

        3.      CONTESSA Had A Wave Of Disenrollments ..............................20

        4.      Defendants' Truth, Opinion, And Warnings Arguments Fail ..........20

IV.     The SAC Pleads A Strong Inference Of Scienter.................................................23

A.      The SAC's CW Allegations Should Be Credited .....................................23

B.      The SAC's Allegations Strongly Evidence Scienter...................................26

C.      Defendants' Competing Inference Is Not More Compelling......................29

V.      The §20(a) Claim Should Not Be Dismissed .......................................................30

CONCLUSION ...........................................................................................................30

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ................................................................................. 22

*Avila v. L.A. Police Dept.*, No. 12-55931,
   2014 WL 3361123 (9th Cir. Feb. 6, 2014) ............................................................ 13

*Berry v. Valence Tech., Inc.*,
   175 F.3d 699 (9th Cir. 1999) ................................................................................. 12

*Berson v. Applied Signal Tech.*,
   527 F.3d 982 (9th Cir. 2008) ..................................................... 16, 19, 20, 22

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ..................................................... 16, 19, 20, 21

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010) .................................................... 28

*Derr v. RA Med. Sys.*, No. 19-cv-1079-LAB-AHG,
   2021 WL 1117309 (S.D. Cal. Mar. 24, 2021) ........................................... 21

*Edwards v. McDermott Int'l, Inc.*, No. 18-cv-4330,
   2021 WL 1421609 (S.D. Tex. Apr. 14, 2021) ........................................... 16

*ESG Capital Partners, LP v. Stratos*, No. 13-56684,
   2016 U.S. App. LEXIS 12718 (9th Cir. July 11, 2016) ............................ 26

*Gebhart v. S.E.C.*,
   595 F.3d 1034 (9th Cir. 2010) ................................................................... 13

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..................................................... 16, 19, 20, 23

*Huang v. Avalanche Biotechnologies, Inc.*, No.15-cv-03185-JD,
   2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) ............................................ 19

*In re Adaptive Broadband Sec. Litig.*, No. 01-cv-1092-SC,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ............................................................ 25

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................. 23

*In re Amgen, Inc. Sec. Litig.*, No. CV 07-2536 PSG,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................... 14

*In re Apple Sec. Litig.*, No. 19-cv-02033-YGR,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ........................................................ 21

*In re Arrowhead Pharm., Inc. Sec. Litig.*, No. CV 16-08505 PSG-PJW,
2017 WL 5635422 (S.D. Cal. Sept. 20, 2017) ...................................................... 19

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008) ................................................................... 19

*In re Century Aluminum Co. Sec. Litig.*,
749 F. Supp. 2d 964 (N.D. Cal. 2010) .................................................................. 28

*In re Connetics Corp. Sec. Litig.*, No. 07-cv-02940 SI,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ..................................................... 18

*In re Delcath Sys. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014) ..................................................................... 20

*In re Geron Corp. Sec. Litig.*, No. 14-cv-01224-CRB,
2015 U.S. Dist. LEXIS 49759 (N.D. Cal. Apr. 15, 2015) .................................... 18

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................................... 21

*In re Immune Response Sec. Litig.*,
375 F. Supp. 983 (S.D. Cal. 2005) ........................................................................ 18

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .................................................................... 15

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) .............................................................. 23

*In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849
   2003 WL 24051280 (N.D. Cal. Mar. 25, 2003) ...................................................... 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ................................................................................ 19

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..................................................................... 19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Sup. 2d 1059 (N.D. Cal. 2001) .................................................................. 14

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) .................................................................................... 27

*In re Toronto-Dominion Bank Sec. Litig.*, No. 17-cv-1665 (NLH/JS),
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ............................................................ 16

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F.Supp.2d 964 (N.D. Cal. Mar. 27, 2009) ..................................................... 28

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .............................................................................. 15

*Lifschitz v. NextWave Wireless, Inc.*, No. 08CV1697-LAB (WMC),
   2010 WL 11512356 (S.D. Cal. Mar. 5, 2010) ...................................................... 14

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ................................................................................ 23

*Maiman v. Talbott*, No. SACV 09-0012 AG (ANx),
   2010 U.S. Dist. LEXIS 142712 (C.D. Cal. Aug. 9, 2010) ................................... 14

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ......................................................................................... 13

*Mauss v. NuVasive, Inc.*, No. 13-cv-2005 JM (JLB),
   2014 WL 4161431 (S.D. Cal. Aug. 19, 2014) ...................................................... 14

*McKay v. Ingleson*,
   558 F.3d 888 (9th Cir. 2009) ................................................................................ 13

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Co. 2017) ................................................................... 20

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) ............................................................................. 12

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................. 24

*Murphy v. Am. Gen. Life Ins. Co.*,
   74 F. Supp. 3d 1267 (C.D. Cal. 2015) ................................................................ 12

*Neborsky v. Valley Forge Composite Techs., Inc.*, No. 13-CV-2307-MMA (BGS),
   2014 WL 1705522 (S.D. Cal. Apr. 28, 2014) .................................................... 14

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................... 27

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ......................................................................................... 21

*Perez v. Higher One Holdings, Inc.*, No. 14-cv-755(AWT),
   2017 WL 4246775 (D. Conn. Sept. 25, 2017) .................................................... 16

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................................. 23

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ............................................................................. 21

*Salameh v. Tarsadia*,
   726 F.3d 1124 (9th Cir. 2013) ............................................................................. 12

*Scott v. ZST Dig. Networks, Inc.*, No. CV 11-03531 GAF
   2012 WL 538279 .................................................................................................. 23

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009)
   *aff'd*, 563 U.S. 27 (2011) ................................................................................... 22

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ................................................................................ 22

*Smith v. Antares Pharma, Inc.*, No. 17-8945 (MAS),
    2020 WL 2041752 (D.N.J. Apr. 28, 2020) ................................................................... 19

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................................... 15, 26, 28

*Tadros v. Celladon Corp.*, No. 15cv1458 AJB (DHB),
    2016 U.S. Dist. LEXIS 139956 (S.D. Cal. Oct. 7, 2016) ......................................... 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................ 13, 15, 29

*Tomek v. Apple, Inc.*,
    636 Fed. App'x 712 (9th Cir. 2016) .............................................................. 13

*Union Asset Mgmt. Holding AG v. Sandisk Corp.*,
    No. 15-cv-0145-VC, 2016 WL 406283 (N.D. Cal. Jan. 22, 2016) .......................... 15

*W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,
    No. 3:16-CV-470-PK, 2017 WL 3668957 (D. Or. June 2, 2017),
    *adopted sub nom.*, 2017 WL 3622779 (D. Or. Aug. 23, 2017) ............................... 15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ................................ 13, 28

## Statutes

15 U.S.C. §78u-4(b)(1) ..................................................................................... 13, 22

Private Securities Litigation Reform Act of 1995 ................................................... 15, 22

Securities Exchange Act of 1934 §10(b) ................................................................ 26, 30

## Rules

Fed. R. Civ. P. 8 .................................................................................................. 15

Fed. R. Civ. P. 12(b)(6)........................................................................................ 12

Securities and Exchange Commission Rule 10b-5 ................................................ 13, 16

Lead Plaintiff Kevin Kendall ("Lead Plaintiff") respectfully submits this Opposition to Defendants' Motion to Dismiss (Dkt. No. 25) (the "Motion") his Second Amended Complaint (Dkt. No. 24) (the "SAC").[1]

## INTRODUCTION

This case presents a straightforward fraud whereby three venture capitalists, holding a lottery ticket to generational wealth if the FDA approved Odonate's only drug candidate, misrepresented to public investors like the Lead Plaintiff, Mr. Kendall, the true risks of putting their money into the gamble. They repeatedly said that tesetaxel was "generally well tolerated" with "manageable side effects," as they touted enrollment milestones in its CONTESSA Phase 3 clinical trial. Yet, Defendants knew that in CONTESSA's first months, patients were experiencing serious Adverse Events at elevated rates, causing patients, doctors, and entire clinical trial sites to discontinue (disenroll) from CONTESSA in such numbers that Defendants ordered a revision to the CONTESSA trial protocol and an "emergency" program of presentations to all 100-120 clinical trial sites in just two weeks to salvage the trial. By concealing this information, Defendants repeatedly accessed the public equity markets, raising nearly $400 million from unsuspecting investors, to see if their own lottery ticket would hit big. Defendants met with FDA by December 2020, yet waited until March 2021 to finally admit that tesetaxel's clinical package could not support FDA approval. They abruptly wound down Odonate, wiping out its investors, leaving this lawsuit as their sole recourse.

---

[1] Herein, unless otherwise noted: (i) all defined terms are the SAC's definitions, (ii) "¶" refers to the SAC's paragraphs, (iii) "Memo" means Defendants' memorandum of law (Dkt. No. 25-1); (iv) "RJN" refers to Defendants' request for judicial notice (Dkt. No. 25-4) and "Exh." refers to Defendants' proposed RJN exhibits; (v) "RJN Opp." refers to Lead Plaintiff's accompanying RJN opposition (Dkt. No. 28); (vi) "SOF §" and "ARG §" refer to the Statement of Facts or Argument sections herein; and (vii) all bolded, italicized and/or underlined text reflects added emphasis.

## STATEMENT OF RELEVANT FACTS

## I.    The Individual Defendants' Large, Illiquid Private Equity Investments

Defendants Tang (Odonate's CEO), Lemkey and Hearne (its CFOs) are venture capitalists with a private equity firm, Tang Capital Management LLC ("TCM") that had committed 90% of its ~$550 million portfolio, through its investment fund Tang Capital Partners LP ("TCP"), to huge, illiquid investments in just three companies: 12.2 million post-IPO Odonate shares valued at $300+ million and representing 47.5% of their firm's portfolio, and $263 million invested in two other pharmaceutical companies. ¶¶3, 30-31, 185.[2]  TCM / TCP was Odonate's majority shareholder, with a 52.9% pre-IPO controlling stake.  ¶32.

## II.    Odonate's Tesetaxel Trials And Massive Capital Needs

Odonate had just one drug candidate – tesetaxel – an orally administered chemotherapy agent in a class of drugs called taxanes.  ¶¶2, 34.  Odonate sought tesetaxel's FDA approval for treatment of metastic breast cancer ("MBC") patients dosed with an FDA-approved drug, capecitabine, or secondarily, as a monotherapy. ¶¶2, 35.[3]  FDA approval would have vested Defendants' stock options and permitted them to sell Odonate to a larger company at a significant profit (¶¶35, 187), so Defendants wanted to try, so long as other shareholders funded the effort.

Odonate required hundreds of millions of dollars to fund tesetaxel's Phase 3 CONTESSA clinical trials – an amount that Defendants could only raise by repeatedly accessing the public equities markets.  ¶¶4, 186.  This funding need motivated Defendants to misrepresent the true risk profile of tesetaxel and the CONTESSA trial and the true risks of FDA non-approval, while concealing negative information known

---

[2]    Tang is TCM's principal / manager, Hearne its CFO, and Lemkey its COO.  ¶30.
[3]    Defendants' irrelevant reference to FDA approval rates for other cancer drugs (Memo at 4) should be rejected, as explained in the accompanying RJN Opp.

to Defendants about tesetaxel, CONTESSA, and the FDA's concerns about tesetaxel's clinical data package and any potential approval, so as to inflate Odonate's stock price and thereby maximize the proceeds from necessary offerings and minimize the dilution to Defendants' large Odonate position from the offerings. ¶4.

Odonate began the CONTESSA Phase 3 clinical trial of tesetaxel combined with capecitabine in MBC patients in December 2017. ¶36. It later initiated Phase 2 studies CONTESSA 2 and CONTESSA TRIO. *Id.* Odonate's value proposition hinged on tesetaxel being not only efficacious and convenient, but also safe. *Id.* To fund CONTESSA, Odonate raised $394.6 million gross and $369.8 million net from public investors during the Class Period (December 7, 2017 – March 19, 2021), including: (a) Odonate's IPO pursuant to a December 6, 2017 Registration Statement, raised $160.6 million gross / $147.3 million net; (b) Odonate's June 2019 Offering raised $142 million gross / $135.1 million net; (c) its September 2020 Offering raised $92 million gross / $87.4 million net; (d) Odonate's February 2021 agreement allowed it to sell up to $100 million more in common stock offerings. *Id.* ¶¶37-39, 188.

## III.   Material, Negative Facts Concealed From Investors

Unbeknownst to investors, tesetaxel was a much riskier bet than realized, with longer FDA approval odds and deficient clinical trial data. ¶¶5, 39, 168. Tesetaxel, particularly combined with capecitabine, raised serious safety concerns, which manifested in elevated AE risks and high discontinuation rates from the CONTESSA trial. ¶40. Defendants knew of these issues, which were evidenced by real-time trial data and feedback from doctors and trial sites, early in the Class Period. *Id.*

### A.   The SAC Relies On Adequately Pled CW Statements

The SAC has a standalone section describing the five CWs, providing details like their titles, tenures, direct supervisors, and job responsibilities. ¶¶24-29. This section, combined with the more specific allegations setting forth each CW's substantive statement and relevant observations, as summarized in SOF §III.B. *infra*,

satisfies applicable pleading standards and demonstrates the CWs' reliability.

### B.    The CWs Detail Undisclosed, Material, Negative Facts

The CWs establish that as early as May / June 2018 and by no later than August 2018, Defendants knew of critical safety issues in the CONTESSA trial.  ¶5.  CW2 said CONTESSA began patient enrollment during winter and that doses were administered in early 2018, while CW5 said trial data was already coming in by May 2018.  ¶41.  CW1 confirmed doses were administered by June / July 2018 and said that by August 2018, trial sites were already reporting to Odonate a much-higher-than-expected rate of neutropenia, including febrile neutropenia.  ¶¶41-42.  CW1 said trial doctors grew frustrated and angry and expressed concerns to Odonate about it.  ¶42.  CW1 said a lot of patients began withdrawing from CONTESSA, both voluntarily and after removal by their doctors, due to both neutropenia and diarrhea.  *Id*.  CW1 called the rate of neutropenia and related patient withdrawals sharply unexpected and large enough to cause serious concern to Odonate's leadership.  ¶43.  By then, concerned doctors and clinical trial sites were reporting elevated patient discontinuation rates due to adverse events (AEs) (23.1% rate), including AEs from neutropenia or febrile neutropenia (4.2%) and neuropathy (3.6%), and many withdrew from CONTESSA.  ¶5.

CW1 confirmed that Tang, Lemkey, and Odonate's CMO knew of the higher-than-expected neutropenia numbers, the related patient discontinuations, and the concerns of trial doctors.  ¶43. CW1 said CONTESSA was not a double-blind trial, so throughout the trial, Odonate had visibility on raw trial data that trial sites entered into a software program and sent on regular intervals (twice monthly or monthly) directly to Odonate, after it fired the CRO early.  *Id*.  CW1 said that febrile neutropenia usually requires hospitalization and serious AEs like hospitalizations had mandatory, expedited reporting (48-72 hours) from sites to Odonate leadership, including Tang, Lemkey, and Odonate's CMO.  *Id*.  CW1 said Odonate's top leadership received expedited reports of patients hospitalized for neutropenia in the first few months of CONTESSA.  *Id*.

An "urgent" teleconference was held in mid- to late-August 2018, which CW1 joined, where Odonate's CMO and its VP of Site Management announced a new, urgent "all-hands-on-deck" program to lower the rate of patients leaving CONTESSA by advising all trial sites how to identify neutropenia early and how to treat it in permitted ways. ¶¶5, 44. During the call, the CMO said that three employees would be trained to give a presentation to clinical sites and would give a practice run on company leadership, including Tang and Lemkey. ¶¶5, 44. The VP of Site Management told CW1 that the directive for this response came from Tang, Lemkey, and the CMO. ¶46. CW1 said the goal was to lower withdrawals due to neutropenia through alternatives, like lowering the tesetaxel does for a short time, to keep patients in the trial. ¶44. CW1 described an "emergency level" and said Odonate wanted the presentation delivered to all 100-120 trial sites in two weeks. *Id*. CW2 and CW5 corroborated this August 2018 emergency program,[4] and CW5 added that Odonate altered the CONTESSA trial protocol to adjust blood draws from the National Cancer Institute's standard of care (Days 1 and 15) to a shorter standard (Days 1 and 8). ¶45.[5]

CW1 said setbacks continued after the presentation, as doctors grew frustrated and dropped out of CONTESSA. ¶47. CW1 said in the first months of CONTESSA, 10 sites (roughly 10% of the total) dropped out due to the higher-than-expected neutropenia rates, an unusually high rate, forcing Odonate to find new sites. *Id*.

---

[4]  CW1 said a similar program was later done for patients with diarrhea AEs. ¶44.
[5]  The record is *silent* as to whether and when Defendants disclosed this protocol revision to the FDA, which is *required* by the FDA, per the "Clinical Research" page of its website: "The developer is responsible for informing the review team about new protocols, as well as serious side effects seen during the trial. This information ensures that the team can monitor the trials carefully for signs of any problems." *See* https://www.fda.gov/patients/drug-development-process/step-3-clinical-research

Defendants' knowledge of these undisclosed adverse facts is clear. CW1, CW4, and CW5 all describe Tang's heavy involvement in everything at Odonate, a small company, with Lemkey his right-hand man. ¶46. CW3 confirmed that Defendants Tang and Lemkey and other Odonate executive management closely monitored tesetaxel's AE rates and AE reports from trial sites, and they discussed them at regularly scheduled, weekly or bi-weekly meetings, the written minutes of which were circulated by CW3 to them afterward and stored on a shared access file on Odonate's internal computer system. ¶¶5, 49-51. CW3 said that Odonate's CMO presented AE reports to Tang and other executives, including specifically reports of AEs concerning neutropenia and diarrhea. ¶50. CW3 recalled Tang paying close attention, asking questions, and getting upset at setbacks. *Id*. CW5 said that the CONTESSA clinical trial safety board compiled AE data on an ongoing basis at regular intervals and provided AE reports roughly every six months to both the FDA and Defendant Tang and other top Odonate executives. ¶¶5, 48. CW4 and CW5 described a clinical trial database with all CONTESSA daily data, including AE data, from which reports could be run and given to Odonate leadership. ¶52. Yet, Odonate's leadership limited access to trial data, including the database, by rank-and-file employees. *Id*.

## C. Tesetaxel's Clinical Package Did Not Support FDA Approval

Unbeknownst to investors, as Defendants later admitted, *see* SOF §V. *infra*, tesetaxel's clinical package did not support FDA approval. Tesetaxel when combined with capecitabine raised significant safety concerns, in the form of highly elevated incidences of Grade ≥3 AEs, including, neutropenia (71.2% of patients), febrile neutropenia (12.8%), and neuropathy (5.9%), among others. ¶¶5, 54.

## IV. Defendants' Materially False Or Misleading Misstatements And Omissions

The SAC alleges with particularity that Defendants' misstatements and omissions falsely and misleadingly touted tesetaxel's profile, CONTESSA's enrollment and progress milestones, and the pathway to tesetaxel's FDA approval, while concealing the

high rates of AEs and trial discontinuations and Odonate's August 2018 emergency program, thereby perpetuating Odonate's stock inflation and muting the corrective effect of the company's August 24, 2020 partial disclosure.  ¶¶5-7, 10, 56-162.

### A.   Clinical Trials & Business Operations Fraud (¶¶57-138)

#### 1.   Pre-August 24, 2020 Misstatements And Omissions

Odonate's SEC filings, including its Forms 10-K and S-3, touted tesetaxel as "*unique among taxanes*" and "*generally well tolerated in clinical studies*" and claimed that "*[n]onclinical and clinical studies support investigating whether reducing the dose of capecitabine in combination with a taxane will reduce toxicity without a reduction in efficacy*" (or similar wording).  ¶¶6, 58-59, 61, 64-69, 71, 77, 79, 81-85, 87, 89, 91, 97, 99, 101, 105, 107-109, 114, 116.  Investor presentations in May and June 2019 – 9-10 months *after* Odonate's August 2018 emergency program was rushed out to stem the tide of patient, doctor, and trial site withdrawals due to high AE rates – boasted that "*Tesetaxel has been generally well tolerated in clinical studies*…." and that "[t]he all-oral *regimen of tesetaxel plus* a reduced dose of *capecitabine* will lengthen PFS *while being well-tolerated as compared to capecitabine alone*."  ¶¶6, 93, 95.  After stating "*we expect to complete enrollments in CONTESSA…in the second half of 2029*" (¶¶81, 91, 97, 99, 101, 144-146), Defendants touted the "*completion of enrollment in CONTESSA*" (¶¶103, 105, 107, 110, 114, 116) without disclosing the setbacks reaching that milestone, from the high discontinuation rates to the company's urgent implementation of the August 2018 program.  ¶6.  On February 20, 2020, Odonate's 2019 Form 10-K said, "*the trend toward improved efficacy with lower doses of capecitabine may result from the significantly lower proportion of patients discontinuing study therapy prematurely because of toxicity*" (¶112) – 17 months after Odonate's August 2018 emergency program to slow patient discontinuations.

#### 2.   Misstatements And Omissions On And After August 24, 2020

After an August 24, 2020 partial corrective disclosure, discussed in *see* SOF §V.

*infra*, Defendants made more false and misleading positive statements to mute its impacts. ¶¶10, 118-138. They continued to tout tesetaxel as "***unique among taxanes***" and called the top-line CONTESSA results "***positive***," characterized the reported AEs as "***manageable side effects***," and noted the "***absence of an adverse effect***" on overall survival rates despite incomplete data and "***low rates of clinically significant… neuropathy***" (or similar wording). ¶¶10, 118, 120, 122, 124, 126-127, 132-135, 137.

On December 11, 2020, Tang admitted Odonate was ***already*** meeting with FDA, describing CONTESSA data and saying "***[t]he treatment discontinuation rate due to neutropenia was low***," "***this study would suggest that tesetaxel plus a reduced dose of capecitabine may represent a new treatment option***," and "***with this positive experience, the company went to the FDA to discuss this registration study***." ¶¶10, 129. Tang touted "***a lot of interest in tesetaxel monotherapy***" and Odonate's expanded clinical study into monotherapy. ¶129. In response to an analyst question about FDA engagement, Tang added, "***we're on track with our goal to submit an NDA in the middle of next year***." *Id.* Indeed, Defendants repeatedly insisted, "***We plan to submit an [NDA] for tesetaxel to the FDA in mid-2021***." ¶¶10, 118, 120, 122, 126, 132, 137.

## B.    Reported Results Fraud (¶¶139-153)

Odonate reported Class Period operating and financial results, SOX certified by Defendants Tang, Lemkey, and Hearne, with MD&A sections attributing them to tesetaxel's R&D and purported advancing of tesetaxel through CONTESSA toward FDA approval. ¶¶7, 140-152. They repeated misstatements like "***tesetaxel has been generally well tolerated in clinical studies***" (*e.g.*, ¶¶140-141), "***tesetaxel plus capecitabine was associated with a manageable side effect profile***" (*e.g.*, ¶151), "***we expect to complete enrollment in CONTESSA…in the second half of 2019***" (*e.g.*, ¶¶144-146), "***we are pleased to have recently announced the completion of enrollment in CONTESSA***" (*e.g.*, ¶¶147-148), "***we expect to…report top-line results in 2020***" (*e.g.*, ¶144-150), and "***we are pleased to have recently announced positive***

*top-line results from CONTESSA…[and] [w]e continue to plan to submit an NDA for tesetaxel to the FDA in mid-2021*" (*e.g.*, ¶¶151-152).  The SAC pleads these MD&A statements were materially false and misleading, including by violating SEC Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).  ¶¶139, 153.

### C. Internal Controls Fraud (¶¶154-162)

The SAC also pleads that the SOX certifications signed by Tang, Lemkey, and Hearne and accompanying Odonate's Forms 10-Q and 10-K were materially false and misleading, due to the material undisclosed facts discussed herein.  ¶¶7, 154-162.

## V. Odonate Admits Tesetaxel Cannot Be FDA Approved, Ends Operations

Expecting positive tesetaxel news in early August 2020 (¶¶163-164), the market instead was shocked by the August 24, 2020 announcement that although its primary endpoint was met, the tesetaxel plus capecitabine combination caused Grade 3 or higher neutropenia in 71.2% of patients, versus just 8.3% for capecitabine alone, and caused an overall discontinuation rate of 23.1%, versus just 11.9% for capecitabine alone, including discontinuation rates of 4.2% from neutropenia and 3.6% from neuropathy.  ¶¶8, 165.  This news caused a $15.21 (-45.35%) stock drop on August 24, 2020 (¶¶9, 166), muted by Defendants' continued misstatements (¶¶10, 167).[6]

On March 22, 2021, Odonate disclosed that FDA's feedback at a pre-NDA meeting caused it to decide that tesetaxel's clinical package was unlikely to support FDA approval, that it would cease tesetaxel's development, and that it would wind down company operations, dropping its stock price $15.07 (-79%) that day.  ¶¶11, 168-169.  On March 25, 2021, Odonate added color, reconfirming its wind-down of operations, disclosing a plan of termination for employees previously working on tesetaxel development, and disclosing $14 million in restructuring costs.  ¶¶11, 170.

---

[6]  Defendants' citing cherry-picked analyst report excerpts not quoted in the SAC and FDA labels of other drugs (Memo at 6-7, n.2) should be rejected.  *See* RJN Opp.

This news pushed the stock down $0.52 (-14.4%).  ¶¶11, 171.

These disclosures and declines inflicted huge losses on investors.  ¶¶12, 172.

## VI.    The Strong Inference Of Defendants' Scienter

The SAC alleges a strong inference of scienter based on motive and opportunity, actual knowledge, recklessness, and other circumstantial evidence that must be viewed holistically.  ¶¶173-202.  Specifically:

Motive (¶¶185-190):  Tang, Lemkey, and Hearne indirectly owned 12.2 million Odonate shares valued at $300+ million (47.5% of TCM's portfolio) (¶185) and directly owned stock options that would vest on FDA approval (¶187), but with 90% of TCM's ~$550 million portfolio committed to three large, illiquid ownership stakes (¶185), they had to raise hundreds of millions of dollars to fund CONTESSA from the public equity market (¶¶186, 188).  They were motivated to misrepresent the true risk profile of tesetaxel and CONTESSA and to conceal the negative information known to them, both to permit the offerings to draw investor interest and to inflate Odonate's stock value to maximize proceeds and minimize dilution to their holdings (¶¶186-187).  They raised $394.6 million gross and $369.8 million net from public investors during the Class Period (*see* ¶188; SOF §II., *supra*) through false and misleading SEC filings (¶189) that allowed them to attempt FDA approval without committing more of their own capital.  These allegations evidence individual and corporate scienter.  ¶190.

Actual knowledge or reckless disregard (¶¶174-181):  As discussed in SOF §III.B., *supra*, the CWs establish that Defendants knew tesetaxel, as a monotherapy or combined with capecitabine, raised serious safety issues that manifested themselves in elevated AE incidents and high CONTESSA discontinuation rates by concerned patients, doctors, and trial sites, which were reported to Defendants from May-August 2018.  ¶¶174-177.  CW1 and CW2 reveal that the urgent teleconference when Odonate's CMO announced an "all hands on deck" program to slow neutropenia-related discontinuations was in mid-August 2018, Tang and Lemkey issued the

program directive, the "emergency" effort was to deliver a presentation pre-approved by Tang and Lemkey to all 100-120 trial sites in two weeks, and Odonate did a similar program for diarrhea discontinuations. ¶¶44, 46, 176. Despite these efforts, CW1 said an unusually high 10 trial sites (10% of sites) withdrew from CONTESSA in the first months, due to the elevated neutropenia rates. *Id.* ¶¶47, 176. CW3 described weekly or bi-weekly meetings where Tang and Lemkey got CONTESSA updates, including AE reports, from Odonate's CMO, which Tang closely followed, with notes circulated afterward. ¶¶49-51, 178. CW1 also described real-time access to unblinded raw trial data, including AE numbers, provided to Odonate once or twice a month, with serious AEs like hospitalizations reported within 3 days. ¶¶43, 179. CW4 and CW5 said Odonate executives had access to a database with these reports. ¶¶52, 180. CW5 said that Tang received AE data from the clinical trial safety board every six months. ¶¶48, 180. Tang himself admitted engaging FDA by December 2020. ¶¶10, 180.

Core Operations (¶¶191-192): It is undisputed that Odonate's sole purpose was to get FDA approval of tesetaxel, the CONTESSA Phase 3 trial was required to do so, and AEs occurred at elevated rates that prompted both patient, doctor, and trial site discontinuations from CONTESSA and FDA feedback indicating tesetaxel would not be approved. *See* SOF §III.B., *supra*; ¶191. The CWs also establish that Tang, Lemkey, and Hearne, venture capitalists with an enormous stake in Odonate, had hands-on roles, received all CONTESSA data and AE reports, and (for Tang and Lemkey) ordered the August 2018 emergency program and vetted its presentation. ¶¶5, 191. These allegations implicate the core operations doctrine. ¶¶191-192.

Signatures, quotations, and SOX Certifications (¶¶193-194): Defendants Tang, Lemkey, and Hearne signed, were quoted in, and/or SOX certified most of the SEC filings at issue and were under duties to investigate, familiarize themselves with the subject matter, and speak truthfully, which they violated. ¶¶193-194.

Data restrictions and employee retaliations (¶¶182-184): CW1 said that Tang

fired the external CRO within months to bring CONTESSA trial management in-house, CW2 and CW4 said that Odonate leadership blocked employee access to large parts of the CONTESSA data, and CW4 said that Tang would not reveal his site doctor communications with CW4 (despite CW4's oversight of 75 clinical trial sites). ¶¶52, 182.  CW2 and CW3 described a toxic environment with retaliation against employees who tried to correct trial data.  ¶183.

Code of Conduct (¶¶195-200):  Odonate's Code of Conduct was binding on Tang, Lemkey, and Hearne (¶¶195-197), barred "tak[ing] unfair advantage of anyone through…concealment, [or] misrepresentation of facts" (¶198), and required SEC filings and public statements to "contain full, fair, accurate, timely, and understandable disclosure" (¶199).  The alleged fraud violated its provisions.  ¶200.

Lemkey resignation, wind-down of operations (¶¶201-202):  Lemkey resigned suspiciously as CFO at the height of the fraud on December 10, 2020.  ¶201.  Odonate suspiciously announced wind-down of operations, a *de facto* mass resignation by Tang, Hearne, and leadership, at the Class Period end.  ¶202.

# ARGUMENT

## I.   Applicable Legal Standards

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Salameh v. Tarsadia*, 726 F.3d 1124, 1129 (9th Cir. 2013).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* Rule 12(b)(6) dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one." *Murphy v. Am. Gen. Life Ins. Co.*, 74 F. Supp. 3d 1267, 1287 (C.D. Cal. 2015) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).  All reasonable inferences must be drawn in Plaintiff's favor.  *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 706 (9th Cir. 1999).

Defendants challenge ***only*** the SAC's pleading of materially false or misleading statements/omissions and scienter, thus waiving any arguments at this stage as to the other elements of a §10(b) and Rule 10b-5 claim.[7]

To plead falsity, a complaint must "specify each statement alleged to have been misleading, the…reasons why…, and if an allegation…is made on information and belief, … all facts on which that belief is formed.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-991 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (quoting 15 U.S.C. §78u-4(b)(1)).  "Averments of fraud must be accompanied by the 'who, what, where, when, and how' of the misconduct charged." *Tomek v. Apple, Inc.*, 636 Fed. App'x 712, 713 (9th Cir. 2016) (quotation omitted).  Disclosure is required where "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'" and "when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-1323 (2011).

Plaintiffs must also plead a strong scienter inference, which exists if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  Allegations are examined holistically.  *Id.* The inference "need not be irrefutable, *i.e.* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.*  "Scienter can be established by direct or circumstantial evidence."  *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). Scienter can be established by showing motive and opportunity or providing "evidence

---

[7]    *See, e.g.*, *Avila v. L.A. Police Dept.*, No. 12-55931, 2014 WL 3361123, at *3 (9th Cir. Feb. 6, 2014) ("Arguments 'not raised clearly and distinctly in the opening brief' are waived.") quoting *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

of reckless or deliberate behavior." *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849 2003 WL 24051280, at \*13 (N.D. Cal. Mar. 25, 2003). Between competing inferences, "a tie goes to the plaintiff." *In re Amgen, Inc. Sec. Litig.*, No. CV 07-2536 PSG, 2014 WL 12585809, at \*8 (C.D. Cal. Aug. 4, 2014); *Maiman v. Talbott*, No. SACV 09-0012 AG, 2010 WL 11421950, at \*6 (C.D. Cal. Aug. 9, 2010).

## II.     Defendants' "Pleading Requirements" Arguments Lack Merit

Defendants' "pleading requirements" arguments (Memo at 2, 9-12) lack merit.

First, Defendants wrongly claim the SAC is "puzzle pled." Memo at 2, 10-11.[8] To satisfy their burden, Plaintiffs must plead the "who, what, where, when, and how" of the misconduct. *See* ARG §I, *supra*. The SAC does so, specifying for each alleged misstatement the speaker, false or misleading content, document or presentation containing it, date, and delivery method (SEC filing, oral remarks, etc.). *See* ¶¶56-162. The vast majority of misstatements ***have*** bolded / italicized emphasis,[9] and ***all*** are followed by a paragraph explaining the reasons why they are false or misleading, which contrary to Defendants' spurious argument, evolve and change during the

---

[8]     Notably, Defendants' "puzzle pleading" authority supports granting leave to further amend if the Court finds any pleading deficiencies in the SAC. Three of the four cases they cite dismissed without prejudice and with leave to further amend. *See Neborsky v. Valley Forge Composite Techs., Inc.*, No. 13-CV-2307-MMA (BGS), 2014 WL 1705522, at \*5 (S.D. Cal. Apr. 28, 2014); *Lifschitz v. NextWave Wireless, Inc.*, No. 08CV1697-LAB (WMC), 2010 WL 11512356, at \*4 (S.D. Cal. Mar. 5, 2010); *Mauss v. NuVasive, Inc.*, No. 13-cv-2005 JM (JLB), 2014 WL 4161431, at \*8 (S.D. Cal. Aug. 19, 2014). The fourth was dismissed with prejudice, because the parties had already litigated two motions to dismiss, with the court partially granting the prior one. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Sup. 2d 1059, 1075 (N.D. Cal. 2001).
[9]     *See* ¶¶6, 10, 57-59, 61, 63-69, 71, 73, 75, 77, 79, 81-85, 87, 89, 91, 93, 95, 97, 99, 101, 103, 105, 107-112, 114, 116, 118, 120, 122, 124, 126-27, 129, 132-33, 135, 137, 155-56, 158, 160.

chronology. *Compare, e.g.*, ¶60 *with* ¶138 *and* ¶153. This pleading suffices.[10]

Second, the Class Period is not "overbroad." Memo at 2, 11-12. As Defendants ultimately admitted, tesetaxel's clinical package was unlikely to support FDA approval (¶168) – a fact true ***throughout*** the entire Class Period. Moreover, the SAC pleads that as early as ***May / June 2018***, when CONTESSA trial data began to be received (¶41), and *by no later than* August 2018, when the "emergency" program was launched at all 100-120 clinical sites to stop already-occurring discontinuations (¶¶41-44), Defendants specifically knew of critical safety issues in CONTESSA. ¶5.[11]

Third, the "bootstrap" argument (Memo at 2, 12) has been widely rejected by federal courts upholding the ***very same*** pleading approach – in cases where defendants fully responded to (and unsuccessfully sought dismissal of) the multiple overlapping

---

[10]  *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (complaint fulfills Rule 8 by putting defendants on notice of substance of claims where plaintiff "detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading" even where plaintiff largely repeated same set of reasons why multiple statements were false or misleading); *W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.,* No. 3:16-CV-470-PK, 2017 WL 3668957 at *19 (D. Or. June 2, 2017), *adopted sub nom.*, 2017 WL 3622779 (D. Or. Aug. 23, 2017) (Rule 8 satisfied where "allegations specify with particularity which statements are challenged, when and under what circumstances each challenged statement was made, by whom each statement was made, and that each statement was false or misleading (for one or more of a set of specific reasons)" and defendants could prepare cogent defense in opposition).

[11]  Defendants' cited cases are distinguishable. *See* Memo at 12 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (overlong class period pled to reach more insider sales to amplify scienter); *Union Asset Mgmt. Holding AG v. Sandisk Corp.*, No. 15-cv-0145-VC, 2016 WL 406283, at *5 (N.D. Cal. Jan. 22, 2016) (all misstatements in "overlong" portion of class period protected by the PSLRA safe harbor provision). *Vantive* is also widely recognized as abrogated by the Supreme Court *Tellabs* decision. *See, e.g.*, *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (*Vantive* is "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright" given *Tellabs*).

threads of alleged fraud.[12]  To the extent Defendants failed to move against any SAC allegations, they have waived their arguments at this stage.  *See* n.7, *supra*.

### III.   The SAC Pleads Material Misstatements And Omissions

#### A.   Defendants Had A Duty Of Disclosure

Contrary to Defendants' miscasting of the SAC (*e.g.*, Memo at 1-2, 12-13), Plaintiffs do not allege a duty, in a vacuum, to disclose patient-by-patient interim data during a clinical trial.  Rather, as Defendants concede (Memo at 1, 13), information must be disclosed when its omission "make the actual statements" made "misleading." Defendants wrongly suggest (Memo at 2) that no misstatements concerned clinical trial safety (some did) or that CONTESSA's elevated AE rates and unusually high discontinuations by patients, doctors, and trial sites or the company's "emergency" presentation to all 100-120 trial sites and its revision to the CONTESSA protocol did not have to be disclosed given what they ***chose*** to say publicly.  *See Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008) (once defendants chose to speak, they "were bound to do so in a manner that wouldn't mislead investors").[13]

---

[12]   *See Edwards v. McDermott Int'l, Inc.*, No. 18-cv-4330, 2021 WL 1421609 (S.D. Tex. Apr. 14, 2021) (upholding alleged 3-prong fraud – CB&I/Focus Project Fraud, Technology Business Fraud, Capital Structure/Liquidity Fraud); *Perez v. Higher One Holdings, Inc.*, No. 14-cv-755(AWT), 2017 WL 4246775, at *2 (D. Conn. Sept. 25, 2017) (upholding alleged 5-prong fraud – Legal Compliance Fraud, Cole Taylor Fraud, Operating Results Fraud, Products Transparency Fraud, Class Action Resolution Fraud); *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-cv-1665 (NLH/JS), 2018 WL 6381882, at *2 (D.N.J. Dec. 6, 2018) (upholding alleged 3-prong fraud – Business Operations Fraud, Reported Results Fraud, Risk Management/Internal Controls Fraud).

[13]   *See also, e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omissions actionable when misleading and "create[ing] an impression of a state of affairs that differs in a material way from the one that actually exists"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts…necessary to make disclosed statements, whether mandatory or volunteered, not misleading.").

## B.    Defendants Violated Their Duty

Lead Plaintiff rejects Defendants' attempts to reorganize, miscast, and misframe the SAC's allegations (Memo at 14-19) and presents this roadmap instead.

### 1.    Tesetaxel Was Not "Generally Well Tolerated"

Defendants are simply wrong (Memo at 14) that saying a drug in clinical trials was "well tolerated" is not a statement about safety – whether a drug is well or poorly tolerated, by definition, concerns whether it causes undesirable, negative side effects, *i.e.* AEs that speak to its safety (as versus its efficacy).  Defendants' attempt to frame *every* statement as to tesetaxel's being "well tolerated" as *only* describing *past* clinical trials predating CONTESSA (Memo at 2, 15) fails.  Their argument ignores the statements' plain text, the rules of the English language, and the common sense a reasonable investor would apply.  First, despite their best efforts to whitewash it now, Defendants used *different* wording in these misstatements – sometimes saying "tesetaxel *was* generally well tolerated in clinical studies,"[14] but other times saying that "Tesetaxel *has been* generally well tolerated in clinical studies," both before CONTESSA began[15] and after (or long after) it was underway,[16] or that *CONTESSA's* rationale was that "[t]he all-oral regimen of tesetaxel plus a reduced dose of capecitabine *will* lengthen PFS *while being* well-tolerated as compared to capecitabine alone."[17]  There is a difference between saying tesetaxel "was" well-tolerated in clinical studies before CONTESSA even began (when the only clinical studies involving tesetaxel were prior ones), as compared to saying it was "has been *generally*" well-tolerated a year into CONTESSA (where the word "generally" disclaims any limitations

---

[14]    *See* ¶58 (Registration Statement); ¶¶67-68 (2017 10-K); ¶84 (2018 10-K).
[15]    *See* ¶58 (Registration Statement); ¶¶64, 109 (2017 10-K).
[16]    *See, e.g.*, ¶¶71, 141 (Q1 2018 10-Q filed May 3, 2018); ¶93 (May 2019 Presentation); ¶95 (June 2019 Presentation).
[17]    *See* ¶93 (May 2019 Presentation); ¶95 (June 2019 Presentation); Memo at 16.

as to one study or another).  <u>Second</u>, these are different verb tenses as a matter of basic English – "was" is the past tense, whereas "has been" is the present perfect continuous tense, meaning something started in the past and is continuing at the present time, and "will" is the future tense.  <u>Third</u>, particularly for statements made once CONTESSA began or was far along, a reasonable investor would view the continued use of the "has been" version of these statements to include not only completed clinical trials, but also the one bet-the-company trial then-ongoing and keenly eyed by the market.  An apt analogy would be an Airbnb listing for a home that featured a private boat dock recently washed away in a storm.  Any reasonable renter would see a material difference between two versions of its latest rental listing – one saying "our private dock *was* enjoyed by our guests" and the other saying "our private dock *has been* enjoyed by our guests" – the latter version conveys that the boat dock still exists and could be enjoyed by the next renter.  Moreover, no reasonable investor would view the "will" version of these statements, made to explain *CONTESSA's* rationale, ~15 months after it began and 12+ months into receiving trial data, as pertaining to prior, completed, pre-CONTESSA trials.

Contrary to the Memo at 15-16, courts routinely uphold such statements as actionable.[18]  This Court should reach the same conclusion, particularly where the

---

[18]    *See, e.g.*, *In re Connetics Corp. Sec. Litig.*, No. 07-cv-02940 SI, 2008 WL 3842938, at \*6 (N.D. Cal. Aug. 14, 2008) ("Velac was safe and well tolerated" was misleading where "made without the disclosure of additional facts that raised serious questions about the safety of Velac"); *In re Geron Corp. Sec. Litig.*, No. 14-cv-01224-CRB, 2015 U.S. Dist. LEXIS 49759, at \*2-3 (N.D. Cal. Apr. 15, 2015)  (denying dismissal of statements that drug was "well tolerated" in patients where defendants had information revealing safety concerns and patients left the trial because "a revelation of the true state of affairs and/or of the known unknowns…would have materially altered the total mix of information available to investors"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 983, 1019 (S.D. Cal. 2005) (statements that drug "has an excellent safety profile, is well tolerated and is easy to administer" actionable).

SAC pleads that Defendants not only knew tesetaxel was <u>not</u> being well-tolerated in CONTESSA, given the elevated AE rates, but also that a resulting, undisclosed, mass exodus of patients, doctors, and trial sites prompted them to initiate a trial-wide "emergency" program coincident with a revision to the CONTESSA trial protocol to try to stem discontinuations.  *See* SOF §III.B.; *Berson*, 527 F.3d at 987, *Brody*, 280 F.3d at 1006, *Hanon*, 976 F.2d at 504.  Defendants ignore those remarkable facts, which render their cases (Memo at 1-2, 12-13, 14-16) distinguishable.[19]

### 2. Tesetaxel Did Not Have "Manageable Side Effects"

Defendants said, "Tesetaxel plus capecitabine was associated with *a manageable side effect profile*" in CONTESSA (¶126),[20] without disclosing that they "managed" it by secretly implementing a revised trial protocol and an "emergency" program at all 100-120 trial sites to stem the exodus of patients, doctors, and sites that had found the elevated rates of AEs to be serious, risky, and decidedly *unmanageable*.  *See* SOF §III.B.[21]  They now claim that "Odonate investors were free to form their

---

[19]    *See In re Rigel Pharms., Inc. Sec. Litig.,* 697 F.3d 869 (9th Cir. 2012) (later disclosures of "few" or "some" cases of side effects not inconsistent with statements); *In re Arrowhead Pharm., Inc. Sec. Litig.*, No. CV 16-08505 PSG-PJW, 2017 WL 5635422 (S.D. Cal. Sept. 20, 2017) (bare assertions drug "dangerously toxic" and "unsafe" were "conclusory")*; In re Sanofi Sec. Litig.,* 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (defendants projected 10% likelihood that FDA would not approve drug by milestone date); *Smith v. Antares Pharma, Inc*., No. 17-8945 (MAS), 2020 WL 2041752, at *6 (D.N.J. Apr. 28, 2020) ("positive safety data" statement allegedly false/misleading solely because of observed adverse events inactionable); *In re AstraZeneca Sec. Litig*., 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008) (FDA briefing reports did not "demonstrate there were certain dangers, known all along to defendants, which would prevent approval and marketing of drug"); *Huang v. Avalanche Biotechnologies, Inc.*, No.15-cv-03185-JD, 2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) (no duty to disclose interim reports by simply alleging final data with mixed results).
[20]    *See also* ¶10, 118, 120, 122, 127, 129, 151.
[21]    As explained in the RJN Opp., Defendants improperly cite Exh. R (Memo at 18).

own opinions of the top-line results from CONTESSA" (Memo at 18), which misses the point. Any reasonable investors would have found the omitted facts to materially alter the total mix of available information on which to form those opinions. *See Berson*, 527 F.3d at 987, *Brody*, 280 F.3d at 1006, *Hanon*, 976 F.2d at 504. The "manageable" statements are actionable.[22]

### 3. CONTESSA Had A Wave Of Disenrollments

Defendants *concede* that for "two and a half years" they spoke about CONTESSA's enrollment (Memo at 6) before finally disclosing, for the first time, the level of patient discontinuations (*i.e.*, disenrollments) due to AEs on August 24, 2020 (*id.* at 7). It is undisputed that they *never* disclosed the rates of doctor and trial site discontinuations or Odonate's "emergency" program and protocol revision in August 2018 to slow discontinuations. Thus, contrary to the Motion at 17, not only are Defendants' CONTESSA "enrollment" statements[23] actionable, also actionable are their statements regarding the rates at which patients "discontinued"[24]. *See Berson*, 527 F.3d at 987, *Brody*, 280 F.3d at 1006, *Hanon*, 976 F.2d at 504.

### 4. Defendants' Truth, Opinion, And Warnings Arguments Fail

Defendants declare, categorically, certain misstatements inactionable because

---

[22]   *See, e.g.*, *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d 320, 329 (S.D.N.Y. 2014) ("[t]he chemotherapeutic agent remaining in the bloodstream after filtration is a fraction of the infused drug, resulting in manageable toxicities" was actionable); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1123 (D. Co. 2017) (statements describing drug as "safe" "well tolerated" and side effects as "manageable" actionable).

[23]   *See* ¶¶6, 59, 81, 91, 97, 99, 101, 103, 105, 107, 110, 114, 116, 144-50.

[24]   For instance, Defendant Tang spoke about CONTESSA's discontinuation (*i.e.*, disenrollment) rates at the 12/11/2020 VIA Event, stating: (a) "[I]t is notable to mention that *only 4.2% of patients discontinued treatments due to neutropenia or febrile neutropenia in the doublet arm or the combination arm*. This compares to 1.5% in the capecitabine alone arm" and (b) "*The treatment discontinuation rate due to neutropenia was low*...." *See* ¶129. *See also* ¶¶112, 129.

they were purportedly true (Memo at 2, 14, 16-18, 24), opinions (Memo at 2, 14-16, 18, 24), or covered by risk warnings (Memo at 2-3, 4-5, 25).  These arguments fail.

First, even assuming, *arguendo*, any misstatement was "true" (which Lead Plaintiff does not concede), that fact alone does not, categorically, mean it would be inactionable.  *See, e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1052 (9th Cir. 2008) ("Omitting the role of [prohibited] off-label marketing in a press release highlighting the drug's success made a true statement (that demand was strong) also a misleading one.").[25]  The SAC pleads why they were still misleading.  SOF §III. B.[26]

Second, Defendants claim that their statements are not actionable simply because they are purportedly "opinions."  Not so.  *See Omnicare, Inc. v. Laborers Dist. Council*

---

[25]  *See also Brody*, 280 F.3d at 1006 ("a statement that is literally true can be misleading and thus actionable under the securities laws"); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (true statement is false if it creates a different impression of a state of affairs than from the one that actually exists); *In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *19 (N.D. Cal. June 2, 2020) (statements created misleading impression defendants had no information to suggest there issues with phone batteries when defendants allegedly were tracking and internally discussing the issue); *Derr v. RA Med. Sys.*, No. 19-cv-1079-LAB-AHG, 2021 WL 1117309, at *6 (S.D. Cal. Mar. 24, 2021) (complaint sufficiently alleged false or misleading statements that "may have been technically true, but both would mislead a reasonable investor" where defendants failed to disclose certain information).

[26]  Contrary to the Memo at 6, 18, Lead Plaintiff does not need to allege that FDA or the monitoring committee expressed a specific interim concern, a fact on which the record is silent.  Defendants ***chose*** to speak about specific topics, but omitted material information necessary to make their statements not misleading.  The record likewise does not support Defendants' claim that the "first time" Odonate "received feedback from the FDA" was "in March 2021."  Memo at 8, 18.  To the contrary, Defendant Tang disclosed on ***December 11, 2020*** that Odonate was then ***already*** meeting with FDA to discuss tesetaxel's clinical data, including its neutropenia rate.  ¶¶10, 117.  It defies credulity to suggest that those discussions, initiated ***three months before*** March 2021, were entirely one-sided and offered not even a peek into FDA's views.

*Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015) ("[A] reasonable investor may… understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."). The undisclosed facts (SOF §III. B.) fatally undermine any articulable basis for any "opinions" underlying the misstatements and render them misleading.

Third, the purported risk warnings (Memo at 2-5) fail to trigger the PSLRA safe harbor, which protects statements identified as forward-looking and accompanied by *meaningful* cautions. 15 U.S.C. §78u-5(c)(1)(A)(i); ¶¶203-204. Defendants have not established that all alleged misstatements were identified as forward-looking, and they quote hedged, speculative cautionary language ("may cause," "could delay," "could reveal," etc.) concerning *events that had already occurred* when they spoke.[27] Such warnings are legally deficient. *Berson*, 527 F.l3d at 987 (warnings that customers might issue stop-work orders did not prevent investors from being misled because "learning that stop-work orders might be issued is quite different from knowing they were *in fact* issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.") (emphasis original); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) *aff'd*, 563 U.S. 27 (2011)

---

[27] For instance, they quote the warning "Undesirable side effects could adversely affect patient enrollment" and *concede* it was repeated, without alteration, throughout the Class Period – even after unexpectedly high AEs *had already adversely affected patient enrollment* to such a degree that they launched an "emergency" program and trial protocol revision in August 2018 to stem the tide of unusually high patient, doctor, and trial site discontinuations. *Slayton v. Am. Express Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received…belies any contention that the cautionary language was tailored to the specific future projection."); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) ("[T]he cautionary language remains fixed even as the risks changed" "[t]hus this complaint could not be dismissed under the safe harbor").

("the Form 10-Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition'"). At most, the cited warnings raise factual disputes inappropriate for resolution now. *See*, *e.g.*, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc*., 416 F.3d 940, 946-48 (9th Cir. 2005) (warnings must be such that reasonable minds could not disagree challenged statements not misleading). Moreover, any truth-on-the-market defense is non-viable on the pled facts[28] and ignores the stock price reaction to the alleged corrective disclosures.[29]

## IV. The SAC Pleads A Strong Inference Of Scienter

### A. The SAC's CW Allegations Should Be Credited

The SAC's detailed, standalone section pleads with particularity each CWs job title, tenure, supervisors, and responsibilities (¶¶24-29), and its substantive CW allegations (¶¶40-55) add particularized pleading as to each CW's relevant observations and information and the basis upon which they make their statements[30] and the extent to

---

[28] Defendants bear a "heavy burden" and "must prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Provenz v. Miller* 102 F.3d 1478, 1492-1493 (9th Cir. 1996); *Hanon*, 976 F.2d at 503 (same). "As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts **rarely** dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). Even "[s]ummary judgment is proper only if [defendants] show that 'no rational jury could find' that the market was misled." *Provenz*, 102 F.3d at 1493.

[29] *See, e.g., In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073-75 (E.D. Wash. 2016) (rejecting truth-on-the-market defense, despite prior publication of full study an allegedly misleading press release summarized, given stock drop due to alleged corrective); *Scott v. ZST Dig. Networks, Inc.*, No. CV 11-03531 GAF, *Scott*, 2012 WL 538279, at *11-12 (rejecting truth-on-the-market for same reason).

[30] *See, e.g.*, ¶41 (CW2 pegged CONTESSA's enrollment as starting in the winter months of early 2018, based on the timing of CW2's conducting an Investigative Site Visit in Washington, D.C.); ¶41 (CW5 pegged Odonate's receipt of CONTESSA trial data by May 2018, based on the fact that it was already being received when CW5

which they cross-corroborate one another.[31] *See* SOF §III.B. These allegations suffice under the Defendants' cited standards (Memo at19-20).[32]

Defendants' scattershot attacks on the CWs (Memo at 20-21) fall well short:

• Defendants attack CW3 for the single detail that CW3 (honestly) said CW3 "vaguely recalls" (Memo at 20), while ignoring the rest of CW3's ***two and one-half pages*** of first-hand accounts as both an ***attendee*** of regular weekly or bi-weekly executive management meetings attended by Defendants Tang and Lemkey and a half-dozen other executives CW3 lists by name and the ***primary note taker*** of those meetings, whose typed minutes served as their official record and were circulated to the attendees and uploaded by CW3 onto a shared access file in Odonate's computer system. *See* ¶¶49-51. Indeed, the SAC alleges that CW3 "specifically recalled" Odonate's CMO reporting CONTESSA neutropenia AE events during these meetings

joined the company in May 2018); ¶44 (CW1 described the "urgent" teleconference that laid out the details of Odonate's "emergency" presentation program to clinical sites as occurring at 6:00 p.m. in mid- to late-August, based on CW1's participation on the call); ¶46 (CW1 was told by the VP of Site Management that Tang, Lemkey, and O'Connell issued the directive for the presentation program); ¶53 (CW2 attesting to toxic environment at Odonate based on CW2's own firing).

[31] *See, e.g.*, ¶41 (CW2 and CW5 cross-corroborate on when CONTESSA trial data was received); ¶¶44-45 (CW2 and CW5 cross-corroborate CW1 as to the "emergency" presentation program to all 100-120 clinical trial sites and as to the CONTESSA trial protocol change); ¶46 (CW5 and CW4 cross-corroborated CW1 as to Tang's and Lemkey's authorization and knowledge of the "emergency" presentation program); ¶52 (CW1, CW2, and CW4 cross-corroborating one another as to Odonate leadership's tight in-house control over information; ¶52 (CW5 cross-corroborated CW4 as to the existence of Odonate's internal clinical trial database); ¶53 (CW3 cross-corroborated CW2 as to the stressful environment within Odonate).

[32] *See also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) (citing *Daou*, 411 F.3d at 1016) "Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a "large degree of specificity," especially where the witnesses' exact title is used.".

(¶50), which, contrary to the MEMO at 21, links that data directly to Defendants Tang and Lemkey, just like CW1, CW4, and CW5 link the "emergency" presentation program in August 2018 to Tang and Lemkey (¶¶44, 46).  CW3 should be credited.[33]

• Defendants' swipe at CW2 (Memo at 20) is patently deficient – the SAC alleges that CW2 was a Director of Clinical Operations at Odonate from June 2017 to September 2019 who was part of a small clinical operations team *responsible for starting up and running the CONTESSA trial*!  *See* ¶10.[34]

• Defendants' challenge (Memo at 20-21) to CW1, whose role as Associate Director, Clinical Site Relationship Management was to act as a liaison between Odonate and medical facilities and investigators in the CONTESSA trial and to manage those relationships (¶25), ignores that CW1's statements (¶¶41-44, 46-47, 52) concern matters within CW1's area of responsibility and/or firsthand knowledge *during* CW1's tenure, which *coincided* with the time period (May-August 2018) when elevated AE rates and high discontinuations prompted the "emergency" presentation program.[35]

---

[33]    *See In re Adaptive Broadband Sec. Litig.*, No. 01-cv-1092-SC, 2002 WL 989478, at *11 (N.D. Cal. Apr. 2, 2002) (crediting administrative assistant as a CW on matters of substance and finding "Plaintiffs [] provided sufficient detail as to the job descriptions and responsibilities of their confidential sources, and the ways in which they came to know the information pleaded in Plaintiffs' complaint").

[34]    That CW2 expressed "shock" that 71% of CONTESSA patients on tesetaxel plus capecitabine experienced neutropenia (Memo at 20 n.6) aligns with CW2's statement that Odonate's leadership decided to lock employee access to large parts of the CONTESSA data, preventing rank-and-file employees from spotting trends, even at CW2's level.  *See* ¶52.  These well-pled CW allegations illustrate the absurdity of Defendants' suggestion elsewhere in their brief (Memo at 18) that Odonate's investors were "free to form their own opinions" about CONTESSA's data and results.

[35]    Defendants lob rhetorical questions at CW1 (Memo at 20) that do *nothing* to undermine CW1's firsthand accounts.  Their brief fails to answer the most important, (now-) rhetorical question of all:  Why didn't they disclose to investors that CONTESSA patients had AE rates so high and patients, doctors, and trial sites were

## B.     The SAC's Allegations Strongly Evidence Scienter

Contrary to the Memo at 19-24, the SAC pleads a strong inference of Defendants' scienter in a standalone section.  ¶¶173-202; SOF §VI.

<u>Actual knowledge or reckless disregard</u>:  As discussed *supra*, Defendants' statements were materially false and misleading and violated their duties of disclosure. *See* ARG §III.  Citing just a single, inapposite, extra-jurisdictional case (Memo at 3, 21-22), they claim their August 2020 disclosure and characterization of neutropenia AEs and discontinuation rates – without ***any*** disclosure that those very issues had prompted an "emergency" program to stem the exodus of patients, doctors, and trial sites to salvage CONTESSA ***two years*** earlier – meant that they did not knowingly misleading investors.  Memo at 21.[36]  ***No*** Ninth Circuit precedent supports that position, particularly given their undisputed access to negative, undisclosed data.[37] Defendants tout that the FDA never halted CONTESSA (Memo at 3, 22), but that is not the basis for Lead Plaintiffs' claims (and would have been publicly obvious). They are not liable under Exchange Act §10(b) because they "acted" on neutropenia (Memo at 22), but because they ***did not disclose to investors*** that they acted.

---

disenrolling at levels so atypically high that they revised the trial protocol and launched an "emergency" presentation program to all 100-120 trial sites in two weeks flat?

[36]     Defendants make no argument that this conduct was not at least deliberately reckless, which would legally suffice, and thus waive that argument.  *See* n.7, *supra*.

[37]     *See ESG Capital Partners, LP v. Stratos*, No. 13-56684, 2016 U.S. App. LEXIS 12718, at *19 (9th Cir. July 11, 2016) (scienter "by showing…'some degree of intentional or conscious misconduct'"); *Tadros v. Celladon Corp.*, No. 15cv1458 AJB (DHB), 2016 U.S. Dist. LEXIS 139956, at *40-*41 (S.D. Cal. Oct. 7, 2016) (complaint details as to access to company information can evidence scienter) (citing, *inter alia*, *S. Ferry*, 542 F.3d at 785 (allegations about management's role, importance of corporate information misrepresented, and management's exposure to information within company can create strong scienter inference)); *Daou*, 411 F.3d at 1022 (allegations that executives monitored company database a factor in favor of inferring scienter).

Motive: The SAC pleads (¶¶185-190) that Tang, Lemkey, and Hearne indirectly owned a $300+ million stake in Odonate, but with 90% of their venture fund's ~$550 million portfolio committed to three large, illiquid investments, they needed hundreds of millions of dollars to fund CONTESSA and motivated to commit fraud to attract investors, inflate Odonate' stock price, and minimize their dilution, permitting them to raise $394.6 million gross ($369.8 million net) – nearly 4.5 times as much as they newly invested (Memo at 23) – from investors. SOF §VI. These allegations suffice. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive to commit fraud survives motion to dismiss where misstatements allegedly increased stock price, permitting capital raise at higher offering price, with less shares issued and less dilution). Defendants hyperbolically miscast the SAC ("death knell," "doomed to fail," "never be approved") (Memo at 3, 23) to mask a coherent theme: they misrepresented the ***true risk profile*** of tesetaxel and CONTESSA, misleading investors.[38]

Data restrictions and employee retaliations: In addition to alleged retaliation, the SAC pleads that Defendants' restricting access to data evidences scienter (¶¶182-184). Defendants ignore this allegation and waive argument. *See* n.7, *supra*.

Core Operations: Odonate's sole purpose was tesetaxel's FDA approval based on CONTESSA, in which elevated AE rates prompted (a) increased patient, doctor, and trial site discontinuations, (b) Tang and Lemkey – hands on venture capitalists with a huge stake in Odonate – to authorize the "emergency" program, and (c) FDA to indicate tesetaxel would not be approved. ¶¶5, 191. These allegations implicate the

---

[38]  That Defendants did not sell stock does not undermine the scienter inference, particularly where their outsized roles and ownership stake would have caused Odonate's stock to crater when they sold their first share. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

core operations doctrine. *See* SOF §III.B., ¶191-192.[39]

Signatures, quotations, and SOX Certifications: Contrary to the Memo at 23-24, SOX certifications (¶194) support a scienter inference. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 972 (N.D. Cal. 2010). The SAC pleads that being quoted in or signing SEC filings gave rise to a duty to speak truthfully, which Defendants violated (¶193). Their failure to argue otherwise waives the argument. *See* n.7, *supra*.

Code of Conduct: The SAC pleads that Code of Conduct violations, like the alleged misstatements, support a scienter inference. ¶¶195-200. Defendants argue that this allegation is "circular." Memo at 24. It is not. *See Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010) (defendants' violation of their Ethics Code is a factor "supporting a strong inference of scienter").

Lemkey resignation, wind-down of operations: The SAC pleads, *inter alia*, that Lemkey attended meetings where AE data was presented by Odonate's CMO (¶¶49-51), authorized the undisclosed "emergency" presentation program (¶46), and resigned without explanation at the height of the fraud on December 10, 2020 (¶201). The SAC also pleads that Odonate's wind-down of operations amounted to a suspiciously timed, *de facto* mass resignation by Tang and Hearne (¶202), an allegation Defendants fail to challenge, waiving any argument (*see* n.7, *supra*). These allegations suffice. *In re UTStarcom, Inc. Sec. Litig.*, 617 F.Supp.2d 964, 976 (N.D. Cal. Mar. 27, 2009) ("proximity of Defendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle'").

---

[39] *See, e.g.*, *South Ferry*, 542 F.3d at 785 (allegations of corporate structure may support strong scienter inference combined with allegations of management's exposure to factual information in company); *Zucco*, 552 F.3d at 1000 ("falsity may itself be indicative of scienter" where combined with allegations as to "management's role in the company" suggesting "actual access to the disputed information").

## C.     Defendants' Competing Inference Is Not More Compelling

Under *Tellabs*,[40] Defendants' competing inference must be ***more*** compelling than that pled by Plaintiffs or their Motion must be denied.  *See* ARG §I.  They miscast the SAC "basic theory of fraud" to give themselves a chance.  *See* Memo at 8 (citing ¶5).  However, the SAC's inference is coherent, well-pled, and at least as strong as any competing one.  Needing to access public equities markets for the hundreds of millions of dollars necessary to fund tesetaxel's clinical trials, seek its FDA approval, and have a chance at recouping their substantial prior investment (a sunk cost), Defendants knowingly chose to speak about topics like (1) CONTESSA's enrollment progress and discontinuation rate, (2) how well-tolerated tesetaxel was in clinical studies, (3) how tesetaxel compared to capecitabine alone, and (4) how severe were tesetaxel's side effects – while omitting critical information, revealed by the CWs, that was necessary to make their statements not misleading when made.  In doing so, Defendants misrepresented the true risks of tesetaxel's clinical development and FDA approval path, thereby inflating Odonate's stock price, maximizing their return from public offerings while minimizing dilution to their large stake, and misleading investors into a riskier bet than the one for which they had bargained.

For their counter-inference (Memo at 25), Defendants: (a) point to legally deficient cautionary language warning of potential risks *that had already materialized*; (b) claim that FDA never gave any indication of concern between December 2020 (or earlier) when Defendant Tang said Odonate was meeting with FDA and March 2021 when Defendants finally admitted tesetaxel's clinical package was unable to support FDA approval; (c) claim that their failure to liquidate their 47.5% Odonate stake is

---

[40]    *Tellabs* expressly requires a "holistic" review of scienter allegations.  *See* 551 U.S. at 326.  Contrary to the Memo at 24, Lead Plaintiff's accurate citation of that controlling legal standard is not a "tacit acknowledgment" of anything.

exonerating, when in reality, any attempted sales on their part would have sent a no-confidence signal to the market, cratering the stock price and eviscerating their chances of accessing the public equities markets for the hundreds of millions of dollars needed to attempt an FDA approval; and (d) ask the Court to ignore that they specifically spoke about tesetaxel's purportedly being "well tolerated in clinical studies" with "manageable side effects" and CONTESSA's enrollment progress and discontinuation rates, without *ever* disclosing the "emergency" presentation to all 100-120 trial sites and the revised trial protocol in August 2018 implemented to slow the exodus from CONTESSA of patients, doctors, and trial sites due to elevated AEs. That inference, such as it is, is not *more* compelling, as it must be for a dismissal.

## V.     The §20(a) Claim Should Not Be Dismissed

Defendants argue that the §20(a) claim should be dismissed solely for failure to plead a §10(b) primary violation. *See* Memo at 25. Thus, if the Court upholds the §10(b) claim, the §20(a) claim against Tang, Hearne, and Lemkey will also survive.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Motion be denied.[41]

---

[41]     If the Court is inclined to grant the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Curry v. Hansen Med., Inc.*, No. 5:09-cv-05094-JF (HRL), 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011)(in §10(b) cases, "[l]eave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment"); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error."). The Court has not yet vetted the pleadings, and further amendment could add, *inter alia*, more CWs, given the exodus of Odonate employees due to its wind-down of operations. *See* ¶24.

Dated:  June 25, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*

Matthew L. Tuccillo (admitted *pro hac vice*)
(NY Bar # 5008750)
Jennifer Banner Sobers (admitted *pro hac vice*)
(NY Bar # 4411922)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:    (917) 463-1044
Email: mltuccillo@pomlaw.com
        jbsobers@pomlaw.com

**POMERANTZ LLP**

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**HOLZER & HOLZER, LLC**

Corey D. Holzer (admitted *pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff*

# **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October June 25, 2021.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo